**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SOUL QUEST CHURCH OF MOTHER )
EARTH, INC., *et al.*, )
)
     Plaintiffs, )
)
vs. )     Case No.: 6:20-cv-00701-WWB-DCI
)
MERRICK B. GARLAND, Attorney )
General of the United States )
of America, *et al.*, )
)
     Defendants. )
_____ )

**PLAINTIFFS' RENEWED PETITION FOR**
**PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**
**(Preliminary Injunctive Relief Requested)**

COME NOW, the Plaintiffs, Soul Quest Church of Mother Earth, Inc., a Florida

Domestic Non-Profit Corporation, on its own behalf and on behalf of its members, and

Christopher Young, individually and as the spiritual leader of Soul Quest Church of Mother

Earth (hereinafter, collectively, "Plaintiffs"), by and through the undersigned counsel,

respectfully move, pursuant to Fed. R. Civ. P. 65 and M. D. Fla. Local Rules 4.05 and

4.06, for this Court to enjoin the Defendants from prosecuting and arresting the Plaintiffs,

and the members of Plaintiff Soul Quest Church.  As required by M. D. Fla. Local Rule

4.05, this Petition is supported by a Second Amended Verified Complaint, filed

contemporaneously with this Motion, and by the Declaration of Plaintiff Christopher

Young, attached hereto as Exhibit 1.  In support thereof, Plaintiffs state as follows:

## I.   __INTRODUCTION__

1.      Determined to exercise its authority without regard for judicial mandates or the Plaintiffs' valid, expressed religious needs, the Defendants have unlawfully impeded and, indeed, entirely barred Plaintiffs from practicing their religious faith.  The Defendants' conduct at issue here, as fully set forth in the Plaintiffs' Verified Complaint, show the lengths to which the Defendants have gone to persecute Plaintiffs' minority religion, and deny Plaintiffs their Constitutional right to practice their faith.

2.      The Defendants have violated, and continue to violate, the Plaintiffs' rights under the First Amendment to the United States Constitution to practice their religion and to free speech, and the Plaintiffs' rights under the Due Process Clause of the Fifth Amendment.  The continuing threat of arrest and prosecution against the Plaintiffs, and the members of Plaintiff Soul Quest Church, Inc. (hereinafter, "Soul Quest Church"), and the continuing failure to process the Plaintiffs' request for a religious exemption, have placed the Plaintiffs into a position where they are unable to freely practice their sacred religious practices; likewise, there remains an ongoing, imminent threat of harm stemming from the prospect of arrest and prosecution.

3.      As set forth below, the Plaintiffs establish all four elements for entry of a preliminary injunction. "Because Plaintiffs' First Amendment rights are at risk via direct penalization by the government, an injunction is the proper remedy."  The Complete Angler, LLC v. City of Clearwater, 607 F. Supp. 2d. 1326, 1335 (M. D. Fla. 2009) (citing to KH Outdoor, LLC v. City of Trussville, 458 So. 2d 1261, 1271-71 (11th Cir. 2006)).

4.      First, the Plaintiffs are likely to succeed on the merits, as the Defendants' conduct is unconstitutional both on its face and as-applied, as they have impermissibly punished,

and continue to seek to punish, the Plaintiffs for practicing their religion, in addition to actively denying the Plaintiffs the right to seek redress of their grievances, and by insisting that the Plaintiffs so petition through a byzantine and unclear system. Second, each day that the Plaintiffs are prohibited from practicing their religion through these threats and denied rights to fairly petition for redress of same, constitutes an irreparable injury that cannot be redressed except through injunctive relief. Third, the Defendants' conduct does nothing to protect the public interest. Finally, no bond should be required, as none is appropriate where the Plaintiffs, as here, allege the infringement of a fundamental Constitutional right.

## FACTS

5.    Plaintiff Soul Quest Church is a registered domestic non-profit corporation incorporated under the laws of the State of Florida, with a principal office located in Orlando, Florida.

6.    A copy of Plaintiff Soul Quest Church's faith-based principles is attached hereto, and incorporated by reference herein as Exhibit 2.

7.    A copy of Plaintiff Soul Quest Church's fundamental moral and ethical tenets is attached hereto, and incorporated by reference herein as Exhibit 3.

8.    A copy of Soul Quest Church's scriptural and liturgical foundations, and Soul Quest Church's mission statement, is attached hereto, and incorporated by reference herein as Exhibit 4.

9.    A copy of Soul Quest Church's religious holiday calendar is attached hereto, and incorporated by reference herein as Exhibit 5.

10.    A copy of Soul Quest Church's dietary and fasting rituals is attached hereto, and incorporated by reference herein as <u>Exhibit 6</u>.

11.    A copy of Soul Quest Church's documents setting out its governance is attached hereto, and incorporated by reference herein as <u>Exhibit 7</u>.

12.    A copy of Soul Quest Church's documents setting out the roles and responsibilities of its members is attached hereto, and incorporated by reference herein as <u>Exhibit 8</u>.

13.    A copy of Soul Quest Church's federal and state incorporation documents, demonstrating its purpose as a religious non-profit institution, is attached hereto, and incorporated by reference herein as <u>Exhibit 9</u>.

14.    Sacramental use of ayahuasca plays a central and indeed critical role in Soul Quest Church's theology and religious practice, and the Spirit of Ayahuasca is the head of Soul Quest Church. <u>See</u> <u>Exhibits 2-9</u>.

15.    Ayahuasca is a sacramental beverage prepared from the Banisteriopsis caapi vine, and the Psychotropia viridis vine.

16.    Psychotropia viridis contains <u>trace</u> amounts of the substance N,N-5,5-dimethyltryptamine ("DMT").

17.    DMT is listed as a Schedule I controlled substance in the Controlled Substances Act ("CSA").  21 U.S.C. § 812(c)(c)(6).

18.    Therefore, the Plaintiffs are not able to import substances containing DMT, including the Plaintiffs' sacramental ayahuasca.

19.    In light of ayahuasca's importance to the Plaintiffs' sincere religious beliefs, and the Controlled Substances Act's prohibition upon DMT, the Plaintiffs filed a religious

exemption application with the Defendants on or about August 21, 2017. A copy of the Plaintiffs' application for a religious exemption is attached hereto, and incorporated by reference herein as Exhibit 10.

