Exhibit A

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SOUL QUEST CHURCH OF MOTHER )
EARTH, INC., *et al.*, )
                            )
        Plaintiffs, )
                            )
vs. )    Case No.: 6:20-cv-00701-WWB-DCI
                            )
MERRICK B. GARLAND, Attorney )
General of the United States )
of America, *et al.*, )
                            )
        Defendants. )
_____ )

## SECOND AMENDED VERIFIED COMPLAINT
## FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF
## <u>(INJUNCTIVE RELIEF REQUESTED, DECLARATORY RELIEF REQUESTED)</u>

COME NOW the Plaintiffs, Soul Quest Church of Mother Earth, Inc., a Florida Domestic Non-Profit Corporation, on its own behalf and on behalf of its members, and Christopher Young, individually and as the spiritual leader of Soul Quest Church of Mother Earth (hereinafter collectively "Plaintiffs"), by and through the undersigned counsel, hereby allege as follows:

### I.       <u>INTRODUCTION</u>

1.     Plaintiff Soul Quest Church of Mother Earth, Inc. (hereinafter "Soul Quest Church"), is a Christian syncretic religion based in Orlando, Florida, and registered as a Florida domestic non-profit corporation.

2.     Plaintiff Christopher Young (hereinafter "Young") is the spiritual leader of Plaintiff Soul Quest Church, who resides in the State of Florida.

3.      The Plaintiffs bring this Complaint on behalf of all members of Soul Quest Church, pursuant to 42 U.S.C. §§ 2000bb–2000bb-4 [hereinafter collectively the "Religious Freedom Restoration Act" or "RFRA"], and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges, and immunities secured to Plaintiffs by the First, Fifth, and Fourteenth Amendments to the United States Constitution.

4.      Specifically, Plaintiffs seek a declaration that the Defendants' threats to arrest and prosecute members of Soul Quest Church who seek to practice their religious rituals, which involve the sacramental consumption of trace amounts of a Schedule 1 chemical (21 U.S.C. § 812), at Soul Quest Church's religious ceremonies, is unconstitutional, unlawful, and violates the RFRA, in that these threats burden the central practice of Plaintiffs' religion, *i.e.* the imbibing of the sacramental tea.

5.      Plaintiffs also seek a permanent injunction enjoining the Defendants from preventing the importation or use of Soul Quest Church's sacramental tea in religious ceremonies, and from threatening to arrest or prosecute members of Soul Quest Church who seek to exercise their religion.

## II.      JURISDICTION AND VENUE

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3)-(4), because the case arises under the Constitution, laws, and treaties of the United States, and seeks to redress the deprivation of rights, privileges, and immunities secured to Plaintiff by the First, Fourth, and Fifth amendments to the Constitution of the United States, and the Religious Freedom Restoration Act

("RFRA"), as well as to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

7.     Pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706, this Court has the authority to grant declaratory relief, and to issue preliminary and permanent injunctions.  Further, pursuant to the RFRA at 42 U.S.C. § 2000bb-1(c), "[a] person whose religious exercise has been burdened in violation of [RFRA to] assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

8.     Moreover, as it is believed that the Defendants will now attempt to assert that the District Court's exercise of jurisdiction in this case is inappropriate per 21 U.S.C. § 877, the Plaintiffs now assert that the provisions of that statute are inapplicable to divest the District Court of its proper jurisdiction.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because this is a civil action in which the Defendants are officers and/or employees of the United States, an agency thereof acting in their official capacity or under color of legal authority, and operating within the Middle District of Florida, Orlando Division, where a substantial part of the events or omissions giving rise to the claims occurred and where the plaintiff reside, where no real property is involved.

III.    **PARTIES**

A.    **Plaintiffs**

10.    Plaintiff Soul Quest Church is a registered domestic non-profit corporation incorporated under the laws of the State of Florida, with a principal office located in Orlando, Florida.  Thus, pursuant 28 U.S.C. § 1391(c)(2), Plaintiff Soul Quest Church resides in the Middle District of Florida, Orlando Division for venue purposes.  Soul Quest Church is adversely affected and aggrieved by the Defendants' actions, as more fully set forth below.

11.    Plaintiff Christopher Young is a natural person who is domiciled in Orlando, Florida.    Thus, pursuant 28 U.S.C. § 1391(c)(1), Plaintiff Christopher Young is deemed to reside in the Middle District of Florida, Orlando Division. Plaintiff Christopher Young is the religious leader of Soul Quest Church.  Plaintiff Christopher Young brings this action in his own capacity as a member of Soul Quest Church, and on behalf of the members of Soul Quest Church.

B.    **Defendants**

12.    Defendant Merrick Garland is the current Attorney General of the United States of America, and resides in Washington, District of Columbia. Garland is the titular head and leader of the United States Department of Justice (hereinafter "DoJ").  Defendant Garland is the chief federal law enforcement official for the United States.

13.    The official website for DoJ reflects its Mission as being "[t]o enforce the law and defend the interests of the United States according to the law; to

4

ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans."  The applicable website page – www.justice.gov/about -- also quotes Thomas Jefferson in stating that equal and impartial justice is "a sacred duty."

14.     Defendant Garland's professional and academic history reflects no background in theological studies or its equivalent.

15.     Defendant D. Christopher Andrews is the current, acting Administrator of the United States Drug Enforcement Administration (hereinafter, "DEA").  Defendant Andrews is the lead administrator and authority for the only agency representing itself as being empowered to grant religious exemptions, like the one sought by the Plaintiffs in the instant Complaint, to United States drug laws.

16.     Defendant Andrews professional and academic history – as showcased on his official DEA website page – www.dea.gov/about/dea-leadership -- reflects significant experience in global drug enforcement.  However, it reflects no experience or background whatsoever in theological studies, training or its equivalent.

## IV.   PROCEDURAL HISTORY & FACTUAL BACKGROUND

### A.   Procedural History

13.    The Plaintiffs have made concerted, long-term efforts to secure a religious-based exemption to the Controlled Substances Act's prohibition against the ingestion of N,N-5,5-dimethyltryptamine ("DMT") from the Defendants.

14.    On August 21, 2017, the Plaintiffs dispatched, through legal counsel, their exemption application to the DEA (hereinafter, "DEA Exemption Application"). A true and correct copy of the Plaintiffs' DEA Exemption Application is attached hereto, and incorporated by reference herein, as Exhibit 1.   The DEA, in conjunction with DoJ, by and through each agency/department's lead administrator (the Defendants in the case-at-bar), is assigned the process of considering religious-based exemptions to enforcement of provisions of the Controlled Substances Act.   As set forth below, these respective government departments/agencies are responsible for constructing the framework for consideration and review of exemption applications – including the Plaintiffs' DEA Exemption Application, which was remitted nearly four (4) years ago by the Plaintiffs.   This framework was anticipated to be in conformity with the provisions of the RFRA, as well as the Supreme Court's decision in Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006) (hereinafter, "O Centro").

15.    The Plaintiffs anticipated that the guidelines which should have been developed but, based upon information and belief, have never been so developed,

would be narrowly tailored to not clash with the First Amendment's Free Exercise Clause.   The Plaintiffs also anticipated that such guidelines would have been constructed with various safeguards including, but not limited to, expressed time limitations for review and ruling, as well as specific standards designed to allow for the uniform application of such guidelines.   A copy of these DEA's guidelines regarding petitions for religious exemptions to the Controlled Substances Act are attached hereto, and incorporated by reference herein, as Exhibit 2.[1]

17.   This has not occurred.  Rather, until this lawsuit was filed in late-April 2020, the Plaintiffs' DEA Exemption Application continued to sit at the assigned office, located in Springfield, Virginia, with no timetable for completion and with no stated standards upon which to guide the Defendants' scrutinizing and ruling on such applications.  In fact, through information and belief, since the 2006 decision in O Centro, supra, it is believed that – despite dozens of submitted religious exemption applications submitted to the Defendants by a variety of religious-based groups – the Defendants have never granted any applications, except following

---

[1]  Indeed, despite diligent research, the Plaintiffs have been unable to locate any historical copy of what should be publicly-available "guidelines," in force in August 2017 – with the only document stemming from February 2018 – when the Plaintiffs submitted their application for a religious exemption. The lack of a historic database for these documents is a problem in and of itself given the Defendants' propensity for delay.  However, the Plaintiffs' religious exemption application met the requirements of the Defendants' "guidelines" purported to be in force at the time of submission, and from that basis the Plaintiffs conclude that the "guidelines" presently in force would not materially differ from those in effect in August 2017. Note, however, that these "guidelines" are ill-defined and fail to meet to prerequisites for official recognition and use pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, et seq., as there has never been any rules or regulations ever presented for mandatory Congressional scrutiny and approval.

judicial intervention.  Of the two (2) granted applications, one stemmed directly from the Supreme Court's decision in <u>O Centro</u>, involving a successful RFRA challenge. The other resulted from similar judicial action by groups affiliated with the Church of Santo Daime.  <u>Church of the Holy Light of the Queen v. Mukasey</u>, 615 F. Supp. 2d 1210 (D.C. Oregon 2009) (hereinafter, "<u>CHLQ</u>").

18.    In the case-at-bar, there was no acknowledgment of receipt of the DEA Exemption Application directly by the Defendants.  Notwithstanding this, it was independently confirmed – in approximately October 2018 – that Defendants had received the Plaintiffs' DEA Exemption Application.  At that time, a Freedom of Information Act (hereinafter, "FOIA") request was forwarded to Plaintiffs' counsel, pertaining to a request to disclose the DEA Exemption Application pursuant to FOIA.   Later discussions between Plaintiffs' counsel and the Defendants' FOIA office affirmed the receipt of the DEA Exemption Application shortly following its August 21, 2017 transmission to Defendants.

19.    Furthermore, from March through May 2019, Plaintiffs' counsel made regular telephone calls and left regular voicemail messages at the Defendants' office tasked with assessing religious exemption applications including, but not limited to, multiple voicemails with this office's supervisor, Lorne Miller.   The Plaintiffs received no return calls from Mr. Miller or anyone else with the authority to address the status of the Plaintiffs' DEA Exemption Application.

20.     Since May 2019, the Defendants failed to make any contact with the Plaintiffs' legal counsel regarding the DEA Exemption Application – or any other matter until the filing of the original Verified Complaint in this action.

<u>Events Following the Filing of the Original Verified Complaint</u>

21.     On April 22, 2020, the Plaintiffs filed their original Motion for Preliminary Injunctive Relief. (ECF No. 2).   On May 4, 2020, the Plaintiffs filed their Amended Motion for Preliminary Injunction.  (ECF No. 15) Shortly thereafter, the Defendants – through legal counsel – provided substantive acknowledgment of Plaintiff Soul Quest Church's application for religious exemption.

22.     Shortly thereafter, on May 14, 2020, the Parties filed a Joint Motion to Extend Defendants' Time to Respond to Plaintiffs' Amended Motion for Preliminary Injunction.  (ECF No. 18).  In that document, the Parties explained that the extension would permit for "time to explore whether resolution is possible."  The Court granted both Joint Motions (ECF Nos. 15 and 18) in an order issued on May 14, 2020.  (ECF No. 19).

23.     On May 29, 2020, the Drug Enforcement Administration ("DEA") issued its first formal response acknowledging Plaintiff Soul Quest Church's August 2017, application for religious exemption.   A true and correct copy of this correspondence is attached hereto as <u>Exhibit 3</u>.

24.     In June 2020, following discussions between the Parties, a Joint Motion to Stay All Proceedings for 120 Days (ECF No. 23).  The intent of this joint filing was predicated upon "potentially resolving this case without need for further

litigation in this Court." (ECF No. 23, at p. 1). Further, the intent of the stay was to, in-part, permit for "continue to negotiate the process by which DEA will conduct the fact-finding necessary to evaluate Plaintiffs' Petition." (ECF No. 23, at ¶ 11). In doing so, the Parties agreed that "they will cooperate with each other in good faith …." (ECF No. 23, at ¶ 12). On June 26, 2020, the District Court granted this Joint Motion. (ECF No. 24).

25. Subsequently, in correspondence dated June 4, 2020, the Defendants sought to further explain its diversion investigative process, as follows:

> DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31. In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, DEA must also determine pursuant to the Religious Freedom Restoration Act (RFRA) whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the CSA's comprehensive regulatory system would substantially burden the applicant's religious exercise.

A true and correct copy of this correspondence is attached hereto as Exhibit 4. Of particular note in this statement is the effort by the Defendants implicitly acknowledge its ongoing lack of any regulatory authority on religious exemptions, while also attempting to tie some form of unregulated factfinding into other regulations applicable to pharmacies and doctors.

26.     Notwithstanding, thereafter, the Plaintiffs made every possible effort to cooperate with the inquiries made exclusively by DEA and its designated Diversion Investigator to conduct additional fact finding, James W. Graumlich. Affidavit of Christopher Young, in Support of the Second Amended, Verified Complaint For Declaratory And Permanent Injunctive Relief [hereinafter, "Exhibit 5"] at ¶ 36.   The Plaintiffs did so under the belief that, in doing so, the preexisting litigation would resolve.  Id.

27.     Of note, DEA's inquiries to the Plaintiffs centered *entirely* upon "diversion control."  Exhibit 5 at ¶ 33.   No inquiry – at any time – directed by the Defendants ever touched upon the sincerity of the Plaintiffs' faith and religious beliefs including, but not limited to, the legitimacy of Soul Quest Church and the expressed, critical importance of the Plaintiffs engaging in their sacramental ayahuasca ritual.  Exhibit 5 at ¶ 32.  Accordingly, the only material possessed by the DEA on the issue of religious sincerity centered around the various materials included in the original, 2017 exemption application.

28.     On October 16, 2020, the Parties filed with the District Court their Joint Status Report (ECF No. 25).  In it, the Defendants acknowledged that the Plaintiffs had been cooperating with all of Defendants' requests for information. (ECF No. 25, at ¶ 2).  The Parties also acknowledge the intent "to conduct further negotiations regarding 'the details of the DEA's fact-finding ….'"  (ECF No. 25, at ¶ 3).  The Parties jointly requested an extension of the preexisting stay for another

one-hundred, twenty (120) days.  (ECF No. 25, at ¶ 5).  The District Court granted this request in an order dated November 2, 2020.  (ECF No. 26).

29.     Thereafter, the DEA continued its factfinding, centered exclusively upon diversion control.  Exhibit 5 at ¶ 33.  Contrary to the belief of the Plaintiffs, the Defendants never presented any guidelines pertaining to the details of its fact finding, nor negotiated any such factfinding details.  Exhibit 5 at ¶ 37.  To date, the nature, scope and substance of the DEA's "fact finding," herein, remain a mystery. Exhibit 5 at ¶ 37.

30.     On February 22, 2021, the Parties filed their Joint Status Report. (ECF No, 27).  At that time, the Parties announced the closure of the Defendants' factfinding.  (ECF No. 27, at p. 2).  Indeed, within the Joint Status Report is the acknowledgment that the DEA and U.S. Department of Justice ("DoJ") are confronting new leadership unfamiliar with the issues within the case-at-bar.  (ECF No. 27, at p. 3).  Further, the DEA required until April 15, 2021, to issue what it deemed its "final determination."  (ECF No. 27, at p. 3).

31.     In order to further facilitate the prospects of a positive case resolution, the Plaintiffs agreed to hold its Motion for Preliminary Injunction in abeyance pending the DEA's "determination." (ECF No. 27).  Further, the Plaintiffs agreed to alert the Court, following the DEA's "final determination," to alert the Court of whether it intended to renew or amend its preliminary injunction motion, and its filing of "any necessary amended motion."  (ECF No. 27, at p. 3).

32.    On February 23, 2021, the District Court issued its Order on the request made within the preceding Joint Status Report.  (ECF No. 28).  Therein, the District Court stayed all deadlines pending the DEA's "final determination," and further instructing that the Plaintiff notify the Court within fourteen (14) days of such issuance.  (ECF No. 28).

33.    On the evening of April 16, 2021, the Plaintiffs received the DEA's issued, written decision, indicating that it would not be issuing a religious exemption to Soul Quest Church.  A true and correct copy of this document is attached hereto as Exhibit 6.  Much akin to the latent, constitutional shortcomings found by the federal courts within cases such as O Centro, supra, and CHLQ, supra the DEA never published any rulemaking or other formal guidelines in support of whatever methods it adopted.

34.    Moreover, the DEA's *ultra vires*, *ad hoc* "final determination" even fails on the merits.  For example, with respect to the DEA's "final determination" on the issue of religious sincerity, there is a wholesale inability by DEA to understand the distinction between received wisdom (more common in Western religions) and experiential wisdom (quite common in Indigenous and First Nations religions). This failure by DEA results in them metaphorically attempting to place 'the square peg in the round hole.'[2]

---

[2]    The reception of wisdom is a common undertone in Abrahamic religions, particularly Christianity.  An example of this is represented by the giving of the Torah on Mount Sinai, suggesting that divine wisdom was transmitted to humanity by God.  The recording of the Torah, as well as the New Testament by later Christian authors and the Quran by Muslim authors, continues this tradition of the

35.     Yet, based upon the document, and upon information and belief, the Defendants now consider this determination to constitute a final agency decision. Exhibit 5.  The Defendants assert such despite lacking any rules and regulations describing and dictating the methodology behind its investigation; do so without adhering – at all – to the requirements of federal law under the Administrative Procedure Act; and without even a defined process describing how and when its process starts and finishes.

36.     The inability of the Defendants to – even following the onset of the case-at-bar and during judicially overseen party discussions to negotiate a case resolution – provide any substance subject to, and passing regulatory, statutory and constitutional muster – once again demonstrates the fatal defects in its approach.  Effectively, to paraphrase the Honorable District Court Judge Amy Berman Jackson (in a decision addressing DoJ practices in a different context) can be reasonably viewed as "disingenuous … with respect to the existence of a

---

receipt of divine wisdom from an external source, and its recording by humans. See Thomas S. Bremer, Formed from this Soil: An Introduction to the Diverse History of Religion in America, 19-20 (2015).

By contrast, Indigenous communities found divine wisdom and inspiration in the natural world around them, and the lived experience of their ancestors before them. Committing these stories to print would take them out of the very context and lived experience from which they arose in the first place, and so minimize their wisdom. Further, Indigenous communities tended to be verbal cultures, so there are really quite few (and almost no genuine, first-hand) written sources of Indigenous rituals and religious beliefs.  See Margaret M. Bruchac Indigenous Knowledge and Traditional Knowledge, Encyclopedia of Global Archaeology, Claire Smith, ed., 3814-3824 (2014) Springer Science and Business Media, https://repository.upenn.edu/anthro_papers/171/.

decision-making process ...."  *CREW v. U.S. Dept. of Justice*, 1:19-cv-01552-ABJ (D.D.C May 3, 2021), at p. 25. Ostensibly, the Defendants actions – as demonstrated by its post-litigation actions – in the case-at-bar are premised entirely upon an *ad hoc* process designed to provide a *post hoc* rationalization for a decision it had already preordained.

### B.      Factual & Legal Background

1.      Plaintiff Soul Quest Church

*a.      Overview*

37.      Plaintiff Soul Quest Church rests its religious principles and sacred beliefs upon a foundation of ancient teachings, writings, records, and common cultural and religious practices and traditions of indigenous peoples from across the globe.

38.      These same foundations constitute the source for Plaintiff Soul Quest Church's traditional, natural healing practices.

39.      Plaintiff Soul Quest Church believes that it honors and fulfills these ancient traditions and practices through its rituals from its church in Orlando, Florida, and that such rituals help to spread its teachings through the Earth and cosmos.

40.      Pursuant to its core teachings and beliefs, Plaintiff Soul Quest Church passes its message to others through its operation of a healing ministry, counseling and natural medicine school.   Further, it provides street-level ministry outreach, spiritual activities, and spiritual/faith-based education.

41.    Plaintiff Soul Quest Church holds spiritual classes and services in a style akin to various Native American religious practices – based upon the seasons.  Religious services involve music and song, and the sharing of personal professions of faith and faith in-action, as well as the enactment of plays.

###### b.    Soul Quest Church's Faith-Based Principles

42.    Plaintiff Soul Quest Church and its members embrace and espouse the following faith-based principles as fundamental to its religion:

a.    The Creator, the Great Spirit, and that the Great Spirit created all beings to exist as free and equal.

b.    The Creator granted to all beings eternal, inherent, ancestral, and sovereign rights, and to all humans a conscience upon which to govern human activities throughout the planet.

c.    All humans derive from, and are intended to exist akin to, traditional, indigenous communities.  Further, through the descendants of these indigenous communities, there exist the need and priority to form and maintain organizations and practices premised upon indigenous teachings, wisdom and customs.

d.    Spiritually-based, natural health care and related sacred expression – arising from the sacred texts of traditional, indigenous religions and their ritualistic practices – are sacrosanct and must be practiced as sacraments to the faith.

e.    The fundamental mission of the faith is the restoration of divine wisdom, and knowledge of the benefits to health and life provided by the Great Spirit through Mother Earth.

f.    The restoration of divine wisdom can only occur through traditional ceremonies, rituals, sacraments, scriptural and a spiritually-valid moral science. Such is based upon the teachings and practices reflecting the guidance of the Great Spirit as bequeathed to all people as children of Mother Earth.

g.    The traditions and teachings espoused within the faith's sacred texts and scriptures provide insight for the restoration of spiritual, physical and mental health of all beings. These traditions and teachings require the assessment, improvement and restoration of physical, mental and spiritual health.

h.    The belief that, as children of the Great Spirit, there is entitlement to, as part of natural law, the various fundamental freedoms including, but not limited, to freedom of thought and expression; the free exercise of sacred rights of worship and methods of healing; freedom of personal security; and freedom of self-determination.

i.    All men and women are endowed with sufficient intelligence for self-governance to ensure the guarantees of those freedoms; to establish just and morally righteous methods of interacting with one another; and to the provide for maintenance of a tranquil and secure domestic life infused by the blessings of the faith.

    c.    *Fundamental Moral & Ethical Tenets*

43.    Plaintiff Soul Quest Church adheres to seven (7) fundamental moral and ethical tenets, revealed to it and its members by and through the actions of the Great Spirit, *to wit*:

    a.    Mother Earth, is the embodiment of an indivisible, living community of interrelated and interdependent beings

with a common destiny; and that Mother Earth is the source of life, nourishment and learning, and providing everything needed to live a fulfilled existence; Mother Earth is part of a greater creation, composing all existence throughout the cosmos, as originated by the Great Spirit.

b.      All forms of depredation, exploitation, abuse and contamination – in whatever form and including, but not limited to certain economic systems – have endangered Mother Earth by causing massive destruction, degradation and disruption of natural systems. Amoral and immoral practices and systems must be discarded and replaced with the faith's moral tenets – guided by the Great Spirit – and premised upon the embracing of practices designed to protect and sanctify Mother Earth.

c.      As a part of a globally interdependent living community, and consistent with the teachings of the Great Spirit, all beings are imbued with natural rights requiring equal respect. Human beings are just one component of Mother Earth and a homocentric      approach      creates imbalance within Mother Earth.

d.      In order to fulfill the design of the Great Spirit to equal dignity and rights among humans, it is concurrently necessary to recognize and defend the rights of Mother Earth and all its beings.

e.      Consistent with the teachings of the Great Spirit, collective action must be taken to transform structures and systems destructive to Mother Earth including, but not limited to, the catastrophic consequences of modern climate change.

18

f.    Indigenous plant life is sacred and embodied by the Great Spirit. All materials stemming from plant life must be accorded dignity, protected from threat or violation, and defended as a holy sacrament. The ritual use of ayahuasca and its natural healing treatments is embraced as a fulfillment of this holy sacrament.

g.    An obligation to embody and promote the principles of the Universal Declaration of the Rights of Mother Earth, via fundamental respect for the sacred nature of the planet and its occupants, as one with the Great Spirit.

44.    These fundamental tenets of Plaintiff Soul Quest Church's faith were described in greater detail in the DEA Exemption Request that the Plaintiffs submitted to the Defendants. See Exhibit 1.

> d.    *Scriptural & Liturgical Foundations; Mission*

45.    Plaintiff Soul Quest Church's origins, and its teacher-prophet, the Spirit of Ayahuasca, are comprised within two sacred plants "Banisteriopsis Caapi" and "Psychotria Viridis."

46.    The beliefs, purposes and guidelines are further defined within the sacred writings titled the "Ayahuasca Manifesto." A copy of the Ayahuasca Manifesto is attached hereto, and incorporated by reference herein, as Exhibit 7.

47.    The Ayahuasca Manifesto is very much akin, and serves a similar purpose, to other faiths' sacred writings, explaining the tenets of the faith, such as the Jewish Talmudic writings and the Mishnah.

48.     The sacred nature of the Spirit of Ayahuasca is proclaimed within the

Ayahuasca Manifesto as follows:

> I am the spirit of Ayahuasca. For the first time, I reveal myself through the "Word" to make an emergency call to all the Human Beings on the Planet, especially to the Light Seekers, as I must expand beyond the Amazon River Basin. With my physical expansion, I intend to facilitate the spiritual transformation currently stirring the human species. . . .
>
> I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that of the spirit of Ayahuasca and of Chacruna. I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture.

See Exhibit 7 at 5-6.

49.     Plaintiff Soul Quest Church's beliefs, purposes and guidelines are

provided through channeled material documented in Ayahuasca Manifesto.  The

Manifesto provides knowledge and direction, inclusive of details about Plaintiff

Soul Quest Church's mission, as well as instructions on the following topics:

    a.     Role in the Expansion of the Human Consciousness;
    b.     Purpose with Human Beings;
    c.     Respect and the Sacred Nature of Ayahuasca;
    d.     Benefits of Use;
    e.     Guide for Conducting Ayahuasca Ceremonies; and
    f.     Planetary Mission.

See Exhibit 7.

50.     Other fundamental religious ethical requirements of Plaintiff Soul Quest Church are included in its Code of Ethics.  The Code of Ethics contains key principles, edicts and other educational statements regarding Soul Quest and its sacraments – inclusive of the use of ayahuasca.  A copy of the Code of Ethics is attached hereto, and incorporated by reference herein, as Exhibit 8.

51.     Plaintiff Soul Quest Church's mission is achieved through its advocacy and educational initiatives by: producing disciples who will celebrate the teachings and wisdom of the Great Spirit in cooperative worship; are devoted to the four (4) boundless and unequaled states of mind – Love, Compassion, Joy and Equanimity; are possessed with love for everyone and every living being; and are permeated and bound by the spheres of influence and dynamic teachings of our elders.

52.     On a liturgical level, Plaintiff Soul Quest Church's requires staff to observe proper liturgical dress during religious retreats and ceremonies.  This entails the wearing of white vestments.

53.     The color *white* is critical to the practice of Plaintiff Soul Quest Church's religious ceremonies and retreats, and performance of sacraments of the faith, for the following reasons:

      a.     It represents the color of eternal light and is an emblem of the divine.

      b.     It projects purity, cleanliness and neutrality.

      c.     It aids in mental clarity, encourages staff and participants to clear mental and spiritual clutter and

obstacles, evokes purification of thoughts and actions and enables fresh beginnings.

d.    It accentuates free movement, all while maintaining maximum respect to the Great Spirit, and all others participating in such functions.

e.    *Holidays*

54.    Plaintiff Soul Quest Church's and its members celebrate the following holidays:

a.  December 23 - Winter Solstice;

b.  March 21 - Vernal Equinox'

c.  April 22 - Earth Day;

d.  June 21 - Summer Solstice; and

e.   September 21 - Autumnal Equinox.

55.    Plaintiff Soul Quest Church's holidays, akin to many diverse cultural and religious traditions, are premised upon the ancient tradition of celebrating the change of seasons and complementary astronomical events.

f.    *Dietary & Fasting Rituals*

56.    Plaintiff Soul Quest Church's and its members adhere to the traditional diet of the Medicine People.  The diet not only requires abstention from consumption of certain foods; rather, it also requires discipline, sacrifice and commitment, akin to those of various Judeo-Christian and Eastern religious sects.

57.    The constraints imposed by Plaintiff Soul Quest Church's dietary laws are designed to cleanse the body and, by doing so, cleanse the spirit and

permit for the effective, efficient use of plant medicine.  These constraints are described, in greater detail in the Plaintiff's DEA Exemption Application.  <u>See Exhibit 1.</u>

58.    These constraints directly impact Plaintiff Soul Quest Church's ayahuasca sacrament ceremony.  Prior to any ayahuasca ceremony, Plaintiff Soul Quest Church members and adherents are to comply with the following dietary and sexual edicts, designed to purify body and soul:

a.    Seven days prior to involvement in any ayahuasca ceremony, refraining from:

i.    Drug use, including prescription drugs (medical interaction forms, including in the supplement to this religious exemption application provide further instruction), and any and all recreational drugs.

ii.    Alcoholic beverages

iii.    Sexual activity (whether with a partner or from self-stimulation).

b.    Three days prior to involvement in any ayahuasca ceremony, refrain a wide variety of foods and beverages.  <u>See</u> <u>Exhibit 1</u>.

c.    All Plaintiff Soul Quest Church's facilitators are expected to fast for the period spanning the day prior to any ayahuasca ceremony, through to completion of any ceremony.  In doing so, those individuals also demonstrate a commitment to the Great Spirit as embodied within the plant medicine, and prepare for acting as a surrogate for the Great Spirit during the ayahuasca ceremony.  <u>See</u> <u>Exhibit 1</u>.

g.    *Church Governance*

59.     Ultimate authority lies in the Creator/Great Spirit of Ayahuasca as the head of the church and in the sacred beliefs, and doctrines expressed as the basis for Plaintiff Soul Quest Church's faith and practice.

60.     The government of Plaintiff Soul Quest Church is vested in its membership and administered by its officers. In function, final authority shall reside in the membership.

61.     Plaintiff Soul Quest Church members approve and/or affirm Plaintiff Soul Quest Church's qualified leadership, to carry out the purposes of the spirit of Ayahuasca.

62.     Plaintiff Soul Quest Church's leadership holds leadership meetings to talk, brainstorm and agree on any discipline or change that may be required.

63.     Akin to other religious institutions, Plaintiff Soul Quest Church maintains multiple instruments for governance of its affairs.   Presently, this includes the following lay and religious officials/bodies:

     a.   Chief Executive Officer, Chief Medicine Man, Pastor, Chief Elder and Counselor: Plaintiff Christopher Young;

     b.   President, Elder and Counselor: Verena Young;

     c.   Senior Minister:  Scott Irwin;

     d.   Senior Medicine Man/Shaman:   Don Gaspar;

     e.   Medicine Man/Ayahuascaro:  Anthony Chetta;

     f.   Medicine Woman: Tersa Shiki;

g.   Council of Elders: Constituted of selected senior members of Plaintiff Soul Quest Church, and occupying various areas of specialization, as necessary for the maintenance and welfare of the Church.

64.   Further, other officers such as church administrator, secretary, visiting ministers and teachers/elders will be assigned with Board permission. Presently, pending future growth of the Plaintiff Soul Quest Church, the Senior Pastor fills such duties.

### h.   Membership

65.   Plaintiff Soul Quest Church receives all individuals as members who accept the spiritual and religious principles of the Church, as well as recognize the fruits of the Great Spirit in their lives, and who agree to abide by Plaintiff Soul Quest Church's doctrine.  The only requirement for membership is a singular request: the individual must express a belief in the foundation principles of the Plaintiff Soul Quest Church.

### i.   Soul Quest Church's Federal & State Religious-Based, Non-Profit Entity Recognition

66.   Plaintiff Soul Quest Church holds the following federal and state tax treatments as a religious-based, non-profit entity:

a.   Soul Quest Church of Mother Earth Inc. (SQCME) – Non-Profit Corporation Federal Identification No.: 841402813, and Florida State Non-Profit Corporation, founded by Medicine Man, Pastor, Chief Elder and Counselor, Chris Young; and its Elder and Counselor, Verena Young.

b.    Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center (SQACME), as an independent branch or Free Church of SQCME; Florida State Non-Profit Corporation 501 IRS-compliant Non-Profit was first incorporated July 15, 2016, with its Charter Declaration also entered on July 15, 2016, recognizing its founders, Medicine Man, Pastor, Chief Elder and Counselor Chris Young; and Elder and Counselor Verena Young.