20.    In drafting this application, the Plaintiffs made use of a "guide" to the filing of religious exemptions, proffered to the public by the Defendants as a purported aid to follow during the process. A copy of this "guide" is attached hereto, and incorporated by reference herein as Exhibit 11.

21.    While Plaintiffs' application for a religious exemption remains pending, the Plaintiffs are prohibited by the Defendants from blending their sacramental ayahuasca. See Exhibit 11 at § 7. Likewise, the rejection of any such application would have the effect of entirely undermining the ability of the Plaintiffs to practice their fundamental sacramental ritual involving the consumption of ayahuasca tea.

22.    From the day the Plaintiffs filed their application to the present, the Plaintiffs have routinely made inquiries to the Defendants as to the status of their application.

23.    Despite the Plaintiffs' diligent efforts in preparing and submitting an application, the Plaintiffs have never received any sort of notification that their application has ever been "accepted for filing." See Exhibit 11 at § 4.

24.    The passage of time does not appear to have led to progress upon the Plaintiffs' religious exemption application, as routine efforts by the Plaintiffs to inquire about the status of their religious exemption application never – prior to the filing of the original Motion and Amended Motion for Preliminary Injunctive Relief – received any response as to its status.

25.     After years spent pursuing an exemption application, apparently in vain, while their rights are being denied them, futilely waiting for the Defendants to take action, the Plaintiffs turned to this Court, seeking relief.

*Procedural History of Plaintiffs' Motion for Preliminary Injunction*

26.     On April 22, 2020, the Plaintiffs filed their original Motion for Preliminary Injunctive Relief. (ECF No. 2).  On May 4, 2020, the Plaintiffs filed their Amended Motion for Preliminary Injunction.  (ECF No. 15) Shortly thereafter, the Defendants – through legal counsel – provided substantive acknowledgment of Plaintiff Soul Quest Church's application for religious exemption.

27.     Shortly thereafter, on May 14, 2020, the Parties filed a Joint Motion to Extend Defendants' Time to Respond to Plaintiffs' Amended Motion for Preliminary Injunction.  (ECF No. 18).  In that document, the Parties explained that the extension would permit for "time to explore whether resolution is possible."  The Court granted both Joint Motions (ECF Nos. 15 and 18) in an order issued on May 14, 2020.  (ECF No. 19).

28.     On May 29, 2020, the Drug Enforcement Administration ("DEA") issued its first formal response acknowledging Plaintiff Soul Quest Church's August 2017, application for religious exemption.   A true and correct copy of this correspondence is attached hereto as Exhibit 12.

29.     In June 2020, following discussions between the Parties, a Joint Motion to Stay All Proceedings for 120 Days (ECF No. 23).  The intent of this joint filing was predicated upon "potentially resolving this case without need for further litigation in this Court."  (ECF No. 23, at p. 1).  Further, the intent of the stay was to, in-part, permit for "continue to negotiate the process by which DEA will conduct the fact-finding necessary

to evaluate Plaintiffs' Petition." (ECF No. 23, at ¶ 11).  In doing so, the Parties agreed that "they will cooperate with each other in good faith …."  (ECF No. 23, at ¶ 12).  On June 26, 2020, the District Court granted this Joint Motion.  (ECF No. 24).

30.     Subsequently, in correspondence dated June 4, 2020, the Defendants sought to further explain its diversion investigative process, as follows:

> DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31. In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, DEA must also determine pursuant to the Religious Freedom Restoration Act (RFRA) whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the CSA's comprehensive regulatory system would substantially burden the applicant's religious exercise.

A true and correct copy of this correspondence is attached hereto as Exhibit 13.  Of particular note in this statement is the effort by the Defendants implicitly acknowledge its ongoing lack of any regulatory authority on religious exemptions, while also attempting to tie some form of unregulated factfinding "process" into other regulations applicable to pharmacies and doctors.

31.     Notwithstanding, thereafter, the Plaintiffs made every possible effort to cooperate with the inquiries made exclusively by DEA and its designated Diversion Investigator to conduct additional fact finding, James W. Graumlich.   Affidavit of Christopher Young, in Support of Motion for Preliminary Injunction Exhibit 1, at ¶ 36.  The Plaintiffs did so under the belief that, in doing so, the preexisting litigation would resolve. Exhibit 1, at ¶ 36.

32.     Of note, DEA's inquiries to the Plaintiffs centered *entirely* upon "diversion control."  Exhibit 1, at ¶ 33.   No inquiry – at any time – directed by the Defendants ever touched upon the sincerity of the Plaintiffs' faith and religious beliefs including, but not limited to, the legitimacy of Soul Quest Church and the expressed, critical importance of the Plaintiffs engaging in the sacramental ayahuasca ritual.   Exhibit 1, at ¶ 32. Accordingly, the only material possessed by the DEA on the issue of religious sincerity centered around the various materials included in the original, 2017 exemption application.

33.     On October 16, 2020, the Parties filed with the District Court their Joint Status Report (ECF No. 25).  In it, the Defendants acknowledged that the Plaintiffs had been cooperating with all of Defendants' requests for information.  (ECF No. 25, at ¶ 2). The Parties also acknowledge the intent "to conduct further negotiations regarding 'the details of the DEA's fact-finding ….." (ECF No. 25, at ¶ 3).  The Parties jointly requested an extension of the preexisting stay for another one-hundred, twenty (120) days.  (ECF No. 25, at ¶ 5).  The District Court granted this request in an order dated November 2, 2020.  (ECF No. 26).

34.     Thereafter, the DEA continued its factfinding, centered exclusively upon diversion control.  Exhibit 1, at ¶ 33.  Contrary to the belief of the Plaintiffs, the Defendants never presented any guidelines pertaining to the details of its fact finding, nor negotiated any such factfinding details.  Exhibit 1, at ¶ 37.  To date, the nature, scope, and substance of the DEA's "fact finding," herein, remain a mystery.  Exhibit 1, at ¶ 37.

35.     On February 22, 2021, the Parties filed their Joint Status Report.  (ECF No, 27). At that time, the Parties announced the closure of the Defendants' factfinding.  (ECF

8

No. 27, at p. 2).  Indeed, within the Joint Status Report is the acknowledgment that the DEA and U.S. Department of Justice ("DoJ") are confronting new leadership unfamiliar with the issues within the case-at-bar.  (ECF No. 27, at p. 3).  Further, the DEA required until April 15, 2021, to issue what it deemed its "final determination."  (ECF No. 27, at p. 3).