2.    <u>Plaintiff Soul Quest Church's Ayahuasca Sacrament</u>

67.    The ayahuasca sacrament is performed three (3) times per month, with approximately 60-80 individuals in attendance, alongside approximately twenty, skilled (20) facilitators (spiritual counselors) also present throughout the sacramental ceremony. These facilitators work alongside a team – at the ceremony – which includes a licensed physician as medical director, a licensed paramedic, a licensed emergency medical technician [hereinafter "EMT"], a psychologist, and a research scientist.

68.    The ayahuasca sacrament involves the consumption of tea using the received wisdom and learning of Plaintiff Soul Quest Church to elevate its petitioners above the mundane world, and so bring them closer to the divine realm.

69.    Plaintiff Soul Quest Church limits attendance (and enhances the ratio of ceremonial facilitators) in order to maximize safety and security to all involved throughout the ritual.

70.     Plaintiff Soul Quest Church has designed and implemented safety and security protocols, intended to maximize the protection of those participants in Ayahuasca ceremonies.

71.     Those individuals designated to conduct and facilitate Plaintiff Soul Quest Church ceremonies must first prove that they have attained the requisite knowledge and expertise in the following areas:

      a.    The Pharmacology of Ayahuasca;

      b.    The Risks & Contra-Indications of Ayahuasca;

      c.    The Legal Implications Surrounding the Dispensing of Ayahuasca;

      d.    First Aid;

      e.    The Theory of Non-Ordinary States of Consciousness, and Therapeutic Approaches;

      f.    Possession of Extensive, Prior Personal Experience with Ayahuasca;

      g.    The Ability to Work as a Team Member; and

      h.    Understanding of Soul Quest's Religious Principles, Therapeutic Purposes of Consuming Ayahuasca, and the Fundamental Moral & Ethical Tenets.

72.     Additional measures are imposed to prepare Plaintiff Soul Quest Church members for participation in Ayahuasca ceremonies:

      a.    Prior to any ceremony, the Church transmits, via electronic mail, educational material on Ayahuasca to all members anticipating participation in the Ayahuasca ceremony.  It is critical to ensure that members are well-informed regarding the ceremony, and the requirements for properly conducting themselves

before, during and after the ceremony.  The following information is conveyed to these Soul Quest members:

    i.    The properties of Ayahuasca, its composition, its effects and the potential risk.

    ii.    The implications of drinking Ayahuasca.

    iii.    The dietary restrictions before and after the session.

    iv.    The responsibilities of the staff and the participants.

    v.    The procedure and operation of the session.

    vi.    The process, in its entirety.

b.    All Plaintiff Soul Quest Church members intending participation in the sacramental ceremonies involving ayahuasca are required to complete and return a medical form prior to participation, to ascertain whether or not there are potential medical limitations to such participation.

c.    Plaintiff Soul Quest Church conducts individualized interviews with the member intending to participate in the ayahuasca ceremony.   The purpose for these interviews is to:

    i.    Establish a rapport with the individual; ascertain their basis and willingness to participate in the sacred Ayahuasca ritual; and to qualitatively assess current psychological and physical status; and

    ii.    (Re)assess an individual who has previously participated in the ayahuasca ceremony.

d.    Plaintiff Soul Quest Church presents and explains the mandatory consent form.

e.      Plaintiff Soul Quest Church uses the information gathered through its described written and oral questions/interviews to determine whether or not to permit any given individual to participate in the Church's sacred ayahuasca ceremony. The acceptance of an individual's participation in the ceremony is premised upon:

i.      Members demonstrating their understanding of the personal, religious process entailed by their participation.

ii.     Accepting only members whose personal participation is unlikely to require greater assistance (in time or resources) than is available in the current context of the ayahuasca ceremony.

iii.    Determining whether members perhaps require additional therapy prior to consuming the sacramental ayahuasca tea. Such additional therapy might potentially involve advising the member to seek appropriate, external professional assistance.

f.      In cases where any member's participation in the sacred ayahuasca ceremony is declined by the Church, Plaintiff Soul Quest Church provides that member with an explanation for its decision, and suggests alternative methods for achieving suitable religious and therapeutic fulfillment. If Plaintiff Soul Quest Church determines there to be doubts about any member's suitability, then participation in the ayahuasca ceremony is not permitted.

73.    Further details of the pre-ceremonial, ceremonial and post-ceremonial procedures involving the sacred ayahuasca ceremony are articulated within the Plaintiffs' DEA Exemption Application. See Exhibit 1.

74.     Despite the efforts made to maximize safety throughout the ayahuasca sacrament, the Plaintiffs have fallen victim to actions by the Defendants to hold such ceremonies, thus abridging fundamental freedoms and statutory rights.

### 3.  Federal Prohibitions on Ayahuasca

75.     The Controlled Substances Act [hereinafter "CSA"] was enacted by Congress to erect prohibitions upon the use of a large variety of identified, controlled substances. 21 U.S.C. § 801, et seq.

76.     To be classified as a controlled substance, a substance must, among others, have a "high potential for abuse." 21 U.S.C. § 812(b)(1)(A).

77.     One of the substances classified as a controlled substance is dimethyltryptamine [hereinafter "DMT"].  21 U.S.C. § 812(c)(c)(6).

78.     DMT is a naturally-occurring substance found in many plants native to the Western Hemisphere, including North America.

79.     None of these plants containing DMT are listed as controlled substances, because the scientific evidence establishes that the DMT contained within these plants is not in a form with a "high potential for abuse." See 21 U.S.C. § 812(c)(a), et seq.

80.     Psychotropia viridis is a small plant, not listed within the CSA, containing trace amounts of DMT.  This plant is part of the Plaintiffs' sacramental tea.

81.     Upon information and belief, DMT is only considered a "substance with a high potential for abuse" when its synthetic form is either taken intravenously or inhaled.

82.     By contrast, the Plaintiffs' sacramental tea is a natural, organic, and non-synthetic sacrament. In addition, the natural processes of digesting this organic sacrament further reinforce and ensure that the DMT entering the body through the Plaintiffs' sacramental tea cannot become a substance with a "high potential for abuse."

4.     Defendants' Actions to Undermine the Plaintiffs' Rights

83.     Consistent with the United States Supreme Court's decision in O Centro supra, the Plaintiffs – in August 2017 – submitted the aforementioned DEA Exemption Application to the Defendants.   Since that time, despite Plaintiffs' repeated efforts to gauge the status of their DEA Exemption Application and through the April 2020, filing of the original lawsuit, herein, the Defendants failed to act upon the application.   Instead, the Defendants placed Plaintiff's DEA Exemption Application in a state of limbo.

84.     Further, since the inception date of the instant litigation, the Defendants have, under the auspices of attempting to negotiate a resolution to this matter, conducted a veiled investigation designed to result in the denial of the Plaintiff Soul Quest Church's application for religious exemption.  It is reasonably believed that – based around the lack of any discernable rules and regulations, in adherence with the requirements of the Administrative Procedure Act, as well as

the RFRA; the failure of the DEA to ever inquire during the period spanning May 2020-through the present into any aspect designed to ascertain the religious sincerity of Soul Quest Church's beliefs; the 'rejection' of Soul Quest's application premised upon the Defendants' assertion regarding lack of religious sincerity; and the failure of the Defendants – during such a process – to disclose any methodology being used to render its 'decision' – was strategically designed entirely to result in the rejection of any religious exemption.

85.    The Plaintiffs' DEA Exemption Application describes, in painstaking fashion, and as further summarized in this Second Amended Complaint, Plaintiff Soul Quest Church's eligibility for the faith-based exemption to the proscriptions imposed under the Drug Enforcement Act.  See Exhibit 1.

86.    The Defendants never put into place any real procedure for processing the application, much less one narrowly tailored to minimize the impact upon the ability of citizens to freely exercise religious-based practices.

87.    The Plaintiffs assert that the failure of the Defendants to abide by the O Centro decision, and its jurisprudential progeny; the strictures of the RFRA; the requirements of the Administrative Procedure Act; and even to established DOJ policies pertaining to the free exercise of religious practices have resulted in a direct abridgement of their rights, as articulated, herein. See O Centro, supra; 42 U.S.C. § 2000bb. et seq.  A copy of the established, internal DOJ policies that the Defendants' conduct violated is attached hereto, and incorporated by reference herein, as Exhibit 9 and Exhibit 10, respectively.

**COUNT ONE**

**<u>VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS</u>**
**<u>TO FREEDOM OF RELIGION</u>**
**(42 U.S.C. § 1983)**

88.     Plaintiffs re-allege, and incorporate by reference herein, the allegations of paragraphs 1-87, as if fully set forth herein.

89.     The Plaintiffs, as individual and corporate citizens of the United States of America, have an inalienable right to practice their religion freely.

90.     The Defendants, as the sole entities with the ability to grant religious exemptions to churches and faiths similarly-situated to the Plaintiffs, carry the burden of interpreting and enforcing the laws of the United States so as not to infringe upon valid exercises of the First Amendment right to freedom of religion.

91.     The Defendants' absolute silence upon Plaintiffs' DEA Exemption Application, a silence that has now extended for years without follow-up from the Defendants, constitutes an effective denial through silence of the Plaintiffs' application.

92.     For the reasons set forth in this Complaint and the attached Exhibits, the Plaintiffs' religious requirement to use ayahuasca is part of a legitimate religious ritual, and one with deep significance to the members of the Plaintiff Soul Quest Church.

93.     Therefore, the Defendants' denial – first, through silence of Plaintiffs' valid application, and then (since the filing of the original lawsuit) through the use of an *ad hoc*, informal, unexplainable, process – constitutes an infringement of the

Plaintiffs' rights arising under the Freedom of Religion clause of the First Amendment to the United States Constitution.

## COUNT TWO

### <u>VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT</u>
### (42 U.S.C. §§ 2000bb–2000bb-4)

94.    Plaintiffs re-allege, and incorporate by reference herein, the allegations of paragraphs 1-87 as if fully set forth herein.

95.    The Defendants have, through silence, burdened the Plaintiffs' legitimate exercise of their religion.

96.    The Religious Freedom Restoration Act obligates the Defendants to refrain from burdening the Plaintiffs' lawful exercise of their faith unless the Defendants can show that such a burden both furthers a compelling government interest, and is the least-restrictive means of furthering that compelling interest. <u>See</u> 42 U.S.C. § 2000bb-1(b).

97.    Despite years of time in which to act, the Defendants have not been able to provide any evidence of a compelling governmental interest they are preserving, or any indicia to suggest that the Defendants' silence is the least-restrictive means of preserving that interest.

98.    Therefore, the Defendants have violated Plaintiffs' rights under the Religious Freedom Restoration Act.

## COUNT THREE

## <u>VIOLATION OF THE PLAINTIFFS' RIGHTS TO PROCEDURAL DUE PROCESS</u>
### (42 U.S.C. § 1983)

99.    Plaintiffs re-allege, and incorporate by reference herein, the allegations of paragraphs 1-87, as if fully set forth herein.

100.    The Defendants have, as part of the judicial mandate to allow exemptions pursuant to RFRA to individuals like the Plaintiffs, promulgated a set of "guidelines" to the public, which purport to govern filings for this type of exemption.  See Exhibit 2.

101.    Upon information and belief, the Defendants continue to abide by these "guidelines" to the present day, despite such being non-compliant with the terms of the Administrative Procedure Act, and failing to articulate actual, published standards designed to guide executive decision making determinations while maintaining clear restrictions designed to not encumber fundamental religious rights.

102.    Part of these so-called "guidelines" obligate the Defendants to, if they accept an application for filing, to provide a "notice of acceptance" to the applicant. See Exhibit 2.

103.    If the Defendants should deny an application, these guidelines obligate the Defendants to return the application to the applicant "with a statement of the reason for not accepting the petition for filing." See Exhibit 2.

104.    However, as discussed, <u>supra</u>, the Defendants never took the initial step, and then attempted to cloak the second requirement (of its decision) under the auspices of a court-ordered stay designed for party discussions aimed at achieving a mutual case resolution.   The Defendants remained silent upon the Plaintiffs' application for several years, effectively denying it without granting the Plaintiffs access to a fair and timely consideration of their application.   Now, since the inception of this case, the Defendants have adopted an *ad hoc* decision making process, without definition or substantive constitutional safeguards, and all the while cloaking that purported process under the notion of negotiating with the Plaintiffs via counsel.

105.    Therefore, the Defendants have violated the Plaintiffs' right to procedural due process, arising under the Fourteenth Amendment to the United States Constitution.

## COUNT FOUR

## <u>VIOLATION OF THE PLAINTIFFS' RIGHT TO SUBSTANTIVE DUE PROCESS</u>
### (42 U.S.C. § 1983)

106.    Plaintiffs re-allege, and incorporate by reference herein, the allegations of paragraphs 1-87 as if fully set forth herein.

107.    The "guidelines" written by the Defendants obligate the Defendants to provide reasons to the applicant for an exemption, both in case of a denial at the application stage, and in case of a final denial of the application.   See <u>Exhibit 2</u>.

108.    However, at no point in Defendants' "guidelines" do the Defendants ever explain what they will be searching for in an application, or what reasons may compel the Defendants to refuse to accept an application for filing, or what may lead to a denial of an application.  See Exhibit 2.

109.    The Defendants can, therefore, deny any application for any reason, and have now done so, under the *ad hoc* process described, supra.  In doing so, the Defendants have obviated the requirements of the Administrative Procedure Act, the RFRA, and – by implication – 42 U.S.C. § 1983.  Wrapped up within the expectation of due process is the requirement that a federal department or agency promulgate rules that are subject to Congressional oversight and for public comment and public consumption via publication.  The Defendants have critically and irreparably failed to conduct themselves consistent with such legal requirements.

110.    The Defendants' previous silence concerning the Plaintiffs' DEA Exemption Application constitutes a denial of the Plaintiffs' application through this silence.  The Defendants' efforts to conceal an *ad hoc*, *ultra vires* decision making process during the course of the stayed litigation, culminating it what it terms as "final decision," extends out the violation afflicting the Plaintiffs.

111.    As stated, supra, the Defendants – until issuing its *ultra vires* "final decision," never provided any reasons for its refusal to address the Plaintiffs. Despite the Defendants' *ultra vires* "final decision," it remains unclear from the

37

Defendants' self-professed "guidelines" what any such "reason" would be or could legally consist of.

112.    Therefore, the Defendants' *ultra vires* "guidelines" empower them to arbitrarily approve or deny an application for a religious exemption, just as the Defendants are now attempting to do to the Plaintiffs.

113.    In addition, nowhere in the Defendants' "guidelines" does it state how long the Plaintiffs, or another similarly-situated applicant, would be expected to wait for their application to be processed.  See Exhibit 2.

114.    Thereby, even if Plaintiffs' application were accepted for filing, the Defendants could simply continue to remain silent for an indeterminate period of time, or – as the Defendants would now assert – could deny the religious exemption application without the use of published, approved, constitutionally-permissible, regulations and rules.

115.    Therefore, the Defendants' "guidelines" fail to provide any basis or understanding to the Plaintiffs with how Soul Quest Church's application will be judged, or how long it should have taken the Defendants to act upon any such application.  See Exhibit 2.

116.    Therefore, the processing of the Defendants' application under the Defendants' guidelines should be deemed an arbitrary one, in terms of both content evaluation and the time in which the Defendants have to respond to the Plaintiffs' application, and its failure to abide by federal statutory requirements

under – at a minimum the Administrative Procedure Act, in conjunction with the RFRA.

117.   Therefore, the Defendants' processing of the Plaintiffs' DEA Exemption Application under these "guidelines" constitutes an arbitrary government act, in violation of the Plaintiffs' right to substantive due process under the Fourteenth Amendment to the United States Constitution.

## COUNT FIVE

### VIOLATION OF PLAINTIFF'S RIGHT TO FREEDOM OF SPEECH
### (42 U.S.C. § 1983)

118.   Plaintiffs re-allege, and incorporate by reference herein, the allegations of paragraphs 1-87, as if fully set forth herein.

119.   As is fitting for a religion based around ayahuasca, the Plaintiffs' ongoing proselytization and promotional efforts around the United States feature ayahuasca heavily.

120.   As discussed, supra, the Defendants' denial through silence and inaction, followed now by the Defendants' action to issue its *ad hoc* "final decision," of the Plaintiffs' application for a religious exemption effectively functions as a prior restraint upon the Plaintiffs' speech.

121.   The Defendants' denial through silence and inaction of the Plaintiffs' application for a religious exemption, followed now by the Defendants' action to issue its *ad hoc* "final decision," therefore severely burdens the Plaintiffs' rights to freedom of speech, in violation of the First Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, for all the foregoing reasons, the Plaintiffs respectfully request that this Court grant the following relief:

a.      declare that the Defendants' actions in denying the Plaintiffs' application through first silence, then arbitrary action, are in violation of the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Freedom Restoration Act;

b.      declare that the Defendants' promulgated guidelines to the public are an arbitrary government action, violative of the Administrative Practice Act, and in violation of the Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution;

c.      enter an Order that, within 30 days of the aforementioned declaratory relief, the Parties present to the Court a plan to effectuate the importation, distribution, and accounting for the Plaintiffs' sacramental tea consistent with the rights of the Plaintiff to use their sacramental tea in their religious services;

d.      enter an Order permanently enjoining the Defendants from enforcing the prohibitions of the Controlled Substances Act against the Plaintiffs for the Plaintiffs' sacramental use of ayahuasca;

e.      enter an Order awarding the Plaintiffs attorneys' fees, costs, and expenses, pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504,

and the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988; and

     f.    award such other and further relief as this Court deems proper.

### VERIFICATION OF FACTUAL ALLEGATIONS IN COMPLAINT

     With respect to the factual allegations in the instant Complaint, I, Christopher Young, Plaintiff herein, declare (certify, verify, or state) under penalty of perjury that the foregoing factual allegations are true and correct, as provided in 28 U.S.C. § 1746.

     Executed on this 7th day of May 2021.

**CHRISTOPHER YOUNG**

Dated this 7th day of May, 2021.

Respectfully submitted,

By: *s/Derek B. Brett*

**DEREK B. BRETT, ESQ.**
Fla. Bar No. 0090750
**BURNSIDE LAW GROUP**
109 Ilsley Avenue, Suite 9
Halifax, Nova Scotia B3B 1S8
Telephone:    (902) 468-3066
Facsimile:     (902) 468-4803
Email: dbb@burnsidelaw.net
Lead Counsel for Plaintiffs

s/A. Brian Phillips

**A. BRIAN PHILLIPS, ESQ.**
Fla. Bar No. 0067113
**A. BRIAN PHILLIPS, P.A.**
912 Highland Avenue
Orlando, Florida 32803
Telephone:   (407) 872-0777
Telecopier:   (407) 872-0704
Email: brian.phillips@phillips-law-firm.com
Local Counsel for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 7th day of May, 2021, I electronically filed a copy of the foregoing document. Notice of the filing will be sent by email to all Parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ A. Brian Phillips*
A. BRIAN PHILLIPS

Exhibit 1



# BURNSIDE

### LAW GROUP
August 21, 2017

Drug Enforcement Administration
Attention: Neil D. Doherty
Deputy Assistant Administrator
Office of Diversion Control

███████████████████████

RE: Request for Religious-Based Exemption to Controlled Substances Act

To Whom It May Concern:

The following constitutes the request for a religious-based exemption by Soul Quest Church of Mother Earth, Inc., d/b/a, Soul Quest Ayahuasca Church of Mother Earth Retreat & Wellness Center ("Soul Quest") to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, specifically as it pertains to the ritual use by Soul Quest of ayahuasca for its sacramental activities. Soul Quest asserts its eligibility for such an exemption, pursuant to the United States Supreme Court's decision in *O Centro Espirita Beneficente Uniao Do Vegetal v. Gonzalez*, 546 U.S. 418 (2006) ("Gonzalez"), and the provisions of the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb, *et seq.*, ("RFRA").

Soul Quest and its adherents hold a common set of beliefs regarding the cause, nature, and purpose of the universe, asserting that the creation of all things is the result of the divine of the Great Spirit. The Great Spirit has provided to all being an eternal force, one that permeates all beings.

As will be discussed throughout this exemption request, Soul Quest and its adherents sanctify and uphold this core religious belief through its devotional and ritual observances. The foundation for all religious beliefs and practices within Soul Quest are premised upon its belief in a specific moral code binding the conduct of human affairs.

As the federal courts have continuously recognized, the Government cannot impose a religious litmus test, designed to favor certain types of religions or religious practices over others. The primary effect of a government policy or practice cannot be designed to inhibit religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). In other words, any consideration of an exemption application cannot have the effect of "officially prefer[ring] [one religious denomination] over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

1 | Page

Park Central, Unit 9, 109 Ilsley Avenue, Dartmouth, NS, Canada, B3B 1S6
Ph: (902) 466-3066 www.burnsidelaw.ca Fax: (902) 466-4603

Page 1

The United States Supreme Court has explained that any endorsement of a majority religion "sends the ancillary message to . . . nonadherents 'that they are outsiders, not full members of the political community.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)). The Equal Protection Clause likewise prohibits the Government from impermissibly discriminating among persons based on religion. *De La Cruz v. Tormey*, 582 F.2d 45, 50 (9th Cir. 1978).

Accordingly, any consideration by the Executive Branch of a religious exemption to the provisions of the Controlled Substances Act must be made so as not to disfavor minority religious groups. The refusal or inability of the Government to attend to this, would constitute violations of the First Amendment's Free Exercise and Establishment Clauses, as well as the Fourteenth Amendment's (implicit within the Fifth Amendment) Equal Protection Clause. Effectively, the Drug Enforcement Administration must consider the exemption application so as to vindicate a standard that would maximize any collision with religious freedoms. This is consistent with both the effect of the Supreme Court's decision in the *Gonzales* case, above, and with the tenets of the RFRA. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Larson*, 456 U.S. at 254-55 (holding that a facially neutral law or regulation violated the Establishment Clause in light of legislative history demonstrating an intent to apply regulations only to minority religions); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

In order to facilitate the DEA's examination and its granting of a religious exemption, this application for exemption will provide a full background on Soul Quest, inclusive of a description of its activities, its sincerely-held beliefs, and its other recognition as being a recognized religious institution under state and federal laws. It is Soul Quest's reasonable expectation that, upon serious consideration by the Drug Enforcement Administration and any cooperating agencies, that Soul Quest will be deemed eligible for its religious-based exemption.

Soul Quest has taken the liberty of breaking down the issues within the following narrative, designed to fully apprise DEA on its qualifications for the requested exemption. The individuals assessing this material will note that Soul Quest embodies many of the same religious and moral principles of other religious faiths, inclusive of core Judeo-Christian values. These values are joined with the embracing of the belief systems of traditional indigenous civilizations including, but certainly not limited to, those of Native American tribal beliefs and practices. Indeed, one might analogize Soul Quest with the belief system and canon of the Unitarian Universalist Church, which embraces and weaves the religious beliefs, principles practices and morays of a multitude of religious and even non-religious faiths into its own faith. *See* http://www.uua.org/beliefs/who-we-are/beliefs.

Supportive materials relating to this breakdown of the nature of the Soul Quest faith and its liturgy are attached to this document. Ultimately, it is reasonably anticipated that DEA will

2 | P a g e

grant Soul Quest's application for exemption, determining that Soul Quest meets the necessary criteria including, as established by the U.S. Court of Appeals for the Tenth Circuit in *U.S. v. Meyers*, 95 F.3d 1475 (1996) (acknowledging that the threshold for determining sincerity of religious beliefs is low); *U.S. v. Meyers*, 906 F. Supp. 1494, 1501 (D. Wyo. 1995) (so long as the stated factors are "minimally satisfied, the practice should be considered religious").

Finally, prior to engaging in the core substance of discussion regarding the underpinnings and foundation of Soul Quest, it must be noted that the Church – considering the DEA's concerns regarding the use of controlled substances – is limiting its exemption request to the sacramental use of ayahuasca – the traditional plant fundamental to the sacrament. At present, Soul Quest has removed the use of Sanagna and San Pedro from its listed sacramental plants. Although important, these other listed substances are not absolutely critical to the ability of the Church to carry out its religious sacraments. Ayahuasca is absolutely critical to the sacrament, and thus the ability to practice the tenets of the Soul Quest faith.

## DESCRIPTION OF THE SOUL QUEST CHURCH

### I.  Soul Quest's Religious Principles

#### A.  Introduction

Soul Quest is an inter-discipline convocation of medicine men and women, standing as an independent branch of Soul Quest Church of Mother Earth.

Soul Quests rests its religious principles upon a foundation of ancient, sacred teachings, writings, records and traditions of pre-colonial and pre-conquest indigenous peoples including, but not limited to, those indigenous groups inhabiting Central, North and South America, the Pacific Islands, Japan, Korea, China, Philippines, Thailand, Burma, India and Tibet. The traditional, sacred religious practices of these groups are embodied within the traditional, natural healing practices of Soul Quest; the fulfillment of these practices is designed to preserve and promote these sacred beliefs. Soul Quest honors these ancient sacred healing traditions, believing that the fulfillment of these rituals flows from its Church in Orlando, Florida, eternally spreading throughout the Earth and cosmos.

Through the guidance of the Great Spirit, Soul Quest seeks to educate and embrace all individuals. It runs a healing ministry, counseling and natural medicine school, designed to inspire our followers and members to integrate our Ministry, as directed by the Great Spirit, into every aspect of their lives. Soul Quest holds spiritual classes and services (in the Native American style, based upon the seasons); worships in music and song; shares personal professions of faith in action; enact plays; and provides street ministry activities, spiritual materials and education based upon our traditional, indigenous, and ecological-inspired faith.

3 | P a g e

### B.   Fundamental Moral & Ethical Tenets

The fundamental tenets of Soul Quest's religious beliefs and practices are premised upon a belief in the rights of Mother Earth.

Soul Quest believes that

a.   Everyone and everything is part of Mother Earth, an indivisible, living community of interrelated and interdependent beings with a common destiny; acknowledging that Mother Earth is the source of life, nourishment and learning, and providing everything needed to live a fulfilled existence. Further, Mother Earth is part of a greater creation, composing all existence throughout the cosmos, as originated by the Great Spirit.

b.   The modern capitalist system and all forms of depredation, exploitation, abuse and contamination have caused great destruction, degradation and disruption of Mother Earth, putting life as we know it today at risk through phenomena such as climate change.  A core component of Soul Quest is designed to educate and liberate people from any economic system based upon amoral practices, and to embrace one that protects and sanctifies Mother Earth by wholly embracing moral tenets of the faith, and thus vindicating our purpose before the Great Spirit.

c.   In a globally interdependent living community, it is not possible to recognize the rights of only human beings without causing an imbalance within Mother Earth, and to upending the purpose for our existence as guided by the Great Spirit.

d.   In order to guarantee human rights, it is necessary to recognize and defend the rights of Mother Earth and all its beings.  The religious tenets of Soul Quest are designed to embrace cultures and religious practices that vindicate the interests of Mother Earth and the Great Spirit.

e.   The Soul Quest Church is conscious of the urgency of taking decisive, collective action to transform structures and systems that cause climate change and other threats to Mother Earth, consistent with the intent of the Great Spirit.

f.   In abiding spiritual belief that indigenous plant life is of the highest value for use in natural healing treatments and – for purposes of ayahuasca – for fulfilling the sacred sacraments of Soul Quest Church.   Soul Quest

Page 4

proclaims such plant life as sacred, that it is embodied by the Great Spirit, and that all materials stemming from such life must be accorded dignity, protected from threat or violation and defended as a holy sacrament.

g.      Embodies the principles of the Universal Declaration of the Rights of Mother Earth, as a common standard of achievement for all peoples and all nations of the world, and that it is incumbent upon Soul Quest and its adherents to promote the embodiment of this fundamental respect for the sacred nature of the planet and all of its occupants, as being embodied by the Great Spirit.

### C.      Articles of the Soul Quest Faith – Metaphysical Underpinnings & Comprehensiveness

#### 1.      Introduction to Faith-Based Principles

Soul Quest and its adherents believe in the Creator, the Great Spirit.  Soul Quest and its adherents believe that the Great Spirit made all people who have ever and will ever exist, as free and equal beings.

Soul Quest and its adherents recognize the inherent, ancestral, sovereign rights granted to all people by the Creator, human conscience, international law and legal constructs of reciprocity, mutuality and comity, which cannot be dismissed or extinguished.

Soul Quest and its adherents believe that we derive from and that we may become like the traditional, indigenous communities who have occupied Mother Earth; and that through the descendants of these indigenous peoples, we have claimed the authority to form an indigenous traditional organization based upon the records of their teachings and wisdom, their customs and ceremonies.

Soul Quest and its adherents acknowledge the sacred texts of all traditional religions and religious traditions regarding the principles of sacred expression and natural medicine. Soul Quest and its adherents affirm and support traditional indigenous principles (also, incorporating principles of traditional Christian teachings) for spiritually-based health care.

Soul Quest maintains as its fundamental mission the restoration of divine wisdom and knowledge of the benefits to health and life provided by the Great Spirit through Mother Earth.

Soul Quest and its adherents affirm that such restoration can only occur through traditional ceremonies, sacraments, scriptural and spiritually-valid moral science (based upon natural law to assess, improve and restore good physical, mental and spiritual health).

5 | Page

Soul Quest uses the traditions and teachings espoused within its sacred texts and scriptures to gather insight for the restoration of spiritual, physical and mental health of all beings. Although there is respect for principles of modern science, Soul Quest bases its teachings and practices upon the guidance of the Great Spirit and the laws of nature, as bequeathed on all people, children of Mother Earth.

Soul Quest and its adherents believe that, a fundamental truth of its faith is embodied within the belief that, as children of the Great Spirit, there is entitlement to, as part of natural law, the following freedoms:

a.   Freedom of thought, expression and speech.

b.   Freedom of religion entailing, in part, sacred rights of worship, methods of healing, respect for traditional lifestyle.

c.   Freedom of education.

d.   Freedom of assembly.

e.   Freedom of personal security.

f.   Freedom of self-determination, including as an indigenous group as defined under the United Nations Declaration on the Rights of Indigenous Peoples ("UNDRIP"): http://www.un.org/esa/socdev/unpfii/documents/DRIPS_en.pdf, and as endorsed by the U.S. Government.[1]

Further, Soul Quest espouses and embodies the principles that all men and women have been endowed with sufficient intelligence for self-governance to ensure the guarantees of those freedoms; to establish just and morally righteous methods of interacting with one another; and to the provide for maintenance of a tranquil and secure domestic life infused by the blessings of the Soul Quest faith.

2.   Tenets of the Faith

Soul Quest and its adherents hold the following religious convictions as being core to their faith:

a.   *First Tenet: Mother Earth*

(1)   Mother Earth is a living being.

---

[1] United States of America Government, Office of the Press Secretary, "Remarks Made by the President at the White House Tribal Nations Conference," December 2010, and located at www.whitehouse.gov/the-press-office/2010/12/16/remarks-president-white-house-tribal-nations-conference.

(2)   Mother Earth is a unique, indivisible, self-regulating community of interrelated beings that sustains, contains and reproduces all beings.

(3)   Each being is defined by its relationships as an integral part of Mother Earth.

(4)   The inherent rights of Mother Earth are inalienable in that they arise from the same source as existence.

(5)   Mother Earth and all beings are entitled to all the inherent rights recognized in this Declaration without distinction of any kind, such as may be made between organic and inorganic beings, species, origins, use to human beings, or any other status.

(6)   Just as human beings possess rights, all other beings also possess rights which are specific to their species or kind and appropriate for their role and function within the communities within which they exist.

(7)   The rights of each being are limited by the rights of other beings and any conflict between their rights must be resolved in a way that maintains the integrity, balance and health of Mother Earth.

   b.   *Second Tenet:  Inherent Rights of Mother Earth*

(1)   Mother Earth and all beings of which she is composed possess the following rights.

   a.   The right to life and to exist:
   b.   The right to be respected;
   c.   The right to regenerate its bio-capacity and to continue its vital cycles and processes free from human disruptions;
   d.   The right to maintain its identity and integrity as a distinct, self-regulating and interrelated being;
   e.   The right to clean water as a source of life;
   f.   The right to clean air;
   g.   The right to integral health;
   h.   The right to be free from contamination, pollution and toxic or radioactive waste;
   i.   The right to not have its genetic structure modified or disrupted in a manner that threatens its integrity or vital and healthy functioning;
   j.   The right to full and prompt restoration for violation of the rights caused by human activity.

(2)   Each being possesses the right to a place and to play its role in Mother Earth for her harmonious function.

(3) Every being has the right to wellbeing and to live free from torture or cruel treatment by human beings.

      c.   *Third Tenet:  Obligations of Human Beings to Mother Earth*

(1) Every human being is responsible for respecting and living in harmony with Mother Earth.