36.      In order to further facilitate the prospects of a positive case resolution, the Plaintiffs agreed to hold its Motion for Preliminary Injunction in abeyance pending the DEA's "determination."  (ECF No, 27).  Further, the Plaintiffs agreed to alert the Court, following the DEA's "final determination," to alert the Court of whether it intended to renew or amend its preliminary injunction motion, and its filing of "any necessary amended motion."  (ECF No. 27, at p. 3).

37.      On February 23, 2021, the District Court issued its Order on the request made within the preceding Joint Status Report.  (ECF No. 28).  Therein, the District Court stayed all deadlines pending the DEA's "final determination," and further instructing that the Plaintiff notify the Court within fourteen (14) days of such issuance.  (ECF No. 28).

38.      On the evening of April 16, 2021, the Plaintiffs received the DEA's issued, written decision, indicating that it would not be issuing a religious exemption to Soul Quest Church.  A true and correct copy of this document is attached hereto as Exhibit 14.  Much akin to the latent, constitutional shortcomings found by the federal courts within cases such as Gonzales v. O Centro Espírita Beneficente União do Vegetal, 546 US 418, 426 (2006) ("O Centro Espírita"), and Church of the Holy Light of the Queen v. Mukasey, 615 F. Supp. 2d. 1210, 1215 (D. Oregon 2009) ("CHLQ"), the DEA never published any rulemaking or other formal guidelines in support of whatever methods it adopted.  In fact,

the DEA's entire decision was predicated on – despite making zero substantive efforts to inquire over the past year (indeed, for four years) – on the claimed absence of sincere religious belief by Plaintiffs. Exhibit 14.

**PLAINTIFFS MEET ALL REQUIREMENTS FOR
PRELIMINARY INJUNCTIVE RELIEF**

**A.      Plaintiffs are Likely to Succeed on the Merits.**

As discussed, supra, ayahuasca plays a central role within the Plaintiffs' religion. See Exhibits 2-9. The Plaintiffs believe that, through careful and measured consumption of ayahuasca within a religious ritual, they become closer to the divine. Id. Therefore, the Defendants' conduct prohibiting the Plaintiffs from practicing their religion without interference violates the Plaintiffs' rights under both the First Amendment of the United States Constitution, and the Religious Freedom Restoration Act.

In addition, the Defendants' conduct also infringes upon the Plaintiffs' rights to procedural and substantive due process, due to unrestrained arbitrariness within the Defendants' "guide" to those filing religious exemption applications, and the Defendants' failure to provide Plaintiffs notice and a chance to be heard before effectively denying their religious exemption application through inaction.

Finally, the Defendants' conduct infringes upon the Plaintiffs' rights to freedom of speech by creating an unlawful prior restraint, without a compelling interest. In addition, the actions taken by the Defendants to restrict the Plaintiffs' rights are far from the least restrictive means.

  1.      The Defendants' Conduct Violates Plaintiffs' Rights to Freedom of Religion, Under the First Amendment and the Religious Freedom Restoration Act.

Jurisprudence surrounding the Free Exercise Clause of the First Amendment to the United States Constitution was upended in 1990, when the Supreme Court decided the case of Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 874 (1990). This case "largely repudiated the method of analyzing free-exercise claims that had been used in cases like Sherbert v. Verner and Wisconsin v. Yoder." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 691 (2014) (internal citations omitted). In response to Employment Div., Dept. of Human Resources of Oregon v. Smith, the United States Congress passed the Religious Freedom Restoration Act (hereinafter, "RFRA") three years later. 42 U. S. C. § 2000bb(a)(4).

RFRA operates to explicitly restore the "compelling-interest test as set forth in Sherbert v. Verner, and Wisconsin v. Yoder." 42 U.S. Code § 2000bb(b)(1). To succeed upon a free-exercise claim under this test, the Plaintiff[s] must show the existence of three separate elements:

(1)     That the Plaintiff[s]' religious practice has been substantially burdened by a governmental act;

(2)     Once the Plaintiff[s] have demonstrated that their religious practice has been substantially burdened by governmental acts, the Defendants must demonstrate that its actions serve a compelling governmental interest; and

(3)     The Defendants must also show that the governmental acts performed in furtherance of this compelling interest are the least restrictive means available to further that governmental interest.

Hobby Lobby Stores, 584 U.S. at 692.

For purposes of the case-at-bar, a critical feature of RFRA is found at Section (c), providing relief for substantial burden of religious exercise.   Under this particular provision, Congress provided for exclusive judicial relief, *to wit*:

> A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense *in a judicial proceeding* and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.  42 U.S.C. §§ 2000bb-1(c).

(Emphasis added).  In other words, nowhere within the RFRA was it anticipated that the DEA would be vested with the power and authority to determine which adherents are entitled to a religious exemption.  Indeed, based upon the nature of DEA and DoJ's functions – prioritizing enforcement of federal drug prohibitions, neither government department/agency is qualified to render any determination regarding religious sincerity.  After all, RFRA contains no such authority, and the Controlled Substances Act (hereinafter, "CSA") contains no category for religious exemption.  Instead, it would appear reasonable, consistent with Supreme Court jurisprudence in O Centro Espirita, for the DEA to – upon promulgation of appropriate rules – to exercise only a role in control-diversion.

Rather, to the contrary, the CSA specifically – by its plain language – presently limits the authority of the DEA.  Section 823(a)(1) of the CSA limits DEA authorization solely to register applicants for legitimate medical, scientific, research and industrial purposes.  When coupled with the abject failure – post-O Centro Espirita – by the Government to attempt to promulgate any rules pursuant to the Administrative Procedure Act (as further discussed, *infra*), the DEA lacks both the authority (and, the Plaintiffs would submit, the ability) to render decisions pertaining to religious exemption applications.  If so, then the logical extent of any such DEA role would be premised exclusively upon

assisting a religious entity with prospective measures designed to facilitate that agency's control-diversion function.

As will be demonstrated, the Defendants undoubtedly <u>have</u> substantially burdened the Plaintiffs' religious practice by refusing to grant the Plaintiffs a religious exemption to the Controlled Substances Act. In addition, the government will be unable to demonstrate that its actions serve a compelling governmental interest. Finally, the government will be unable to show that the means it has chosen to employ against the Plaintiffs are the least restrictive means.