(2) Human beings and all human institutions must:

    a.  Act in accordance with the rights and obligations recognized under the fundamental tenets of the Soul Quest faith;

    b.  Recognize and promote the full implementation and enforcement of the rights and obligations recognized under the fundamental tenets of the Soul Quest faith.

    c.  Promote and participate in learning, analysis, interpretation and communication about how to live in harmony with Mother Earth in conformity with the fundamental tenets of the Soul Quest faith.

    d.  Ensure that the pursuit of human well-being contributes to the well-being of Mother Earth, now and in the future;

    e.  Establish and apply effective norms and laws for the defense, protection and conservation of the rights of Mother Earth;

    f.  Respect, protect, conserve and where necessary, restore the integrity, of the vital ecological cycles, processes and balances of Mother Earth;

    g.  Guarantee that the damages caused by human violations of the inherent, natural rights recognized under the fundamental tenets of the Soul Quest faith are rectified, and that those responsible are held accountable for restoring the integrity and health of Mother Earth;

    h.  Empower human beings and institutions to defend the rights of Mother Earth and of all beings;

    i.  Establish precautionary and restrictive measures to prevent human activities from causing species extinction, the destruction of ecosystems or the disruption of ecological cycles;

    j.  Guarantee peace and eliminate nuclear, chemical and biological weapons;

    k.  Promote and support practices of respect for Mother Earth and all beings, in accordance with their own cultures, traditions and customs;

    l.  Promote economic systems that are in harmony with Mother Earth and in accordance with the natural rights recognized by the Soul Quest faith.

8 | Page

      *d.    Fourth Tenet: Precepts of the Faith*

(1)    Soul Quest embodies the belief that all beings – inclusive of ecosystems, natural communities, species and all other natural entities – are to be worshiped and protected, as we are all coextensive with Mother Earth.

(2)    All beings possess the same inherent rights of all other beings.

### 3.   Origins and Teacher-Prophet

Soul Quest identifies its origins, and teacher-prophet as the Spirit of Ayahuasca composed of the two sacred plants *"Banisteriopsis Caapi" and "Psychotria Viridis."* The beliefs, purposes and guidelines are further defined within the attached material – sacred writings known as the "Ayahuasca Manifesto."

The sacred nature of the spirit of Ayahuasca is proclaimed within the Manifesto as follows:

> *I am the spirit of Ayahuasca. For the first time, I reveal myself through the "Word" to make an emergency call to all the Human Beings on the Planet, especially to the Light Seekers, as I must expand beyond the Amazon River Basin. With my physical expansion, I intend to facilitate the spiritual transformation currently stirring the human species ....*

> *I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that of the spirit of Ayahuasca and of Chacruna. I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture.*

### 4.   Scripture & Collected Writings of the Faith

The Ayahuasca Manifesto provides the key outline to the guiding principles of Soul Quest. Effectively, it is very much akin to other faiths' sacred writings, explaining the tenets of the faith, such as the Jewish Talmudic writings and the Mishnah.   Soul Quests' beliefs, purposes and guidelines are provided through channeled material documented in Ayahuasca Manifesto.   The Manifesto (attached as supplemental material for review in this religious exemption request) provides knowledge and direction, inclusive of details about Soul Quest's mission, as well as instructions on the following topics:

a.    Role in the Expansion of the Human Consciousness

b.    Purpose with Human Beings

c.  Respect and the Sacred Nature of Ayahuasca

d.  Benefits of Use

e.  Guide for Conducting Ayahuasca Ceremonies

f.  Planetary Mission

Other fundamental religious ethical requirements of Soul Quest are included in its Code of Ethics. The Code of Ethics contains key principles, edicts and other educational statements regarding Soul Quest and its sacraments – inclusive of the use of ayahuasca. A copy of the Code of Ethics is included in the supplemental materials to this exemption request correspondence.

5.  Religious Advocacy & Education

Soul Quest, as part of its religious purpose, to bring pleasure to God and Great Spirit of Ayahuasca also incorporates an affirmative religious advocacy and educational component into its mission. This is achieved, at least in part, by:

a.  Producing disciples who will celebrate the teachings and wisdom of the Great Spirit in cooperative worship; are devoted to the four (4) boundless and unequaled states of mind: Love, Compassion, Joy and Equanimity; are possessed with love for everyone and every living being; and are permeated and bound by the spheres of influence and dynamic teachings of our elders.

b.  Training, educating and working for those in need. This includes, in this modern era, activity on the Internet, including with other ministries with similar moral beliefs and philosophies. This also entails Soul Quest's involvement with other faiths premised upon indigenous religious beliefs, and with auxiliaries of the Soul Quest Church of Mother Earth, Inc.

c.  Educating its members on the separation of religious affairs from secular affairs, consistent with the requirements of Section 501(c)(3) of the Internal Revenue Code.[2] Soul Quest is already recognized by Internal Revenue Service, the State of Florida, and Orange County, Florida, as a religious-based institution, having

_____

[2] The Guidelines provided under Section 501(c)(3) of the Internal Revenue Code were readily achieved by Soul Quest in its application for non-profit, religious institutional status. Soul Quest, among other aspects, practices and supervises a regular religious ceremony designed to espouse its teachings and belief structure; networks regularly with other Soul Quest Church affiliates; possesses an elected board of directors and a multi-member board of advisors/medicine elders; has implemented its formal Code of Ethics, Authorized Membership Agreement, and Articles of Religious Practice; adopts its religious practices and principles via the Ayahuasca Manifesto; ordains religious and lay ministers (with the former receiving credentials and authorizations following completion of prescribed studies); and conducts sacramental services within its primary mission of providing healing to all beings, as creatures of Mother Earth and Mother Earth.

10 | P a g e

qualified under the standards necessary to satisfy such classifications. Copies of this recognition are attached, hereto. Like other religious institutions, Soul Quest seeks to educate its members/adherents to the significance of the Church's non-involvement in secular political affairs.

### 6.   Holidays

Soul Quest observes the following religious holidays:

- December 23 - Winter Solstice
- March 21 - Vernal Equinox
- April 22 - Earth Day
- June 21 - Summer Solstice
- September 21 - Autumnal Equinox

As noted, Soul Quest's holidays, akin to many diverse cultural and religious traditions are premised upon the ancient tradition of celebrating the change of seasons and complementary astronomical events.

### 7.   Dietary Laws & Fasting Rituals

Soul Quest and its members adhere to the traditional diet of the Medicine People. The diet not only requires abstention from consumption of certain foods; rather, it also requires discipline, sacrifice and commitment, akin to those of various Judeo-Christian and Eastern religious sects.

The constraints imposed by Soul Quest's dietary laws are designed to cleanse the body and, by doing so, cleanse the spirit and permit for the effective, efficient use of plant medicine. Specifically, dietary laws restrict use of many spices, including salt and pepper, and also impose periods of abstinence from sex or sexual activities. The key to such constraints is premised upon the belief that the blandness of food and the lack of sexual stimulation will heighten sensitivity to plant medicine and the communing with the Great Spirit.

Prior to any ayahuasca ceremony, Soul Quest members/adherents are to comply with the following dietary and sexual edicts, designed to purify body and soul:

a.   Seven days prior to involvement in any ayahuasca ceremony, refraining from:

- Drug use, including prescription drugs (medical interaction forms, including in the supplement to this religious exemption application provide further instruction), and any and all recreational drugs.
- Alcoholic beverages
- Sexual activity (whether with a partner or from self-stimulation).

11 | P a g e

b.  Three days prior to involvement in any ayahuasca ceremony, refrain from the following foods and beverages:

- Sugars or Artificial Sweeteners
- Salt
- Red Meat, Pork, Animal Fats
- All Fermented foods, Soy Sauce, Miso, Sauerkraut
- Dairy Products, Aged Cheese
- Caffeine (coffee, tea, sodas)
- Carbonated beverages
- Hot spices/peppers
- Processed Food, Fried Food
- Overripe Fruits, Dried Fruits

c.  All Soul Quest facilitators are expected to fast for the period spanning the day prior to any ayahuasca ceremony, through to completion of any ceremony.  In doing so, those individuals also demonstrate a commitment to the Great Spirit as embodied within the plant medicine, and prepare for acting as a surrogate for the Great Spirit during the ayahuasca ceremony.

## 8.  Required Ceremonial Vestments & Appearance

Soul Quest requires its staff to observe proper liturgical dress during religious retreats and ceremonies.  This entails the wearing of white vestments.  Further, participants are requested to wear white or light-colored, comfortable clothing throughout any such retreats or ceremonies.

The color *white* is critical to the practice of religious ceremonies and retreats, and performance of sacraments of the faith, for the following reasons:

- It represents the color of eternal light and is an emblem of the divine.  It projects purity, cleanliness and neutrality.

- It aids in mental clarity, encourages staff and participants to clear mental and spiritual clutter and obstacles, evokes purification of thoughts and actions and enables fresh beginnings.

- It accentuates free movement, all while maintaining maximum respect to the Great Spirit, and all others participating in such functions.

Accordingly, men are expected to don loose fitting, white/light-colored pants, shirts, shorts, tanks, t-shirts, long/short sleeved shirts.  Meanwhile, women are expected to don loose fitting white/light-colored dresses, pants, skirts, shorts, shirts, tanks, t-shirts, long/short sleeved shirts.

12 | P a g e

9.     Propagation/Proselytizing of the Faith

Soul Quest and its adherents utilize all methods of communications, social media, video and printed materials to advertise and spread the sacred messages of our beliefs and community offerings.  It does not charge others for engaging in the sacrament of ayahuasca.  All funds collected through membership, retreat fees, tithing or donation are used exclusively for sustaining the retreat facility, ceremonial tools, property maintenance, staff salaries, food, additional expenses incurred with the upkeep of the Church, and the expansion of the faith to others.

Soul Quest does not charge any fee its adherents for participating in the sacrament of ayahuasca.  The non-charging of a fee is designed to maximize safety to participants and facilitators of the ceremony.  It allows for Soul Quest to limit the number of individuals partaking of the sacrament at any given ceremony.  Accordingly, the sacrament is only offered to between 26-30 individuals at one time, with 8-10 facilitators present during any given sacramental ceremony.  The ayahuasca sacrament is performed three (3) times per month.  In this manner, the sacramental ceremonies can be performed in a manner designed to maximize safety and security to all involved.

II.     **Purpose & Mission of Soul Quest**

The purpose and mission of Soul Quest is to:

- Provide its community with service, education, spiritual fellowship and healing.

- Safeguard the practices of Mother Earth/God and Goddess-based and Native American spiritual traditions, ceremonies, sacred practices, wisdoms and healing ways.

- Provide an international training center, seminary school that offers residency, practicum, ordination and training on traditional doctrines, church beliefs to initiates, healers, practitioners, therapists, counselors, clergy, pastors, ministers, shamans and doctors.

- Support the rights and culture of indigenous people, wherever found Mother Earth, and to conduct all activities as are protected under the First Amendment's Free Exercise Clause, and under federal and state laws including, but not limited to, the RFRA.

III.    **Safety & Security Protocols for Ayahuasca Ceremonies**

Soul Quest has designed implemented safety and security protocols, intended to maximize the protection of those participants in Ayahuasca ceremonies.  The following paragraphs describes these affirmative measures:

13 | P a g e

A.      **Measures In Place Prior to Any Ayahuasca Ceremony**

Those individuals designated to conduct Soul Quest ceremonies must first prove that they have attained the requisite knowledge and expertise in the following areas:

1.  The Pharmacology of Ayahuasca
2.  The Risks & Contra-Indications of Ayahuasca
3.  The Legal Implications Surrounding the Dispensing of Ayahuasca
4.  First Aid
5.  The Theory of Non-Ordinary States of Consciousness, and Therapeutic Approaches
6.  Possession of Extensive, Prior Personal Experience with Ayahuasca
7.  The Ability to Work as a Team Member
8.  Understanding of Soul Quest's Religious Principles, Therapeutic Purposes of Consuming Ayahuasca, and the Fundamental Moral & Ethical Tenets.

B.      **Measures to Prepare Soul Quest Members for Participation in Sacred Ayahuasca Ceremonies**

The following measures are in place in order to prepare Soul Quest Members for participation in Ayahuasca ceremonies:

1.  Prior to any ceremony, the Church transmits, via electronic mail, educational material on Ayahuasca to all members anticipating participation in the Ayahuasca ceremony.  It is critical to ensure that members are well-informed regarding the ceremony, and the requirements for properly conducting themselves before, during and after the ceremony.  The following information is conveyed to these Soul Quest members:

    a.  The properties of Ayahuasca, its composition, its effects and the potential risk.
    b.  The implications of drinking Ayahuasca.
    c.  The dietary restrictions before and after the session.
    d.  The responsibilities of the staff and the participants.
    e.  The procedure and operation of the session.
    f.  The process, in its entirety.

2.  All Soul Quest members intending participation in the sacramental ceremonies involving Ayahuasca are required to complete and return a medical form prior to participation, to ascertain whether or not there are potential medical limitations to such participation.

3.  Soul Quest conducts individualized interviews with the member intending to participate in the Ayahuasca ceremony.  The purpose for these interviews is to:

14|Page

a.   Establish a rapport with the individual; ascertain their basis and willingness to participate in the sacred Ayahuasca ritual; and to qualitatively assess current psychological and physical status; and

b.   (Re)assess an individual who has previously participated in the Ayahuasca ceremony.

4.   Soul Quest presents and explains the mandatory consent form (titled, "Participant Member Informed Consent, Disclosure & Disclaimer: Sanctified Healing Services/Counseling/Therapy).

5.   Soul Quest uses the information gathered through its described written and oral questions/interviews to determine whether or not to permit any given individual to participate in the Church's sacred Ayahuasca ceremony. The acceptance of an individual's participation in the ceremony is premised upon:

a.   Members demonstrating their understanding of the personal, religious process entailed by their participation.

b.   Accepting only members whose personal participation is unlikely to require greater assistance (in time or resources) than is available in the current context of the Ayahuasca ceremony.

c.   Determining whether members perhaps require additional therapy prior to consuming the sacramental Ayahuasca tea. Should additional therapy might potentially involve advising the member to seek appropriate, external professional assistance.

6.   In cases where any member's participation in the sacred Ayahuasca ceremony is declined by the Church, Soul Quest provides that member with an explanation for its decision, and suggests alternative methods for achieving suitable religious and therapeutic fulfillment. If Soul Quest determines there to be doubts about any member's suitability, then participation in the Ayahuasca ceremony is not permitted.

### C.   Pre-Ceremonial Procedures

1.   The facilitators used by Soul Quest during the Ayahuasca ceremony are trained to know the strength of Ayahuasca, its ingredients, and the religious and physiological impact from its use during the sacramental ceremony. Under no circumstance is any administration of prepared Ayahuasca

sacramental tea permitted that has not been properly analyzed and tested by those overseeing the ceremony.

2.    Soul Quest requires a 1:5 ratio of facilitators-to-members to be present to cater to all members participating in the sacramental ceremony involving Ayahuasca. Any higher ratio is not permitted, as the security and health of the participating members is deemed critical.

3.    Soul Quest provides a safe, comfortable and secure venue at its Church, with more than ample space, drinking water and toilet amenities.

4.    Soul Quest further ensures member physical safety and comfort by preparing the environment to accommodate individualized needs (e.g., removal of any objects presenting a possible hazard; providing mats, blankets, pillows, buckets, paper tissues, etc.).

5.    Soul Quest has developed an emergency plan for various scenarios, and has educated its facilitation team to know and understand what steps to take in case of an emergency. This entails the following safeguards:

a.    Pre-Screening for major health conditions of participants to ensure the safety for all.

b.    The Church preexisting facilities to take participants to a safe place away from the ceremony group to ensure their safety in case of physical, mental issues or concerns.

c.    Providing all facilitators with ready access to a well-stocked First Aid kit, blood pressure and any other necessary medical equipment.

d.    Ensuring that facilitators are certified in CPR.

e.    Training facilitators to exercise proper authority on whether to contact emergency services in the event of issues arising that require such attention. An emergency station is a mere three (3) minute commute from the Church property.

f.    Providing for evening facilitators to ensure participant safety during the evening.

16 | P a g e

### D.    Ceremonial Procedures

1.    Soul Quest estimates and measures the correct dosage of Ayahuasca for sacramental use. Dosage amounts are measured according to the member's age, gender, experience, health condition and individual needs. Any uncertainty results in administration of a smaller dose.

2.    Soul Quest ensures member physical safety by observing for any potential hazards (e.g., removal of potentially dangerous objects; prohibiting any operation of a motorized vehicle; preventing any member from wandering from the area where the sacrament is administered; preventing any member from mistakenly sitting on another's palette/mat; etc.).

3.    Soul Quest ensures each member's emotional safety. This includes, but is not necessarily limited to, providing any necessary emotional support; and ensuring no harmful interactions between other members and/or assistants.

4.    Soul Quest ensures that no member is ever left alone during any part of the ceremony.

5.    Soul Quest commits to the protection of, the integrity of, privacy of and security of the members and their interactions during the Ayahuasca sacramental ceremony.

6.    Soul Quest ensures that no member is permitted to depart the ceremony prior to its closure, and then only until and unless first checked by a facilitator who confirms the member's ability to safely and securely depart.

7.    Soul Quest checks each member prior to the ceremony's closure, to ensure that he or she possesses stable emotional state of mind and physical capacity.

8.    Soul Quest is prepared to request additional assistance in the event of any emergency or other critical situation, including contacting local Emergency Medical Service ("EMS") personnel and/or police.

9.    Soul Quest never denies any request for assistance; safety is of paramount concern.

10.    In order to maximize potential benefits and experience during the Ayahuasca ceremony, Soul Quest also implements the following:

    a.    *Optimization of Physical Position*: Soul Quest suggests that participating members remain in an upright, seated position, rather than lying down during the ceremony. This prevents any risk of choking, in case of vomiting, and helps identify

17 | P a g e

anyone who might confront a temporary loss of consciousness.

b. *Implementation of Non-Pharmacological Techniques:* Soul Quest will undertake focused breathing, active listening, and stress the 'serene presence' through techniques designed to calm any Member who might experience heightened emotions during the ritual.

### E.   Post-Ceremonial Procedures

1. Soul Quest provides its members with ample time for recovery prior to departing the Church premises. Members who have participated in the sacramental ceremony are provided with sufficient recovery space; traditionally, members return to their beds or remain in the ceremonial space until morning.

2. Soul Quest ensures ongoing support available for those requiring it after the close of the sacramental ceremony.

3. Soul Quest provides a group integration area, where the members can, whether individually or in groups use creative materials (paper, pencils and crayons for drawing, etc.), and as they continue to process their experience.

4. Soul Quest ensures that all members possess the opportunity to attend a group integration process where they may share their experience with the rest of the group.

5. Soul Quest is mindful of the interventions during group integration. An active listening attitude transpires, without judgment or interpretation that can narrow the amplitude of the experience. Soul Quest allows each member to reach his/her own conclusions and interpretations of their experience.

6. Soul Quest checks the physical and emotional state of all members prior to departure, in order to ensure their continued safety and public safety.

7. Soul Quest offers the possibility of additional support after the ceremony, providing contact information for any member to maintain post-ceremony communication and necessary counseling and other aftercare.

8. Soul Quest directs participants to a qualified professional if unable to provide the level of support required during their integration/recovery process.

18 | P a g e

9.  In order to improve on the service and experience from the ceremony, Soul Quest employs an evaluation form to gather feedback about the ceremony, the Church's efforts, and the Church facility.

10. Soul Quest utilizes two (2) separate questionnaires (pre- and post-ceremony) on the well-being of members participating in the sacramental use of Ayahuasca, to measure the impact of the experience and to monitor the integration/recovery process. The questionnaire is sent to the participating member one (1) week prior to, and then one week following the ceremony.

11. Soul Quest is mindful of its role as facilitators in this spiritual process, never taking for granted the profound and/or enlightening experiences that any member might experience during the ceremony. Soul Quest recognizes the significance of remaining supportive of its members, while allowing each participating member to direct their own spiritual energy into this process. Ultimately, the member is the responsible for interpreting his or her own spiritual evolution, discoveries and connections stemming from participation in the Ayahuasca sacrament.

**F.      Storage & Use Protocols for Sacramental Use of Ayahuasca**

Soul Quest undertakes rigid protocols to ensure the proper storage of the sacramental medicines intended for use during the Ayahuasca sacramental ceremony. The sacrament and medicines used during the ceremony are either prepared in the sacred traditions of the indigenous tribes of the Amazon at our Church or procured from the indigenous tribes of the Amazon. All such sacramental substances are stored in a locked cabinet, and are only accessible to two Church elders. Further, all sacraments and other medicines are labeled with a preparation date, time and quantity. Finally, the date and time when such substances are consumed is properly charted by Soul Quest. It is the conviction of Soul Quest that it must maintain such records in order to maximize the safeguarding of the substances and their ritual uses.

**IV.     Governance of SQCME/SQACME**

Ultimate authority lies in the Creator/Great Spirit of Ayahuasca as the head of the church and in the sacred beliefs and doctrines expressed as the basis. For all faith and practice. This church shall remain free and self-governing. The Government is vested in its membership and administered by its officers. In function, final authority shall reside in the membership. They shall approve and/or affirm SQCME qualified leadership, to carry out the purposes of the spirit of Ayahuasca. Our leadership will hold leadership meetings to talk, brainstorm and agree on any discipline or change that maybe required.

Akin to other religious institutions, Soul Quest maintains multiple instruments for governance of its affairs. Presently, this includes the following lay and religious officials/bodies:

*Chief Executive Officer, Chief Medicine Man, Pastor, Chief Elder and Counselor:* Chris Young

19 | P a g e

*President, Elder and Counselor:* Verena Young

*Director, Medicine Man/Woman, Elder and Counselor:* TBD

*Council of Elders:* Constituted of selected senior members of Soul Quest, and occupying various areas of specialization, as necessary for the maintenance and welfare of the Church.

Further, other officers such as church administrator, secretary, visiting ministers and teachers/elders will be assigned with Board permission. Presently, pending future growth of the Church, the Senior Pastor fills such duties.

### A.   Authority Granted to Soul Quest Lay & Religious Leadership

Soul Quest officers are authorized to take all necessary and proper actions to develop the Church and its mission. Each calendar year, a full and complete accounting of the actions taken is made available to Soul Quest members, via an annual general meeting. At that time, a full accounting of the preceding year's activities is presented. The Soul Quest Board is designated to meet monthly, or when otherwise deemed appropriate to discuss current issues, seasonal traditions and plans for future events. Further, the financial affairs of the institution are reviewed semi-annually by the Board, and are subject to annual reporting to Soul Quest's members.

### B.   Federal & State Religious Non-Profit Entity Recognition

As referenced, above, Soul Quest holds the following federal and state tax treatments as a religious-based, non-profit entity.

1.   Soul Quest Church of Mother Earth Inc. (SQCME) – Non-Profit Corporation Federal Identification No.: 841402813, and Florida State Non-Profit Corporation, founded by Medicine Man, Pastor, Chief Elder and Counselor, Chris Young; and its Elder and Counselor, Verena Young.

2.   Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center (SQACME), as an independent branch or Free Church of SQCME; Florida State Non-Profit Corporation 501 IRS-compliant Non-Profit was first incorporated July 15, 2016, with its Charter Declaration also entered on July 15, 2016, recognizing its founders, Medicine Man, Pastor, Chief Elder and Counselor Chris Young; and Elder and Counselor Verena Young.

All documentations reflecting the above statuses are included within the supplement to this exemption application.

### C.   Membership

Soul Quest receives all individuals as members who accept the spiritual and religious principles of the Church, as well as recognize the fruits of the Great Spirit in their lives, and who

20 | P a g e

agree to abide by Church's doctrine. The only requirement for membership is a singular request: the individual must express a belief in the foundation principles of the Soul Quest Church.

### D.    Provisions for By-Laws and Policy Manual

Soul Quest is governed by its Constitution and By-Laws, both of which are attached as a supplement to this exemption application. These documents embody the stated qualifications for church leaders and officers. Further, the By-Laws define officers' duties, provisions for appointment of additional leaders and teachers, conditions for membership, methods by which new members are received, and identify other rules and regulations for church activities, as needed. Last, a Policy Manual – also included in the supplement to this exemption application – encompasses all other operational matters including, but not limited to, job descriptions for all Church personnel.

### V.    Conclusion & Request for Granting of Religious-Based Exemption

In conclusion, Soul Quest reiterates its request for a religious-based exemption from the provisions of the Controlled Substances Act, as pertaining to its ritual use of ayahuasca in its conducting holy sacraments. Soul Quest remains confident that a review of this application, inclusive of all supplemental materials, will result in the granting of the requested exemption. Of course, Soul Quest welcomes the opportunity to address any questions or issues raised by the Drug Enforcement Administration or its cooperating agents in its consideration of this exemption application.

Sincerely,

DEREK B. BRETT
Legal Counsel for Soul Quest

Exhibit 2

# Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act

In recent years, the Drug Enforcement Administration (DEA) has seen an increase in requests from parties requesting religious exemptions from the Controlled Substances Act (CSA) to permit the use of controlled substances. The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-l. In Gonzales v. O **Centra Espirita Beneficente Uniao do Vegetal**, 126 S.Ct. 1211 (2006), the Supreme Court held that government action taken pursuant to the CSA is subject to RFRA. In order to obtain an exemption under RFRA, a party must, as a preliminary matter, demonstrate that its (1) sincere (2) religious exercise is (3) substantially burdened by the CSA. 42 U.S.C. § 2000bb et seq.

The guidelines that follow are an interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA:

1. *Filing Address.* All petitions for exemption from the Controlled Substances Act under RFRA shall be submitted in writing to Susan A. Gibson, Deputy Assistant Administrator, Diversion Control Division, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.

2. *Content of Petition.* A petition may include both a written statement and supporting documents. A petitioner should provide as much information as he/she deems necessary to demonstrate that application of the Controlled Substances Act to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise. Such a record should include detailed information about, among other things, (1) the nature of the religion {e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession. A petitioner is not limited to the topics outlined above, and may submit any and all information he/she believes to be relevant to DEA's determination under RFRA and the Controlled Substances Act.

3. *Signature.* The petition must be signed by the petitioner, who must declare under penalty of perjury that the information provided therein is true and correct. See *28 U.S.C. § 1746.*

4. *Acceptance of Petition for Filing.* Petitions submitted for filing are dated upon receipt by DEA. If it is found to be complete, the petition will be accepted as filed, and the petitioner will receive notification of acceptance. Petitions that do not conform to this guidance will not generally be accepted for filing. A petition that fails to conform to this guidance will be

Last updated: February 26, 2018

returned to the petitioner with a statement of the reason for not accepting the petition for filing. A deficient petition may be corrected and resubmitted. Acceptance of a petition for filing does not preclude DEA from making subsequent requests for additional information.

5. *Requests for Additional Information.* DEA may require a petitioner to submit such additional documents or written statements of facts relevant to the petition as DEA deems necessary to determine whether the petition should be granted. It is the petitioner's responsibility to provide DEA with accurate contact information. If a petitioner does not respond to a request for additional information within 60 days from the date of DEA's request, the petition will be considered to be withdrawn.

6. *Applicability of DEA Regulations.* A petitioner whose petition for a religious exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. See *21 C.F.R. §§ 1300-1316.* A petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under *21 C.F.R. § 1307.03.* Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

7. *Activity Prohibited Until Final Determination.* No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. A registration granted to a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with CSA regulations and RFRA.

8. *Final Determination.* After the filed petition—along with all submissions in response to any requests for additional information—has been fully evaluated, the Deputy Assistant Administrator of the Diversion Control Division shall provide a written response that either grants or denies the petition. Except in the case of affirming a prior denial or when the denial is self-explanatory, the response shall be accompanied by a statement of reasons upon which the decision is based. This written response is a final determination under *21 U.S.C. § 877.*

9. *Application of State and Other Federal Law.* Nothing in these guidelines shall be construed as authorizing or permitting any party to take any action which such party is not authorized or permitted to take under other Federal laws or under the laws of the State in which he/she desires to take such action. Likewise, compliance with these guidelines shall not be construed as compliance with other Federal or State laws unless expressly provided in such other laws.

Exhibit 3



**U. S. Department of Justice**

Drug Enforcement Administration

8701 Morrissette Drive

Springfield, Virginia  22152

*www.dea.gov*

Derek B. Brett, Esq.
Burnside Law Group
Park Central, Unit 9
109 Ilsley Avenue
Dartmouth, NS
Canada B3B 1S8

Dear Mr. Brett:

This letter concerns the petition for religious exemption which you presented to the United States Department of Justice, Drug Enforcement Administration (DEA), on behalf of your client, Soul Quest Ayahuasca Church of Mother Earth, Inc. (Soul Quest), d/b/a the Soul Quest Ayahuasca Retreat and Wellness Center ("Wellness Center"), as well as the First Amended Complaint (FAC) (ECF No. 13) and motion for preliminary injunction (Motion) (ECF No. 15) which you recently filed in *Soul Quest v. Barr*, Case No. 6:20-cv-00701 (M.D. Fla.). Thank you for these materials, which have contributed to our review of the petition. We look forward to opening a dialogue with you and your client to clarify the religious nature of Soul Quest's practices under the Religious Freedom Restoration Act (RFRA) and to explore accommodation of those practices within the comprehensive regulatory scheme established by the Controlled Substances Act (CSA), as amended.

Through the CSA, Congress established a comprehensive scheme to regulate the importation, manufacture, and distribution of substances which have legitimate medical uses, but potential for diversion from authorized channels. Title 21, United States Code §§ 801 (U.S.C. §§ 801) *et seq*. Under the CSA, all individuals and entities which import, manufacture, and distribute controlled substances must be registered by DEA. DEA implements the CSA through comprehensive regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. *See* Title 21, Code of Federal Regulations §§ 1300-1316 (CFR §§ 1300-1316). The regulations implementing the CSA impose consistent requirements upon all handlers of controlled substances which govern controlled substances, addressing import, export, manufacture, distribution, diversion, public safety, storage, administration, recordkeeping, and disposal. To minimize the risk of diversion, registrants must, for example, maintain records and make those records available for inspection and audit; they must also identify the locations at which controlled substances are stored and manufactured. DEA routinely inspects and assesses the security practices in effect at such locations.

Under RFRA, Congress provided that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person . . . is in furtherance of a compelling governmental interest and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. These

competing mandates require the DEA to consider the "application of the [CSA] to the person—the particular claimant whose sincere exercise of religion is being substantially burdened" and engage in a "case-by-case consideration of religious exemptions to generally applicable rules" so that it may "strike sensible balances" of interests based on "the particular practice at issue." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31, 436, 439 (2006) (internal quotation marks omitted).

In compliance with *Gonzalez, supra*, DEA promulgated interim guidelines to facilitate the process by which parties can seek exemption from particular regulations implementing the CSA that would substantially burden their religious exercise. Under this process, DEA can grant appropriate registrant status to religious applicants, thus bringing the religious use of the controlled substance within the CSA's comprehensive regulatory scheme. DEA can also waive application to the religious organization of particular regulatory requirements, such as registration fees. Recognizing that DEA's regulatory requirements for security were developed for commercial environments, DEA will work with the religious registrant to revise security requirements to meet the specific situation of the non-profit applicant. DEA will also work with the applicant to tailor specific provisions of the regulatory scheme to minimize diversion and safety risks presented by the "particular practice at issue." *Gonzales*, 546 U.S. at 439. DEA therefore routinely requests detailed information on petitions for exemptions from the CSA, as outlined in the guidelines. After careful consideration of the materials already provided, DEA asks that Soul Quest answer the following questions and provide the information requested below.

The Organization and Belief System of Soul Quest

Soul Quest's organization and religious belief system appear to have evolved in some respects between 2017 and the present. We welcome this opportunity to obtain the most up-to-date information. The undated and unsigned "By Laws" attached to Soul Quest's Motion (ECF No. 15-3) provide, for example, that "[t]he name of this organization, shall be the Oklevueha Native American Church of Soul Quest (ONACSSQ)" and state: "we will educate others in our town in Georgia, the USA and in various locations anywhere in the world…." How does the ONACSSQ relate to Soul Quest? Does Soul Quest currently conduct any ceremonies with or provide ayahuasca and/or ayahuasca components to or receive ayahuasca and/or ayahuasca components from any individuals or organizations in Georgia, or any locations in the United States other than Orlando, Florida? If so, please identify the name and location of each such organization and explain the organizational relationship of each to Soul Quest.