As discussed, <u>supra</u>, ayahuasca plays a major role in the Plaintiffs' religious beliefs and traditions. <u>See</u> <u>Exhibits 1, 2, & 10</u>. Not only do Plaintiffs believe that consumption of sacramental ayahuasca elevates them closer to the divine, a significant portion of the Plaintiffs' liturgy stems from the revelations that the Plaintiffs have received from the spirit of ayahuasca. <u>Id.</u>  The Plaintiffs sincerely believe that they are divinely commanded to consume ayahuasca to become closer to the divine, and to spread the truths of the Spirit of Ayahuasca to the world. <u>Id.</u>  The Defendants' actions therefore substantially burden the Plaintiffs' religious practices in at least two ways: (1) the Plaintiffs are denied the ability to speak the truth of a significant aspect of their religious beliefs to others; and, (2) the Plaintiffs are prevented from consuming their religious sacraments. <u>Id.</u> Therefore, the Defendants' actions undoubtedly place a substantial burden upon the Plaintiffs' religious practices.

In a case very similar to the present case, the Defendants claimed that their application of the Controlled Substances Act furthered three compelling governmental interests: "protecting the health and safety of UDV members, preventing the diversion of

[ayahuasca] from the church to recreational users, and complying with the 1971 United Nations Convention on Psychotropic Substances, a treaty signed by the United States and implemented by the Act." O Centro Espírita, 546 U.S. at 426. However, the Supreme Court rejected such a categorical recitation of compelling interests, instead requiring the Defendants to "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' —the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 430-431. As will be demonstrated, the Defendants cannot make such a showing.

In O Centro Espirita, the Supreme Court observed that the mere fact that Congress had "determined [the psychotropic component of ayahuasca] should be listed [as a Schedule I controlled substance]" of the Controlled Substances Act was an insufficient showing to relieve the Defendants of their burden under RFRA. O Centro Espirita, 546 U.S. at 432.  Similar logic should control in the instant case, and operate to deny any and all efforts by the Defendants to justify their actions under the Controlled Substances Act, because the Plaintiffs' religious use of sacramental ayahuasca is not only carefully controlled and managed by the Plaintiffs, but also because religious exemptions to Schedule I drugs are expressly contemplated by RFRA. Id. at 433 (discussing the long-standing religious exemption for the religious use of peyote, another drug regulated by the Controlled Substances Act).

In the past, the Defendants have also raised the compelling governmental interest of preventing diversion of ayahuasca from religious use. Id. at 426. In the present case, the Plaintiffs have made a verified showing of their policies and procedures designed to both ensure that none of the Plaintiffs' religious sacraments are diverted to any other use,

and that medical health facilities are readily available in case of emergency. <u>See</u> <u>Exhibit</u> <u>10</u>. Even if the Defendants should be able to muster evidence to the contrary, the Supreme Court has held that equality in evidence is not sufficient for the Defendants to have demonstrated a compelling governmental interest. <u>O Centro Espirita</u>, 546 U.S. at 426-427. To date, the Defendants have still failed to provide the Plaintiffs with any evidence whatsoever that would make diversion a compelling government interest in the present case.

The Supreme Court has also observed that the claim of a compelling governmental interest in, and reliance upon, the 1971 United Nations Convention on Psychotropic Substances (hereinafter, the "Convention"), even if ayahuasca is included therein, is a tenuous claim at best because the Controlled Substances Act implements the Convention in American law. <u>Id.</u> at 438. Therefore, to properly advance a compelling government interest arising from the need to enforce American obligations under the Convention, the Defendants would need to introduce "evidence addressing the international consequences of granting a[] [religious] exemption for the Plaintiff[s]." <u>Id.</u> To date, the Defendants have provided the Plaintiffs with no evidence whatsoever that would make international consequences a compelling government interest in the present case.

Nor can it be said that the Plaintiffs' sacramental tea poses any significant health risks.  The Plaintiffs' sacramental ayahuasca is chemically akin to the Daime tea consumed by members of the Santo Daime faith, in that both are prepared from the Banisteros caapi vine and the leaves of the Psychotropia viridis plant using the same methodology. <u>Church of the Holy Light of the Queen v. Mukasey</u>, 615 F. Supp. 2d. 1210, 1215 (D. Oregon 2009) (hereinafter, "<u>CHLQ</u>"). This method of preparation has been

15

observed to make the DMT in Daime tea, and the Plaintiffs' sacramental ayahuasca, "far less potent" than synthetic injection or inhalation of DMT in its pure form. Id. at 1215. At this level of potency, consumption of Daime tea and similar beverages has actually been observed to have the following positive effects:

1)  Assistance in overcoming alcohol dependency and abuse; and,

2)  Loss of interest in 'habitual use of alcohol, cocaine, and other addictive substances'; and,

3)  Amelioration of anxiety and panic symptoms.

Id. at 1215-1218; see also United States v. Hoffman, 4:19-cr-00693, at pp. 6-14 (D. Ariz., 2020) (holding that the provision of aid could be a religious activity entitled to RFRA protection).

In addition, there was no evidence adduced to suggest that the consumption of Daime tea, or the chemically similar sacramental ayahuasca that the Plaintiffs employ, could contribute to any form of a psychotic episode. CHLQ, 615 F. Supp. 2d, at 1216. Therefore, the Defendants cannot reasonably claim that the consumption of the Plaintiffs' sacramental ayahuasca is likely to cause any form of adverse health effects.

Even if the Defendants could demonstrate that they had a compelling government interest, the Defendants must also justify the means they have chosen to further that compelling interest as being the least restrictive means available. See, e.g., Hobby Lobby Stores, 573 U.S. at 720; Sherbert v. Verner, 374 U.S. 398, 406 (1963). The Defendants are unlikely to be able to do this, because the Plaintiffs – entirely on their own initiative, and out of respect for their belief in the sacred nature of ayahuasca and the health of the members of their church – have already implemented considerable policies and

procedures to both prevent against diversion, and to ensure the health of its members. Exhibit 10, at pp. 14-17.

Separately, but critically, the Defendants have failed to promulgate any regulations under which to provide the Plaintiffs with any real notion of *standards* to be used in issuing *any* determinations regarding religious exemptions. Of course, in order to be able to even do so – under any circumstance – a federal entity must first adhere to the requirements imposed under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* This point merits significant discussion, specifically as it pertains to RFRA and any rulemaking occurring under that legislation.