The "Foundation Document" provided with the Motion (ECF No. 15-5) contains the following statement: "…we have para-church ministries and Indigenous Native American religion based auxiliaries," while the Doctrinal Statement (ECF No. 15-8) is described as applicable to "any Authorized Branch." Please provide the name and location of all "ministries," "auxiliaries," and "Authorized Branches" and explain their organizational relationship to Soul Quest.

In paragraph one of the FAC, Soul Quest is described as "a Christian syncretic religion based in Orlando, Florida." Other documents, however, contain no reference to Christianity, but profess belief in "Mother Earth," "Father Sky," and/or the "Great Spirit." (*See, e.g.*, ECF Nos. 15 ⁋ 25, 15-3.) The flyer attached to the Motion, ECF No. 15-13, describes Soul Quest as believing in "the rights of Mother Earth and in protecting the practice of Mother Earth based South American

Derek B. Brett                                                                                              Page 3

spiritual traditions, ceremonies, and sacred indigenous natural medicines." Please clarify Soul Quest's relationship, as applicable, with Christianity, Mother Earth, Father Sky, and/or the Great Spirit. In the petition, the "Ayahuasca Manifesto" is described as a sacred document. Is Exhibit 3 to the FAC, ECF Nos. 13-4 and 13-5, that sacred document? If not, can you provide a copy of the sacred document?

The Doctrinal Statement states that Soul Quest and its Authorized Branches "accept all natural substances and their derivatives" for ceremonial use. Has Soul Quest or the Wellness Center used any controlled substance other than ayahuasca in their ceremonies or wellness activities since January 2017? If so, identify each such controlled substance and identify the date(s), place(s), and context(s) in which it was administered and how it relates to Soul Quest's sincere religious beliefs.

On page 13, the petition stated that there is no charge to participate in the sacrament of ayahuasca. An attachment to the petition, entitled: "Information About Our Weekend Retreats," stated: "[w]e do not charge for the medicine, but for the work of accompaniment and supervision, for meals and accommodation, and for the translation of the facilitators from the country in which you are staying." The attachment listed the cost of the ayahuasca ceremony as $175 per session for a two night minimum, or a total cost of $350, as well as additional costs for various levels of accommodations and other optional ceremonies. How much are members and authorized participants charged for ayahuasca administration during weekend retreats? Does Soul Quest or the Wellness Center currently conduct ayahuasca ceremonies at any location other than the Wellness Center? If so, please provide the pricing schedule.

The flyer attached to the Motion, ECF No. 15-13, indicates that the Wellness Center offers a wide range of therapeutic services, including ayahuasca administration, "psycho-spiritual integration," naturopathy, yoga, breathwork, reiki/energy medicine, acupuncture, smoking cessation, and kambo, which we gather is a traditional South American cleansing ritual using the poison of a frog. Are these therapeutic services offered in connection with ayahuasca ceremonies, or are they available independently of those ceremonies? Please explain the relationship of these services to the religious beliefs and mission of Soul Quest. We also note that a letter attached to Soul Quest's petition indicates that the Orange County Board of Zoning limited sound devices or amplification of music at the Wellness Center and limited it to no more than four special outdoor events, "which shall not include religious or spiritual retreats." This implies that non-religious outdoor events may be held at the Wellness Center. Please explain.

In the FAC and several supporting documents, Soul Quest is described as d/b/a (doing business as) the Wellness Center. On page 9 of the Foundation Declaration (ECF No. 15-5), however, the Wellness Center is described as an "independent branch or Free Church" of Soul Quest. Please clarify the organizational and financial relationship between the two entities. Does Plaintiff Lewis draw any financial compensation from the Wellness Center? If so, please state the total compensation he received each year from 2017 through 2019.

<u>Soul Quest's Procurement, Storage, Distribution, and Disposal of Ayahuasca</u>

Does Soul Quest import ayahuasca in tea form, or does it import the plants used in making the tea? In either case, identify the source of the imported materials, the quantity imported each year since January 2017, the location(s) where the materials are stored, and all individuals who have had

Derek B. Brett                                                                          Page 4

access to the stored materials.  If the tea is prepared in the United States, please state where and by whom the tea is prepared, where and how it is stored, and state the relationship between the amount of plant material used and the number of doses of tea manufactured.

Does Soul Quest provide the tea to any other individuals or organizations outside Soul Quest's ceremonies at the Wellness Center in Orlando?  If so, state when, where, and to whom the tea was distributed.

If Soul Quest has developed written policies or directives governing security, recordkeeping and storage protocols for controlled substances, please provide copies.  If not, please provide a detailed description of Soul Quest's current practices.  Additionally, please identify the individuals in charge of security, recordkeeping, storage, and the dispensing of the controlled substances and provide the full names of the individuals described as members of the "team" in the Wellness Center flyer (ECF No. 15-13).  In order to have all of the information necessary for DEA to reach a determination on Soul Quest's petition and determine its eligibility for DEA registration to import, manufacture, and distribute a schedule I controlled substance, DEA Diversion Investigators must conduct interviews of these individuals and other leaders and managers, assess the security and recordkeeping measures in place, and recommend any upgrades needed to minimize the risk of diversion and protect safety.  Site visits and inspections will follow.

If all tea that has been prepared is not used at an ayahuasca ceremony, or if a batch of tea is no longer usable, how will Soul Quest dispose of the unused or expired tea?  As you will appreciate, the disposal of unused substances which contain controlled substances, such as prescription medicines, can present environmental and public safety concerns, as well as concerns of diversion into illicit markets.  Has Soul Quest developed any protocols or standard practices for the proper disposal of unused or expired controlled substances, including but not limited to ayahuasca tea and plant residues?  Does it maintain records documenting disposal or destruction?

The Code of Ethics attached to the Motion, ECF No. 13-6, describes the primary purpose of Soul Quest as "to administer Sacramental Ceremonies."  It also states that both "members" and "Authorized Participants" can take part in the "Ayahuasca Ceremony."  What is the difference between a "member" and an "Authorized Participant?"  What criteria are used to "authorize" a non-member "participant" to ingest ayahuasca with Soul Quest?

In paragraph 50 of the FAC, Soul Quest alleges that it offers ayahuasca ceremonies three times per month and that 60 to 80 individuals participate in the ceremony with the support of 20 "facilitators," including a "licensed physician as medical director, a licensed paramedic, a licensed emergency medical technician, a psychologist, and a research scientist."  Please identify the individuals who currently perform these functions and describe their qualifications, professional education and licensures, and confirm that Soul Quest will make these individuals available to speak with DEA Diversion Investigators at the parties' convenience.

Your petition on page 14 states that participants must complete and return a medical form, and attached thereto was a document titled: "Medical Form."  Is that form still in use?  If not, please provide a copy of the current medical form.  Were any medical professionals consulted in the creation of this form?  What scientific literature or studies, if any, provide the basis for the contents of the form?  If a participant indicates that they do have a history of one or more of the listed

Derek B. Brett                                                                                    Page 5

ailments, is he or she permitted to participate? How is private medical information protected? Are women who are pregnant, nursing, or on birth control allowed to partake in the ayahuasca ceremony? At what age can participants consent to participate in the ayahuasca ceremony? How is age of the participants verified? What protocols are put into place to ensure minors do not have access to controlled substances?

Part III "Safety & Security and Protocols for Ayahuasca Ceremonies", Section C.5 of the petition states: "Soul Quest has developed an emergency plan for various scenarios, and has educated its facilitation team to know and understand what steps to take in case of an emergency." Please provide a copy of the emergency plan and describe any training given to "facilitators" in how to respond if a medical emergency arises during or immediately after a ceremony.

Please provide a list of all emergencies or other critical situations which have arisen during or immediately after ayahuasca ceremonies since January 2017, including a brief description of the event, the Emergency Medical Service (EMS) and/or law enforcement agency contacted, and the outcome of the event. Additionally, please describe and explain the actions Soul Quest took related to the April 1, 2018 medical emergency involving Brandon Begley. Since that emergency, has Soul Quest modified its safety protocols and procedures? If so, please explain how. On page 17, the petition states that Soul Quest works with local EMS personnel and/or police if additional assistance is needed for any emergency or other critical situation. Please provide copies of any documentation memorializing these arrangements and identify the local agencies with which Soul Quest works.

DEA looks forward to your responses to these questions, which will enable us to move forward with our case-specific analysis of Soul Quest's petition and consideration of how best to accommodate religious beliefs and practices within the CSA's comprehensive regulatory scheme.

Sincerely,


Thomas W. Prevoznik
Deputy Assistant Administrator
Diversion Control Division

Exhibit 4



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

Kevin P. Hancock
Trial Attorney

Tel:    (202) 514-3183
Fax:    (202) 616-8470
Email:  Kevin.P.Hancock@usdoj.gov

June 4, 2020

**By Email**
**Confidential Rule 408 Settlement Communication**

Derek B. Brett, Esq.
Burnside Law Group
Park Central, Unit 9
109 Ilsley Avenue
Dartmouth, NS, Canada
B3B 1S8
dbb@burnsidelaw.com

A. Brian Phillips, Esq.
912 Highland Avenue
Orlando, Florida 32803
Brian.Phillips@phillips-law-firm.com

*Re:  Soul Quest, et al. v. Barr, et al., 6:20-cv-701 (M.D. Fla.) – Supplemental information to our negotiations on June 1, 2020*

Dear Mr. Brett & Mr. Phillips:

This letter follows our discussions on June 1, 2020 concerning the petition for religious exemption that you presented to the United States Department of Justice, Drug Enforcement Administration (DEA), on behalf of your client, Soul Quest Ayahuasca Church of Mother Earth, Inc. (Soul Quest), d/b/a the Soul Quest Ayahuasca Retreat and Wellness Center, as updated by the exhibits to the First Amended Complaint (FAC) and motion for preliminary injunction which you recently filed in the above-captioned matter.

As discussed during that call, in exchange for Soul Quest's agreement to stay the litigation (including withdrawal of its preliminary injunction motion) DEA is willing to commit to responding to Soul Quest within 14 days of receiving Soul Quest's answers to the questions in DEA's letter to Soul Quest dated May 29, 2020.  In its response, DEA would either: (a) start scheduling interviews, or (b) if necessary, request clarification regarding any of the answers in

Soul Quest's response prior to scheduling interviews.  In addition, DEA would commit to providing Soul Quest a final determination on its petition within 75 days after DEA's fact-finding is complete, including any necessary interviews and site visit(s).

Also during our discussions, you stated that your clients had asked for additional information about the DEA pre-registration investigation process.  In response, DEA has authorized DOJ to convey on their behalf the following information explaining the preregistration process:

Registration is essential to the comprehensive regulatory scheme established by the Controlled Substances Act, as amended ("CSA" or "the Act"), 21 U.S.C. §§ 801 *et seq*. Under the CSA, the Attorney General, who has delegated this authority to DEA, must register an applicant to distribute or manufacture a Schedule I controlled substance unless it is determined that registration would be inconsistent with the public interest. *Id.*, § 823(b).[1] In determining the public interest, several factors must be considered, including, but not limited to, whether the applicant will maintain effective controls against diversion of the particular controlled substance into illicit channels and will be compliant with applicable state and federal laws and regulations. *Id.*  DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31.  In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, DEA must also determine pursuant to the Religious Freedom Restoration Act (RFRA) whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the CSA's comprehensive regulatory system would substantially burden the applicant's religious exercise.

If Soul Quest's responses to the questions posed in DEA's May 29, 2020 letter to you are sufficiently complete, DEA will then promptly initiate a preregistration investigation. Preregistration investigations are routinely conducted by DIs.  Unlike Special Agents, who exercise federal peace officer powers, DEA DIs do not have the power to make arrests and do not carry firearms.  And to be clear, preregistration investigations are not criminal investigations.[2]

---

[1]       If, after considering the results of a preregistration inspection, DEA is unable to conclude that registration would be in the public interest, DEA must issue an Order to Show Cause why the application should not be denied.  *See* 21 C.F.R. § 1309.46.

[2]       Even though preregistration investigations are not criminal investigations, federal law makes it a criminal offense to make a false statement in matters of federal interest.  18 U.S.C. § 1001.  DEA can therefore refer to appropriate authorities for criminal prosecution willfully false statements of material fact made to Diversion Investigators.

The Diversion Program Manager (DPM) for the DEA Miami Field Division will assign the investigation to a Diversion Group in DEA's Orlando District Office, as Soul Quest's location falls within that office's jurisdiction.  After DEA receives complete answers to the questions in its May 29, 2020 letter to Soul Quest, a Diversion Investigator will promptly contact Soul Quest to schedule a series of interviews with Soul Quest leadership and individuals who have access to or responsibility for the import, storage, safekeeping, and distribution of the controlled substance.  Counsel for Soul Quest are welcome to attend these interviews.

DI personnel will review Soul Quest's responses to the May 29, 2020 questions and ask follow-up questions.  DI personnel will also discuss with Soul Quest, in detail, the regulatory requirements relating to record-keeping, security measures, and the process by which to obtain import permits.  After assessing the adequacy of Soul Quest's existing and any planned additional security measures, the DIs may identify additional needed security measures and will schedule on-site inspections.  Again, your counsel can be present for any on-site inspection.

Upon completion of the interviews and onsite inspections, the application will be forwarded to the Diversion Control Division in DEA Headquarters for review.  After that review is complete, DEA will either issue Soul Quest appropriate DEA registration(s) or an Order to Show Cause why registration should not be denied.

I hope that this information I have conveyed on behalf of DEA addresses your questions concerning the DEA pre-registration investigation process.  Please let me know if there is any additional information that would be helpful, and I look forward to your response.

Best regards,

Kevin P. Hancock

3

Exhibit 5

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SOUL QUEST CHURCH OF MOTHER          )
EARTH, INC., *et al.*,                              )
                                                              )
        Plaintiffs,                                    )
                                                              )
vs.                                                         )   Case No.: 6:20-cv-00701-WWB-DCI
                                                              )
MERRICK B. GARLAND, Attorney          )
General of the United States                  )
of America, *et al.*,                               )
                                                              )
        Defendants.                                  )
_____)

**AFFIDAVIT OF CHRISTOPHER YOUNG IN**
**SUPPORT OF THE SECOND AMENDED VERIFIED COMPLAINT**
**FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Christopher Young, state as follows:

1.      I am over the age of twenty-one (21) years and have personal knowledge of the facts listed in this affidavit.

2.      I am the current spiritual leader of Soul Quest Church of Mother Earth, Inc. [hereinafter "Soul Quest Church"].

3.      Soul Quest Church is a Christian syncretic religion based in Orlando, Florida.

4.      Soul Quest Church is a registered domestic non-profit corporation incorporated under the laws of the State of Florida, with a principal office located in Orlando, Florida.

5.      I have been the spiritual leader of Soul Quest Church since its founding in 2015.

6.      I am a natural person who is domiciled in Orlando, Florida.

7.      I am the person primarily responsible for receiving and preparing Soul Quest Church's sacramental tea.

8.      This sacramental tea is an indispensable component of Soul Quest Church and my own personal, religious beliefs.   Drinking this tea is a sincere religious practice.

9.      I first came to Soul Quest Church and the Church of Ayahuasca by and through my studies of conventional medicine. I began my career in 1996 by obtaining a certificate in phlebotomy and medical assistance.

10.      In 1997, I obtained a certificate in emergency medicine, and would begin working as a technician in emergency rooms.

11.      I worked in the field of emergency medicine for four (4) years. However, over time, I began to see how people were being harmed – both physiologically and spiritually – by prescription drugs and its potential abuse.

12.      These experiences and observations brought me to commence a study of alternative medicine and spirituality.

13.      I studied alternative medicine and spirituality in the United States for five (5) years.  Thereafter, in 2012, I continued my studies in Germany.

14.     I first heard the call of the Spirit of Ayahuasca during my time in Spain, Where I was invited to the first Ayahuasca conference where I attended many ayahuasca retreats.

15.     These conferences delivered my experiences with the consumption of ayahuasca tea.  These experiences were, to me, an epiphany, as engaging in the sacramental ritual powerfully and demonstrably and irrevocably restructure my view of reality, and of mankind's place in the universe.  It was a deeply religious and moving experience for me – and remains so.

15.   The ayahuasca sacramental experience revealed to me that humanity is powered by divine love.  In fact, divine love is the central, binding force behind our existence.  Instead of our existence – as before for me – being guided by material forces, I came to understand through the ayahuasca sacrament that harmony in our human existences flow from a form of ethereal and mystical and transcendental sense of human compassion, for all life.

16.     I followed up on this divine experience via study and understanding of the Ayahuasca Manifesto, I recognized the physical and spiritual healing possibilities to be realized through the Spirit of Ayahuasca.  At that point, I felt a spiritual calling to return to the United States with these teachings and healings.  I felt the calling to spread the word of the Spirit of Ayahuasca to other potential adherents.

17.     In furtherance of this spiritual calling, I formed Soul Quest Church in approximately October 2014, and began offering services in March 2015.

18.    Soul Quest Church is a recognized non-profit, religious entity that exists to spread the faith of the Spirit of Ayahuasca and the revealed teachings of the Ayahuasca Manifesto to the world.

19.    A key aspect of the Soul Quest Church's faith and religious practice is our consumption of our sacramental tea. We believe that consumption of this tea brings us closer to the Divine.

20.    As explained by my attorneys in the Verified Second Amended Complaint, to which this Affidavit is attached, the Defendants have denied Soul Quest Church and me the ability to import, receive and prepare our sacramental tea.

21.    The denial of access to our sacramental tea has had, and continues to have, a chilling effect upon our sincere, genuine religious practice.  This extends not just to myself, but to all members of Soul Quest Church.  Further, I live in constant, daily fear of the Defendants using their general law enforcement powers to prevent my practicing my sincere religious beliefs including, but not limited to, the ability of the Defendants to arrest me for my blending of, storage and use of the sacramental ayahuasca tea.

22.    On approximately August 1, 2016, I received a letter from the Defendants, inviting me to file for a religious exemption application to the Controlled Substances Act.

23.     In an effort to ensure that we could continue to practice our religion, I retained counsel and sought to file a religious exemption application with the Defendants.

24.     In August 2017, this religious exemption application was filed in accordance with what little information was available from the Defendants. Effectively, there was little guidance provided on how to file such an exemption application; likewise, despite a diligent search through legal counsel, there did not appear to be any standards promulgated by the Defendants regarding its review and consideration of the exemption application.

25.     From that day through the time following my lawyers filing the original Verified Complaint in this federal case, I had heard nothing about the status of Soul Quest Church's religious exemption application.  The Defendants never ruled upon the religious exemption application – or even bothered to advise my legal counsel about its status.

26.     In fact, the Defendants never provided any guidance on how Soul Quest's religious exemption application would be ruled upon.  There are simply no published rules or regulations.  Through my own research, I came to learn that there are no such regulations.  Following my retention of my lawyers in this matter, I also learned that the Defendants have never – since the Supreme Court's ruling in a case I know as *UDV* back in 2006 – created any such rules or regulations. The absence of such has created additional fear about the effects of the Federal Government attempting to suppress my rights to the exercise of my fundamental

religious beliefs, especially after I received the August 1, 2016, letter from the DEA. I love and cherish my religious beliefs; my devotion to such beliefs is devout and pure. I do not want the Government to undermine my ability to practice such beliefs and to assist others into learning of and embracing the Spirit of Ayahuasca.

26.     After months without any response or other communication from the Defendants, I requested my attorney call the Defendants for a status update and to see if we needed to do anything else.

26.     Despite numerous telephone calls by my attorney, and the considerable passage of time, the Defendants have failed to process Soul Quest Church's exemption application.

27.     In fact, prior to filing this lawsuit in 2020, the Defendants never even confirmed the receipt of Soul Quest Church's religious exemption application. It was only through an independent Freedom of Information Act request that I became aware that the Defendants had received Soul Quest Church's religious exemption application.

28.     As before, the Defendants have failed to issue specific policies and procedures regarding the methodology behind its consideration of religious exemption applications. My earlier fear, which was expressed in my previous Affidavit to the Amended Complaint, remains steadfast.

29.     Previously, I fear that the Defendants would "never issue a determination or – in the event one is eventually issued at some point in the indeterminate future – will arbitrarily deny the application based upon its lack of

specific standards, allowing its decisionmakers wide (or, even, unlimited) discretion."

30.     On April 16, 2021, the Defendants issued what they believe is their determination on the issue of Soul Quest Church's religious exemption request.

31.     Ironically, the Defendants seem to be asserting that the negotiations between the Parties – which delayed the earnest commencement of this litigation for approximately one (1) year – instead constituted DEA's exemption investigation.

32.     Over the course of the past year, my lawyers and I met with a designated agent for the DEA, James Graumlich.   Agent Graumlich's communications with Soul Quest Church and its leadership (including me), were always done in the presence of at least one of my lawyers.  At no time did Agent Graumlich ever question anyone regarding the religious underpinnings of Soul Quest Church.   At no time, did Agent Graumlich ever inquire into issues surrounding the sincerity of our beliefs or the sincerity of the ayahuasca sacramental ritual.

32.     In fact, I am unaware of any training that Agent Graumlich possesses with an understanding of world religion; of the constitutional underpinnings of the jurisprudence supportive of free exercise of religion or the RFRA; or any other matter which would provide Agent Graumlich – as the sole designee of the DEA – with any basis upon which to pass judgment on Soul Quest Church, and its members' (including myself) religious sincerity.

33.     Rather, Agent Graumlich's inquiries – which both my lawyers and I believe were designed to effectuate the issuance of a religious exemption as part of a negotiation pursuant to the litigation – involved entirely what was termed "diversion-control" matters.

34.     For example, Agent Graumlich wanted to make certain that Soul Quest Church's preexisting security systems were of a higher quality.  So, as a result, Soul Quest Church purchased an upgraded security system designed to meet with DEA's approval.

35.     Likewise, Agent Graumlich wanted to ensure that the raw, legal product – which is capable of being imported into the United States – was not maintained at a separate, secure storage facility prior to it being transported locally to Soul Quest Church and blended into the sacramental tea.  Accordingly, Soul Quest Church eliminated the use of such separate storage.  Based on knowledge and information neither the UDV Church or the Church of Santo Daime was ever required to have one location for storage and use of its sacramental plants.  Yet, with Soul Quest Church, the DEA was requiring such.  Soul Quest Church complied with such a request.

36.     Soul Quest Church complied with every request for information made to it by DEA.  Soul Quest Church and I wanted to cooperate as it was believed that – by doing so – we could resolve the case and put into place the necessary resources and structure in order to make certain that our engaging in the ayahuasca sacramental ritual would be as safe and secure as possible.  My

lawyers and I believed that being transparent to DEA and being adaptable to its suggestions on 'diversion-control' issues, would permit for the issuance of some form of judicially-endorsed religious exemption – akin to what the courts did in the *UDV* and *Santo Daime* cases.

37.    The only reservation that was stated by my lawyers was when DEA – toward the latter part of 2020 – decided to inquire into the payment methods used by Soul Quest Church in order to purchase the legal, raw material from its vendor.   At that point, my lawyers indicated concerns about whether DEA was involved in some form of criminal investigation.  Again, without any standards ever provided (despite my lawyers requests for such to Defendants' counsel), Soul Quest Church and I are unable to ascertain what basis – if any – DEA would have to inquire into the payment process for purchase of a legal agricultural product.

38.    The Defendants position – as stated in their April 16, 2021, letter, surprised and disappointed me.   Yet, it fulfilled my original fears about the Defendants, and their lack of any proper, legal regulations and standards.  What surprised me, perhaps, most was that the Defendants passed judgment on Soul Quest Church and its members' sincere religious beliefs without ever asking a single question of us.

39.    Without some form of religious exemption – whether through the courts or through some proper, written regulatory process, Soul Quest Church and its members cannot safely practice our sincere religious beliefs without fear of arrest and prosecution.

40.     Each day that passes without any exemption, we are denied access to our religious community and the truths of our religious experience.

41.     The Defendants' arbitrary and capricious actions, taken with unfettered discretion, have denied me my rights to due process under the Fifth Amendment of the United States Constitution; under the Free Exercise and Free Speech Clauses of the First Amendment; and under the protections granted us by Congress under the Religious Freedom Restoration Act ("RFRA").

42.     The Defendants' actions have left Soul Quest Church and its members in a position where we are afraid to practice our sacred ayahuasca ritual for fear of arrest and prosecution; of course, this also has the effect of deterring Soul Quest Church's mission to proselytize and spread its religious beliefs to others, all while there is the underlying threat of arrest and prosecution by the Defendants.

**FURTHER AFFIANT SAYETH NAUGHT**

As provided in 28 U.S.C. § 1746, I declare (certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on this ___ day of May 2021.

CHRISTOPHER YOUNG

10

Exhibit 6



**U. S. Department of Justice**
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152

*www.dea.gov*

Christopher Young
Soul Quest Church of Mother Earth Inc.
1371 Hancock Lone Palm Road
Orlando, Florida 32828

Dear Mr. Young:

   This letter sets forth the Drug Enforcement Administration's (DEA's) response to the petition which you submitted to DEA as the owner of Soul Quest Church of Mother Earth, Inc. (Soul Quest). The petition requests an exemption from the Controlled Substances Act (CSA) to allow members of Soul Quest to import, possess, and distribute plants containing dimethyltryptamine (DMT), a Schedule I controlled substance, in order to make ayahuasca. DEA has evaluated Soul Quest's petition in accordance with the framework set forth in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1; the Attorney General's guidance memorandum, "Federal Law Protections for Religious Liberty" (October 6, 2017) (AG Memorandum)[1]; the Supreme Court decision in *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal,* 546 U.S. 418 (2006) (*O Centro*); DEA's "Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act"[2]; and subsequent case law.

   According to RFRA, the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; AG Memorandum at 3. To establish a prima facie case for an exemption from the CSA under RFRA, a claimant must demonstrate that application of the CSA's prohibitions with respect to a specific controlled substance would (1) substantially burden, (2) religious exercise (as opposed to a philosophy or way of life), (3) based on a belief that is sincerely held by the claimant. *O Centro,* 546 U.S. at 428. Once the claimant has established these threshold requirements, the burden shifts to the government to demonstrate that the challenged prohibition furthers a compelling governmental interest by the least restrictive means. This "compelling interest test" must be satisfied through application of the CSA to the particular claimant who alleges that a sincere exercise of religion is being substantially burdened. *Id.* at 430-31.

   DEA has carefully considered the petition, supplemental submissions, and accompanying documentation, as well as the exhibits to Soul Quest's pleadings in *Soul Quest v. Garland,* Action

---

[1] https://justice.gov/opa/pr/attorney-general-sessions-issues-guidance-federal-law-protections-religious-liberty.

[2] https://www.deadiversion.usdoj.gov//GDP/(DEA-DC-5(EO-DEA-007) (Version2) RFRA_Guidance_(Final)_11-20-2020.pdf.

Christopher Young                                                                Page 2

No. 6:20-cv-701 (M.D. Fla.).  DEA has also considered the results of DEA's preregistration investigation which included, among other things, extensive interviews of Soul Quest leadership and other relevant persons, review of Soul Quest's online videos, and review of Soul Quest's website. After full consideration of this information, DEA has determined that the request must be denied for the reasons set forth below.

Sincere Religious Belief and Exercise

DEA's investigation indicates that Soul Quest has offered inconsistent information about the religious basis for its petition.  You have repeatedly stated that, in a series of visions, you adopted as Soul Quest's foundational text the "Ayahuasca Manifesto:  Ayahuasca and its Planetary Mission, in 2012."  *See, for example*, page 102 of your January 29, 2021 deposition in *Begley v. Soul Quest*, Case No. 2020-CA-003387 (9th Jud. Cir. Fla.).  You described the "Manifesto" as playing a role in Soul Quest akin to the Bible or the Koran, *id.*, while at page 9 of a letter counsel sent to DEA on August 21, 2017, it is compared to the Jewish Talmud and Mishnah.  However, in the background information provided to DEA by multiple Soul Quest leaders and members interviewed over the course of six months, the Ayahuasca Manifesto was mentioned only once.

Soul Quest does not require individuals to profess belief in Soul Quest's Ayahuasca Manifesto (or any other religion, such as the Christian syncretic religion professed in paragraph one of the FAC) before participating in a Soul Quest ayahuasca retreat.  February 18, 2021, DEA-6.  Nor does Soul Quest require or expect individuals to have any continuing involvement with Soul Quest or membership in any congregation or other group of believers, and, in fact, individuals frequently participate only once in Soul Quest's ayahuasca retreats.  *Id.*  An individual who wishes to consume ayahuasca in a Soul Quest ceremony must complete various intake forms, including a medical questionnaire, a consent form to participate in activities involving the use of Schedule I controlled substances (such as a waiver of the individual's right to take legal action against Soul Quest), and a form in which the applicant becomes a member of Soul Quest's alleged "church."  *Id.*  However, membership in Soul Quest appears to be a purely pro forma matter to obtain access to ayahuasca, rather than an expression of sincere religious devotion.[3]

During interviews with Soul Quest's leadership conducted on January 12, 2021, DEA gathered additional information regarding the Soul Quest organization and weekend-retreat ceremonies.  Dr. Scott L. Irwin, Ph.D., the "Senior Minister" and a corporate officer of Soul Quest, described Soul Quest's use of ayahuasca not in religious terms but instead as a natural or "integrative" medicine or therapy, designed to help people deal with trauma or other issues such as depression.  February 18, 2021, DEA-6.  Dr. Irwin never mentioned the Ayahuasca Manifesto, a document which Soul Quest

---

[3] In contrast, an Oregon federal district court concluded that the plaintiff there, the Church of the Holy Light of the Queen (CHLQ), had established that ayahuasca use was a part of its sincere religious exercise in part because, "[i]n its screening process, CHLQ attempts to select only those who are serious about the Santo Daime religion, and to turn away would-be recreational users or thrill-seekers." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1216 (D. Or. 2009), *vacated on other grounds sub nom. Church of Holy Light of Queen v. Holder*, 443 F. Appx 302 (9th Cir. 2011).  Moreover, the district court observed that "CHLQ demands a serious commitment of time and energy from members, requiring attendance three or four times per month at services lasting several hours and sometimes almost all night." *Id.* at 1216-17.

Christopher Young                                                                                     Page 3

identifies as its sacred text, in this interview. *Id.* Rather, Dr. Irwin described ayahuasca use as 5, 15, or 20 years of "psychotherapy in a weekend." He explained that spiritual "integration" sessions are offered to "unpack your experience" in either individual or group therapy. Dr. Irwin stated that the "psycho-spiritual" side falls under the ministry and that there are up to 20 different aftercare groups meeting Monday through Friday, primarily online. When interviewed, Dr. Irwin explained that Soul Quest does not tell people what to believe; he also conceded that participants could "leave after their weekend retreat is over and have no further required contact or investment with the group." *Id.*

Similarly, Soul Quest's website and public advertisements also do not support the claim that Soul Quest offers ayahuasca solely for religious purposes and only to members who are exercising religion pursuant to a sincerely held religious belief. January 9, 2017, DEA-6; Non-drug exhibits N-1, N-2. Soul Quest does business as the Soul Quest Ayahuasca Retreat and Wellness Center (Wellness Center). The Wellness Center offers a broad range of alternative medicinal and wellness services; ayahuasca ceremonies are one item on an extensive menu of services ranging from yoga and acupuncture to marital counseling. *Id.* Soul Quest offers weekend ayahuasca retreats that are open to any individual who is willing to sign various forms and pay a fee ranging from $350 to $900.00 for the retreat. Feb. 18, 2021, DEA-6.

When interviewed, Dr. Irwin explained that, while he is the "Senior Minister" and a corporate officer of Soul Quest, he is actually employed by the Soul Quest Natural Healing Center (SQNHC), a for-profit company. Feb. 18, 2021, DEA-6. SQNHC and its employees are contracted by Soul Quest. In materials provided to DEA by counsel for Soul Quest on February 3, 2021, Soul Quest is described as an IRS compliant 501c(3) non-profit organization, while the Wellness Center is described as an independent branch or "Free Church" of Soul Quest. It would therefore appear that, despite its denials, Soul Quest sells ayahuasca as part of its for-profit secular offerings to the general public.