Recently, in filings in a lawsuit before the Northern District of California, brought against the Government by the North American Association of Visionary Churches, the DEA stated its intention to engage in formal rulemaking on the subject of religious exemption under RFRA and the CSA. Arizona Yage Assembly, *et al.* v. Barr, 20-cv-0398 (N.D. Ca. 2020), at Doc. 19-1 (Declaration of Scott A. Brinks, at p. 5).

Through this acknowledgment by a DEA official, we establish that the Government has failed to establish any regulatory regime; any such regime would necessarily require the provision of notice to a religious exemption applicant – such as Plaintiff Soul Quest Church. Yet, contrary to both constitutional and statutory edits, the Defendants have failed to establish any form of regulatory protocols – at least, not ones that are approved by Congress, published, and which provide notice to religious exemption applicants.

From a statutory perspective, the Defendants have never developed rules and regulations, consistent with APA requirements, and – as pertinent to the case-at-bar – pertaining to the religious use of ayahuasca. Indeed, rather than doing so – at best – the

Defendants rely on *ad hoc* decision making, wherein all necessary care is taken not to overstep constitutional authority.  The shocking aspect of this is that even oversteps the bounds of Department of Justice policy, a fact which would necessarily inhere in each aspect of the Plaintiffs' arguments, herein, both constitutional and statutory-based.  See Implementation of Memorandum on Federal Law Protections of Religious Liberties (U.S. Department of Justice, Oct. 6, 2017); Federal Law Protections for Religious Liberties (U.S. Department of Justice, Oct. 6, 2017) (hereinafter, "Sessions Memorandum").[1]

As referenced, above, the RFRA vests *zero* authority to define religion in any agency.  Instead, the RFRA provides only for a claim or defence in a judicial proceeding.  Given this lack of authority, it is legally impossible and – the Plaintiffs would assert – constitutionally impermissible – for the DEA to engage in any determination as to religious sincerity.[2]  As the Sessions Memorandum, even acknowledges, in relevant part:

> **12.    RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**
>
> RFRA applies to all sincerely  held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the

---

[1]    Respectively, these documents are located at https://www.justice.gov/opa/press-release/file/1001886/download;            and            https://www.justice.gov/opa/press-release/file/1001891/download.

[2]    The Plaintiffs would embrace the Supreme Court's opinion in O Centro Espirita that the Government possesses a rational basis for ensuring public safety and diversion prevention.  The imposition of such regulations, while following the strictures of the APA – would likely address security to a church's ayahuasca tea and minimal safety guidelines surrounding the sacramental use of the tea (*i.e.*, adequate warnings, screening and in-ceremony care).  These types of regulations – which would be applied prospectively as prerequisites to the sacramental use of the blended, ayahuasca tea – neither pass judgment on the nature of religious beliefs nor allow for the DEA to examine sincerity of belief.

<u>reasonableness of such lines drawn, nor would it be appropriate for government to do so ….</u>

**13.    A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. <u>In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion ….</u>

Sessions Memorandum, at p. 4. (Emphasis added). The leaves open the real inference that the Defendants are presumably unable to rebut: if the Sessions Memorandum binds Department of Justice and its corollary agencies – inclusive of DEA – then how do these federal departments/agencies possess any freedom to 'not follow' this established policy?

The perspectives expressed in the Sessions Memorandum are consistent with recent Supreme Court jurisprudence. <u>See</u>, <u>e.g.</u>, <u>Hobby Lobby</u>, <u>supra</u> (wherein the Supreme Court assumed, and never analyzed, either the religious nature or sincerity of the company owner's religious beliefs, and in the unique setting of whether a corporate entity could hold and exercise such religious beliefs). This same perspective accords with then-Judge Gorsuch's opinion in <u>Yellowbear v. Lampert</u>, 741 F.3d 48, 54 (10th Cir. 2014), which states that

> [w]hen inquiring into a claimant's sincerity, then our task is instead a more modest one, limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud on the court – whether he actually holds the beliefs he claims to hold – a comparatively familiar task for secular courts that are regularly called upon to make credibility assessments – and an important task too, for ensuring the integrity of any judicial proceeding.

In the case-at-bar, Plaintiff Soul Quest Church – whose standing as a religious entity has already been validated by the Federal Government via the Internal Revenue Service under Section 501(c)(3) of the Internal Revenue Code – has readily demonstrated, via the materials submitted alongside its application for religious exemption and as appended to this Motion. Yet, again, this raises the fundamental issue of the Defendants' failure to even attempt to establish a proper regulatory regime under the authority of the RFRA and the APA.

Under the APA, 5 U.S.C. § 551(13), an "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial, thereof, or failure to act. Section 552 details the process of providing public information required of an agency in formal rulemaking.

Section 553 is titled "Rule making," and requires publication of the specifics of the rule making proceedings and particularized information in the Federal Register of "the legal authority under which the rule is proposed." It also requires the subsequent publication of a proposed, substantive rule, rules of interpretation, and statements of policy not less than thirty (30) days prior to its effective date.

Consequently, coupling the RFRA with the APA reveals a very telling flaw in the DEA approach: DEA has no grant of authority for rulemaking under the RFRA, and – even if such did exist – the DEA (as the agency tasked generally with regulation of

20

psychotropic substances for the public good) still is unable to do so as pertains to making any determination on whether claimants of religious exemption – inclusive of Plaintiff Soul Quest Church – are either *religious enough* or *sincere enough* to be eligible for an exemption.  Indeed, in the case-at-bar, the only items in Defendants' possession reflective of the issue of religious sincerity are the very items submitted by Plaintiff Soul Quest Church in support of its August 2017, application for religious exemption.  No further inquiries have ever been directed by the DEA to the Plaintiffs pertaining to the nature and sincerity of the religious beliefs of Plaintiff Soul Quest Church, Plaintiff Christopher Young, or the other members of Soul Quest's faith. Exhibit 1, at ¶ 32.

Accordingly, the Plaintiffs have a strong likelihood of success at trial on the merits of their claims arising under the First Amendment to the United States Constitution and the Religious Freedom Restoration Act, and thereby meet this element of the test for issuance of a preliminary injunction with regards to these claims.

        2.    The Defendants' Conduct Violates the Plaintiffs' Rights to Procedural Due Process.

The Fifth Amendment to the United States Constitution clearly states that no individual's liberty or property is to be taken from them without "due process of law." U.S. Const. Amend. V.  Procedural due process, an aspect of the overall right to due process of law, "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth. . . Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). In determining whether or not a plaintiff's right to procedural due process has been violated, courts answer the following three questions:

     (1)     Have the Plaintiffs suffered an identifiable loss of liberty or deprivation of property?