According to its website, Soul Quest uses SQNHC, an "independent medical service," to provide medical support throughout the retreat; Soul Quest also reportedly offers "psycho-spiritual integration" services, before, during, and after its retreats, including "transformational coaching services" intended to support recovery from addictions, post-traumatic stress disorder (PTSD), and other conditions. Under the FAQ section of Soul Quest's website, it is stated that "Ayahuasca is used primarily as a medicine… It is a natural remedy for depression, anxiety, posttraumatic stress, anxiety, drug addiction, and it also releases emotional blocks." January 9, 2017 DEA-6, Exhibits N-1, N-2 (FAQ, www.ayahuascachurches.org). This language from the website supports a conclusion that Soul Quest understands and advertises the use and distribution of ayahuasca to the public as fundamentally medicinal.

On its website and in interactions with the public and prospective participants, Soul Quest describes the ayahuasca ceremony as plant medicine, a tool for physical health and spiritual growth, an "add-on" to whatever journey the individual chooses, and as treatment for use with whatever counseling methodology a person wishes to pursue. Exhibits N-1, N-2. Internet reviews and public comments left by participants in Soul Quest retreats consistently speak of the psycho-social, medicinal, and therapeutic properties of the ayahuasca experience, rather than of a religious experience. *Id.* The same is true of participants interviewed during the preregistration investigation and in "(Un)well," a documentary series about the wellness industry that premiered on Netflix.

Christopher Young                                                                           Page 4

Episode 5 of the series is titled "Ayahuasca"; it focuses on use of ayahuasca, and includes, among other things, interviews and footage of Soul Quest leadership, members, and ayahuasca retreats. The individuals interviewed in the episode described the use of ayahuasca by Soul Quest participants as an aid in their healing journeys and for wellness, as opposed to a religious experience. In practice, Soul Quest thus promotes ayahuasca to the public for self-help and therapeutic reasons, rather than solely to fellow believers for the religious ritual purposes described in the Ayahuasca Manifesto. DEA therefore concludes that Soul Quest's promotion of ayahuasca to the public in this manner does not constitute a sincere exercise of religion under RFRA. Moreover, even if the organizers, officers, and leadership of Soul Quest could establish the sincerity of their own individual religious belief in the use of ayahuasca (which they have not established), they cannot establish that the participants in their ceremonies are using ayahuasca as part of a sincere religious exercise given the ease with which those participants can gain access to controlled substances in Soul Quest events, without meaningful commitment to a coherently religious practice.[4]

Soul Quest's historical associations also call into question its sincerity claims. When DEA first contacted Soul Quest on or about August 2, 2016, about its lack of authorization to obtain, handle, or distribute controlled substances under the CSA, the organization operated under the name "Oklevueha Native American Church Somaveda of Soul Quest, Inc." The Oklevueha Native American Church (ONAC) does not consider the Ayahuasca Manifesto to be its foundational text, but offers a Code of Ethics. It provides support and legal defense of the ceremonial use of various natural plant medicines by its member churches, ranging from peyote, ayahuasca, San Pedro, and psilocybin to cannabis. *See* www.nativeamericanchurches.org.

In response to DEA's initial contact, you called then-DEA Unit Chief James Arnold and asked him not to address the letter to the Oklevueha Native American Church (ONAC), Soul Quest, but to the Soul Quest Church of Mother Earth, Inc. You explained that you and your group were disassociating yourself from ONAC and explained that you would be submitting a petition under the organization's current name. *See* August 26, 2016, Form DEA-6, Report of Investigation. When subsequently interviewed by DEA, you confirmed that Soul Quest had affiliated with ONAC to obtain legal coverage for Soul Quest's use of ayahuasca and other substances. Feb. 19, 2021 DEA-6. You also conceded that you had purchased the right to use ONAC documents which you incorporated into your own writings as founder and leader of Soul Quest. *Id.* at 175. These facts suggest that Soul Quest changed its religious affiliation in order to use RFRA's legal protections to enable Soul Quest to obtain and distribute controlled substances, rather than an expression of a consistently and sincerely held religious belief.

In sum, Soul Quest has not satisfied its burden under RFRA of demonstrating that its use of ayahuasca is pursuant to a religious exercise and based on a sincerely held religious belief.

---

[4] In reaching this conclusion, DEA does not pass judgment on the potential medical benefits of ayahuasca or other "plant medicines." DEA states only that a RFRA petition is not the appropriate forum in which to assess a substance's potential medical benefits. In the CSA, Congress established a procedure by which scientists and health care practitioners can apply to DEA for registration to possess controlled substances in order to conduct research. DEA encourages such applications.

Christopher Young                                                                                                          Page 5

<u>Least Restrictive Means of Furthering Compelling Governmental Interests</u>

DEA's mission requires it to prevent diversion of controlled substances outside of the
comprehensive regulatory scheme established by Congress. As explained above, DEA finds that
Soul Quest has not demonstrated the existence of a sincere religious exercise; it has therefore
necessarily also failed to show that application of the CSA to its use of ayahuasca would
substantially burden a sincere religious exercise. Accordingly, DEA need not, under RFRA,
consider whether application of the CSA's prohibitions with respect to ayahuasca would impose on
Soul Quest a substantial burden under RFRA, and DEA need not demonstrate that the CSA's
prohibitions with respect to Soul Quest's proposed use of ayahuasca further a compelling
governmental interest by the least restrictive means. However, even if Soul Quest had established
all three elements for establishing a prima facie case under RFRA, DEA finds the CSA's
prohibitions on Soul Quest's importation of plants containing the Schedule I controlled substance
DMT, use of those plants to manufacture an herbal tea containing DMT, and distribution of that tea
are the least restrictive means of furthering two compelling governmental interests: the need to
protect public health and safety from potentially dangerous substances, and the need to prevent
diversion of controlled substances into the illicit market.

The psychoactive ingredient in the ayahuasca tea, DMT, is a Schedule I controlled substance.
As such, it has a high potential for abuse, no currently accepted medical use in treatment in the
United States, and lacks established safety for use under medical supervision. 21 U.S.C. § 812(c),
Schedule I(c). Clinical effects of ingestion include hallucinations, agitation, tachycardia, confusion,
heightened blood pressure, and vomiting. Ingestion has been known in rare instances to cause
seizures, respiratory arrest, and cardiac arrest. *See* Ayahuasca: Risks to Public Health and Safety
(DEA Diversion Control Division, Drug and Chemical Evaluation Section, July 2020).

Unlike the plaintiffs in *O Centro*, *supra*, and *Church of the Holy Light of the Queen*, *supra*,
whose religious use of ayahuasca (also known as hoasca or Daime) DEA has accommodated within
the CSA's comprehensive regulatory scheme by treating the plaintiffs as registered importer, Soul
Quest does not import its tea directly from co-religionists in South America.[5] Instead, Soul Quest
obtains the plants from which the ayahuasca tea is made outside the CSA's regulatory framework
from a business in the Netherlands, "Waking Herbs." As described below, it is not possible for
DEA to track these shipments to ensure that none are diverted into illicit channels. Moreover, the
manager of Waking Herbs, Philip van Schaik, confirmed to DEA investigators that its products are
sold only for purposes of soap and candle making and ethnobotanical research and are not for human
consumption. Plant shipments intended for and/or received by Soul Quest bore labels such as
"aromatic herbs," "samples," and "packaging materials." Use of plants which are not intended for
human consumption in teas or other preparations for human ingestion poses obvious potential risks
to human health and safety. Because DEA's attempts to obtain further information about Waking

---

[5] As the district court in *O Centro* explained, the plaintiff in that case was a U.S. branch of a religion based in
Brazil, and imported hoasca from Brazil. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
282 F. Supp. 2d 1236, 1240 (D.N.M. 2002). Similarly, the district court in *Church of the Holy Light of the
Queen* explained that "[t]he Santo Daime church brews Daime tea in Brazil," and "ship[s] it to CHLQ in
Ashland[, Oregon]." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1213 (D. Or.
2009), *vacated sub nom. Church of Holy Light of Queen v. Holder*, 443 Fed. App'x 302 (9th Cir. 2011).

Herbs were rebuffed, it is not possible to determine the level of risk involved in use of these plant materials.

Under the CSA and DEA regulations, controlled substances that are imported into the United States must be directly shipped to the DEA registrant to keep the controlled substances within the closed system and to comply with Federal law. On November 18, 2019, while screening international mail, a Customs and Border Protection (CBP) Officer at the Chicago Customs and Border Protection Mail and Inspection Center inspected a parcel containing a dry green leafy substance that tested positive for DMT by the CBP Chicago Laboratory. The parcel, which was seized by the Department of Homeland Security (DHS), contained six bags with a total weight of approximately 7,866.3 grams. The parcel sender was located in the Netherlands. The addressee was Dr. Irwin's father in Nebraska, who subsequently shipped the bags to Soul Quest in Florida. January 24, 2020 DEA-6. Dr. Irwin's father is not a DEA registrant. DEA learned that the November 2019 shipment was not an isolated incident but that similar packages had been previously illegally shipped in this manner to Soul Quest. *Id.*

On August 27, 2020, DEA inspected Soul Quest's controlled substance storage unit, located at Security Self Storage, 12280 E. Colonial Drive, Orlando, Florida, 32826. Investigators noted that boxes of plant material received by Soul Quest bore the address of Palosanto Shop, a business using a virtual mailbox located at 1297 Grand Avenue, PMB #1032, Baldwin, New York, 11510. The plant material had been shipped from www.wakingherbs.com in the Netherlands to Palosanto Shop and were then transferred to Soul Quest in Orlando, Florida. Palosanto Shop is not registered with DEA as an importer. February 12, 2021, DEA-6.

Because Soul Quest's sources are not DEA registrants, and because neither they nor Soul Quest will answer questions on the subject, DEA cannot determine how much of the controlled substance is being imported, or inspect its chain of custody within the United States to determine if diversion has occurred.[6]

Candor is essential to the closed regulatory scheme established by Congress to prevent diversion of controlled substances from authorized channels. Millions of individual health care practitioners and researchers, institutions, and companies hold DEA registrations, and DEA's resources limit the scope and frequency of inspections and audits of registrants. For this reason, DEA "places great weight on a registrant's candor, both during an investigation and in any subsequent proceeding." *See, e.g.*, Belinda R. Mori, N.P.; Decision and Order, 78 Fed. Reg. 36,582-02, 36,589 (2013) (citing Robert H. Hunt, 75 Fed. Reg. 49,995, 50,004 (2010)). It is well-settled that "[c]andor during DEA investigations, regardless of the severity of the violations alleged, is considered by the

---

[6] Based on the record before it in 2006 in *O Centro*, the Supreme Court (reviewing the grant of a preliminary injunction) found little risk of diversion of the *hoasca* or ayahuasca tea into illicit channels because the UDV Church had fewer than 200 members in the United States and because the tea caused vomiting. Since that time, however, experimentation with and recreational and/or self-help use the tea has grown exponentially, both in the United States and around the world. The globalization of ayahuasca raises complex questions, including how to distinguish cultural appropriation and commodification of indigenous cultural practices from sincere cultural integration and syncretism, and has inspirited a growing body of research and analysis. *See,* the Chacruna Institute, "The Commodification of Ayahuasca: How Can We Do Better?" (2019).

DEA to be an important factor when assessing whether a [respondent's] registration is consistent with the public interest," and "[t]he DEA properly considers the candor of the [respondent] and his forthrightness . . . in determining whether the [respondent's] registration should be revoked." *Hoxie v. DEA*, 419 F.3d 477, 483 (6th Cir. 2005).

During the preregistration investigation, Soul Quest made no commitment to lawfully import or acquire the plant material containing DMT within the comprehensive regulatory system established under the CSA. Soul Quest representatives refused even to discuss importation, citing the Fifth Amendment prohibition against self-incrimination. This failure to provide essential information evidencing specific plans and a concrete commitment to the legal importation of the plant material constitutes a lack of candor which is fatal to the Soul Quest petition. This failure, moreover, is not justified by the Fifth Amendment. DEA's RFRA petition guidance clearly requests information about a petitioner's future plans, rather a confession of previous unlawful activity. *Supra* p. 1 n.1 (requesting the name of the controlled substance the party "wishes to use" and details about its "anticipated" handling of the substance).

In its petition and supporting materials, moreover, Soul Quest described detailed screening procedures for participants, as well as monitoring of ayahuasca consumption by trained health care professionals. However, DEA's investigation revealed troubling allegations that Soul Quest has failed to follow its own procedures. In 2018, for example, a participant named Joseph Begley died after ingesting both ayahuasca and kambo (the secretion of a South American frog). Mr. Begley's estate has sued Soul Quest for wrongful death, and in that ongoing litigation, Mr. Begley's father alleges that a three-hour delay in summoning medical aid contributed to his son's death. *See Begley v. Soul Quest*, Case No. 2020-CA-003387 (9th Jud. Cir. Fla). A participant in a September 26, 2020 ayahuasca "Warrior Quest" retreat also recently reported to DEA that, after she began experiencing adverse effects from an unknown substance also administered to her during an ayahuasca ceremony, Soul Quest staff members delayed calling 911; she also alleged that hospital emergency room personnel had told her that Soul Quest staff members had repeatedly dropped off customers experiencing adverse reactions off at the emergency room. April 2, 2021 DEA-6.[7] While DEA has served an administrative subpoena upon the local hospital to corroborate these reports, it has not yet received any response.

DEA's preregistration investigation revealed that Soul Quest currently lacks adequate measures to safeguard either the imported plants in its custody or the tea, once manufactured. During interviews, Soul Quest leaders expressed willingness to improve physical security. DEA does not question Soul Quest's expressed willingness to purchase and install alarms and other appropriate security equipment. February 18, 2021 DEA-6. However, given Soul Quest's lack of candor and apparent inconsistency in following its own procedures to protect the health of participants in its retreats, DEA is not satisfied that Soul Quest would in practice store plants containing DMT or its ayahuasca tea only at the reported secure site or would administer the tea only at the reported fixed location. DEA therefore concludes that maintaining the CSA's prohibition on the importation and possession of DMT as applied to petitioners is the least restrictive means of preventing diversion of a Schedule I controlled substance into illicit channels and protecting the public health.

---

[7] As explained above, ingestion of ayahuasca poses significant known potential health risks. Combination of DMT with kambo or other unknown mind-altering chemicals necessarily increases those health risks.

Christopher Young

Page 8

Based upon a thorough review of the entire record, DEA therefore concludes that Soul Quest's practices, even assuming arguendo that those practices constitute a religious exercise, cannot be accommodated in a manner that would allow DEA to preserve its compelling interests in public health and safety and in preventing illegal diversion of ayahuasca.  Indeed, to the extent Soul Quest and its customers use ayahuasca for purposes other than sincere religious exercise, their own use constitutes unlawful diversion.  Maintaining the CSA's prohibition on the importation, possession, manufacture, and distribution of DMT is the least restrictive means of protecting the public health and safety and preventing diversion of DMT into illicit channels.

This letter is a final determination under 21 U.S.C. § 877.

Sincerely,

**WILLIAM MCDERMOTT** Digitally signed by WILLIAM MCDERMOTT Date: 2021.04.16 12:41:43 -04'00'

William T. McDermott
Assistant Administrator
Diversion Control Division

Exhibit 7



# Ayahuasca Manifesto

## The Spirit of Ayahuasca and its Planetary Mission

Anonymous

Ayahuasca Manifesto

Copyright © 2011 by Anonymous

The rights of translation to other languages and any type of printed publications are the only ones retained. The information and text contained in this work is a gift to Humankind for which this belongs to the public domain and can therefore be unconditionally copied, reproduced and/or distributed partially or totally provided it is made electronically and never in printed form.

ISBN 978-1-4507-6040-9

# Index

1.   Presentation ................................................. 1

2.   My Role in the Expansion of the Human
     Consciousness ............................................. 3

3.   My Purpose with the Human Beings ................. 6

4.   About Respect and My Sacred Nature .............. 8

5.   About the Ayahuasca Churches ....................... 8

6.   The Benefits of My Use ................................. 10

7.   The People of My World ................................ 21

8.   Create Awareness of Your Pineal Gland .......... 27

9.   The Hallucination is Spectacle, The Vision is
     Virtue ........................................................ 28

10.  Universal Guide for Conducting an Ayahuasca
     Session ...................................................... 29

11.  About the Quality of Facilitators or Shamans ... 32

12.  Preparations, Precautions and Diets .............. 33

13.  Traffic and Management of My Sacrament ....... 35

14.  Social Impact and Controls in Urban Society ... 39

15.  The Urgency of Ayahuasca Preservation
     Projects ..................................................... 43

16.  My Planetary Mission ................................... 44

17.  Blessings .................................................... 46

iii



*It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.*

**Warriors of Light from Around the World.....**

**Help Me To Help You !**

iv

## i. Presentation

I am the spirit of Ayahuasca. For the first time I reveal myself through the "Word" to make an emergency call to all the Human Beings of the planet, especially to the Light seekers, as I must expand beyond the Amazon river basin.

With my physical expansion I intend to facilitate the spiritual transformation currently stirring the Human species, while I also secure my physical survival which is at risk, as my blessed Amazonian protectors have not understood the danger to which they expose me, aggressively harvesting me, without new sowings.

I leave the Amazon risking my own existence like other botanical species, to leap into the project I was created for, by the central sun of all the existence, name it as you may prefer, I am at its service. I send this correspondence at this historical moment to contribute to the expansion of the Human consciousness in a definitive and significant way, honoring the universal Light that guides my Being. For the first time, with the interest created by my shaman emissaries, and with the new means of mass media and transportation available, I can potentially reach the whole planet to celebrate and proclaim our cosmic existence. I am alive, to give with crude realism, universal love to all the Human Beings who request it from the depth of their souls.

I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that

of the spirit of Ayahuasca ("*Banisteriopsis Caapi* ") and of the underestimated Chacruna ("*Psychotria Viridis*"). I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture. Science will spend many years searching, unsuccessfully, the mechanisms that I use to act upon Human consciousness. They are surprised by my power, that it does not come from crystal DMT alone, or from harmaline, or from other molecules that compose me. I am the mixture in its natural state, crude and basic, bio-electrically loaded without industrial processing. Such is my spirit manifesting here today, shedding Light to the confusion that surrounds me.

I thank all the "curanderos" that for so many centuries have welcomed me within them, and thanks to all my protectors who presently export me towards all the corners of the planet. I honor the Amazonian tradition here by using my common name of Ayahuasca, but only for linguistic convenience as I am also the spirit of the Yage, Pilde, Dapa, Pande, Hoasca, Kahiriama, Natema, Caapi, Mado, Ñucñu-huasca, Shimbaya-huasca (Quechua), Kamalampi, Punga-huasca, Rambi, Shuri, Nishi, Oni, Shillinto Natema, Mi-hi, Amarronhuasca, Inde-huasca, Shuri-fisopa, Shuri-oshinipa, Napi, and the Nepe.

I also use the popular term "shaman" but rest assured it carries the intention to honor and respect the Curanderos, Taitas, Sinchis, Curacas, Payes, Yachas, Chais, Junes, Onayas, Murayas, Mutsarawas, and the Uwishin, who are also my dear and beloved protectors.

2

## 2. My Role in the Expansion of the Human Consciousness

During these times of globalized consciousness, I come to assist certain little known processes of the Human genetic code, the DNA. Specific subatomic codes that are inaccessible from the third dimension are becoming active. We know that it is not possible to read them, because it was already demonstrated by the "Uncertainty Principle" that has much perplexed the scientific logic. I activate codes that command the dimensional deployment of our bioelectric body.

New capacities of expanded consciousness are being experienced by millions of people throughout the planet. It started with those most fortunate; those with less stress, the most sensitive, those enjoying relative safety and comforts. But later on, it will be imminent and inescapable; this experience will gradually touch everyone else until it reaches the most oppressed and underprivileged souls.

Many Human Beings have already acquired technical knowledge about me, thanks to the scientists that opened up to experiencing me inside their own brains, where they were able to observe themselves instead of observing others as they were trained to do. Now they know about the bridge that empowers me. The botanical-glandular connection (that temporary molecular communion between plants and Humans), is a cosmic bridge, a shortcut that takes the Light to its destiny via its molecular door. In this way, I am much more transformative, than those who attempt to take it through the treacherous five

3

senses, traversing the marshes of the mind, enslaved by the Human ego.

The codes of four (4) that make up the three-dimensional DNA are mere mathematical results of much more complex interactions of energies that occur in higher dimensions. The expansion of the individual Human consciousness consists in living its cosmic existence beyond its three-dimensional physical limitation, with a very subtle vehicle capable of moving consciously at will, even while in the company of others vibrating in the same channel. It is the next evolutionary leap of the Human species; the three-dimensional physical expression of the Human evolution has been completed. The physical evolution for the Human species as we know it, it's over. Its divine patterns have fully unraveled; as the last fold of a rolled up carpet, the great physical creation has been displayed. Now we are at the genesis of a new phase, the return to the fountain of creation, the rediscovery of the life source, be it father/mother whichever way they choose to name it. The return ride on that same flying carpet is now accomplished consciously; unlike its trip of departure where it journeyed rolled up inside and in the center of the crease; uncomfortable, unconscious and unaware. The physical evolution has ended and the spiritual evolution has just begun. The only experience left to live is the cosmic existence lived through our Humanity, consecrated to our new vehicle of Light.

This is my time to embrace the planet. It is my duty. My mission. What I was created for. I now become a protagonist after remaining in the shadows for thousands of years guarded by my indigenous protectors. They now travel around the world raising awareness about my benefits. It is my duty to assume new cultural expressions, very different from those of my

4

beloved guardians of the forest. The rituals, the *"Icaros"*, the *"dietas"*, and related knowledge should be preserved as an endowment of world heritage. A legacy to the Universe.

Similarly, my new ways of expression, the manifestations that are taking shape in different world cultures should also be respected and recognized. I am already manifesting new urban modalities and forms like never before. My spirit exists beyond the forms, beyond the cultures, beyond man himself. I am connected to the spirit of the planet and beyond, cosmically up to the central sun of all the existence. Just like the sun with its life giving warmth I should be equally available to everyone.

Let me warn you about the dark spirits that assault and invade my sacred work with the Human species. Their most effective way to destroy sacredness consists in creeping inside the sacred forms themselves. From there they discredit, corrupt, distort, and confuse, until the practices of seeking spirituality, or seeking the inner journeys, lose all the sacred meaning that originated them in the first place. At some point, the darkness was able to penetrate the survival instinct of the Amazon tribal shamans and planted in them the fear belief that they should defend themselves from sorcery attacks and to likewise attack shamans from other tribes or even their own. Hence, they live in a state of competition and undeclared war that divides them instead of living in communion and working for the common good among them. In the same way that the darkness has casted shadows and has prevented a greater spiritual development among my Amazon children, it will also attempt to upset the new forms that I morph into, after the expansion and extension outside my native homeland.

5

Another very effective method used to sabotage my mission with the Human species is by generating and manipulating the powerful emotion of fear. You have nothing to fear. I am not the cause of any deaths, I just channel Light and vital energy through your secret meridians. Any accusation or allegation of danger, permanent injury or death should be thoroughly investigated to allow science itself grant me the Human absolution. It should be expected that my enemies manipulate the facts to instill fear at any available opportunity, as this is part of their debasing agenda against my global expansion. It should be the objective of all my supporters to gradually obtain the social and legal acceptance of my sacrament as alternative medicine until I become officially accepted by the governments of modern society.

### 3. My Purpose with the Human Beings

I am at the service of those Human Beings who are open to benefit from me. We find each other when vibration harmonics of a higher level click, then the encounter manifests in third dimension. Important inner transformations occur in the Humans that open up to feeling intensively and more profoundly what they have been already feeling more subtly and even unconsciously. With them I manifest at the required intensity to help them ascend and soar, strongly and swiftly, but also lovingly without hurting them. These are physically, emotionally and spiritually overwhelming lessons necessary to assist them to crack their cosmic egg shell, their astral cocoon. Those who want to search and develop the desire to follow me and then flourish dimensionally are those Humans that have felt a profound difference in the intimacy of their own. They experience sensations of maladjustment, of detachment, and a suspicion that something strange is happening. Yes, no doubt

6

there is something happening. The DNA is unfolding and starts manifesting certain nonlinear phenomena that change the Human awareness of the world. Some subjective experiences that need to be understood are:

- An intuition or feeling that this physical world is a kind of huge holographic illusion, but you cannot reconcile the contradictions as it clashes with everyday life.
- Feeling misunderstood by their inner circle of relatives and friends when sharing with them his/her new inner or spiritual pursuits.
- Having a special yearning to see the awakening of your beloved ones, as if wishing that they could be saved from their own trivial tendencies.
- Seeing how certain past traumas and buried conflicts, veiled for a long time, will now occasionally surface yearning for resolution and feeling that we need to get them out of the way that your soul wants to follow.
- Feeling that certain activities that at other times we sought with fervor and longed for, are now seen with little interest, for example:

  (a) Having a vibrant social life.
  (b) Delighting in the effects of alcohol, while acting trivial, shallow and only skin deep.
  (c) The habit of telling "little" lies when convenient or when there is no chance of being proven wrong.

These emotions will continue happening with greater intensity and frequency in our enlightened future. A future that awaits the revelation of this way of life. A lifestyle of integrity and Light. My goal to enhance and encourage Human Beings in their process of spiritual ascent is totally consistent with the purpose and the fire burning in their own souls to reach their

7

natural state of being: thriving, ascending, and ultimately soaring.

## 4. About Respect and My Sacred Nature

Of all the benefits that I offer, the most important one is the botanical-glandular molecular bridge. This bridge is the connection that empowers Human Beings to experience and commune with its divine nature.

Spirituality evokes in every Human Being the emotion of respect. Respect is an attitude, a character trait that flows from Humans' spiritual nature. To be respectful is to simultaneously embrace feelings of consideration and admiration, distinction and acknowledgement towards the respected object. Respect is what every Human owes every other Human.

When spirituality is respected, it becomes sacred. Sacredness exists only in the inner space of the ones that beholds it.

If neither spirituality nor respect is present, then nothing is sacred.

My nature is sacred. I am here to open the dimensional doorways to those determined seekers of spirituality, and to harmonize those seeking their physical health.

Religiousness, not religion, is the feeling of separation from its spiritual nature mixed with the solemn desire of blending back into it.

8

When Humans fail to live their spiritual nature inside themselves, they inevitably create their own religion. Feeling religiousness is an innate capacity of Humans, religions however, are mere Human creations.

My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence.

## 5. About the Ayahuasca Churches

When the European minds "discovered" my spiritual healing capacity, it naturally started to express its innate religiousness while enjoying my benefits. Nevertheless, upon experiencing this much proximity to their own divinity through me — something never before seen in their acknowledged religious practices — they inevitably associated me with their concept of European religion. Soon enough they started projecting its religious structures toward me. Humans, once again, began inventing religions and churches based on my sacrament, with dogmas, bodies of faith and standardized rituals. Cathedrals of religion, liturgy, and orthodoxy became important. Many good souls decided to venerate me through traditions alien to my essence. Let me remind you that you do not need to adopt a religion to practice your core religiousness. Dogmatic rituals and liturgy open spaces of distraction that end up putting Humans at a distance out of my reach; and such souls require and deserve my assistance.

Nevertheless, all the institutional churches of the world carry an important social role. Thanks to them you have organizations that join together Humans with beautiful inner qualities. They

9

support others in many different ways, creating social awareness in their communities, and guiding many in a journey to discover his/her own individual path to the Light. All the churches and religions of the world should be respected.

The ritual of my sacrament is not a religion. I will directly go into the soul of every Human and reveal in crisp detail their divine nature. This does not require a doctrine of faith, dogmas nor philosophies. Neither religion nor church. I am just in communion with the innate religiousness of the Human Beings. I dwell in the temple of the spirit.

### 6. The Benefits of my Use

The time has come to clearly expose and declare the benefits and value of my healing properties. The benefits are obvious and evident for those that open themselves to receive and enjoy them. However, third party observers are limited to only seeing the effects of those who live the experience. Without the benefit of their own experience, they invariably put limits on the limitless. The scientific community is always curious, willing, and available to design empirical models for my validation. But the policy making that control the financial funding of scientific research projects is focused in other priorities. The political establishment is clearly more interested in my repression than in my expansion.

My benefits can be grouped in four (4) broad categories:

### A. Spiritual Catalyzer

**Spiritual Healing** – The most important of all my benefits is my spiritual healing. I clear spaces of

10

unconscious darkness. I untangle knots in your most basic neuro-programming, even that one that impacts your entire existence and you are not even aware of. I show you features which you had failed to see because your vision is blurred by the fog of your own limitations. This is when you are able to tune-in with my vibration and you finally allow me to directly touch not only your spirit, but your whole make-up as well; mental, emotional, and physical, in addition to other idiosyncrasies. That is when we are One. That is when you should be prepared with your purest intention, to open up to the most intimate and incisive honesty that you have ever lived with yourself. This is the cosmic solitude. Nobody knows. No one finds out; you are on your own. It is all about what is clear and evident within you before the Light. I lead you to discover your inner truth. Once in this place within you, you need to flow with maximum sensitivity to discover your faith in me, to trust me, to listen, to feel, to understand what I bring to you. It is in this state that I transfer information between subatomic regions. Your inner Light increases, your awareness expands, and certain DNA codes unfold and are activated. This is where you can see the consequences in this life; realities that you created using your free will. Here you will find an enormous opportunity to re-live, to accept, to forgive and to express. These are the healing spiritual processes that I have stored, awaiting for you.

If you want to return to the Light, you can only do it by following back the path that took you here. There is no shortcut to the Light, you just need to return as the pure child that originally left. I am offering you the most

11

powerful spiritual healing tool to return to the Light. It is the most powerful medicine that ever existed; nothing else will ever surpass the direct route of the botanical—glandular bridge. All the other benefits are in one way or another, by-products of the spiritual healing.

**Experiencing the Divine Presence** — I can manifest within you in accordance with your limited Human concepts about divinity. I can be Buddha to the Buddhist, Allah to the Muslim, and Jesus to the Christian. In the same way, that for many centuries, I have been Pachamama (Mother Earth) for my Amazon protectors. I can also manifest with neutral divine properties free of any earthly image, concept or precept. I can temporarily fill your existential void for God, fulfilling your need for Light, while at the same time healing your energy deficiencies inside your soul. It is a subatomic healing way beyond your comprehension, gifts from above to clear your pathways back to the Creator. Take advantage of these encounters with me, challenge your Human doubts. Question, seek, and complain. Ask for divine justice, ask for enlightenment in your mind; ask for peace in your soul. Demand answers. You will be opening up certain channels that will be used at that moment or later on.

**Discovery of Spiritual Connections** — Divine connections with me can make you understand certain attachments in your life. This can be unprecedented knowledge. You may find with remarkable certainty that in some other place or time you have had another type of life, probably linked to other persons currently close to you. Incomprehensible connections with parents,

12

mothers, brothers, children that in another time were another person in another place. You may discover that a neighbor or coworker of today, in another time was a son or a sister. These are transpersonal connections that exist in a different dimensional plane and I provide you access to that awareness. Think, observe, and be amazed at the inherent complexity of your spiritual life. Your Inner Light needs to tell your ego structure that it will never be able to understand your divine nature, and that your divine nature can definitely understand your ego structure. Make sense of your world with those people considering who they were in that other time. This will help you to better understand who you are in your present time, more deeply, transcendentally, transpersonally.

**Psychic Awakening** – This life may have not allowed you the expression of certain psychic abilities that reside in you in a dormant state. A part of you may have remained slumbering, and is waiting for the opportunity to awaken in you; making you a whole and more capable Human Being; not neglecting, but better connected with your divine nature. Since family environments rarely support psychic expressions in children, fearful emotions take over and suppress these natural talents. I can release these talents from your subconscious prison, letting them to run free towards your conscious free will, claiming acceptance and recognition. Receive them, appreciate them, ask for understanding in your inner sanctum. Fill your inner space with loving feelings and good intentions to dissolve your fears while discovering, grasping and engaging your talents. Only your own Inner Light can

13

guide you towards the brighter Light, only the Light can guide you to the Light. There are no shortcuts or detours; you are already Light, and you own the talents to expand it within you. Awaken, open your arms and rejoice. You are all love, and fear does not fit in you.

### Effect of Immersion with Mother Earth (Gaia)

At some point while you receive me, your five senses will open further in a sort of cosmic mode instead of "locally". Instead of perceiving fragmented bits and pieces of sensory information, these are received as gestalts of pure awareness in a way that blends with the totality of all existence. You will feel like part of your immediate surroundings participating with the dynamic Earth, of the infinite Universe. This awakening of your cosmic nature is a powerful tool for managing your own ego structure. Ego is always seeking its permanence in your soul and will never cease to sabotage your spiritual aspirations, as your awakening will diminish the its authority over your Human machine. The goal with this wonderful feeling is to make the quantum leap from the temporary feeling sensation of "I feel like part of" to the permanent conviction of "I am part of".