     (2)     If so, is the liberty lost or property taken within the contemplation of the Due Process Clause?

     (3)     Once it has been determined that due process applies, what procedure is due?

Morrissey v. Brewer, 408 U.S. 471, 481 (1973).

Here, the Plaintiffs have undeniably suffered a recognizable loss of liberty. As discussed, supra, the Defendants' unexplainable delay in processing the Plaintiffs' application for a religious exemption, or communicating with them upon its merits, operates as a functional denial – thereby leaving the Controlled Substances Act's prohibition of ayahuasca in effect, and the Plaintiffs unable to fully practice their sincere religious beliefs. See Exhibit 10, at § 7.

Through this arbitrary and unexplainable silence upon even the status, much less the essentials, of the Plaintiffs' religious exemption application – a silence that has now lasted over two and a half years – the Defendants have completely denied the Plaintiffs their right to notice and to be heard before a final decision is made. Fuentes v. Shevin, 407 U.S. 67, 80 (1972) (citing to Baldwin v. Hale, 1 Wall. 223, 233 (1863); Windsor v. McVeigh, 93 U.S. 274 (1876); Hovey v. Elliott, 167 U.S. 409 (1897); and Grannis v. Ordean, 234 U. S. 385 (1914)). Consequently, the Plaintiffs have suffered, and continue to suffer, an identifiable loss of liberty. The Defendants have denied the Plaintiffs their right to notice and be heard.

Unquestionably, the right to notice and to be heard is within the contemplation of the Due Process Clause. The United States Supreme Court held that the right to notice and to be heard is a "fundamental requirement of due process." Armstrong v. Manzo, 380

U.S. 545, 552 (1965).  Additionally, the lack of proper notice and/or an opportunity to be heard has, standing alone, been deemed a sufficient reason to merit full reversal upon due process grounds. Armstrong, 380 U.S. at 552. Therefore, the Constitutional right to notice and be heard in a reasonable time and manner is within the contemplation of the Due Process Clause.

In determining what procedures are due, the Plaintiffs respectfully request this Court observe that the Defendants' own proffered "guide" does attempt to set out several procedures, of which notice and the right to be heard are a part. See Exhibit 11. However, as discussed, infra, the Defendants' "guide" does not contain any requirement whatsoever that these notices and opportunities to be heard be granted at any time, much less a reasonable or meaningful one. See Exhibit 11, at §§ 4 (Petitioners should receive notice of any acceptance or incompleteness in their religious exemption applications, but no timeframe for this is provided), 8 (Petitioners should receive notice of the final determination of their application, including a statement of the reasons relied upon by the Defendants in making their final decision, but no timeframe for this is provided). Moreover, as argued, above, the Defendants have failed to promulgate any rules and regulations pursuant to the APA; this has the necessary effect of immediate violation of the procedural due process anticipated by Congress under RFRA, and which is co-extensive with the procedural due process issues, herein.  Therefore, the Plaintiffs therefore request this Court issue a judgment declaring that the Defendants must grant applicants for religious exemptions their Constitutional rights to notice and an opportunity to be heard within a reasonable time and in a meaningful manner.

Therefore, the Plaintiffs are likely to succeed at trial upon their procedural due process claim, due to the Defendants' actions denying the Plaintiffs their Constitutional right to notice and to be heard without due process of law.

3.   The Defendants' Conduct Violates the Plaintiffs' Rights to Substantive Due Process.

The Due Process Clause of the Fifth Amendment reads as follows: "No State shall . . . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The right to "worship God according to the dictates of [an individual's] own conscience" has long been held to be one of these fundamental liberties protected by the Due Process Clause. Meyer v. Nebraska, 262 U.S. 390, 399-400 (1923).

Yet, this is precisely what the Plaintiffs seek to do in the instant case, and are being barred from doing by the Defendants' constitutionally unjustifiable actions that directly hamper the Plaintiffs' sincere religious beliefs. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 235-236 (1972). In order to ensure that Americans receive due process of law, courts have recognized that the guarantee of due process extends beyond the procedural aspect of law, to encompass the underlying, substantive elements of these procedures. County of Sacramento v. Lewis, 523 U.S. 833, 836 (1998).

The constitutional right to substantive due process of law requires that government acts which deprive an individual of life, liberty, or property be done in a fair and just manner, and be governed by appropriate standards, to remove arbitrariness and unfettered discretion by government officials. See, e.g., Santosky v. Kramer, 455 U.S. 745, 762 (1982) (deeming unconstitutional those procedures which were "unusually open to the subjective values of the" factfinder. Meyer, 262 U.S. at 403   (deeming unconstitutional laws which were "arbitrary and without reasonable relation to any end");

24

Wolff v. McDonnell, 418 U.S. 539, 558 (1974) (observing that the "touchstone of due process is protection of the individual against the arbitrary actions of government"). In the present case, there can be no doubt that the Plaintiffs have a right to practice their religion as they see fit, and that the Defendants are acting to deny Plaintiffs this right via the arbitrary and unreasonable guidelines by which the Defendants evaluate religious exemption applications, like the one filed by the Plaintiffs in the instant case. Exhibit 11.

As the Defendants' "guide" to the public seeks to tell the tale, the process of filing a religious application is a straightforward one.  Individuals must:

1)   Develop a petition containing an argument discussing why the Plaintiffs are entitled to this religious exemption;

2)   Sign this petition under penalty of perjury;

3)   Have their petition be accepted for filing by the DEA;

4)   Supply any and all additional information the DEA requests; and

5)   Refrain from "engag[ing] in any activity prohibited under the Controlled Substances Act" until receiving the DEA's final determination.

See Exhibit 11.

However, upon closer review, the subjectivity and arbitrariness of the Defendants' religious exemption "guide" becomes apparent.

The subjective and arbitrary nature of the Defendants' religious exemption application process is made apparent very early on, when an applicant has submitted their application and is waiting to hear if it has been accepted for filing. In their "guidance," the Defendants have stated that only a "complete" application will be accepted for filing, while an incomplete application will be rejected. Exhibit 11, at § 4. However, the Defendants never state what an applicant must provide for an application to be complete,

instead merely stating what an applicant "may" provide - and then moot even that very low bar, by stating that a petitioner is "not limited to the topics" the Defendants' "guide" suggests. Exhibit 10, at § 2. Even at this most basic level, of simply determining whether or not an application is "complete" enough to be accepted for filing - much less any form of actual review - the Defendants' version of this process is "unusually open to the subjective values" of whomever is examining such an application for completeness due to the lack of standards defining a "completed" application, and is therefore a violation of the Plaintiffs' right to substantive due process under the United States Constitution. Santosky, 455 U.S. at 762 (1982).