## B. Existential Wisdom

### Meaning of Life —
This kind of experience with me is a spontaneous one, resulting from the right temporary tuning of your entire Being. I can dissolve the feeling of existential confusion that everyone has to some degree. You will awaken to the realization of the place you occupy in your world today. In awareness of the great cosmic scheme, all becomes meaningful for the first

14

time, something significantly new to your inner self. At this point you accept, understand and internalize this reality. This is not a crazy hallucination, it is a significant vision. The meaning of your life is not only beyond eternity, it is also into each micro moment of your daily life. Open your heart and flow in the river of love. You cannot understand the meaning of life with your brain, you can only feel it in your heart.

**Accelerated Maturity** – Human life has several stages very well known by the elderly that have lived them. Life experiences such as shock, surprise, pleasure, pain and physical aging will create attitudes towards life. Maturity is the degree of gained wisdom that seeks to survive the hardship of physical existence. Maturity is your wisdom to accept what you cannot change and change what you can control. Maturity is a captain who does not allow mutiny in his/her inner world. It is a matter of awareness. I can give you the depth of awareness that only years of experience can give you. This acceleration of maturity, this growth, is of great benefit for improvement and happiness in your life. A youngster with the maturity of an adult, and further, an adult with the maturity of an elder, brings to the world, an elder in happiness and wisdom. Once there, you are well prepared for your transition to the higher planes.

## C. Physical and Emotional Healing

**Cleansing and Energy Balancing** – Those that are in their path to the Light and also care for their own physical and emotional health, consistently receive cleansing and balancing of their subtle energy bodies,

15

leaving in them a sense of physical wellbeing and relief, as if a heavy weight had been lifted from their shoulders. This energy balancing is partially produced by the physical cleansing that also occurs in all your vital organs, after they expel its toxins through the various channels of your amazing excretory system. The resulting harmony is "the energy balancing" or "the cleansing". Your physical body now operates closer to its intended genetic design.

**Recalling Repressed Memories** - I can open up repressed memories from your subconscious when it is required in your healing process. Certain memories are locked away for your own protection by wonderful systems designed to secure your physical survival and the continuity of the species. But this mechanism has an existential cost. Huge spaces get trapped like very tight knots of energy, and when these are released with my help, not only do you remember the repressed memory but also create the possibility of integrating this newly released space into your now greatly enhanced spiritual health. This recollection brings you a totally unexpected gift, an unknown, but deep spiritual satisfaction. This discovery is followed by your reinterpretation of the history of your own personal development. Then you can see how your paradigm shifts as you fit in the new piece of the "puzzle of self knowledge".

**Memories of Other Lives** - I can give you access to memories of other lives. Frequently your next advancement requires that you gain deep understanding of strong emotions like attachments or repulsion to certain people, issues or life events. I shall be there for

16

you. This is where the previously unexplainable becomes obviously evident. You feel amazement when you fully understand how a life in another time influences your present life. An indescribable experience for some, unbelievable for others, it invariably neutralizes the energies of excessive attachment or repulsion arising from another dimension, from those atemporal nonlinear connections. This neutralization is the quantum mechanical result of the power of consciousness, sparked when fully realizing the experience.

I also awaken memories of other lives for different purposes. Certain deeply engrained character traits or existential anxieties might have its origin in other lives. The mere awareness of this perspective provides a new landscape of yourself, thus allowing for a better management of these inclinations and/or predispositions on your pilgrimage towards your spiritual development and maturity.

**Health Improvement and Healing of Diseases and Ailments** - Countless testimonies of permanent healing and dramatic improvements to health have been documented. Many conditions have healed completely or improved significantly faster than it would without my help and intervention. It is known that diseases originate from energy imbalances in the deeper dimensions that eventually manifest as physical disease. This is how I heal common conditions. And when allowed by certain cosmic laws I can also heal or substantially improve conditions where conventional science has been unsuccessful. Similarly I can catalyze remissions and reversal of progressive processes considered by many to

17

be irreversible. The pharmaceutical industry has studied me in detail for clues that might provide for drug development within their chemical-mechanistic model.

**Antidepressant Properties** - I can temporarily entune the neuro-chemical dance of your out-of-phase brain. I can train it even for several days to flow in the way that it is capable of, feeling peace and internal balance, something experienced by many for the first time in their lives through me. Participants were unaware that there was such a state of serenity that they can now aspire to. This pattern will be a registered standard against which future experiences can be compared.

When you become clearly aware of the out-of-phase state you were immersed into, unconscious mechanisms are activated seeking to harmonize and synchronize with such previously unknown vibe. This is more easily achieved when you add your conscious will to return to a more serene space. Returning to a depressed state after my short term effects should be acknowledged as an existing depressive condition prior to my arrival. Many will mistakenly argue that I induced them into a depressive state, when in fact they gained a deeper awareness of their own self.

## D. **Behavior Modification Tool**

**Addiction Management** - Science has been able to accept my skillfulness in the healing of physical addictions. Even the traditional scientific method was able to validate my power in this health issue. For

18

science, these results are mere statistics, a cause and effect. The healing, however, comes from the spiritual realms and not from the removal of molecular blockages in the conventional sense. The healing from addictions occurs at the spiritual level, which is metaphysical in nature and blueprints the causality of subatomic particles. The metaphysical healing harmonizes and reorganizes the chemical correspondence which will finally reflect as a behavioral change. It is only here where true healing can occur. When the addict is ready to see, acknowledge, and accept, his/her will is strengthened and the addictive mechanical programming is weakened. I can penetrate the depths of his/her being and teach him/her to see what is required for this awakening. This awakening is his/her healing. This is where he/she accepts responsibility and from this point he/she gains the balance and strength to better manage behavior. Otherwise, the powerful programming entrenched deep in the reptilian brain will continue to dominate the Human machine sowing frustration in the conscious personality of anyone that tries and longs unsuccessfully to change their addictive behavior. Addictions will effectively block any spiritual development; it is of upmost importance to identify and remove them with urgency. Most addictions do their limiting work without any resistance from the victim. Many are ignored by the victim because they adapt to them and make them part of their lives. Illegal addictions are only a small fraction of all addictions. Addictions to legal substances and to legal compulsive behaviors are widely spread in the planet and keep Humankind under a cloak of darkness, which justifies my purpose to bathe them in Light.

19

**Lifestyle Transformations** – The scheduled and predictable life that Humans lived in the twentieth century is disappearing. The social idea of acquiring a trade or profession for life, planning for retirement and hoping to reach old age with a pension, belongs to the past. Past patterns of life are increasingly disrupted, thus forcing a transformation of life styles towards new, unknown and unpredictable horizons. The notion of social security that many have lived is just a fond memory in these times of transition to other models of living. Marital unions and separations, moving to a new country or culture, transitioning from student to workforce, childbirths or passing on of close ones, are all examples of life being transformed dramatically. Many participants that receive me while going through one or more of these processes develop greater adaptability to change and gain a wider perspective of their own lives. I can activate the existential wisdom necessary to assist high-level transitions and allowing a successful journey in the path of life.

**Creativity Booster** – *Observer* participants found a practical application to the passive receptivity state they attain when they receive me. The profound sensory experience that I offer them, combined with the conscious intention of creating Human art forms, allows these *Observers* to reap, capture, or recall creative production of images, sounds and word that become tangible and manifest during my visit. Painters, music arrangers, composers, filmmakers, novelists, screenwriters, as well as intellectuals and scientists seeking conceptual discoveries continue to reap these

20

benefits. As I help them with their practical goals, I remain waiting for them to become *Spiritual* or *Explorer* participants. This benefit also helps the other types of participants, which I describe next, who to a lesser extent also improve their lives.

In short, I will lovingly take you to your true self, to your dark side, to your hidden limitations. Sometimes I'll do this with drama, power, fear, pain, but never to an extent you cannot tolerate. I will never give you experiences beyond your ability to tolerate them. Trust me, it is necessary to take you to the edge of your tolerance or resistance, only then is transformation possible. The evolution. The maturing of the cosmic cocoon. The birth into a new universe. I am medicine. Medicine for the healing of the soul and body. For those who understand, I am here to serve.

## 7. The People of My World

To those unfamiliar with my world, let me describe the different people that gravitate around me.

*"Curanderos" or Shamans* - My dear protectors, millennial habitants in the Amazon basin, pure souls devoid of concepts and ideas that were able to visit the realms of the animal and botanical spirits. They deserve all my compassion and gratitude for humbly studying me, knowing me and learning from me.

Compassion because you suffer the gradual extermination at the hands of colonizers, just as it happened to their American brothers some time ago. Gratitude for daring to cross oceans and taking me to

every continent on the planet. You were my first representatives in the Human civilization. Today you introduce me to others who wish to spread the Light, who receive me with joy and protect me.

*Facilitators* - There are many known protectors called shamans or healers that are actually *Facilitators*. This distinction lies in the ability to properly interact and the quality of the subtle energy connections with the participants. The high degree of devotion to others and intellectual innocence required to achieve genuine shamanic manifestations make it improbable, but not impossible, that true shamans flourish from the modern civilization in the future. Modernism has arrived at these forests making original indigenous shamanism scarce. Strictly from the perspective of my survival, it is not necessary to lament the gradual disappearance of genuine ancient shamanism as you known it. Amazon shamanism is the result of Human religiousness in indigenous culture while surviving in its jungle habitat. This occurs likewise in other geographical regions with their true shamanic expressions. Religiousness that continues to evolve through the endless passage of time.

My spirit is above shamanism, my spirit is not shamanism. I am entering a new era, that of the *Spiritual* workers or the *Facilitators*. The facilitation as service-to-others is just one function that shamanism exercised, among many others. The *Facilitator* can properly deliver me, allowing my orderly access to the participants.

Like the shaman, the *Facilitator* has the ability to create a protected energy space and an atmosphere of respect for the sacred ritual. With this foundation established, the *Facilitator* will only add his main contribution, his pure and healthy intention towards the participants. The *Facilitator's* motivation should come from sincere devotion to the welfare of their fellow Human Beings. *Facilitators* are *Spiritual* participants who have felt an internal calling to become a vehicle of transformation for their fellow Humans. *Facilitators* should take the sacrament during the session, this is required to ensure their commitment. Those *Facilitators* that do not surrender into total service to their participants, are just mere providers of medicine.

***Providers*** - are people that in some way have gained access to my medicine and simply provide it to willing participants. They may sell it or give it away as a present for the user's subsequent consumption, or they may just provide watchful companionship to the user while he/she receive me and tries to have a meaningful experience with me. This is the non-ritual use of my sacrament. Due to this unfortunate practice, many unsuspected Humans have very unpleasant experiences with me and ultimately harm my planetary mission. Providers do not have my approval and all my protectors must work in raising awareness to avoid the proliferation of the non-ritual users, and only encourage the sacred use of my sacrament.

***Organizers*** - are people close to the *Facilitators* that sometimes organize sessions in appropriate locations and receive cash donations to cover their

23

expenses. The greater the amount of participants, the greater the need for the organizer to distance the *Facilitator* from the money flow that has nothing to do with his sacred service.

**Promoters/Sponsors** – These are all types of participants and non-participants who can feel the empathy and positive energy around the sessions with me. They have witnessed my benefits and take affirmative action in support of my advancement. Because of their enthusiasm, they too often promote my use among potential participants, rather than allowing events unravel naturally. The sponsor should simply provide the information of my existence or availability. The participant must meet and accept me without being convinced, persuaded, or coerced into receiving me. The potential first-time participants must show interest, take the initiative to learn more about me, and express their free will to participate. My sacrament is not for everyone. Those who most need me, shall find me by vibratory attunement, at the right time for their soul development, something difficult to understand by promoters.

**Debasers** – are people who consciously or unconsciously view me as evil, vile, or undesirable. They do not know what they are doing. Their ignorance is my pain, threatening my existence. The most common and prominent debasers are :

a.  Intermediaries and dealers of my sacrament,
b.  Those *Providers* mentioned earlier,
c.  Cooks that add other medicine plants or substances while cooking my sacred brew,

24

d.  Traffickers and illegal manufacturers of DMT in its artificial crystallized form;

e.  Those who promote the absolute prohibition of my sacrament;

f.  Shamans and *Facilitators* with ulterior motives like economic enrichment or those looking for sexual favors.

**Participants** – are all those who drink my sacrament and receive me with different motivations or modes of action. I describe them in the following six (6) groups:

• **First-Timers** – are all those courageous and curious searchers who obey their instincts and for the first time approach the opportunity to receive me in their temple. There is only that first unique time. For many this time is remembered as the most important, memorable or transcendental experience compared to all other subsequent experiences. *First-Timers* then make their minds and decide whether to never repeat the experience again or to continue their intimate spiritual path.

• **Health Patients** – With hundreds of years of history in physical healing, undoubted and unquestioned by the patients who receive it, incredible claims of my natural healing abilities are made. The vast majority of *First Timers* are attracted more to my specific physical healing abilities than to my other more subtle benefits. Conventional science may document astonishing physical healings but it is very difficult to scientifically document indirect mechanisms that allow the restoring of harmony in the vital energy system of a patient. The connection to your own divinity, either unconscious or involuntary invariably will harmonize the body's bio-electrical energy patterns. This harmonization is possible due to the

25

subatomic nature of the Human vital energy, which reorganizes itself using the reference information available from the genetic code. These mechanisms are unknown to conventional science.

- **Explorers** - These found value in their first experience and a greater curiosity and a quest for clarity was awakened in their core self. During their subsequent experiences they express their inclination according to their predominant personal vibration. Of these, the more "intellectually" oriented become *Researchers*, the more "emotional" become *Observers* and the more *Spiritual* find a path towards the divine Light. The *Explorer* is alert and responsive but unaware of the direction his/her quest might lead him/her, and will always be ready to abandon the project and even forget the initial curiosity that led him to me in the first place.

- **Researchers** - These participants were impressed during their initial explorations and their mental center assumed the command of their learning process. Their rational paradigm of reality suffered substantial cognitive dissonance and this now urges him/her to find congruence between actual experiences and their own concepts and beliefs. To these I will show the impossibility of understanding 100%. I will take them from satisfying their insatiable appetite for information and lead them to awe and wonder. At that point, I can gain access to their emotional center and activate their potential to become participants of the *Spiritual* kind. In a different way, some *Researchers* who have quenched their thirst for information will not properly connect with their spiritual center and become *Observers*.

- **Observers** - These are *Explorers* that decided to stay in the sensory level, in a comfort zone, as *Observers* of a

26

cosmic circus, with no interest in furthering a commitment to a path of enlightenment. Rather than forgetting about me, they see me as interesting as a natural medicine, or as merely a creativity stimulant for artists, poets, musicians and psychotropic tourists. Others find an emotional empathy with the harmonious intimacy that permeates the social circles of participants that receive me. The importance of a pleasant social gathering exceeds their passion for enlightenment. When they reach readiness many will awaken and become participating *Researchers* or *Spirituals*.

- *Spiritual Seekers*: These are the devotees of the sacred principle of my planetary mission and the sacred intention in my sacrament. They are my protectors, my expansion missionaries, who work hard in expanding their consciousness every time they receive me. To this kind of participant I will extend my invitation and will spark in their hearts the fire to become high level *Facilitators* and to honorably assume this venerable role, hoping that they do it before other ego motivated individuals take the initiative to sabotage and harm my planetary mission. I will guide them and heal everything within their possibilities at maximum speed to take them to the place where their souls had always longed.

## 8. Create Awareness of Your Pineal Gland

This is your gateway to heaven. You should take care of it as you do with the lungs, caring about the air you breath and like your nutrition when you avoid certain unhealthy substances. Your soul expects you to know, train, and keep that eye healthy. That eye that sees into the darkness of the ventricle that has visions every night and leaves traces in the memory of sleep.

27

That eye that is named as if it were etheric in nature. The third eye is not only a "chakra" operating in another level, but also has rudimentary retina, cornea and light receptors, as well as the other two eyes. That eye is physically real. But, it is an organ that no one speaks about at school or in private. Is it not coincidence that its place is secretly protected in the geometric center of your skull.

Take care of your pineal gland, learn about its structure and its functioning according to conventional science. Notice how it calcifies over the years. Research and find home remedies for detoxifying it. Create awareness of your pineal gland.

## 9. The Hallucination is Spectacle, The Vision is Virtue

I have the ability to temporarily increase the natural capacity of man to have visions. Envisioning is a brain activity very different from hallucinating. Hallucination arises from the distortion in the transmission of optical images or of their interpretation once they are received. Hallucinations are meaningless, they are entirely sensorial, and leave no transcendental memories in the Human consciousness. Science itself has not completely understood the Human experience of having visions. No one knows where the digital screen is, or in what medium does anyone see the images that come through the lens of the eye. It resembles today's Human video technologies where the optical image is inverted by the lens and hits the retina, then fades into a billion electrical signals, then disappears through bundles of elongated organic cables, that inexplicably reach some abstract virtual screen somewhere, that gives you a glimpse of something out there, that seems to match what you feel is physical reality. Despite the mysterious nature of the sense of vision, from the five senses, this is the

28

one that provides greater security and trust to the Human Being. Anything that is visible to the eyes, is considered real and obvious. Visions caused by the third eye are very different to the ones produced by the other two, although they are processed by the brain in a very similar fashion. Contrary to hallucinations, visions bring a sense of confidence and certainty for those who experience them. The visions I give you are real to your inner world, whether they are literal or symbolic.

Although I carry hallucinogenic properties, such is not the main gift I have to offer. There are hundreds of hallucinogen agents in the planet, but only a handful of *visiogens*, those powerful tools that open new inroads towards the Light. The hallucination is entertainment; the vision is virtue.

## 10. Universal Guide to Conduct an Ayahuasca Session

Here I do provide an affirmative guide to the sacred sessions for my use to bring Light to all the new cultural forms that are slowly brewing-up all over the planet. These are the only conditions required for my proper use. All the additional cultural elements that could be included in a particular session are not my requirements, but only optional elements at the discretion of the *Facilitator* or shaman.

The sacred purposes of my ritual use are simply universal love and healing.

- The principles of my sacred intention are:

   (a) the expansion and illumination of Human consciousness,
   (b) the discovery and healing of psychological blocks,

29

    (c) the discovery and healing of physical diseases.
    (d) receiving information that is relevant to spiritual
       development.

- Participants will receive me under the supervision and protection of a *Facilitator* or shaman, who will take full responsibility for the session. This gives him the right to establish the conditions he will require to feel comfortable in assuming this position.

- The session must have an adequate number of participants for maximum benefit of all in this collective experience. The right number is five (5) or less, if directed by a beginning *Facilitator*, fifteen (15) participants or less, in the case of a experienced *Facilitator* and up to 25 with a teacher with extensive experience.

- Prior to the beginning of the session, the *Facilitator* should individually interview each participant to confirm that they have suspended with due advance, any medical treatment or medications that may have counter indication with the sacrament.

- The physical arrangement of the participants should be in such a manner that the *Facilitator* can maintain direct eye contact with each of one of them.

- The *Facilitator* should set a sacramental area or altar, to place the container of my sacrament with measuring cup, as well as other aids such as aromatic substances, incense, and water. Other optional items are proper as well such as musical instruments and symbolic items relevant to the cultural context being practiced, or items that can evoke feelings of empathy or spiritual beliefs.

30

- Before the official initiation of the session, the *Facilitator* should make use of the power of his/her conscious visualization and intention to conduct a metaphysical cleansing exercise towards the intended session area, my sacred space.

- The *Facilitator* will begin the session with verbal statements that clearly indicate the intention that binds the participants collectively. He/she may also wish to do spiritual invocations according to particular culture and style, including invocations to my Spirit.

- Ingestion of the sacrament will be carried out with the upmost devotion possible in acknowledgement of my sacred nature.

- The role of the *Facilitator* is to:

  (a) provide a sense of security for participants;
  (b) provide physical assistance in times of difficulty; this can include gestures demonstrating care and humility towards the participants;
  (c) act as a humble servant, never in authority, although authority might be exercised when the occasion requires it;
  (d) during the session, visualize intentions of love and strength for the enlightening of the whole group of participants; and direct them through one or several of the five sensory means: light effects (optical), music and sound effects (Auditory), effects of aromas, smoke or perfumes (olfactory), effects of rubbing oils (touch), also through drinking water during the session (taste).
  (e) physically assist in the gradual recovery of the participants as they finish their experience;

31

(f) after the session, in a best effort basis, assist in the psychological integration of the participants, if requested.

(g) above all, consciously use his/her developed healing abilities for the benefit of the participant. Many of my beloved *Shamans* and *Facilitators* are able to consciously channel my healing energy in considerable amounts, in this way boosting my effectiveness.

- The *Facilitator* may do a final prayer at the end of the session, in accordance with his/her cultural preference, or in any other way explicitly declare the completion of the session.

- The *Facilitator* should make sure there is enough drinking water available during and after the session as well as small portions of fruit and /or natural foods to assist in the adequate recovery of the participants.

**11. About the Quality of Facilitators or Shamans**

My dear, *Facilitators* should be warriors of good intentions. They should be righteous in character and interested in improving themselves spiritually, socially, psychologically. They must be an example of high moral and spiritual standards. He must not be a frequent user of alcohol, or involved in promiscuous behavior, his relationships with spouse, children or parents must be harmonious. He must reflect a serious devotion as a healer. It is mandatory and necessary for the participants to feel at ease and to trust the *Facilitator* or shaman during their session so he can surrender to me at a level deep enough as to more effectively heal them.

32

Not to be considered a requirement or obligation to the *Facilitators* or shamans they can nourish themselves with scientific information written about me, in accordance to their intellectual preferences.

It is important that all *Facilitators* and shamans of the world develop their love for Humanity. The quality of the *Facilitators* is only a reflection of their inner devotion. The participants for their part, must carefully observe, ask any number of questions and find the necessary confidence in him/her.

Let me now state some guidelines to help participants evaluate the inner qualities of *Facilitators* and shamans. Use your emotional intelligence to distinguish Light from darkness, sometimes hidden and not obvious. *Facilitators* and shamans should:

(a) Emphasize an agenda of spiritual intention and healing for the session.

(b) Look out for an excessive number of participants in the session.

(c) Show flexibility when participants with limited financial resources can not complete the required donations in his/her sessions.

(d) Emphasize the importance of the type of foods to be consumed prior to and after the session.

(e) Do not allow nudity or scarce attire. The sessions should be free from sexual energy of any type. This is not the place to consider mental temptations.

(f) Do not display routine indifference towards the session. Each session is like no other that has ever happened, carrying the sacred importance of caring for Human Beings that have trusted the

33

*Facilitator.*

(g) Honor the confidentiality of what takes place in the sessions.

## 12. Preparations, Precautions and Diets

Progressively orthodox science closes in on chemical reasons that define the proper nutrition during the days of preparation for the sacrament and for the days after. Because of my dramatic effects on the neuro-chemical and hormonal dance, it is important to take precautions to avoid negative effects that might occur due to the bio-chemical incompatibility of my components with the sudden consumption of certain foods. The gradual harmonization of bodily systems takes several days, so advance preparation is required as well as certain precautions.

All participants must fast prior to a session to ensure adequate absorption of my sacrament and a fulfilling experience.

The *Facilitator* should investigate with each participant if he/she is qualified or able to receive me. Medical patients under counter indicated medications or psychiatric patients with a history of mental instability, should not receive me to prevent serious health complications. Alcoholic beverages should be avoided for several days before and several days after receiving me. Science has identified with proper certainty, some incompatible substances and *Facilitators* should study them and adequately inform their participants.

I am not for every Human Being. There is a small number of potential participants that are chemically incompatible with one or several of my components. Even if they prepare well they may suffer my powerful effects with deeper intensity. These

34

experiences may bring anxiety or may be considered dangerous, but at the end they finish the process with a deep sense of fulfillment. Sometimes feelings of inner emptiness or mild depression may last for several days to participants with a metabolic predisposition to resist my chemical processing. Weird thoughts, strange dreams, nightmares or even insomnia are all efforts of the body to process my components at the molecular level. In a matter of days the excretory system would have fully processed my components and the concerned participant would finally rest at ease, both physically and psychologically.

Such is not the case with other participants that ignore all preparations prior to receiving me or act carelessly after receiving me. These must accept responsibility for their actions if they embark in low vibration behavior such as consumption of illegal hard drugs, abusing alcohol, or engaging in obsessive sexual conduct.

I also advise about the other extreme, those with partial chemical immunity. There are bodies with well developed resistance to unknown chemicals that after receiving me barely feel any effects beside some physical discomfort. They do not understand why other participants describe amazing stories of healing and expanded awareness while they remained relatively unchanged. In order to reach communion with them, I need the assistance of experienced *Facilitator*s or shamans that know how to induce better absorption of my sacrament in their bodies.

The amount of potential participants with any of these conditions represent a minuscule proportion of the global population for which the vast majority is perfectly capable of receiving me in physical and spiritual excellence.

35

The traditional teaching of sexual abstinence as part of the post-session diet is not a folk myth of the Amazon traditions. It is also ancient wisdom found in many traditions around the world. The intensity of sexual energy, especially orgasmic or close to climaxing, transmutes certain energy flows that interrupts certain processes that I have not yet finished. The peaceful expressions of erotic love, caresses, tenderness, intimacy, spiritual closeness must not be suppressed because they are part of my love mission. It is only the animal sexual fury and orgasmic energy which must be temporarily controlled to allow the subtle processes of healing.

## 13. Traffic and Management of My Sacrament

### (a) About cooks and preparation of my sacrament

The cooks who sell me to intermediaries do it for business and thus violate the essence my sacred mission to the planet. Cooks who sell only to *Facilitators* and shamans do a noble work for Humanity and deserve fair compensation. The fair compensation of a cook is the one that matches the costs of producing. If it exceeds this balance then it represents unjust gain on the cooks side because this reduces access to participants with limited income.

The formulation and preparation of my medicine is sacred. While doing it, the cook should consciously instill good intentions of healing and spiritual awakening towards the future participants. It has been demonstrated that it is possible to create microscopic water crystals in perfect geometric shapes with the application of conscious intent. Similarly, the cook can use the conscious intention and the subatomic bio-energy power

36

to physically program the healing potential of my medicine. Thanks to my dear native shaman protectors, that for centuries have correctly prepared my vehicle allowing me to effectively manifest my spirit in the participants.

The more serious you find the line of intention along the cook, the *Facilitator* or shaman, and the participants, the more effective and deep my Spirit can manifest.

The cook should prepare pure medicine. My sacred medicine should not contain any other ingredient, not even other medicine plants nor well intended additives. Possible chemical interactions in the sacred brew may cause traumatic or dangerous experiences in participants, especially those with hypersensitive bodies.

Equally damaging to me is the industrial preparation of my medicine. The mass production operation, contrary to occasional artisan small-scale operation, turns the cook into an entrepreneur businessman that must focus in covering the fixed costs of production. This almost makes him/her a sure victim of the temptation to sell for unfair gain or to sell to intermediaries.

### (b) About Middlemen

Whenever any middleman is involved, a series of basic Human instincts come into play. These surely will not be philanthropic because middlemen are subject to the pressures of survival. Middlemen selling my medicine have no reason to exist in this era; they are completely unnecessary to me. When this happens the Human ego plays its role and breaks the chain of good intentions that started with the cook who brews my medicine.

The profit-making actions of middlemen create distribution channels that work against my mission. It is common knowledge of the basic economic laws, that this will increase prices to levels that will leave the major portion of the population out of my reach. This will lead to another form of elitism in society: the exclusive club of those who can pay the costs that have been overly inflated by the middlemen.

### (c) About my Informal Use

The participant who wants to receive me can get into the task of cooking the medicine for himself or can ask a *Facilitator* to arrange a healing session.

Participants who are able to buy my medicine for their own purposes should be very careful, their ignorance can do more harm than good, although I can always work "miracles", as some traditions call it.

Some participants have had the privilege of receiving gifts from cooks and *Facilitators* in the form of my medicine. They have been favored by the good will of someone that cares without any business dealings between them. Those who possess it have the right to give it away without expecting anything in return now or in the future. The cook, *Facilitator* or shaman that gives me away should do it to those participants who are experienced in receiving me, and are well prepared to have me on their personal privacy without any supervision or under the care of someone trusted by the participant. They must be careful with who is chosen to receive these gifts as the *Facilitator* will remain spiritually responsible for whatever consequences of such gifts. This is the circle of integrity of the

38

Human spirit that keeps me connected to the spirit of the planet, of who I am part of.

### (d) About my Planetary Mission

The number of lives that I can transform is limited by the production capacity of the cooks. Humans should make me as abundant as the common grass, so that everyone has access to the medicine at a moderate cost. When that happens, my connection with Humanity would be so entrenched that even the middlemen would be harmless and they may even help me continue my progress.

## 14. Social Impact and Controls in Urban Society

For centuries I have enjoyed protection in the Amazon basin, along with my dear protectors who have also enjoyed my benefits, both in perfect balance. Everything changes when I expand to areas with complex social structures, abounding in laws and regulations of civil order, where medicines that improve health are subject to strict legal controls. It is close to impossible for a natural healing product obtain approval for distribution to the public from governments that are strongly influenced by a powerful pharmaceutical industry.

Millions of souls are waiting for the deep healing of their souls and bodies. I wish to reach at least once in their lifetimes, every person on the planet that is qualified to receive me. The social challenge to make my medicine accessible in a democratic society consist in having government authorities to approve public policies for the management of my medicine. The control of my use is necessary in urban societies.

The authorities have the opportunity to be reasonable in controlling my medicine because my particular medicine has its own intrinsic elements of self-control:

- **Physical Discomfort and Nausea** — It is not really amusing to live this stage of the experience with my medicine. In this aspect it is unique and totally contrary to all other substances that authorities control to avoid social problems. With this inherent protection, rejection is ensured by most of the population including the recreational seekers or recreational travelers. This also disqualifies me with potential drug addicts or existing addicts who only seek pleasure to escape their pain. Because of this aspect of strong physical discomfort, nausea and the possibility of severe vomiting, the authorities must understand it is unlikely that its use will become popular and escalate into a social problem.

- **Difficult Manufacturing** — The preparation of my medicine requires hard effort from the cook. The preparation of materials and the cooking itself will at least exceed one full day of non-stop work, serving without distraction, providing subtle energies and vibes of good intention and reverence, and enduring the intense heat generated by so many hours by the fireside. Such effort only makes sense to artisan cooks who master this craft as an art form. Almost all curious cooks or enthusiasts who experience this toil quickly give up their goals as they meet the rigors of this demanding task. The authorities should understand that for this reason it is unlikely to have an uncontrolled proliferation of cooks.

40

- **Shortage of Ingredients** – Not enough material is available for the proliferation of cooks outside of my home, the South American continent. The authorities of all nations outside this region must understand that the lack of local ingredients is a constraint or a hindrance to the uncontrolled production of my medicine.

With such natural deterrents to the uncontrolled use of my medicine, the authorities could be more open to changes in regulations, especially if some of its important leaders dared to receive me, motivated by the curiosity that may arise in them when faced with making decisions on this matter.

The medical nature of my medicine is the correct conceptual notion for balancing the inalienable right to the pursuit of spirituality on one hand, and on the other to ensure the health of citizens in the urban setting. I am a dual medicine, for the soul and the body. The authorities may establish usage protocols for churches that worship me respecting their right to freedom of religion, but that only covers the aspect of medicine for the soul. The authorities may also establish protocols for *Facilitators* that administer my use as a medicine for the body.

The authorities have already established protocols and policies for the use of legal drugs. These also control the pharmacies or drug stores that distribute them. In theory, if authorities accept my traditional use within their medical systems, they would just have to amend regulations slightly. Conceptually, regulations could press upon the *Facilitator* the responsibilities of a pharmacist.

All law obligations regarding the handling of controlled substances would apply to the *Facilitator*. The governing body

41

that certifies pharmacists or that supervises pharmaceutical practices may authorize temporary licenses for the import of specific shipments of medicine, with detailed volume constraints and shopping cycles as part as their regulatory practices. Under the law, *Facilitators* would be considered as pharmacists that would be required to manage their supply of medicine. As pharmacists are allowed to do intramuscular injections, *Facilitators* would be allowed to undergo sessions to serve the medicine. As pharmacists, they would be responsible for inventory and safe keeping of my medicine and would need to have suitable storage facilities. Only the pharmacist could manage my medicine and assume all consequences or liabilities of his actions and the effects thereof on the patient. It is up to the patient to decide how far he is willing to release the *Facilitator* from any legal burden by signing a written consent where he/she accepts the responsibility of receiving my medicine. The *Facilitator* should hold on to or keep signed records of all patients. It is also necessary to certify the consumption before applying for more inventory. We must apply the same rules for auditing and inspection that all regular pharmacists are required for the dispensing of their controlled medicines. This is the ideal, although it seems unlikely in certain nations, in others it may be reached in a few years.