Even upon a cursory review, the lack of standards governing how the Defendants purport to evaluate the voluminous information they request be part of a religious exemption application is apparent. Exhibit No. 11, at § 2. The Defendants suggest that applicants submit information upon a wide variety of complex topics, ranging from historical data to canonical law and its interpretations, even to physical security measures and import/export policies. Id. Consolidating such widely disparate subjects and technical subjects into one opinion, without established guidelines, undoubtedly crosses the line into prohibited arbitrariness by granting an unknown, unqualified decisionmaker unfettered authority to employ their own, subjective, judgment.[3]

---

[3] The Defendants' "guide" permits an applicant to supply "any and all information [they] believe relevant to the DEA's determination." Exhibit 11, at § 2. Given this unlimited scope of incoming information, an official's reversion to their own subjective judgment appears inevitable under the standards of the Defendants' "guide." It may also be observed that an infinite scope of response, as the Defendants' "guide" contemplates, would require an infinite amount of policies or procedures to properly account for these infinite possibilities.

Another significant omission from the Defendants' "guide" is the lack of mention of time constraints or estimations. See, e.g., Exhibit 11, at § 4 (requiring Defendants to give notice, but not stating a timeframe for the issuance of this notice), Id. at § 8 (never stating when an applicant can expect a final determination). This carries particular weight in context of the Defendants' expressed desire that applicants not practice their religion until a final determination has arrived. Exhibit 11, at § 7. Without mention of a time constraint, even in the most general language,[4] the Defendants have granted themselves the ability to infringe upon an applicant's First Amendment rights for an indeterminate and arbitrary period of time, simply by remaining silent upon an application or claiming that it is "being processed" or "still under review." See Exhibit 11.

Effectively, what has resulted from the Defendants' lack of any substantive guidelines over the consideration of and standards for religious exemption applications have left such a process as hopelessly, constitutionally defective.   It is well-settled that the government cannot give public officials unbridled discretion to determine whether a would-be speaker has good cause to speak, or – in the case-at-bar, whether a particular religion can be impacted from the free exercise of its fundamental religious practices. This is because "unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757 (1988); see also Saia v. New York, 334 U.S. 558

---

[4] The Administrative Procedures Act, if Defendants had actually adhered to its requirements, obligates the Defendants to "conclude a matter presented to it," like a request for a religious exemption, in a "reasonable time." 5 U.S.C. § 555(b). This language is not present in the Defendants' guide, and - given the delay of years in the present case - the Defendants have clearly not processed the Plaintiffs' application in a reasonable timeframe.

(1948); <u>Niemotko v. Maryland</u>, 340 U.S. 268 (1951); <u>Kunz v. New York</u>, 340 U.S. 290 (1951); <u>Staub v. City of Baxley</u>, 355 U.S. 313 (1958); <u>Freedman v. Maryland</u>, 380 U.S. 51 (1965); <u>Cox v. Louisiana</u>, 379 U.S. 536 (1965); <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147 (1969); <u>Secretary of State of Maryland v. Joseph H. Munson Co.</u>, 467 U.S. 947 (1984); <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215 (1990); <u>Forsyth County. v. Nationalist Movement</u>, 505 U.S. 123 (1992).

> The Supreme Court acknowledged over sixty (60) years ago that

>> it is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

<u>Staub</u>, 355 U.S. at 322.  Yet, here, in the case-at-bar, this is exactly what is occurring; the Defendants' religious exemption application process – directly in defiance of the Supreme Court's edicts in <u>O Centro Espirita</u> and even its own departmental directives – permits for unfettered discretion of its officials to deny or 'virtually' pocket veto any religious group's legitimate request for religious exemption.

The hallmark of this unconstitutional state of affairs is borne out by the Defendants' failure to define even the most basic elements of a religious exemption application, having established no standards for the evaluation of religious exemption applications like the Plaintiffs', and having a completely arbitrary amount of time to do so.  Consequently, Plaintiffs submit that this constitutes a clear violation of their rights to Due Process under the Fifth Amendment.

      4.    <u>The Defendants' Conduct Clearly Violates the Plaintiffs' Rights to Freedom of Speech by Facially Establishing an Impermissible Prior Restraint Upon the Plaintiffs' Speech.</u>

It is axiomatic, and long-standing, law that the "danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." <u>Southwestern Promotions, Ltd. v. Conrad</u>, 420 US 546, 553 (1975). As discussed, <u>supra</u>, and in Plaintiffs' Verified Complaint, Plaintiff Soul Quest Church actively engages in street-level ministry and proselytization by and through, among other activities, the distribution of flyers discussing the key scriptural and liturgical foundations of the Plaintiffs' religion.  A copy of this flyer is attached hereto, and made a part of this motion as <u>Exhibit 15</u>.   City streets have long been recognized as public forums, and as such prior restraints upon speech occurring on the street are unlawful. <u>Kunz</u>, 340 U.S. at 293.

In <u>Kunz</u>, the appellant's permit allowing him to perform street-level ministry and proselytization was revoked, due to evidence that the appellant had spoken out against other faiths. <u>Kunz</u>, 340 U.S. at 292. Feeling compelled by faith to proselytize even despite a permit, the <u>Kunz</u> appellant would later be convicted for failure to possess a permit.  <u>Id.</u> at 293. In reviewing the record, the Supreme Court observed that there were no applicable standards by which a reviewing official could deny permits "on the basis of his interpretation." <u>Id.</u> The Supreme Court described the New York ordinance before it as one which "gives an… official discretionary power to control in advance the right of citizens to speak on religious matters on the streets." <u>Id.</u> The Supreme Court held the granting of this arbitrary, discretionary, power to constitute an unlawful prior restraint on speech. <u>Id.</u>

Kunz and the present case share many factual similarities, and as such the same logic should control. Like the appellant in Kunz, the Plaintiffs are actively engaged in street-level ministry and proselytization by and through the dissemination of information about the Plaintiffs' religious beliefs. Exhibits 2-7 and 15. Like the officials in Kunz, the Defendants have, under color of authority, effectively barred the Plaintiffs from speaking the truth of their religion, and their viewpoint on the sacred and beneficial aspects of ayahuasca, in a public forum, by subjecting the Plaintiffs to the continued threat of arrest via the provisions of the Controlled Substances Act.