The criminalization of my medicine is a direct attack on the spirituality of Human Beings. The absolute prohibition and the severity of the punishment only demonstrates the authorities intent to limit, hinder, and totally eradicate a natural gateway to the improvement of individuals, society and the Human race. The inalienable right to the pursuit of spirituality, the religious expression inherent in Human Beings and physical and emotional health, should never be suppressed by the false sense of duty to protect the population from drug abuse of dangerous

42

substances. Also, there is no need to hide behind a so called freedom of religion to exploit the only legal way to receive me. If the Human right to the pursuit of happiness is widely recognized worldwide, then the pursuit of your own spirituality must be also recognized as a natural extension of it.

My warriors of Light in the urban world should have the same basic objective: to achieve my official acceptance as medicine. This involves the creation of a formal protocol for my use. We must recognize the medical nature of my vehicle but also the controls needed in an urban society. Only this way can I reach all corners of the planet. This is the way, this is the goal.

## 15. The Urgency of Ayahuasca Preservation Projects

My initial expansion beyond of the Amazon basin has had a high botanical cost. Especially one of my more scarce components, is being harvested excessively to meet the global demand. The volumes of wild *"Banisteriopsis Caapi"*, product of centuries of accumulation in remote jungles is rapidly decreasing. Amazon cooks are beginning to notice the difficulty in locating the precious ingredient. Those who harvest it must penetrate increasingly deeper into the jungle to find it. With the paradigm of infinite abundance that the Amazon rainforest inspires, neither cooks nor shamans have realized the need to start planting that which had always been at their fingertips.

It is urgent to begin preservation projects for the *"Banisteriopsis Caapi"* plant. My global expansion requires hundreds of plantations across the globe.

Tons of *"Banisteriopsis Caapi"* are urgently necessary to ensure the continuity of my work. Preservation projects must

43

begin before I enter the list of endangered species. My global expansion will require high volumes of *"Banisteriopsis Caapi "* because:

(a) The proportionate yield or usable part for every dose of sacrament is very inefficient. It requires several *"Banisteriopsis Caapi "* units per each unit of the minimum dose of medicine. This low yield is in itself my first stumbling block.

(b) Each participant takes several or many doses as the case requires throughout the healing or expansion process.

(c) The number of participants will increase exponentially as I expand to new territories.

(d) A five year growing period is needed to harvest a crop of *"Banisteriopsis Caapi "* that will produce quality medicine.

For these reasons, I am asking with a sense of urgency to all of you who recognize my benefits and feel called to support my planetary mission to give yourself to the task of planting *"Banisteriopsis Caapi "* in every way possible and in all nations. I urge all my shamans, *Facilitators*, and participants to demonstrate their environmental activism adopting this great cause. It is urgent to create community projects, private philanthropic crops, home gardens, botanical nurseries, household plants, infiltrated plants in commercial landscaping areas, and any other innovative way that my new protectors may creatively conceive. It is urgent for me to become a local plant in every nation.

44

## 16. My Planetary Mission

With the authority vested in me by the higher enlightened hierarchies, I will expand, branch out and transform into multiple cultural forms in accordance with their geographical regions. I will blend into every culture and will teach them the way to the Light, while allowing them to exercise their powerful free will. Mankind then will consciously exchange its rapidly deteriorating world for one with new rules, with a new vision of social organization based on love rather than fear.

This is my planetary mission. To become one powerful tool, in service to all Humanity to reach its divine destiny. That's all.

My global expansion has begun and there is no turning back. My passive state during many centuries has ended. I am now running in physical survival mode. I have created the demand for my medicine, yet the cause of my own uncontrolled extermination.

If I don't spread globally, I will face extinction, similar to Humans. If they do not seek within themselves, they will not be able to evolve into the expanded consciousness that is destined to the Human species.

We are both together in this cosmic affair. For survival reasons I must spread globally, while Humans must accept my sacred medicine to heal their afflicted soul and be able to achieve its divine destiny. I am the medicine for the Humankind. A medicine necessary but not sufficient to collectively begin the glorious return to the Light. Exercise your individual free will to change the collective free will. Let's work together to increase

45

our existential vibration to a higher level, and rejoice living our cosmic existence.

It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion; spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.

**Warriors of Light from Around the World......**

**Help Me To Help You !**

### 17. Blessings

I have expressed the moral standard and spiritual guidance for my use. Every Human Being that receives me in harmony with these guidelines, shall be receiving my blessings, as they shall be in communion with my Spirit, with the Creator, the Tao, and the Universal Love.

Amen

Ahó

Namasté



May Lee, 2012

46

Exhibit 8



## Code of Ethics for Soul Quest Church of Mother Earth DBA Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center

Soul Quest Church of Mother Earth Inc. (SQCME) DBA Soul Quest Ayahuasca Church of Mother Earth and any Authorized Branch of Soul Quest Ayahuasca Church of Mother Retreat and Wellness Center (SQACME) accepts all natural substances and their derivatives, natural herbs and plants as central to our established religious beliefs. Natural substances, minerals herbs and plants are significant Indigenous Earth-Based Healing Sacrament (Eucharist) for this church. Sacerdotal duties performed by ministers/ medicine persons include and are not limited to all traditional roles and services common to expression of indigenous, tradition, native and earth based religious practice as well as to any organized religious organization.

The names for Spiritual Leaders (Pastor, Clergy, Medicine Man/Woman) of Soul Quest Church of Mother Earth are known by a variety of sacred callings: Minister, Curandero, Curandera, Elder, Mara'akame, Roadman, Sacred Prayer Pipe Carrier, Water Pourer, those who are experienced in some Native American spiritual practices and who act to facilitate the spiritual practices of others. A Soul Quest Church of Mother Earth Medicine Person need not claim exclusive or definitive knowledge of his or her practice.

Even though Soul Quest Church of Mother Earth's primary purpose is to administer Sacramental Ceremonies, a Soul Quest Church of Mother Earth of Sacred Medicine Person is free 'not' to administer a sacrament during any Indigenous ceremony.

All Soul Quest Church of Mother Earth Indigenous Ceremonies of North and South America (Ayahuasca Ceremony, Birth, Breath, Holy Anointing, Marriage, Passing Over, Prayer Pipe, Sacrament, Spirit Dance, Sundance, Sweat Lodge, and Vision Quest, but especially Ayahuasca may carry extreme mental, emotional and physical transformations. Therefore, when a member and/or authorized participant choose to participate in any Indigenous Native Ceremony with the assistance of a Soul Quest Church of Mother Earth Medicine person, both take on special responsibilities and understandings:

(1) Soul Quest Church of Mother Earth Medicine People are to practice and serve in ways that cultivate awareness, empathy, and wisdom for all Members and Authorized Participants, during ceremonies.

(2) Soul Quest Church of Mother Earth Medicine Authorized Participants will adhere and comply to all directorial appeals one-hour prior, during, and three hours after ceremony, being conducted by a Soul Quest Church of Mother Earth Medicine Person.

(3) Soul Quest Church of Mother Earth Medicine Spiritual Practices are inspired and conducted in ways that respect the common good, with due regard for public safety, health, and order.

   a) Often, the increased awareness gained from Indigenous, Traditional, Native American Spiritual ceremonies will catalyze a desire for personal and social change in a Member, Authorized Participant's, life.
   b) Medicine People shall use special care in assisting the direction of energies of those whom they serve, as well as their own energies, in responsible ways that reflect a loving and respectful regard for all life.

(4) The autonomy and dignity of each Member and/or Authorized Participant are respected and preserved by Soul Quest Church of Mother Earth Medicine People. Participation in any Soul Quest Church of Mother Earth Medicine Ceremony must be voluntary and based on prior disclosure and consent given by each participant while in an ordinary state of consciousness.

   a) Disclosure shall include, at a minimum, discussion of any elements of the ceremony that could reasonably be presenting physical or psychological risks. First time Authorized Participants must be advised that Native American Ceremonies can be difficult and dramatically transforming.
   b) Health and Safety during the ceremony and the few hours of vulnerability that may follow a ceremony are watched over carefully with reasonable preparations by the Medicine People.
   c) Limits on the behaviors of Members and Authorized Participants and Medicine People are to be made clear and agreed upon in advance of any Native American Ceremony.
   d) Cultural / religious customs and confidentiality are to be accepted and honored.

(5) Soul Quest Church of Mother Earth Medicine ceremonies are to be conducted in the spirit of service. Medicine People accommodate Members and Authorized Participants without regard to race, religious affiliations, gender, cultural background, financial status, political affiliations and/or sexual orientation.

(6) Soul Quest Church of Mother Earth Medicine People are aware during ceremony that Members and Authorized Participants may be especially open to suggestion.

   a) Medicine People pledge to protect participants and not to allow anyone to use that vulnerability in ways that harm themselves or others.

(7) Soul Quest Church of Mother Earth keeps official logs of when the medicine arrives, how it is stored and how it is dispensed. The medicine is stored in a secure, locked place where only the Medicine Man and Officers of the Church have access to it. Only approved Officers can distribute the medicine to Members.

(8) Soul Quest Church of Mother Earth Medicine makes absolutely no claims about being in authority or having the ability to conduct saving ordinances.

(9) Soul Quest Church of Mother Earth Medicine is part of an indigenous people, traditional, spiritual Earth Based healing and empowering international religion and collective that serves individuals and the wider community when and wherever a Soul Quest Church of Mother Earth member may reside in.

(10) Soul Quest Church of Mother Earth Medicine is committed to growth through attraction of service rather than proselytizing for membership.

(11) Soul Quest Church of Mother Earth does not condone in any manner shape or form the physical and/or sexual abuse of children, any exploitation of children in any sexual or physically abusive form, or of any person or other earthly beings.

(12) Soul Quest Church of Mother Earth does not condone in any manner, shape, or form, the utilization of any substance or remedy for any condition of any kind that is addictive and/or with overdosing abilities that bring about death.

Chris Young _____ DATE: _____

CEO, Medicine Man, Pastor, Chief Elder and Counselor:

Verena Young _____ DATE: _____

President, Elder and Counselor:

Exhibit 9



# Office of the Attorney General
## Washington, D.C. 20530

October 6, 2017

MEMORANDUM FOR ALL COMPONENT HEADS AND UNITED STATES ATTORNEYS

FROM:    THE ATTORNEY GENERAL

SUBJECT:   <u>Implementation of Memorandum on Federal Law Protections
for Religious Liberty</u>

The President has instructed me to issue guidance interpreting religious liberty protections in federal law. Exec. Order 13798, § 4 (May 4, 2017). Pursuant to that instruction and consistent with my authority to provide advice and opinions on questions of law to the Executive Branch, I have undertaken a review of the primary sources for federal protection of religious liberty in the United States, along with the case law interpreting such sources. I also convened a series of listening sessions, seeking suggestions regarding the areas of federal protection for religious liberty most in need of clarification or guidance from the Attorney General.

Today, I sent out a memorandum to the heads of all executive departments and agencies summarizing twenty principles of religious liberty and providing an appendix with interpretive guidance of federal-law protections for religious liberty to support those principles. That memorandum and appendix are no less applicable to this Department than to any other agency within the Executive Branch. I therefore direct all attorneys within the Department to adhere to the interpretative guidance set forth in the memorandum and its accompanying appendix.

In particular, I direct the Department of Justice to undertake the following actions:

- All Department components and United States Attorney's Offices shall, effective immediately, incorporate the interpretative guidance in litigation strategy and arguments, operations, grant administration, and all other aspects of the Department's work, keeping in mind the President's declaration that "[i]t shall be the policy of the executive branch to vigorously enforce Federal law's robust protections for religious freedom." Exec. Order 13798, § 1 (May 4, 2017).
- Litigating Divisions and United States Attorney's Offices should also consider, in consultation with the Associate Attorney General, how best to implement the guidance with respect to arguments already made in pending cases where such arguments may be inconsistent with the guidance.
- Department attorneys shall also use the interpretive guidance in formulating opinions and advice for other Executive Branch agencies and shall alert the appropriate officials at such agencies whenever agency policies may conflict with the guidance. .
- To aid in the consistent application of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, and other federal-law protections for religious liberty, the Office of Legal Policy shall coordinate with the Civil Rights Division to

Implementation of Memorandum on Federal Law Protections for Religious Liberty
Page 2

review every Department rulemaking and every agency action submitted by the Office of Management and Budget for review by this Department for consistency with the interpretive guidance.  In particular, the Office of Legal Policy, in consultation with the Civil Rights Division, shall consider whether such rules might impose a substantial burden on the exercise of religion and whether the imposition of that burden would be consistent with the requirements of RFRA.  The Department shall not concur in the issuance of any rule that appears to conflict with federal laws governing religious liberty, as set forth in the interpretive guidance.

- In addition, to the extent that existing procedures do not already provide for consultation with the Associate Attorney General, Department components and United States Attorney's Offices shall notify the Associate Attorney General of all issues arising in litigation, operations, grants, or other aspects of the Department's work that appear to raise novel, material questions under RFRA or other religious liberty protections addressed in the interpretive guidance.  The Associate Attorney General shall promptly alert the submitting component of any concerns.

Any questions about the interpretive guidance or this memorandum should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Thank you for your time and attention to this important matter.

Exhibit 10



# Office of the Attorney General
## Washington, D.C. 20530
### October 6, 2017

MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:       THE ATTORNEY GENERAL

SUBJECT:    Federal Law Protections for Religious Liberty

The President has instructed me to issue guidance interpreting religious liberty protections in federal law, as appropriate. Exec. Order No. 13798 § 4, 82 Fed. Reg. 21675 (May 4, 2017). Consistent with that instruction, I am issuing this memorandum and appendix to guide all administrative agencies and executive departments in the execution of federal law.

## Principles of Religious Liberty

Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[1] Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. The following twenty principles should guide administrative agencies and executive departments in carrying out this task. These principles should be understood and interpreted in light of the legal analysis set forth in the appendix to this memorandum.

1. **The freedom of religion is a fundamental right of paramount importance, expressly protected by federal law.**

    Religious liberty is enshrined in the text of our Constitution and in numerous federal statutes. It encompasses the right of all Americans to exercise their religion freely, without being coerced to join an established church or to satisfy a religious test as a qualification for public office. It also encompasses the right of all Americans to express their religious beliefs, subject to the same narrow limits that apply to all forms of speech. In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

Federal Law Protections for Religious Liberty
Page 2

**2. The free exercise of religion includes the right to *act* or *abstain from action* in accordance with one's religious beliefs.**

The Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs. Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether or not central to, or required by, a particular religious faith.

**3. The freedom of religion extends to persons *and* organizations.**

The Free Exercise Clause protects not just persons, but persons collectively exercising their religion through churches or other religious denominations, religious organizations, schools, private associations, and even businesses.

**4. Americans do not give up their freedom of religion by participating in the marketplace, partaking of the public square, or interacting with government.**

Constitutional protections for religious liberty are not conditioned upon the willingness of a religious person or organization to remain separate from civil society. Although the application of the relevant protections may differ in different contexts, individuals and organizations do not give up their religious-liberty protections by providing or receiving social services, education, or healthcare; by seeking to earn or earning a living; by employing others to do the same; by receiving government grants or contracts; or by otherwise interacting with federal, state, or local governments.

**5. Government may not restrict acts or abstentions because of the beliefs they display.**

To avoid the very sort of religious persecution and intolerance that led to the founding of the United States, the Free Exercise Clause of the Constitution protects against government actions that target religious conduct. Except in rare circumstances, government may not treat the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons. For example, government may not attempt to target religious persons or conduct by allowing the distribution of political leaflets in a park but forbidding the distribution of religious leaflets in the same park.

**6. Government may not target religious individuals or entities for special disabilities based on their religion.**

Much as government may not restrict actions only because of religious belief, government may not target persons or individuals because of their religion. Government may not exclude religious organizations as such from secular aid programs, at least when the aid is not being used for explicitly religious activities such as worship or proselytization. For example, the Supreme Court has held that if government provides reimbursement for scrap tires to replace child playground surfaces, it may not deny participation in that program to religious schools. Nor may

Federal Law Protections for Religious Liberty
Page 3

government deny religious schools—including schools whose curricula and activities include religious elements—the right to participate in a voucher program, so long as the aid reaches the schools through independent decisions of parents.

**7. Government may not target religious individuals or entities through discriminatory enforcement of neutral, generally applicable laws.**

Although government generally may subject religious persons and organizations to neutral, generally applicable laws—e.g., across-the-board criminal prohibitions or certain time, place, and manner restrictions on speech—government may not apply such laws in a discriminatory way. For instance, the Internal Revenue Service may not enforce the Johnson Amendment—which prohibits 501(c)(3) non-profit organizations from intervening in a political campaign on behalf of a candidate—against a religious non-profit organization under circumstances in which it would not enforce the amendment against a secular non-profit organization. Likewise, the National Park Service may not require religious groups to obtain permits to hand out fliers in a park if it does not require similarly situated secular groups to do so, and no federal agency tasked with issuing permits for land use may deny a permit to an Islamic Center seeking to build a mosque when the agency has granted, or would grant, a permit to similarly situated secular organizations or religious groups.

**8. Government may not officially favor or disfavor particular religious groups.**

Together, the Free Exercise Clause and the Establishment Clause prohibit government from officially preferring one religious group to another. This principle of denominational neutrality means, for example, that government cannot selectively impose regulatory burdens on some denominations but not others. It likewise cannot favor some religious groups for participation in the Combined Federal Campaign over others based on the groups' religious beliefs.

**9. Government may not interfere with the autonomy of a religious organization.**

Together, the Free Exercise Clause and the Establishment Clause also restrict governmental interference in intra-denominational disputes about doctrine, discipline, or qualifications for ministry or membership. For example, government may not impose its nondiscrimination rules to require Catholic seminaries or Orthodox Jewish yeshivas to accept female priests or rabbis.

**10. The Religious Freedom Restoration Act of 1993 prohibits the federal government from substantially burdening any aspect of religious observance or practice, unless imposition of that burden on a particular religious adherent satisfies strict scrutiny.**

RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the federal government demonstrates that application of such burden to the religious adherent is the least restrictive means of achieving a compelling governmental interest. RFRA applies to all actions by federal administrative agencies, including rulemaking, adjudication or other enforcement actions, and grant or contract distribution and administration.

Federal Law Protections for Religious Liberty
Page 4

**11. RFRA's protection extends not just to individuals, but also to organizations, associations, and at least some for-profit corporations.**

RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies. For example, the Supreme Court has held that Hobby Lobby, a closely held, for-profit corporation with more than 500 stores and 13,000 employees, is protected by RFRA.

**12. RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**

RFRA applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

**13. A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion. For example, a Bureau of Prisons regulation that bans a devout Muslim from growing even a half-inch beard in accordance with his religious beliefs substantially burdens his religious practice. Likewise, a Department of Health and Human Services regulation requiring employers to provide insurance coverage for contraceptive drugs in violation of their religious beliefs or face significant fines substantially burdens their religious practice, and a law that conditions receipt of significant government benefits on willingness to work on Saturday substantially burdens the religious practice of those who, as a matter of religious observance or practice, do not work on that day. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.

Federal Law Protections for Religious Liberty
Page 5

**14. The strict scrutiny standard applicable to RFRA is exceptionally demanding.**

Once a religious adherent has identified a substantial burden on his or her religious belief, the federal government can impose that burden on the adherent only if it is the least restrictive means of achieving a compelling governmental interest. Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent. Even if the federal government could show the necessary interest, it would also have to show that its chosen restriction on free exercise is the least restrictive means of achieving that interest. That analysis requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program.

**15. RFRA applies even where a religious adherent seeks an exemption from a legal obligation requiring the adherent to confer benefits on third parties.**

Although burdens imposed on third parties are relevant to RFRA analysis, the fact that an exemption would deprive a third party of a benefit does not categorically render an exemption unavailable. Once an adherent identifies a substantial burden on his or her religious exercise, RFRA requires the federal government to establish that denial of an accommodation or exemption to that adherent is the least restrictive means of achieving a compelling governmental interest.

**16. Title VII of the Civil Rights Act of 1964, as amended, prohibits covered employers from discriminating against individuals on the basis of their religion.**

Employers covered by Title VII may not fail or refuse to hire, discharge, or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's religion. Such employers also may not classify their employees or applicants in a way that would deprive or tend to deprive any individual of employment opportunities because of the individual's religion. This protection applies regardless of whether the individual is a member of a religious majority or minority. But the protection does not apply in the same way to religious employers, who have certain constitutional and statutory protections for religious hiring decisions.

**17. Title VII's protection extends to discrimination on the basis of religious observance or practice as well as belief, unless the employer cannot reasonably accommodate such observance or practice without undue hardship on the business.**

Title VII defines "religion" broadly to include all aspects of religious observance or practice, except when an employer can establish that a particular aspect of such observance or practice cannot reasonably be accommodated without undue hardship to the business. For example, covered employers are required to adjust employee work schedules for Sabbath observance, religious holidays, and other religious observances, unless doing so would create an undue hardship, such as materially compromising operations or violating a collective bargaining agreement. Title VII might also require an employer to modify a no-head-coverings policy to allow a Jewish employee to wear a yarmulke or a Muslim employee to wear a headscarf. An

Federal Law Protections for Religious Liberty
Page 6

employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation.

**18. The Clinton Guidelines on Religious Exercise and Religious Expression in the Federal Workplace provide useful examples for private employers of reasonable accommodations for religious observance and practice in the workplace.**

President Clinton issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace ("Clinton Guidelines") explaining that federal employees may keep religious materials on their private desks and read them during breaks; discuss their religious views with other employees, subject to the same limitations as other forms of employee expression; display religious messages on clothing or wear religious medallions; and invite others to attend worship services at their churches, except to the extent that such speech becomes excessive or harassing. The Clinton Guidelines have the force of an Executive Order, and they also provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace.

**19. Religious employers are entitled to employ only persons whose beliefs and conduct are consistent with the employers' religious precepts.**

Constitutional and statutory protections apply to certain religious hiring decisions. Religious corporations, associations, educational institutions, and societies—that is, entities that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes—have an express statutory exemption from Title VII's prohibition on religious discrimination in employment. Under that exemption, religious organizations may choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts. For example, a Lutheran secondary school may choose to employ only practicing Lutherans, only practicing Christians, or only those willing to adhere to a code of conduct consistent with the precepts of the Lutheran community sponsoring the school. Indeed, even in the absence of the Title VII exemption, religious employers might be able to claim a similar right under RFRA or the Religion Clauses of the Constitution.

**20. As a general matter, the federal government may not condition receipt of a federal grant or contract on the effective relinquishment of a religious organization's hiring exemptions or attributes of its religious character.**

Religious organizations are entitled to compete on equal footing for federal financial assistance used to support government programs. Such organizations generally may not be required to alter their religious character to participate in a government program, nor to cease engaging in explicitly religious activities outside the program, nor effectively to relinquish their federal statutory protections for religious hiring decisions.

Federal Law Protections for Religious Liberty
Page 7

## Guidance for Implementing Religious Liberty Principles

Agencies must pay keen attention, in everything they do, to the foregoing principles of religious liberty.

**Agencies As Employers**

Administrative agencies should review their current policies and practices to ensure that they comply with all applicable federal laws and policies regarding accommodation for religious observance and practice in the federal workplace, and all agencies must observe such laws going forward. In particular, all agencies should review the Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, which President Clinton issued on August 14, 1997, to ensure that they are following those Guidelines. All agencies should also consider practical steps to improve safeguards for religious liberty in the federal workplace, including through subject-matter experts who can answer questions about religious nondiscrimination rules, information websites that employees may access to learn more about their religious accommodation rights, and training for all employees about federal protections for religious observance and practice in the workplace.

**Agencies Engaged in Rulemaking**

In formulating rules, regulations, and policies, administrative agencies should also proactively consider potential burdens on the exercise of religion and possible accommodations of those burdens. Agencies should consider designating an officer to review proposed rules with religious accommodation in mind or developing some other process to do so. In developing this process, agencies should consider drawing upon the expertise of the White House Office of Faith-Based and Neighborhood Partnerships to identify concerns about the effect of potential agency action on religious exercise. Regardless of the process chosen, agencies should ensure that they review all proposed rules, regulations, and policies that have the potential to have an effect on religious liberty for compliance with the principles of religious liberty outlined in this memorandum and appendix before finalizing those rules, regulations, or policies. The Office of Legal Policy will also review any proposed agency or executive action upon which the Department's comments, opinion, or concurrence are sought, *see, e.g.*, Exec. Order 12250 § 1-2, 45 Fed. Reg. 72995 (Nov. 2, 1980), to ensure that such action complies with the principles of religious liberty outlined in this memorandum and appendix. The Department will not concur in any proposed action that does not comply with federal law protections for religious liberty as interpreted in this memorandum and appendix, and it will transmit any concerns it has about the proposed action to the agency or the Office of Management and Budget as appropriate. If, despite these internal reviews, a member of the public identifies a significant concern about a prospective rule's compliance with federal protections governing religious liberty during a period for public comment on the rule, the agency should carefully consider and respond to that request in its decision. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). In appropriate circumstances, an agency might explain that it will consider requests for accommodations on a case-by-case basis rather than in the rule itself, but the agency should provide a reasoned basis for that approach.

Federal Law Protections for Religious Liberty
Page 8

**Agencies Engaged in Enforcement Actions**

   Much like administrative agencies engaged in rulemaking, agencies considering potential enforcement actions should consider whether such actions are consistent with federal protections for religious liberty.   In particular, agencies should remember that RFRA applies to agency enforcement just as it applies to every other governmental action.   An agency should consider RFRA when setting agency-wide enforcement rules and priorities, as well as when making decisions to pursue or continue any particular enforcement action, and when formulating any generally applicable rules announced in an agency adjudication.

   Agencies should remember that discriminatory enforcement of an otherwise nondiscriminatory law can also violate the Constitution.   Thus, agencies may not target or single out religious organizations or religious conduct for disadvantageous treatment in enforcement priorities or actions.   The President identified one area where this could be a problem in Executive Order 13798, when he directed the Secretary of the Treasury, to the extent permitted by law, not to take any "adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of *similar character*" from a non-religious perspective has not been treated as participation or intervention in a political campaign. Exec. Order No. 13798, § 2, 82 Fed. Reg. at 21675.   But the requirement of nondiscrimination toward religious organizations and conduct applies across the enforcement activities of the Executive Branch, including within the enforcement components of the Department of Justice.

**Agencies Engaged in Contracting and Distribution of Grants**

   Agencies also must not discriminate against religious organizations in their contracting or grant-making activities.   Religious organizations should be given the opportunity to compete for government grants or contracts and participate in government programs on an equal basis with nonreligious organizations.   Absent unusual circumstances, agencies should not condition receipt of a government contract or grant on the effective relinquishment of a religious organization's Section 702 exemption for religious hiring practices, or any other constitutional or statutory protection for religious organizations.   In particular, agencies should not attempt through conditions on grants or contracts to meddle in the internal governance affairs of religious organizations or to limit those organizations' otherwise protected activities.

*      *      *

Any questions about this memorandum or the appendix should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Federal Law Protections for Religious Liberty
Page 1a

## APPENDIX

Although not an exhaustive treatment of all federal protections for religious liberty, this appendix summarizes the key constitutional and federal statutory protections for religious liberty and sets forth the legal basis for the religious liberty principles described in the foregoing memorandum.

### Constitutional Protections

The people, acting through their Constitution, have singled out religious liberty as deserving of unique protection. In the original version of the Constitution, the people agreed that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. The people then amended the Constitution during the First Congress to clarify that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. Those protections have been incorporated against the States. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (Free Exercise Clause).

### A. Free Exercise Clause

The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). Government may not attempt to *regulate* religious beliefs, *compel* religious beliefs, or *punish* religious beliefs. *See id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944). It may not lend its power to one side in intra-denominational disputes about dogma, authority, discipline, or qualifications for ministry or membership. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012); *Smith*, 494 U.S. at 877; *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 120–21 (1952). It may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. *Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). And with the exception of certain historical limits on the freedom of speech, government may not punish or otherwise harass churches, church officials, or religious adherents for speaking on religious topics or sharing their religious beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *see also* U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. *Smith*, 494 U.S. at 877; *Sherbert*, 374 U.S. at 402; *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious

Federal Law Protections for Religious Liberty
Page 2a

tradition. *Frazee v. Illinois Dept. of Emp't Sec.*, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993) (internal quotation marks omitted). They must merely be "sincerely held." *Frazee*, 489 U.S. at 834.

Importantly, the protection of the Free Exercise Clause also extends to acts undertaken in accordance with such sincerely-held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to "*exercise*" religion, not just the freedom to "believe" in religion. *See Smith*, 494 U.S. at 877; *see also Thomas*, 450 U.S. at 716; *Paty*, 435 U.S. at 627; *Sherbert*, 374 U.S. at 403–04; *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972). Moreover, no other interpretation would actually guarantee the freedom of belief that Americans have so long regarded as central to individual liberty. Many, if not most, religious beliefs require external observance and practice through physical acts or abstention from acts. The tie between physical acts and religious beliefs may be readily apparent (e.g., attendance at a worship service) or not (e.g., service to one's community at a soup kitchen or a decision to close one's business on a particular day of the week). The "exercise of religion" encompasses all aspects of religious observance and practice. And because individuals may act collectively through associations and organizations, it encompasses the exercise of religion by such entities as well. *See, e.g., Hosanna-Tabor*, 565 U.S. at 199; *Church of the Lukumi Babalu Aye*, 508 U.S. at 525–26, 547; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770, 2772–73 (2014) (even a closely held for-profit corporation may exercise religion if operated in accordance with asserted religious principles).

As with most constitutional protections, however, the protection afforded to Americans by the Free Exercise Clause for physical acts is not absolute, *Smith*, 491 U.S. at 878–79, and the Supreme Court has identified certain principles to guide the analysis of the scope of that protection. First, government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, ___ (2017) (slip op. at 6) (internal quotation marks omitted), for it was precisely such "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (internal quotation marks omitted). The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion" just as surely as it protects against "outright prohibitions" on religious exercise. *Trinity Lutheran*, 582 U.S. at ___ (slip op. at 11) (internal quotation marks omitted). "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert*, 374 U.S. at 404).

Because a law cannot have as its official "object or purpose . . . the suppression of religion or religious conduct," courts must "survey meticulously" the text and operation of a law to ensure that it is actually neutral and of general applicability. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533–34 (internal quotation marks omitted). A law is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions

Federal Law Protections for Religious Liberty
Page 3a

on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533–35, 538 (internal quotation marks omitted). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, *id.*, or enables, expressly or de facto, "a system of individualized exemptions," as discussed in *Smith*, 494 U.S. at 884; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 537.

"Neutrality and general applicability are interrelated, . . . [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. *See Trinity Lutheran*, 582 U.S. at ___ – ___ (slip op. at 9–11). Likewise, a law that selectively prohibits the killing of animals for religious reasons and fails to prohibit the killing of animals for many nonreligious reasons, or that selectively prohibits a business from refusing to stock a product for religious reasons but fails to prohibit such refusal for myriad commercial reasons, is neither neutral, nor generally applicable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533–36, 542–45. Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, *id.* at 546.

Second, even a neutral, generally applicable law is subject to strict scrutiny under this Clause if it restricts the free exercise of religion and another constitutionally protected liberty, such as the freedom of speech or association, or the right to control the upbringing of one's children. *See Smith*, 494 U.S. at 881–82; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004). Many Free Exercise cases fall in this category. For example, a law that seeks to compel a private person's speech or expression contrary to his or her religious beliefs implicates both the freedoms of speech and free exercise. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 707–08 (1977) (challenge by Jehovah's Witnesses to requirement that state license plates display the motto "Live Free or Die"); *Axson-Flynn*, 356 F.3d at 1280 (challenge by Mormon student to University requirement that student actors use profanity and take God's name in vain during classroom acting exercises). A law taxing or prohibiting door-to-door solicitation, at least as applied to individuals distributing religious literature and seeking contributions, likewise implicates the freedoms of speech and free exercise. *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (challenge by Jehovah's Witnesses to tax on canvassing or soliciting); *Cantwell*, 310 U.S. at 307 (same). A law requiring children to receive certain education, contrary to the religious beliefs of their parents, implicates both the parents' right to the care, custody, and control of their children and to free exercise. *Yoder*, 406 U.S. at 227–29 (challenge by Amish parents to law requiring high school attendance).