Based upon these similarities, this Court - like the Supreme Court in Kunz - should hold that the Defendants' actions constitute a prior restraint upon the Plaintiffs' speech, and are therefore unconstitutional, for no government can "vest restraining control over the right to speak on religious subjects in an administrative official where there are no appropriate standards to guide his action." Kunz, 340 U.S. at 295.

**B.      The Balance of Equities Falls Heavily in the Plaintiffs' Favor, and a Preliminary Injunction is the Appropriate Remedy.**

Because the Plaintiffs' First Amendment rights are at risk via direct penalization by the government, an injunction is the proper remedy. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1271-1272 (11th Cir. 2006). There is not, and cannot be, an adequate remedy at law, for "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id.; Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion).

A similar balancing of the equities in consideration of the Plaintiffs' claims arising under the Due Process Clause and the Freedom of Speech clause, in light of the most

serious possible injury for each party,[5] similarly favors the Plaintiffs. If the Court should grant Plaintiffs' request for a preliminary injunction, the most serious injury the Defendants can suffer is a judicial mandate to do something that the Defendants are already under judicial, and statutory, mandate to do – come to the bargaining table, and discuss the Plaintiffs' application for a religious exemption. O Centro Espirita, 546 U.S. at 434 (obligating the Defendants to consider and issue requests for religious exemptions). By contrast, the Plaintiffs' most serious injury is already ongoing – as discussed, supra, the Plaintiffs have suffered, and continue to suffer, ongoing irreparable injuries from the deprivation of their Constitutional and statutory rights.  Likewise, the Plaintiffs and their members live under the constant threat of federal arrest and prosecution if they engage in the continued, free exercise of their sincere religious beliefs.

Therefore, the Plaintiffs meet the second prong necessary for issuance of a preliminary injunction, as the balance of equities favors this Court's prevention of further infringement of the Plaintiffs' Constitutional and statutory rights.

### C.    A Preliminary Injunction is in the Public Interest.

The Eleventh Circuit has issued rulings supportive of the principle that an unconstitutional application of laws cannot be said to be in the public interest. See, e.g., The Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1335 (M. D. Fla. 2009). The Defendants' actions, as discussed, supra, violate the Plaintiffs' rights under the First Amendment to the United States Constitution, as well as the Due Process Clause of the Fifth Amendment. See supra. Each of these amendments was enacted and

---

[5] The Supreme Court of the United States has permitted such a method of balancing the equities in considering whether to grant preliminary injunctions. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 378 (2008).

applied to the Constitution in order to prevent precisely the conduct the Defendants are herein engaged in - the unlawful infringement upon the rights of American citizens. See, e.g., Griswold v. Connecticut, 381 U.S. 479, 493 (1965) (stating that the reason for the enactment of the Bill of Rights was to protect against governmental intrusion into "fundamental personal liberties").

The Plaintiffs therefore meet the third, and final, prong of the test needed for preliminary injunction.

### D.    No Bond Should Be Required.

Pursuant to Fed. R. Civ. P. 65(c), courts "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "[d]espite the mandatory nature of this language, 'federal courts have come to recognize that the district court possesses discretion over whether to require the posting of security.'" The Complete Angler, 607 F. Supp. 2d at 1335 (quoting Popular Bank of Fla. v. Banco Popular de Puerto Rico, 180 F.R.D. 461, 463 (S.D. Fla. 1998).

"Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." 607 F. Supp. 2d at 1335-36 (citing All States Humane Game Fowl Org. v. City of Jacksonville, Fla., No. 3:08-CV-312-J-33MCR, 2008 WL 2949442, at *13 (M. D. Fla. July 29, 2008); Johnston v. Tampa Sports Authority, No. 8:05-CV-2191-T-27MAP, 2006 WL 2970431, at *1 (M. D. Fla. Oct. 16, 2006).

Accordingly, Plaintiffs respectfully request that this Court exercise its discretion to waive the bond requirement.

## **CONCLUSION**

For the reasons set forth above, a preliminary and permanent injunction[6] should issue to enjoin the Defendants as follows:

(a)    from arresting, prosecuting, or threatening Plaintiffs and members of Plaintiff Soul Quest Church with arrest, prosecution, and/or imprisonment for importing, distributing and ingesting the sacramental tea solely at Plaintiff Soul Quest Church services;

(b)    ordering that within 30 days after the date of issuance of declaratory relief, the parties present the Court with a plan to effectuate the importation, distribution, and accounting for the sacramental tea consistent with the rights of the Soul Quest Church members to use the sacramental tea in ceremonies;

(c)    awarding the Plaintiffs' attorneys' fees, costs and expenses pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and The Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988; and

---

[6]    The relief requested herein is equally applicable to the current Amended Verified Complaint for Declaratory and Permanent Injunctive Relief, or to its successor pleading, which will be accompanied with the appropriate Motion for Leave to Amend.  The dangers presently confronting the Plaintiffs remain constant, regardless of any possible effort by the Defendants to attempt to re-label its illegitimate assertion of authority and its violations of statutory and constitutional protections accorded to the Plaintiffs.

(d)    granting such other and further relief as the Court may deem just and proper.

Respectfully submitted this 7th day of May 2021.

By: *s/Derek B. Brett*_____
**DEREK B. BRETT, ESQ.**
Fla. Bar No. 0090750
**BURNSIDE LAW GROUP**
109 Ilsley Avenue, Suite 9
Halifax, Nova Scotia B3B 1S8
Telephone:    (902) 468-3066
Facsimile:     (902) 468-4803
Email: dbb@burnsidelaw.net
Lead Counsel for Plaintiffs

s/A. Brian Phillips_____
**A. BRIAN PHILLIPS, ESQ.**
Fla. Bar No. 0067113
**A. BRIAN PHILLIPS, P.A.**
912 Highland Avenue
Orlando, Florida 32803
Telephone:    (407) 872-0777
Telecopier:   (407) 872-0704
Email: brian.phillips@phillips-law-firm.com
Local Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 7th day of May, 2021, I electronically filed a copy of the foregoing document. Notice of the filing will be sent by email to all Parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ A. Brian Phillips*
A. BRIAN PHILLIPS