Strict scrutiny is the "most rigorous" form of scrutiny identified by the Supreme Court. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). It is the same standard applied to governmental classifications based on race, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), and

Federal Law Protections for Religious Liberty
Page 4a

restrictions on the freedom of speech, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546–47. Under this level of scrutiny, government must establish that a challenged law "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 546 (internal quotation marks omitted). "[O]nly in rare cases" will a law survive this level of scrutiny. *Id.*

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 537 (government discriminatorily interpreted an ordinance prohibiting the unnecessary killing of animals as prohibiting only killing of animals for religious reasons); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (government discriminatorily enforced ordinance prohibiting meetings in public parks against only certain religious groups). The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *See Trinity Lutheran*, 582 U.S. at __ (slip op. at 6); *cf. Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) (recognizing that Establishment Clause does not justify discrimination against religious clubs seeking use of public meeting spaces); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837, 841 (1995) (recognizing that Establishment Clause does not justify discrimination against religious student newspaper's participation in neutral reimbursement program). That is true regardless of whether the discriminatory application is initiated by the government itself or by private requests or complaints. *See, e.g., Fowler*, 345 U.S. at 69; *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

B. Establishment Clause

The Establishment Clause, too, protects religious liberty. It prohibits government from establishing a religion and coercing Americans to follow it. *See Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819–20 (2014); *Good News Club*, 533 U.S. at 115. It restricts government from interfering in the internal governance or ecclesiastical decisions of a religious organization. *Hosanna-Tabor*, 565 U.S. at 188–89. And it prohibits government from officially favoring or disfavoring particular religious groups as such or officially advocating particular religious points of view. *See Galloway*, 134 S. Ct. at 1824; *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Indeed, "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U.S. at 839 (emphasis added). That "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* Thus, religious adherents and organizations may, like nonreligious adherents and organizations, receive indirect financial aid through independent choice, or, in certain circumstances, direct financial aid through a secular-aid program. *See, e.g., Trinity Lutheran*, 582 U.S. at ___ (slip op. at 6) (scrap tire program); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (voucher program).

C. Religious Test Clause

Finally, the Religious Test Clause, though rarely invoked, provides a critical guarantee to religious adherents that they may serve in American public life. The Clause reflects the judgment

Federal Law Protections for Religious Liberty
Page 5a

of the Framers that a diversity of religious viewpoints in government would enhance the liberty of all Americans. And after the Religion Clauses were incorporated against the States, the Supreme Court shared this view, rejecting a Tennessee law that "establishe[d] as a condition of office the willingness to eschew certain protected religious practices." *Paty*, 435 U.S. at 632 (Brennan, J., and Marshall, J., concurring in judgment); *see also id.* at 629 (plurality op.) ("[T]he American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").

Statutory Protections

Recognizing the centrality of religious liberty to our nation, Congress has buttressed these constitutional rights with statutory protections for religious observance and practice. These protections can be found in, among other statutes, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. Such protections ensure not only that government tolerates religious observance and practice, but that it embraces religious adherents as full members of society, able to contribute through employment, use of public accommodations, and participation in government programs. The considered judgment of the United States is that we are stronger through accommodation of religion than segregation or isolation of it.

A. Religious Freedom Restoration Act of 1993 (RFRA)

The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a), (b). The Act applies even where the burden arises out of a "rule of general applicability" passed without animus or discriminatory intent. *See id.* § 2000bb-1(a). It applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *see* §§ 2000bb-2(4), 2000cc-5(7), and covers "individuals" as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1, including for-profit, closely-held corporations like those involved in *Hobby Lobby*, 134 S. Ct. at 2768.

Subject to the exceptions identified below, a law "substantially burden[s] a person's exercise of religion," 42 U.S.C. § 2000bb-1, if it bans an aspect of the adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, *see Sherbert*, 374 U.S. at 405–06. The "threat of criminal sanction" will satisfy these principles, even when, as in *Yoder*, the prospective punishment is a mere $5 fine. 406 U.S. at 208, 218. And the denial of, or condition on the receipt of, government benefits may substantially burden the exercise of religion under these principles. *Sherbert*, 374 U.S. at 405–06; *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas*, 450 U.S. at 717–18. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself

Federal Law Protections for Religious Liberty
Page 6a

regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 448–49 (1988); *Bowen v. Roy,* 476 U.S. 693, 699–700 (1986).

As with claims under the Free Exercise Clause, RFRA does not permit a court to inquire into the reasonableness of a religious belief, including into the adherent's assessment of the religious connection between a belief asserted and what the government forbids, requires, or prevents. *Hobby Lobby,* 134 S. Ct. at 2778. If the proffered belief is sincere, it is not the place of the government or a court to second-guess it. *Id.* A good illustration of the point is *Thomas v. Review Board of Indiana Employment Security Division*—one of the *Sherbert* line of cases, whose analytical test Congress sought, through RFRA, to restore, 42 U.S.C. § 2000bb. There, the Supreme Court concluded that the denial of unemployment benefits was a substantial burden on the sincerely held religious beliefs of a Jehovah's Witness who had quit his job after he was transferred from a department producing sheet steel that could be used for military armaments to a department producing turrets for military tanks. *Thomas,* 450 U.S. at 716–18. In doing so, the Court rejected the lower court's inquiry into "what [the claimant's] belief was and what the religious basis of his belief was," noting that no one had challenged the sincerity of the claimant's religious beliefs and that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 714–15 (internal quotation marks omitted). The Court likewise rejected the lower court's comparison of the claimant's views to those of other Jehovah's Witnesses, noting that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.* at 715. The Supreme Court reinforced this reasoning in *Hobby Lobby,* rejecting the argument that "the connection between what the objecting parties [were required to] do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they [found] to be morally wrong (destruction of an embryo) [wa]s simply too attenuated." 134 S. Ct. at 2777. The Court explained that the plaintiff corporations had a sincerely-held religious belief that provision of the coverage was morally wrong, and it was "not for us to say that their religious beliefs are mistaken or insubstantial." *Id.* at 2779.

Government bears a heavy burden to justify a substantial burden on the exercise of religion. "[O]nly those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Thomas,* 450 U.S. at 718 (quoting *Yoder,* 406 U.S. at 215). Such interests include, for example, the "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history," *Bob Jones Univ. v. United States,* 461 U.S. 574, 604 (1983), and the interest in ensuring the "mandatory and continuous participation" that is "indispensable to the fiscal vitality of the social security system," *United States v. Lee,* 455 U.S. 252, 258–59 (1982). But "broadly formulated interests justifying the general applicability of government mandates" are insufficient. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 431 (2006). The government must establish a compelling interest to deny an accommodation to the particular claimant. *Id.* at 430, 435–38. For example, the military may have a compelling interest in its

Federal Law Protections for Religious Liberty
Page 7a

uniform and grooming policy to ensure military readiness and protect our national security, but it does not necessarily follow that those interests would justify denying a particular soldier's request for an accommodation from the uniform and grooming policy. *See, e.g.*, Secretary of the Army, Army Directive 2017-03, Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation (2017) (recognizing the "successful examples of Soldiers currently serving with" an accommodation for "the wear of a hijab; the wear of a beard; and the wear of a turban or under-turban/patka, with uncut beard and uncut hair" and providing for a reasonable accommodation of these practices in the Army). The military would have to show that it has a compelling interest in denying that particular accommodation. An asserted compelling interest in denying an accommodation to a particular claimant is undermined by evidence that exemptions or accommodations have been granted for other interests. *See O Centro*, 546 U.S. at 433, 436–37; *see also Hobby Lobby*, 134 S. Ct. at 2780.

The compelling-interest requirement applies even where the accommodation sought is "an exemption from a legal obligation requiring [the claimant] to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. Although "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries,'" the Supreme Court has explained that almost any governmental regulation could be reframed as a legal obligation requiring a claimant to confer benefits on third parties. *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). As nothing in the text of RFRA admits of an exception for laws requiring a claimant to confer benefits on third parties, 42 U.S.C. § 2000bb-1, and such an exception would have the potential to swallow the rule, the Supreme Court has rejected the proposition that RFRA accommodations are categorically unavailable for laws requiring claimants to confer benefits on third parties. *Hobby Lobby*, 134 S. Ct. at 2781 n.37.

Even if the government can identify a compelling interest, the government must also show that denial of an accommodation is the least restrictive means of serving that compelling governmental interest. This standard is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. It requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program. *Id.* at 2781. Indeed, the existence of exemptions for other individuals or entities that could be expanded to accommodate the claimant, while still serving the government's stated interests, will generally defeat a RFRA defense, as the government bears the burden to establish that no accommodation is viable. *See id.* at 2781–82.

B. Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)

Although Congress's leadership in adopting RFRA led many States to pass analogous statutes, Congress recognized the unique threat to religious liberty posed by certain categories of state action and passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to address them. RLUIPA extends a standard analogous to RFRA to state and local government actions regulating land use and institutionalized persons where "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §§ 2000cc(a)(2), 2000cc-1(b).

Federal Law Protections for Religious Liberty
Page 8a

RLUIPA's protections must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A), and treats "[t]he use, building, or conversion of real property for the purpose of religious exercise" as the "religious exercise of the person or entity that uses or intends to use the property for that purpose," *id.* § 2000cc-5(7)(B). Like RFRA, RLUIPA prohibits government from substantially burdening an exercise of religion unless imposition of the burden on the religious adherent is the least restrictive means of furthering a compelling governmental interest. *See id.* § 2000cc-1(a). That standard "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c); *cf. Holt v. Hobbs*, 135 S. Ct. 853, 860, 864–65 (2015).

With respect to land use in particular, RLUIPA also requires that government not "treat[] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," *id.* § 2000cc(b)(2), or "impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3). A claimant need not show a substantial burden on the exercise of religion to enforce these antidiscrimination and equal terms provisions listed in § 2000cc(b). *See id.* § 2000cc(b); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262–64 (3d Cir. 2007), *cert. denied*, 553 U.S. 1065 (2008). Although most RLUIPA cases involve places of worship like churches, mosques, synagogues, and temples, the law applies more broadly to religious schools, religious camps, religious retreat centers, and religious social service facilities. Letter from U.S. Dep't of Justice Civil Rights Division to State, County, and Municipal Officials re: The Religious Land Use and Institutionalized Persons Act (Dec. 15, 2016).

C. Other Civil Rights Laws

To incorporate religious adherents fully into society, Congress has recognized that it is not enough to limit governmental action that substantially burdens the exercise of religion. It must also root out public and private discrimination based on religion. Religious discrimination stood alongside discrimination based on race, color, and national origin, as an evil to be addressed in the Civil Rights Act of 1964, and Congress has continued to legislate against such discrimination over time. Today, the United States Code includes specific prohibitions on religious discrimination in places of public accommodation, 42 U.S.C. § 2000a; in public facilities, *id.* § 2000b; in public education, *id.* § 2000c-6; in employment, *id.* §§ 2000e, 2000e-2, 2000e-16; in the sale or rental of housing, *id.* § 3604; in the provision of certain real-estate transaction or brokerage services, *id.* §§ 3605, 3606; in federal jury service, 28 U.S.C. § 1862; in access to limited open forums for speech, 20 U.S.C. § 4071; and in participation in or receipt of benefits from various federally-funded programs, 15 U.S.C. § 3151; 20 U.S.C. §§ 1066c(d), 1071(a)(2), 1087-4, 7231d(b)(2), 7914; 31 U.S.C. § 6711(b)(3); 42 U.S.C. §§ 290cc-33(a)(2), 300w-7(a)(2), 300x-57(a)(2), 300x-65(f), 604a(g), 708(a)(2), 5057(c), 5151(a), 5309(a), 6727(a), 9858l(a)(2), 10406(2)(B), 10504(a), 10604(e), 12635(c)(1), 12832, 13791(g)(3), 13925(b)(13)(A).

Federal Law Protections for Religious Liberty
Page 9a

Invidious religious discrimination may be directed at religion in general, at a particular religious belief, or at particular aspects of religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 532–33. A law drawn to prohibit a specific religious practice may discriminate just as severely against a religious group as a law drawn to prohibit the religion itself. *See id.* No one would doubt that a law prohibiting the sale and consumption of Kosher meat would discriminate against Jewish people. True equality may also require, depending on the applicable statutes, an awareness of, and willingness reasonably to accommodate, religious observance and practice. Indeed, the denial of reasonable accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it.

    1.  Employment

    i.  Protections for Religious Employees

Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. In Title VII of the Civil Rights Act, Congress declared it an unlawful employment practice for a covered employer to (1) "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," as well as (2) to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *see also* 42 U.S.C. § 2000e-16(a) (applying Title VII to certain federal-sector employers); 3 U.S.C. § 411(a) (applying Title VII employment in the Executive Office of the President). The protection applies "regardless of whether the discrimination is directed against [members of religious] majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977).

After several courts had held that employers did not violate Title VII when they discharged employees for refusing to work on their Sabbath, Congress amended Title VII to define "[r]eligion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Hardison*, 432 U.S. at 74 n.9. Congress thus made clear that discrimination on the basis of religion includes discrimination on the basis of any aspect of an employee's religious observance or practice, at least where such observance or practice can be reasonably accommodated without undue hardship.

Title VII's reasonable accommodation requirement is meaningful. As an initial matter, it requires an employer to consider what adjustment or modification to its policies would effectively address the employee's concern, for "[a]n *ineffective* modification or adjustment will not *accommodate*" a person's religious observance or practice, within the ordinary meaning of that word. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (considering the ordinary

Federal Law Protections for Religious Liberty
Page 10a

meaning in the context of an ADA claim). Although there is no obligation to provide an employee with his or her preferred reasonable accommodation, *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), an employer may justify a refusal to accommodate only by showing that "an undue hardship [on its business] would *in fact* result from *each available* alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *Id.* Likewise, the fact that an accommodation may grant the religious employee a preference is not evidence of undue hardship as, "[b]y definition, any special 'accommodation' requires the employer to treat an employee . . . differently, *i.e.*, preferentially." *U.S. Airways*, 535 U.S. at 397; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they may be treated no worse than other practices. Rather, it gives them favored treatment.").

Title VII does not, however, require accommodation at all costs. As noted above, an employer is not required to accommodate a religious observance or practice if it would pose an undue hardship on its business. An accommodation might pose an "undue hardship," for example, if it would require the employer to breach an otherwise valid collective bargaining agreement, *see, e.g.*, *Hardison*, 432 U.S. at 79, or carve out a special exception to a seniority system, *id.* at 83; *see also U.S. Airways*, 535 U.S. at 403. Likewise, an accommodation might pose an "undue hardship" if it would impose "more than a de minimis cost" on the business, such as in the case of a company where weekend work is "essential to [the] business" and many employees have religious observances that would prohibit them from working on the weekends, so that accommodations for all such employees would result in significant overtime costs for the employer. *Hardison*, 432 U.S. at 80, 84 & n.15. In general, though, Title VII expects positive results for society from a cooperative process between an employer and its employee "in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotations omitted).

The area of religious speech and expression is a useful example of reasonable accommodation. Where speech or expression is part of a person's religious observance and practice, it falls within the scope of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2. Speech or expression outside of the scope of an individual's employment can almost always be accommodated without undue hardship to a business. Speech or expression within the scope of an individual's employment, during work hours, or in the workplace may, depending upon the facts and circumstances, be reasonably accommodated. *Cf. Abercrombie*, 135 S. Ct. at 2032.

The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to "keep a Bible or Koran on her private desk and read it during breaks"; to discuss his religious views with other employees, subject "to the same rules of order as apply to other employee expression"; to display religious messages on clothing or wear religious medallions visible to others; and to hand out religious tracts to other employees or invite them to attend worship services at the employee's church, except to the extent that such speech becomes excessive or harassing. Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, § 1(A), Aug. 14, 1997 (hereinafter "Clinton

Federal Law Protections for Religious Liberty
Page 11a

Guidelines"). The Clinton Guidelines have the force of an Executive Order. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."); *see also* Memorandum from President William J. Clinton to the Heads of Executive Departments and Agencies (Aug. 14, 1997) ("All civilian executive branch agencies, officials, and employees must follow these Guidelines carefully."). The successful experience of the federal government in applying the Clinton Guidelines over the last twenty years is evidence that religious speech and expression can be reasonably accommodated in the workplace without exposing an employer to liability under workplace harassment laws.

Time off for religious holidays is also often an area of concern. The observance of religious holidays is an "aspect[] of religious observance and practice" and is therefore protected by Title VII. 42 U.S.C. §§ 2000e, 2000e-2. Examples of reasonable accommodations for that practice could include a change of job assignments or lateral transfer to a position whose schedule does not conflict with the employee's religious holidays, 29 C.F.R. § 1605.2(d)(1)(iii); a voluntary work schedule swap with another employee, *id.* § 1065.2(d)(1)(i); or a flexible scheduling scheme that allows employees to arrive or leave early, use floating or optional holidays for religious holidays, or make up time lost on another day, *id.* § 1065.2(d)(1)(ii). Again, the federal government has demonstrated reasonable accommodation through its own practice: Congress has created a flexible scheduling scheme for federal employees, which allows employees to take compensatory time off for religious observances, 5 U.S.C. § 5550a, and the Clinton Guidelines make clear that "[a]n agency must adjust work schedules to accommodate an employee's religious observance—for example, Sabbath or religious holiday observance—if an adequate substitute is available, or if the employee's absence would not otherwise impose an undue burden on the agency," Clinton Guidelines § 1(C). If an employer regularly permits accommodation in work scheduling for secular conflicts and denies such accommodation for religious conflicts, "such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness." *Philbrook*, 479 U.S. at 71.

Except for certain exceptions discussed in the next section, Title VII's protection against disparate treatment, 42 U.S.C. § 2000e-2(a)(1), is implicated *any time* religious observance or practice is a motivating factor in an employer's covered decision. *Abercrombie*, 135 S. Ct. at 2033. That is true even when an employer acts without actual knowledge of the need for an accommodation from a neutral policy but with "an unsubstantiated suspicion" of the same. *Id.* at 2034.

### ii. Protections for Religious Employers

Congress has acknowledged, however, that religion sometimes *is* an appropriate factor in employment decisions, and it has limited Title VII's scope accordingly. Thus, for example, where religion "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," employers may hire and employ individuals based on their religion. 42 U.S.C. § 2000e-2(e)(1). Likewise, where educational institutions are "owned, supported, controlled or managed, [in whole or in substantial part] by a particular religion or by a particular religious corporation, association, or society" or direct their curriculum "toward the

propagation of a particular religion," such institutions may hire and employ individuals of a particular religion. *Id.* And "a religious corporation, association, educational institution, or society" may employ "individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335–36 (1987).

Because Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), these exemptions include decisions "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 198–200 (11th Cir. 1997). For example, in *Little*, the Third Circuit held that the exemption applied to a Catholic school's decision to fire a divorced Protestant teacher who, though having agreed to abide by a code of conduct shaped by the doctrines of the Catholic Church, married a baptized Catholic without first pursuing the official annulment process of the Church. 929 F.2d at 946, 951.

Section 702 broadly exempts from its reach religious corporations, associations, educational institutions, and societies. The statute's terms do not limit this exemption to non-profit organizations, to organizations that carry on only religious activities, or to organizations established by a church or formally affiliated therewith. *See* Civil Rights Act of 1964, § 702(a), *codified at* 42 U.S.C. § 2000e-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2773–74; *Corp. of Presiding Bishop*, 483 U.S. at 335–36. The exemption applies whenever the organization is "religious," which means that it is organized for religious purposes and engages in activity consistent with, and in furtherance of, such purposes. Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008). Thus, the exemption applies not just to religious denominations and houses of worship, but to religious colleges, charitable organizations like the Salvation Army and World Vision International, and many more. In that way, it is consistent with other broad protections for religious entities in federal law, including, for example, the exemption of religious entities from many of the requirements under the Americans with Disabilities Act. *See* 28 C.F.R. app. C; 56 Fed. Reg. 35544, 35554 (July 26, 1991) (explaining that "[t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations").

In addition to these explicit exemptions, religious organizations may be entitled to additional exemptions from discrimination laws. *See, e.g., Hosanna-Tabor*, 565 U.S. at 180, 188–90. For example, a religious organization might conclude that it cannot employ an individual who fails faithfully to adhere to the organization's religious tenets, either because doing so might itself inhibit the organization's exercise of religion or because it might dilute an expressive message. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649–55 (2000). Both constitutional and statutory issues arise when governments seek to regulate such decisions.

As a constitutional matter, religious organizations' decisions are protected from governmental interference to the extent they relate to ecclesiastical or internal governance matters. *Hosanna-Tabor*, 565 U.S. at 180, 188–90. It is beyond dispute that "it would violate the First Amendment for courts to apply [employment discrimination] laws to compel the ordination of

Federal Law Protections for Religious Liberty
Page 13a

women by the Catholic Church or by an Orthodox Jewish seminary." *Id.* at 188. The same is true for other employees who "minister to the faithful," including those who are not themselves the head of the religious congregation and who are not engaged solely in religious functions. *Id.* at 188, 190, 194–95; *see also* Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008) (noting that the First Amendment protects "the right to employ staff who share the religious organization's religious beliefs").

Even if a particular associational decision could be construed to fall outside this protection, the government would likely still have to show that any interference with the religious organization's associational rights is justified under strict scrutiny. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (infringements on expressive association are subject to strict scrutiny); *Smith*, 494 U.S. at 882 ("[I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns."). The government may be able to meet that standard with respect to race discrimination, *see Bob Jones Univ.*, 461 U.S. at 604, but may not be able to with respect to other forms of discrimination. For example, at least one court has held that forced inclusion of women into a mosque's religious men's meeting would violate the freedom of expressive association. *Donaldson v. Farrakhan*, 762 N.E.2d 835, 840–41 (Mass. 2002). The Supreme Court has also held that the government's interest in addressing sexual-orientation discrimination is not sufficiently compelling to justify an infringement on the expressive association rights of a private organization. *Boy Scouts*, 530 U.S. at 659.

As a statutory matter, RFRA too might require an exemption or accommodation for religious organizations from antidiscrimination laws. For example, "prohibiting religious organizations from hiring only coreligionists can 'impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities.'" *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 172 (2007) (quoting *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001)); *see also Corp. of Presiding Bishop*, 483 U.S. at 336 (noting that it would be "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court w[ould] consider religious" in applying a nondiscrimination provision that applied only to secular, but not religious, activities). If an organization establishes the existence of such a burden, the government must establish that imposing such burden on the organization is the least restrictive means of achieving a compelling governmental interest. That is a demanding standard and thus, even where Congress has not expressly exempted religious organizations from its antidiscrimination laws—as it has in other contexts, *see, e.g.*, 42 U.S.C. §§ 3607 (Fair Housing Act), 12187 (Americans with Disabilities Act)—RFRA might require such an exemption.

2. Government Programs

Protections for religious organizations likewise exist in government contracts, grants, and other programs. Recognizing that religious organizations can make important contributions to government programs, *see, e.g.*, 22 U.S.C. § 7601(19), Congress has expressly permitted religious organizations to participate in numerous such programs on an equal basis with secular

Federal Law Protections for Religious Liberty
Page 14a

organizations, *see, e.g.*, 42 U.S.C. §§ 290kk-1, 300x-65 604a, 629i.  Where Congress has not expressly so provided, the President has made clear that "[t]he Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." Exec. Order No. 13559, § 1, 75 Fed. Reg. 71319, 71319 (Nov. 17, 2010) (amending Exec. Order No. 13279, 67 Fed. Reg. 77141 (2002).  To that end, no organization may be "discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs." *Id.* "Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)" are eligible to participate in such programs, so long as they conduct such activities outside of the programs directly funded by the federal government and at a separate time and location. *Id.*

The President has assured religious organizations that they are "eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social services programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character." *See id.*; *see also* 42 U.S.C. § 290kk-1(e) (similar statutory assurance).  Religious organizations that apply for or participate in such programs may continue to carry out their mission, "including the definition, development, practice, and expression of . . . religious beliefs," so long as they do not use any "direct Federal financial assistance" received "to support or engage in any explicitly religious activities" such as worship, religious instruction, or proselytization.  Exec. Order No. 13559, § 1.  They may also "use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities," and they may continue to "retain religious terms" in their names, select "board members on a religious basis, and include religious references in . . . mission statements and other chartering or governing documents." *Id.*

With respect to government contracts in particular, Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002), confirms that the independence and autonomy promised to religious organizations include independence and autonomy in religious hiring.  Specifically, it provides that the employment nondiscrimination requirements in Section 202 of Executive Order 11246, which normally apply to government contracts, do "not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 13279, § 4, *amending* Exec. Order No. 11246, § 204(c), 30 Fed. Reg. 12319, 12935 (Sept. 24, 1965).

Because the religious hiring protection in Executive Order 13279 parallels the Section 702 exemption in Title VII, it should be interpreted to protect the decision "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951.  That parallel interpretation is consistent with the Supreme Court's repeated counsel that the decision to borrow statutory text in a new statute is "strong indication that the two statutes should be interpreted pari passu." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559

Federal Law Protections for Religious Liberty
Page 15a

U.S. 573, 590 (2010). It is also consistent with the Executive Order's own usage of discrimination on the basis of "religion" as something distinct and more expansive than discrimination on the basis of "religious belief." *See, e.g.,* Exec. Order No. 13279, § 2(c) ("No organization should be discriminated against on the basis of religion *or* religious belief . . . " (emphasis added)); *id.* § 2(d) ("All organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief. Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice."). Indeed, because the Executive Order uses "on the basis of religion or religious belief" in both the provision prohibiting discrimination against religious organizations and the provision prohibiting discrimination "against beneficiaries or potential beneficiaries," a narrow interpretation of the protection for religious organizations' hiring decisions would lead to a narrow protection for beneficiaries of programs served by such organizations. *See id.* §§ 2(c), (d). It would also lead to inconsistencies in the treatment of religious hiring across government programs, as some program-specific statutes and regulations expressly confirm that "[a] religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation, or receipt of funds from, a designated program." 42 U.S.C. § 290kk-1(e); *see also* 6 C.F.R. § 19.9 (same).

Even absent the Executive Order, however, RFRA would limit the extent to which the government could condition participation in a federal grant or contract program on a religious organization's effective relinquishment of its Section 702 exemption. RFRA applies to all government conduct, not just to legislation or regulation, *see* 42 U.S.C. § 2000bb-1, and the Office of Legal Counsel has determined that application of a religious nondiscrimination law to the hiring decisions of a religious organization can impose a substantial burden on the exercise of religion. *Application of the Religious Freedom Restoration Act to the Award of a Grant,* 31 Op. O.L.C. at 172; *Direct Aid to Faith-Based Organizations,* 25 Op. O.L.C. at 132. Given Congress's "recognition that religious discrimination in employment is permissible in some circumstances," the government will not ordinarily be able to assert a compelling interest in prohibiting that conduct as a general condition of a religious organization's receipt of any particular government grant or contract. *Application of the Religious Freedom Restoration Act to the Award of a Grant,* 31 Op. of O.L.C. at 186. The government will also bear a heavy burden to establish that requiring a particular contractor or grantee effectively to relinquish its Section 702 exemption is the least restrictive means of achieving a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1.

The First Amendment also "supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2328 (2013) (internal quotation marks omitted)). Although Congress may specify the activities that it wants to subsidize, it may not "seek to leverage funding" to regulate constitutionally protected conduct "outside the contours of the program itself." *See id.* Thus, if a condition on participation in a government program—including eligibility for receipt of federally backed student loans— would interfere with a religious organization's constitutionally protected rights, *see, e.g.,*

Federal Law Protections for Religious Liberty
Page 16a

*Hosanna-Tabor*, 565 U.S. at 188–89, that condition could raise concerns under the "unconstitutional conditions" doctrine, *see All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. at 2328.

Finally, Congress has provided an additional statutory protection for educational institutions controlled by religious organizations who provide education programs or activities receiving federal financial assistance. Such institutions are exempt from Title IX's prohibition on sex discrimination in those programs and activities where that prohibition "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). Although eligible institutions may "claim the exemption" in advance by "submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization," 34 C.F.R. § 106.12(b), they are not required to do so to have the benefit of it, *see* 20 U.S.C. § 1681.

### 3. Government Mandates

Congress has undertaken many similar efforts to accommodate religious adherents in diverse areas of federal law. For example, it has exempted individuals who, "by reason of religious training and belief," are conscientiously opposed to war from training and service in the armed forces of the United States. 50 U.S.C. § 3806(j). It has exempted "ritual slaughter and the handling or other preparation of livestock for ritual slaughter" from federal regulations governing methods of animal slaughter. 7 U.S.C. § 1906. It has exempted "private secondary school[s] that maintain[] a religious objection to service in the Armed Forces" from being required to provide military recruiters with access to student recruiting information. 20 U.S.C. § 7908. It has exempted federal employees and contractors with religious objections to the death penalty from being required to "be in attendance at or to participate in any prosecution or execution." 18 U.S.C. § 3597(b). It has allowed individuals with religious objections to certain forms of medical treatment to opt out of such treatment. *See, e.g.*, 33 U.S.C. § 907(k); 42 U.S.C. § 290bb-36(f). It has created tax accommodations for members of religious faiths conscientiously opposed to acceptance of the benefits of any private or public insurance, *see, e.g.*, 26 U.S.C. §§ 1402(g), 3127, and for members of religious orders required to take a vow of poverty, *see, e.g.*, 26 U.S.C. § 3121(r).

Congress has taken special care with respect to programs touching on abortion, sterilization, and other procedures that may raise religious conscience objections. For example, it has prohibited entities receiving certain federal funds for health service programs or research activities from requiring individuals to participate in such program or activity contrary to their religious beliefs. 42 U.S.C. § 300a-7(d), (e). It has prohibited discrimination against health care professionals and entities that refuse to undergo, require, or provide training in the performance of induced abortions; to provide such abortions; or to refer for such abortions, and it will deem accredited any health care professional or entity denied accreditation based on such actions. *Id.* § 238n(a), (b). It has also made clear that receipt of certain federal funds does not require an individual "to perform or assist in the performance of any sterilization procedure or abortion if [doing so] would be contrary to his religious beliefs or moral convictions" nor an entity to "make its facilities available for the performance of" those procedures if such performance "is prohibited by the entity on the basis of religious beliefs or moral convictions," nor an entity to "provide any personnel for the performance or assistance in the performance of" such procedures if such performance or assistance "would be contrary to the religious beliefs or moral convictions of such

Federal Law Protections for Religious Liberty
Page 17a

personnel." *Id.* § 300a-7(b). Finally, no "qualified health plan[s] offered through an Exchange" may discriminate against any health care professional or entity that refuses to "provide, pay for, provide coverage of, or refer for abortions," § 18023(b)(4); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 507(d), 129 Stat. 2242, 2649 (Dec. 18, 2015).

Congress has also been particularly solicitous of the religious freedom of American Indians. In 1978, Congress declared it the "policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. Consistent with that policy, it has passed numerous statutes to protect American Indians' right of access for religious purposes to national park lands, Scenic Area lands, and lands held in trust by the United States. *See, e.g.,* 16 U.S.C. §§ 228i(b), 410aaa-75(a), 460uu-47, 543f, 698v-11(b)(11). It has specifically sought to preserve lands of religious significance and has required notification to American Indians of any possible harm to or destruction of such lands. *Id.* § 470cc. Finally, it has provided statutory exemptions for American Indians' use of otherwise regulated articles such as bald eagle feathers and peyote as part of traditional religious practice. *Id.* §§ 668a, 4305(d); 42 U.S.C. § 1996a.

*          *          *

The depth and breadth of constitutional and statutory protections for religious observance and practice in America confirm the enduring importance of religious freedom to the United States. They also provide clear guidance for all those charged with enforcing federal law: The free exercise of religion is not limited to a right to hold personal religious beliefs or even to worship in a sacred place. It encompasses all aspects of religious observance and practice. To the greatest extent practicable and permitted by law, such religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. *See Zorach v. Clauson,* 343 U.S. 306, 314 (1952) ("[Government] follows the best of our traditions . . . [when it] respects the religious nature of our people and accommodates the public service to their spiritual needs.").