Exhibit 10



# Office of the Attorney General
## Washington, D.C. 20530
### October 6, 2017

MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:      THE ATTORNEY GENERAL

SUBJECT:   Federal Law Protections for Religious Liberty

The President has instructed me to issue guidance interpreting religious liberty protections in federal law, as appropriate. Exec. Order No. 13798 § 4, 82 Fed. Reg. 21675 (May 4, 2017). Consistent with that instruction, I am issuing this memorandum and appendix to guide all administrative agencies and executive departments in the execution of federal law.

## Principles of Religious Liberty

Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[1] Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. The following twenty principles should guide administrative agencies and executive departments in carrying out this task. These principles should be understood and interpreted in light of the legal analysis set forth in the appendix to this memorandum.

1. **The freedom of religion is a fundamental right of paramount importance, expressly protected by federal law.**

   Religious liberty is enshrined in the text of our Constitution and in numerous federal statutes. It encompasses the right of all Americans to exercise their religion freely, without being coerced to join an established church or to satisfy a religious test as a qualification for public office. It also encompasses the right of all Americans to express their religious beliefs, subject to the same narrow limits that apply to all forms of speech. In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

Federal Law Protections for Religious Liberty
Page 2

2.  **The free exercise of religion includes the right to *act* or *abstain from action* in accordance with one's religious beliefs.**

    The Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs.   Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether or not central to, or required by, a particular religious faith.

3.  **The freedom of religion extends to persons *and* organizations.**

    The Free Exercise Clause protects not just persons, but persons collectively exercising their religion through churches or other religious denominations, religious organizations, schools, private associations, and even businesses.

4.  **Americans do not give up their freedom of religion by participating in the marketplace, partaking of the public square, or interacting with government.**

    Constitutional protections for religious liberty are not conditioned upon the willingness of a religious person or organization to remain separate from civil society.   Although the application of the relevant protections may differ in different contexts, individuals and organizations do not give up their religious-liberty protections by providing or receiving social services, education, or healthcare; by seeking to earn or earning a living; by employing others to do the same; by receiving government grants or contracts; or by otherwise interacting with federal, state, or local governments.

5.  **Government may not restrict acts or abstentions because of the beliefs they display.**

    To avoid the very sort of religious persecution and intolerance that led to the founding of the United States, the Free Exercise Clause of the Constitution protects against government actions that target religious conduct.   Except in rare circumstances, government may not treat the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons.   For example, government may not attempt to target religious persons or conduct by allowing the distribution of political leaflets in a park but forbidding the distribution of religious leaflets in the same park.

6.  **Government may not target religious individuals or entities for special disabilities based on their religion.**

    Much as government may not restrict actions only because of religious belief, government may not target persons or individuals because of their religion.   Government may not exclude religious organizations as such from secular aid programs, at least when the aid is not being used for explicitly religious activities such as worship or proselytization.   For example, the Supreme Court has held that if government provides reimbursement for scrap tires to replace child playground surfaces, it may not deny participation in that program to religious schools.   Nor may

Federal Law Protections for Religious Liberty
Page 3

government deny religious schools—including schools whose curricula and activities include religious elements—the right to participate in a voucher program, so long as the aid reaches the schools through independent decisions of parents.

**7. Government may not target religious individuals or entities through discriminatory enforcement of neutral, generally applicable laws.**

Although government generally may subject religious persons and organizations to neutral, generally applicable laws—e.g., across-the-board criminal prohibitions or certain time, place, and manner restrictions on speech—government may not apply such laws in a discriminatory way. For instance, the Internal Revenue Service may not enforce the Johnson Amendment—which prohibits 501(c)(3) non-profit organizations from intervening in a political campaign on behalf of a candidate—against a religious non-profit organization under circumstances in which it would not enforce the amendment against a secular non-profit organization. Likewise, the National Park Service may not require religious groups to obtain permits to hand out fliers in a park if it does not require similarly situated secular groups to do so, and no federal agency tasked with issuing permits for land use may deny a permit to an Islamic Center seeking to build a mosque when the agency has granted, or would grant, a permit to similarly situated secular organizations or religious groups.

**8. Government may not officially favor or disfavor particular religious groups.**

Together, the Free Exercise Clause and the Establishment Clause prohibit government from officially preferring one religious group to another. This principle of denominational neutrality means, for example, that government cannot selectively impose regulatory burdens on some denominations but not others. It likewise cannot favor some religious groups for participation in the Combined Federal Campaign over others based on the groups' religious beliefs.

**9. Government may not interfere with the autonomy of a religious organization.**

Together, the Free Exercise Clause and the Establishment Clause also restrict governmental interference in intra-denominational disputes about doctrine, discipline, or qualifications for ministry or membership. For example, government may not impose its nondiscrimination rules to require Catholic seminaries or Orthodox Jewish yeshivas to accept female priests or rabbis.

**10. The Religious Freedom Restoration Act of 1993 prohibits the federal government from substantially burdening any aspect of religious observance or practice, unless imposition of that burden on a particular religious adherent satisfies strict scrutiny.**

RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the federal government demonstrates that application of such burden to the religious adherent is the least restrictive means of achieving a compelling governmental interest. RFRA applies to all actions by federal administrative agencies, including rulemaking, adjudication or other enforcement actions, and grant or contract distribution and administration.

Federal Law Protections for Religious Liberty
Page 4

**11. RFRA's protection extends not just to individuals, but also to organizations, associations, and at least some for-profit corporations.**

RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies. For example, the Supreme Court has held that Hobby Lobby, a closely held, for-profit corporation with more than 500 stores and 13,000 employees, is protected by RFRA.

**12. RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**

RFRA applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

**13. A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion. For example, a Bureau of Prisons regulation that bans a devout Muslim from growing even a half-inch beard in accordance with his religious beliefs substantially burdens his religious practice. Likewise, a Department of Health and Human Services regulation requiring employers to provide insurance coverage for contraceptive drugs in violation of their religious beliefs or face significant fines substantially burdens their religious practice, and a law that conditions receipt of significant government benefits on willingness to work on Saturday substantially burdens the religious practice of those who, as a matter of religious observance or practice, do not work on that day. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.

Federal Law Protections for Religious Liberty
Page 5

**14. The strict scrutiny standard applicable to RFRA is exceptionally demanding.**

Once a religious adherent has identified a substantial burden on his or her religious belief, the federal government can impose that burden on the adherent only if it is the least restrictive means of achieving a compelling governmental interest. Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent. Even if the federal government could show the necessary interest, it would also have to show that its chosen restriction on free exercise is the least restrictive means of achieving that interest. That analysis requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program.

**15. RFRA applies even where a religious adherent seeks an exemption from a legal obligation requiring the adherent to confer benefits on third parties.**

Although burdens imposed on third parties are relevant to RFRA analysis, the fact that an exemption would deprive a third party of a benefit does not categorically render an exemption unavailable. Once an adherent identifies a substantial burden on his or her religious exercise, RFRA requires the federal government to establish that denial of an accommodation or exemption to that adherent is the least restrictive means of achieving a compelling governmental interest.

**16. Title VII of the Civil Rights Act of 1964, as amended, prohibits covered employers from discriminating against individuals on the basis of their religion.**

Employers covered by Title VII may not fail or refuse to hire, discharge, or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's religion. Such employers also may not classify their employees or applicants in a way that would deprive or tend to deprive any individual of employment opportunities because of the individual's religion. This protection applies regardless of whether the individual is a member of a religious majority or minority. But the protection does not apply in the same way to religious employers, who have certain constitutional and statutory protections for religious hiring decisions.

**17. Title VII's protection extends to discrimination on the basis of religious observance or practice as well as belief, unless the employer cannot reasonably accommodate such observance or practice without undue hardship on the business.**

Title VII defines "religion" broadly to include all aspects of religious observance or practice, except when an employer can establish that a particular aspect of such observance or practice cannot reasonably be accommodated without undue hardship to the business. For example, covered employers are required to adjust employee work schedules for Sabbath observance, religious holidays, and other religious observances, unless doing so would create an undue hardship, such as materially compromising operations or violating a collective bargaining agreement. Title VII might also require an employer to modify a no-head-coverings policy to allow a Jewish employee to wear a yarmulke or a Muslim employee to wear a headscarf. An

Federal Law Protections for Religious Liberty
Page 6

employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation.

**18.  The Clinton Guidelines on Religious Exercise and Religious Expression in the Federal Workplace provide useful examples for private employers of reasonable accommodations for religious observance and practice in the workplace.**

President Clinton issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace ("Clinton Guidelines") explaining that federal employees may keep religious materials on their private desks and read them during breaks; discuss their religious views with other employees, subject to the same limitations as other forms of employee expression; display religious messages on clothing or wear religious medallions; and invite others to attend worship services at their churches, except to the extent that such speech becomes excessive or harassing. The Clinton Guidelines have the force of an Executive Order, and they also provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace.

**19. Religious employers are entitled to employ only persons whose beliefs and conduct are consistent with the employers' religious precepts.**

Constitutional and statutory protections apply to certain religious hiring decisions. Religious corporations, associations, educational institutions, and societies—that is, entities that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes—have an express statutory exemption from Title VII's prohibition on religious discrimination in employment. Under that exemption, religious organizations may choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts. For example, a Lutheran secondary school may choose to employ only practicing Lutherans, only practicing Christians, or only those willing to adhere to a code of conduct consistent with the precepts of the Lutheran community sponsoring the school. Indeed, even in the absence of the Title VII exemption, religious employers might be able to claim a similar right under RFRA or the Religion Clauses of the Constitution.

**20. As a general matter, the federal government may not condition receipt of a federal grant or contract on the effective relinquishment of a religious organization's hiring exemptions or attributes of its religious character.**

Religious organizations are entitled to compete on equal footing for federal financial assistance used to support government programs. Such organizations generally may not be required to alter their religious character to participate in a government program, nor to cease engaging in explicitly religious activities outside the program, nor effectively to relinquish their federal statutory protections for religious hiring decisions.

Federal Law Protections for Religious Liberty
Page 7

## Guidance for Implementing Religious Liberty Principles

Agencies must pay keen attention, in everything they do, to the foregoing principles of religious liberty.

### Agencies As Employers

Administrative agencies should review their current policies and practices to ensure that they comply with all applicable federal laws and policies regarding accommodation for religious observance and practice in the federal workplace, and all agencies must observe such laws going forward. In particular, all agencies should review the Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, which President Clinton issued on August 14, 1997, to ensure that they are following those Guidelines. All agencies should also consider practical steps to improve safeguards for religious liberty in the federal workplace, including through subject-matter experts who can answer questions about religious nondiscrimination rules, information websites that employees may access to learn more about their religious accommodation rights, and training for all employees about federal protections for religious observance and practice in the workplace.

### Agencies Engaged in Rulemaking

In formulating rules, regulations, and policies, administrative agencies should also proactively consider potential burdens on the exercise of religion and possible accommodations of those burdens. Agencies should consider designating an officer to review proposed rules with religious accommodation in mind or developing some other process to do so. In developing that process, agencies should consider drawing upon the expertise of the White House Office of Faith-Based and Neighborhood Partnerships to identify concerns about the effect of potential agency action on religious exercise. Regardless of the process chosen, agencies should ensure that they review all proposed rules, regulations, and policies that have the potential to have an effect on religious liberty for compliance with the principles of religious liberty outlined in this memorandum and appendix before finalizing those rules, regulations, or policies. The Office of Legal Policy will also review any proposed agency or executive action upon which the Department's comments, opinion, or concurrence are sought, *see, e.g.*, Exec. Order 12250 § 1-2, 45 Fed. Reg. 72995 (Nov. 2, 1980), to ensure that such action complies with the principles of religious liberty outlined in this memorandum and appendix. The Department will not concur in any proposed action that does not comply with federal law protections for religious liberty as interpreted in this memorandum and appendix, and it will transmit any concerns it has about the proposed action to the agency or the Office of Management and Budget as appropriate. If, despite these internal reviews, a member of the public identifies a significant concern about a prospective rule's compliance with federal protections governing religious liberty during a period for public comment on the rule, the agency should carefully consider and respond to that request in its decision. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). In appropriate circumstances, an agency might explain that it will consider requests for accommodations on a case-by-case basis rather than in the rule itself, but the agency should provide a reasoned basis for that approach.

Federal Law Protections for Religious Liberty
Page 8

**Agencies Engaged in Enforcement Actions**

Much like administrative agencies engaged in rulemaking, agencies considering potential enforcement actions should consider whether such actions are consistent with federal protections for religious liberty.  In particular, agencies should remember that RFRA applies to agency enforcement just as it applies to every other governmental action.  An agency should consider RFRA when setting agency-wide enforcement rules and priorities, as well as when making decisions to pursue or continue any particular enforcement action, and when formulating any generally applicable rules announced in an agency adjudication.

Agencies should remember that discriminatory enforcement of an otherwise nondiscriminatory law can also violate the Constitution.  Thus, agencies may not target or single out religious organizations or religious conduct for disadvantageous treatment in enforcement priorities or actions.  The President identified one area where this could be a problem in Executive Order 13798, when he directed the Secretary of the Treasury, to the extent permitted by law, not to take any "adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of *similar character*" from a non-religious perspective has not been treated as participation or intervention in a political campaign. Exec. Order No. 13798, § 2, 82 Fed. Reg. at 21675.  But the requirement of nondiscrimination toward religious organizations and conduct applies across the enforcement activities of the Executive Branch, including within the enforcement components of the Department of Justice.

**Agencies Engaged in Contracting and Distribution of Grants**

Agencies also must not discriminate against religious organizations in their contracting or grant-making activities.  Religious organizations should be given the opportunity to compete for government grants or contracts and participate in government programs on an equal basis with nonreligious organizations.  Absent unusual circumstances, agencies should not condition receipt of a government contract or grant on the effective relinquishment of a religious organization's Section 702 exemption for religious hiring practices, or any other constitutional or statutory protection for religious organizations.  In particular, agencies should not attempt through conditions on grants or contracts to meddle in the internal governance affairs of religious organizations or to limit those organizations' otherwise protected activities.

\*     \*     \*

Any questions about this memorandum or the appendix should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Federal Law Protections for Religious Liberty
Page 1a

# APPENDIX

Although not an exhaustive treatment of all federal protections for religious liberty, this appendix summarizes the key constitutional and federal statutory protections for religious liberty and sets forth the legal basis for the religious liberty principles described in the foregoing memorandum.

<u>Constitutional Protections</u>

The people, acting through their Constitution, have singled out religious liberty as deserving of unique protection. In the original version of the Constitution, the people agreed that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. The people then amended the Constitution during the First Congress to clarify that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. Those protections have been incorporated against the States. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (Free Exercise Clause).

A. Free Exercise Clause

The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). Government may not attempt to *regulate* religious beliefs, *compel* religious beliefs, or *punish* religious beliefs. *See id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944). It may not lend its power to one side in intra-denominational disputes about dogma, authority, discipline, or qualifications for ministry or membership. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012); *Smith*, 494 U.S. at 877; *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 120–21 (1952). It may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. *Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). And with the exception of certain historical limits on the freedom of speech, government may not punish or otherwise harass churches, church officials, or religious adherents for speaking on religious topics or sharing their religious beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *see also* U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. *Smith*, 494 U.S. at 877; *Sherbert*, 374 U.S. at 402; *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious

Federal Law Protections for Religious Liberty
Page 2a

tradition. *Frazee v. Illinois Dept. of Emp't Sec.*, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993) (internal quotation marks omitted). They must merely be "sincerely held." *Frazee*, 489 U.S. at 834.

Importantly, the protection of the Free Exercise Clause also extends to acts undertaken in accordance with such sincerely-held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to "*exercise*" religion, not just the freedom to "believe" in religion. *See Smith*, 494 U.S. at 877; *see also Thomas*, 450 U.S. at 716; *Paty*, 435 U.S. at 627; *Sherbert*, 374 U.S. at 403–04; *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972). Moreover, no other interpretation would actually guarantee the freedom of belief that Americans have so long regarded as central to individual liberty. Many, if not most, religious beliefs require external observance and practice through physical acts or abstention from acts. The tie between physical acts and religious beliefs may be readily apparent (e.g., attendance at a worship service) or not (e.g., service to one's community at a soup kitchen or a decision to close one's business on a particular day of the week). The "exercise of religion" encompasses all aspects of religious observance and practice. And because individuals may act collectively through associations and organizations, it encompasses the exercise of religion by such entities as well. *See, e.g., Hosanna-Tabor*, 565 U.S. at 199; *Church of the Lukumi Babalu Aye*, 508 U.S. at 525–26, 547; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770, 2772–73 (2014) (even a closely held for-profit corporation may exercise religion if operated in accordance with asserted religious principles).

As with most constitutional protections, however, the protection afforded to Americans by the Free Exercise Clause for physical acts is not absolute, *Smith*, 491 U.S. at 878–79, and the Supreme Court has identified certain principles to guide the analysis of the scope of that protection. First, government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, ___ (2017) (slip op. at 6) (internal quotation marks omitted), for it was precisely such "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (internal quotation marks omitted). The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion" just as surely as it protects against "outright prohibitions" on religious exercise. *Trinity Lutheran*, 582 U.S. at ___ (slip op. at 11) (internal quotation marks omitted). "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert*, 374 U.S. at 404).

Because a law cannot have as its official "object or purpose . . . the suppression of religion or religious conduct," courts must "survey meticulously" the text and operation of a law to ensure that it is actually neutral and of general applicability. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533–34 (internal quotation marks omitted). A law is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions

Federal Law Protections for Religious Liberty
Page 3a

on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533–35, 538 (internal quotation marks omitted). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, *id.*, or enables, expressly or de facto, "a system of individualized exemptions," as discussed in *Smith*, 494 U.S. at 884; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 537.

"Neutrality and general applicability are interrelated, . . . [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. *See Trinity Lutheran*, 582 U.S. at ___–___ (slip op. at 9–11). Likewise, a law that selectively prohibits the killing of animals for religious reasons and fails to prohibit the killing of animals for many nonreligious reasons, or that selectively prohibits a business from refusing to stock a product for religious reasons but fails to prohibit such refusal for myriad commercial reasons, is neither neutral, nor generally applicable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533–36, 542–45. Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, *id.* at 546.

Second, even a neutral, generally applicable law is subject to strict scrutiny under this Clause if it restricts the free exercise of religion and another constitutionally protected liberty, such as the freedom of speech or association, or the right to control the upbringing of one's children. *See Smith*, 494 U.S. at 881–82; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004). Many Free Exercise cases fall in this category. For example, a law that seeks to compel a private person's speech or expression contrary to his or her religious beliefs implicates both the freedoms of speech and free exercise. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 707–08 (1977) (challenge by Jehovah's Witnesses to requirement that state license plates display the motto "Live Free or Die"); *Axson-Flynn*, 356 F.3d at 1280 (challenge by Mormon student to University requirement that student actors use profanity and take God's name in vain during classroom acting exercises). A law taxing or prohibiting door-to-door solicitation, at least as applied to individuals distributing religious literature and seeking contributions, likewise implicates the freedoms of speech and free exercise. *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (challenge by Jehovah's Witnesses to tax on canvassing or soliciting); *Cantwell*, 310 U.S. at 307 (same). A law requiring children to receive certain education, contrary to the religious beliefs of their parents, implicates both the parents' right to the care, custody, and control of their children and to free exercise. *Yoder*, 406 U.S. at 227–29 (challenge by Amish parents to law requiring high school attendance).

Strict scrutiny is the "most rigorous" form of scrutiny identified by the Supreme Court. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). It is the same standard applied to governmental classifications based on race, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), and

Federal Law Protections for Religious Liberty
Page 4a

restrictions on the freedom of speech, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546–47. Under this level of scrutiny, government must establish that a challenged law "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 546 (internal quotation marks omitted). "[O]nly in rare cases" will a law survive this level of scrutiny. *Id.*

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 537 (government discriminatorily interpreted an ordinance prohibiting the unnecessary killing of animals as prohibiting only killing of animals for religious reasons); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (government discriminatorily enforced ordinance prohibiting meetings in public parks against only certain religious groups). The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *See Trinity Lutheran*, 582 U.S. at __ (slip op. at 6); *cf. Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) (recognizing that Establishment Clause does not justify discrimination against religious clubs seeking use of public meeting spaces); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837, 841 (1995) (recognizing that Establishment Clause does not justify discrimination against religious student newspaper's participation in neutral reimbursement program). That is true regardless of whether the discriminatory application is initiated by the government itself or by private requests or complaints. *See, e.g., Fowler*, 345 U.S. at 69; *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

B.  Establishment Clause

The Establishment Clause, too, protects religious liberty. It prohibits government from establishing a religion and coercing Americans to follow it. *See Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819–20 (2014); *Good News Club*, 533 U.S. at 115. It restricts government from interfering in the internal governance or ecclesiastical decisions of a religious organization. *Hosanna-Tabor*, 565 U.S. at 188–89. And it prohibits government from officially favoring or disfavoring particular religious groups as such or officially advocating particular religious points of view. *See Galloway*, 134 S. Ct. at 1824; *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Indeed, "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U.S. at 839 (emphasis added). That "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* Thus, religious adherents and organizations may, like nonreligious adherents and organizations, receive indirect financial aid through independent choice, or, in certain circumstances, direct financial aid through a secular-aid program. *See, e.g., Trinity Lutheran*, 582 U.S. at ___ (slip. op. at 6) (scrap tire program); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (voucher program).

C.  Religious Test Clause

Finally, the Religious Test Clause, though rarely invoked, provides a critical guarantee to religious adherents that they may serve in American public life. The Clause reflects the judgment

Federal Law Protections for Religious Liberty
Page 5a

of the Framers that a diversity of religious viewpoints in government would enhance the liberty of all Americans. And after the Religion Clauses were incorporated against the States, the Supreme Court shared this view, rejecting a Tennessee law that "establishe[d] as a condition of office the willingness to eschew certain protected religious practices." *Paty*, 435 U.S. at 632 (Brennan, J., and Marshall, J., concurring in judgment); *see also id.* at 629 (plurality op.) ("[T]he American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").

<u>Statutory Protections</u>

Recognizing the centrality of religious liberty to our nation, Congress has buttressed these constitutional rights with statutory protections for religious observance and practice. These protections can be found in, among other statutes, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. Such protections ensure not only that government tolerates religious observance and practice, but that it embraces religious adherents as full members of society, able to contribute through employment, use of public accommodations, and participation in government programs. The considered judgment of the United States is that we are stronger through accommodation of religion than segregation or isolation of it.

A. Religious Freedom Restoration Act of 1993 (RFRA)

The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a), (b). The Act applies even where the burden arises out of a "rule of general applicability" passed without animus or discriminatory intent. *See id.* § 2000bb-1(a). It applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *see* §§ 2000bb-2(4), 2000cc-5(7), and covers "individuals" as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1, including for-profit, closely-held corporations like those involved in *Hobby Lobby*, 134 S. Ct. at 2768.

Subject to the exceptions identified below, a law "substantially burden[s] a person's exercise of religion," 42 U.S.C. § 2000bb-1, if it bans an aspect of the adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, *see Sherbert*, 374 U.S. at 405–06. The "threat of criminal sanction" will satisfy these principles, even when, as in *Yoder*, the prospective punishment is a mere $5 fine. 406 U.S. at 208, 218. And the denial of, or condition on the receipt of, government benefits may substantially burden the exercise of religion under these principles. *Sherbert*, 374 U.S. at 405–06; *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas*, 450 U.S. at 717–18. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself

Federal Law Protections for Religious Liberty
Page 6a

regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–49 (1988); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

As with claims under the Free Exercise Clause, RFRA does not permit a court to inquire into the reasonableness of a religious belief, including into the adherent's assessment of the religious connection between a belief asserted and what the government forbids, requires, or prevents. *Hobby Lobby*, 134 S. Ct. at 2778. If the proffered belief is sincere, it is not the place of the government or a court to second-guess it. *Id.* A good illustration of the point is *Thomas v. Review Board of Indiana Employment Security Division*—one of the *Sherbert* line of cases, whose analytical test Congress sought, through RFRA, to restore, 42 U.S.C. § 2000bb. There, the Supreme Court concluded that the denial of unemployment benefits was a substantial burden on the sincerely held religious beliefs of a Jehovah's Witness who had quit his job after he was transferred from a department producing sheet steel that could be used for military armaments to a department producing turrets for military tanks. *Thomas*, 450 U.S. at 716–18. In doing so, the Court rejected the lower court's inquiry into "what [the claimant's] belief was and what the religious basis of his belief was," noting that no one had challenged the sincerity of the claimant's religious beliefs and that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 714–15 (internal quotation marks omitted). The Court likewise rejected the lower court's comparison of the claimant's views to those of other Jehovah's Witnesses, noting that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.* at 715. The Supreme Court reinforced this reasoning in *Hobby Lobby*, rejecting the argument that "the connection between what the objecting parties [were required to] do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they [found] to be morally wrong (destruction of an embryo) [wa]s simply too attenuated." 134 S. Ct. at 2777. The Court explained that the plaintiff corporations had a sincerely-held religious belief that provision of the coverage was morally wrong, and it was "not for us to say that their religious beliefs are mistaken or insubstantial." *Id.* at 2779.

Government bears a heavy burden to justify a substantial burden on the exercise of religion. "[O]nly those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215). Such interests include, for example, the "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history," *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), and the interest in ensuring the "mandatory and continuous participation" that is "indispensable to the fiscal vitality of the social security system," *United States v. Lee*, 455 U.S. 252, 258–59 (1982). But "broadly formulated interests justifying the general applicability of government mandates" are insufficient. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). The government must establish a compelling interest to deny an accommodation to the particular claimant. *Id.* at 430, 435–38. For example, the military may have a compelling interest in its

Federal Law Protections for Religious Liberty
Page 7a

uniform and grooming policy to ensure military readiness and protect our national security, but it does not necessarily follow that those interests would justify denying a particular soldier's request for an accommodation from the uniform and grooming policy. *See, e.g.,* Secretary of the Army, Army Directive 2017-03, Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation (2017) (recognizing the "successful examples of Soldiers currently serving with" an accommodation for "the wear of a hijab; the wear of a beard; and the wear of a turban or under-turban/patka, with uncut beard and uncut hair" and providing for a reasonable accommodation of these practices in the Army). The military would have to show that it has a compelling interest in denying that particular accommodation. An asserted compelling interest in denying an accommodation to a particular claimant is undermined by evidence that exemptions or accommodations have been granted for other interests. *See O Centro*, 546 U.S. at 433, 436–37; *see also Hobby Lobby*, 134 S. Ct. at 2780.

The compelling-interest requirement applies even where the accommodation sought is "an exemption from a legal obligation requiring [the claimant] to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. Although "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries,'" the Supreme Court has explained that almost any governmental regulation could be reframed as a legal obligation requiring a claimant to confer benefits on third parties. *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). As nothing in the text of RFRA admits of an exception for laws requiring a claimant to confer benefits on third parties, 42 U.S.C. § 2000bb-1, and such an exception would have the potential to swallow the rule, the Supreme Court has rejected the proposition that RFRA accommodations are categorically unavailable for laws requiring claimants to confer benefits on third parties. *Hobby Lobby*, 134 S. Ct. at 2781 n.37.

Even if the government can identify a compelling interest, the government must also show that denial of an accommodation is the least restrictive means of serving that compelling governmental interest. This standard is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. It requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program. *Id.* at 2781. Indeed, the existence of exemptions for other individuals or entities that could be expanded to accommodate the claimant, while still serving the government's stated interests, will generally defeat a RFRA defense, as the government bears the burden to establish that no accommodation is viable. *See id.* at 2781–82.

B. Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)

Although Congress's leadership in adopting RFRA led many States to pass analogous statutes, Congress recognized the unique threat to religious liberty posed by certain categories of state action and passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to address them. RLUIPA extends a standard analogous to RFRA to state and local government actions regulating land use and institutionalized persons where "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §§ 2000cc(a)(2), 2000cc-1(b).

Federal Law Protections for Religious Liberty
Page 8a

RLUIPA's protections must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A), and treats "[t]he use, building, or conversion of real property for the purpose of religious exercise" as the "religious exercise of the person or entity that uses or intends to use the property for that purpose," *id.* § 2000cc-5(7)(B). Like RFRA, RLUIPA prohibits government from substantially burdening an exercise of religion unless imposition of the burden on the religious adherent is the least restrictive means of furthering a compelling governmental interest. *See id.* § 2000cc-1(a). That standard "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c); *cf. Holt v. Hobbs*, 135 S. Ct. 853, 860, 864–65 (2015).

With respect to land use in particular, RLUIPA also requires that government not "treat[] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," *id.* § 2000cc(b)(2), or "impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3). A claimant need not show a substantial burden on the exercise of religion to enforce these antidiscrimination and equal terms provisions listed in § 2000cc(b). *See id.* § 2000cc(b); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262–64 (3d Cir. 2007), *cert. denied*, 553 U.S. 1065 (2008). Although most RLUIPA cases involve places of worship like churches, mosques, synagogues, and temples, the law applies more broadly to religious schools, religious camps, religious retreat centers, and religious social service facilities. Letter from U.S. Dep't of Justice Civil Rights Division to State, County, and Municipal Officials re: The Religious Land Use and Institutionalized Persons Act (Dec. 15, 2016).

C.  Other Civil Rights Laws

To incorporate religious adherents fully into society, Congress has recognized that it is not enough to limit governmental action that substantially burdens the exercise of religion. It must also root out public and private discrimination based on religion. Religious discrimination stood alongside discrimination based on race, color, and national origin, as an evil to be addressed in the Civil Rights Act of 1964, and Congress has continued to legislate against such discrimination over time. Today, the United States Code includes specific prohibitions on religious discrimination in places of public accommodation, 42 U.S.C. § 2000a; in public facilities, *id.* § 2000b; in public education, *id.* § 2000c-6; in employment, *id.* §§ 2000e, 2000e-2, 2000e-16; in the sale or rental of housing, *id.* § 3604; in the provision of certain real-estate transaction or brokerage services, *id.* §§ 3605, 3606; in federal jury service, 28 U.S.C. § 1862; in access to limited open forums for speech, 20 U.S.C. § 4071; and in participation in or receipt of benefits from various federally-funded programs, 15 U.S.C. § 3151; 20 U.S.C. §§ 1066c(d), 1071(a)(2), 1087-4, 7231d(b)(2), 7914; 31 U.S.C. § 6711(b)(3); 42 U.S.C. §§ 290cc-33(a)(2), 300w-7(a)(2), 300x-57(a)(2), 300x-65(f), 604a(g), 708(a)(2), 5057(c), 5151(a), 5309(a), 6727(a), 9858l(a)(2), 10406(2)(B), 10504(a), 10604(e), 12635(c)(1), 12832, 13791(g)(3), 13925(b)(13)(A).

Federal Law Protections for Religious Liberty
Page 9a

Invidious religious discrimination may be directed at religion in general, at a particular religious belief, or at particular aspects of religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 532–33. A law drawn to prohibit a specific religious practice may discriminate just as severely against a religious group as a law drawn to prohibit the religion itself. *See id.* No one would doubt that a law prohibiting the sale and consumption of Kosher meat would discriminate against Jewish people. True equality may also require, depending on the applicable statutes, an awareness of, and willingness reasonably to accommodate, religious observance and practice. Indeed, the denial of reasonable accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it.

 1. Employment

  i. Protections for Religious Employees

Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. In Title VII of the Civil Rights Act, Congress declared it an unlawful employment practice for a covered employer to (1) "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," as well as (2) to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *see also* 42 U.S.C. § 2000e-16(a) (applying Title VII to certain federal-sector employers); 3 U.S.C. § 411(a) (applying Title VII employment in the Executive Office of the President). The protection applies "regardless of whether the discrimination is directed against [members of religious] majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977).

After several courts had held that employers did not violate Title VII when they discharged employees for refusing to work on their Sabbath, Congress amended Title VII to define "[r]eligion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Hardison*, 432 U.S. at 74 n.9. Congress thus made clear that discrimination on the basis of religion includes discrimination on the basis of any aspect of an employee's religious observance or practice, at least where such observance or practice can be reasonably accommodated without undue hardship.

Title VII's reasonable accommodation requirement is meaningful. As an initial matter, it requires an employer to consider what adjustment or modification to its policies would effectively address the employee's concern, for "[a]n *ineffective* modification or adjustment will not *accommodate*" a person's religious observance or practice, within the ordinary meaning of that word. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (considering the ordinary

Federal Law Protections for Religious Liberty
Page 10a

meaning in the context of an ADA claim). Although there is no obligation to provide an employee with his or her preferred reasonable accommodation, *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), an employer may justify a refusal to accommodate only by showing that "an undue hardship [on its business] would *in fact* result from *each available* alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *Id.* Likewise, the fact that an accommodation may grant the religious employee a preference is not evidence of undue hardship as, "[b]y definition, any special 'accommodation' requires the employer to treat an employee . . . differently, *i.e.*, preferentially." *U.S. Airways*, 535 U.S. at 397; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they may be treated no worse than other practices. Rather, it gives them favored treatment.").

Title VII does not, however, require accommodation at all costs. As noted above, an employer is not required to accommodate a religious observance or practice if it would pose an undue hardship on its business. An accommodation might pose an "undue hardship," for example, if it would require the employer to breach an otherwise valid collective bargaining agreement, *see, e.g.*, *Hardison*, 432 U.S. at 79, or carve out a special exception to a seniority system, *id.* at 83; *see also U.S. Airways*, 535 U.S. at 403. Likewise, an accommodation might pose an "undue hardship" if it would impose "more than a de minimis cost" on the business, such as in the case of a company where weekend work is "essential to [the] business" and many employees have religious observances that would prohibit them from working on the weekends, so that accommodations for all such employees would result in significant overtime costs for the employer. *Hardison*, 432 U.S. at 80, 84 & n.15. In general, though, Title VII expects positive results for society from a cooperative process between an employer and its employee "in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotations omitted).

The area of religious speech and expression is a useful example of reasonable accommodation. Where speech or expression is part of a person's religious observance and practice, it falls within the scope of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2. Speech or expression outside of the scope of an individual's employment can almost always be accommodated without undue hardship to a business. Speech or expression within the scope of an individual's employment, during work hours, or in the workplace may, depending upon the facts and circumstances, be reasonably accommodated. *Cf. Abercrombie*, 135 S. Ct. at 2032.

The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to "keep a Bible or Koran on her private desk and read it during breaks"; to discuss his religious views with other employees, subject "to the same rules of order as apply to other employee expression"; to display religious messages on clothing or wear religious medallions visible to others; and to hand out religious tracts to other employees or invite them to attend worship services at the employee's church, except to the extent that such speech becomes excessive or harassing. Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, § 1(A), Aug. 14, 1997 (hereinafter "Clinton

Federal Law Protections for Religious Liberty
Page 11a

Guidelines"). The Clinton Guidelines have the force of an Executive Order. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."); *see also* Memorandum from President William J. Clinton to the Heads of Executive Departments and Agencies (Aug. 14, 1997) ("All civilian executive branch agencies, officials, and employees must follow these Guidelines carefully."). The successful experience of the federal government in applying the Clinton Guidelines over the last twenty years is evidence that religious speech and expression can be reasonably accommodated in the workplace without exposing an employer to liability under workplace harassment laws.

Time off for religious holidays is also often an area of concern. The observance of religious holidays is an "aspect[] of religious observance and practice" and is therefore protected by Title VII. 42 U.S.C. §§ 2000e, 2000e-2. Examples of reasonable accommodations for that practice could include a change of job assignments or lateral transfer to a position whose schedule does not conflict with the employee's religious holidays, 29 C.F.R. § 1605.2(d)(1)(iii); a voluntary work schedule swap with another employee, *id.* § 1065.2(d)(1)(i); or a flexible scheduling scheme that allows employees to arrive or leave early, use floating or optional holidays for religious holidays, or make up time lost on another day, *id.* § 1065.2(d)(1)(ii). Again, the federal government has demonstrated reasonable accommodation through its own practice: Congress has created a flexible scheduling scheme for federal employees, which allows employees to take compensatory time off for religious observances, 5 U.S.C. § 5550a, and the Clinton Guidelines make clear that "[a]n agency must adjust work schedules to accommodate an employee's religious observance—for example, Sabbath or religious holiday observance—if an adequate substitute is available, or if the employee's absence would not otherwise impose an undue burden on the agency," Clinton Guidelines § 1(C). If an employer regularly permits accommodation in work scheduling for secular conflicts and denies such accommodation for religious conflicts, "such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness." *Philbrook*, 479 U.S. at 71.

Except for certain exceptions discussed in the next section, Title VII's protection against disparate treatment, 42 U.S.C. § 2000e-2(a)(1), is implicated *any time* religious observance or practice is a motivating factor in an employer's covered decision. *Abercrombie*, 135 S. Ct. at 2033. That is true even when an employer acts without actual knowledge of the need for an accommodation from a neutral policy but with "an unsubstantiated suspicion" of the same. *Id.* at 2034.

### ii. Protections for Religious Employers

Congress has acknowledged, however, that religion sometimes *is* an appropriate factor in employment decisions, and it has limited Title VII's scope accordingly. Thus, for example, where religion "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," employers may hire and employ individuals based on their religion. 42 U.S.C. § 2000e-2(e)(1). Likewise, where educational institutions are "owned, supported, controlled or managed, [in whole or in substantial part] by a particular religion or by a particular religious corporation, association, or society" or direct their curriculum "toward the

Federal Law Protections for Religious Liberty
Page 12a

propagation of a particular religion," such institutions may hire and employ individuals of a particular religion. *Id.* And "a religious corporation, association, educational institution, or society" may employ "individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335–36 (1987).

Because Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), these exemptions include decisions "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 198–200 (11th Cir. 1997). For example, in *Little*, the Third Circuit held that the exemption applied to a Catholic school's decision to fire a divorced Protestant teacher who, though having agreed to abide by a code of conduct shaped by the doctrines of the Catholic Church, married a baptized Catholic without first pursuing the official annulment process of the Church. 929 F.2d at 946, 951.

Section 702 broadly exempts from its reach religious corporations, associations, educational institutions, and societies. The statute's terms do not limit this exemption to non-profit organizations, to organizations that carry on only religious activities, or to organizations established by a church or formally affiliated therewith. *See* Civil Rights Act of 1964, § 702(a), *codified at* 42 U.S.C. § 2000e-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2773–74; *Corp. of Presiding Bishop*, 483 U.S. at 335–36. The exemption applies whenever the organization is "religious," which means that it is organized for religious purposes and engages in activity consistent with, and in furtherance of, such purposes. Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008). Thus, the exemption applies not just to religious denominations and houses of worship, but to religious colleges, charitable organizations like the Salvation Army and World Vision International, and many more. In that way, it is consistent with other broad protections for religious entities in federal law, including, for example, the exemption of religious entities from many of the requirements under the Americans with Disabilities Act. *See* 28 C.F.R. app. C; 56 Fed. Reg. 35544, 35554 (July 26, 1991) (explaining that "[t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations").

In addition to these explicit exemptions, religious organizations may be entitled to additional exemptions from discrimination laws. *See, e.g., Hosanna-Tabor*, 565 U.S. at 180, 188–90. For example, a religious organization might conclude that it cannot employ an individual who fails faithfully to adhere to the organization's religious tenets, either because doing so might itself inhibit the organization's exercise of religion or because it might dilute an expressive message. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649–55 (2000). Both constitutional and statutory issues arise when governments seek to regulate such decisions.

As a constitutional matter, religious organizations' decisions are protected from governmental interference to the extent they relate to ecclesiastical or internal governance matters. *Hosanna-Tabor*, 565 U.S. at 180, 188–90. It is beyond dispute that "it would violate the First Amendment for courts to apply [employment discrimination] laws to compel the ordination of

Federal Law Protections for Religious Liberty
Page 13a

women by the Catholic Church or by an Orthodox Jewish seminary." *Id.* at 188. The same is true for other employees who "minister to the faithful," including those who are not themselves the head of the religious congregation and who are not engaged solely in religious functions. *Id.* at 188, 190, 194–95; *see also* Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008) (noting that the First Amendment protects "the right to employ staff who share the religious organization's religious beliefs").

Even if a particular associational decision could be construed to fall outside this protection, the government would likely still have to show that any interference with the religious organization's associational rights is justified under strict scrutiny. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (infringements on expressive association are subject to strict scrutiny); *Smith*, 494 U.S. at 882 ("[I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns."). The government may be able to meet that standard with respect to race discrimination, *see Bob Jones Univ.*, 461 U.S. at 604, but may not be able to with respect to other forms of discrimination. For example, at least one court has held that forced inclusion of women into a mosque's religious men's meeting would violate the freedom of expressive association. *Donaldson v. Farrakhan*, 762 N.E.2d 835, 840–41 (Mass. 2002). The Supreme Court has also held that the government's interest in addressing sexual-orientation discrimination is not sufficiently compelling to justify an infringement on the expressive association rights of a private organization. *Boy Scouts*, 530 U.S. at 659.

As a statutory matter, RFRA too might require an exemption or accommodation for religious organizations from antidiscrimination laws. For example, "prohibiting religious organizations from hiring only coreligionists can 'impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities.'" *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 172 (2007) (quoting *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001)); *see also Corp. of Presiding Bishop*, 483 U.S. at 336 (noting that it would be "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court w[ould] consider religious" in applying a nondiscrimination provision that applied only to secular, but not religious, activities). If an organization establishes the existence of such a burden, the government must establish that imposing such burden on the organization is the least restrictive means of achieving a compelling governmental interest. That is a demanding standard and thus, even where Congress has not expressly exempted religious organizations from its antidiscrimination laws—as it has in other contexts, *see, e.g.*, 42 U.S.C. §§ 3607 (Fair Housing Act), 12187 (Americans with Disabilities Act)—RFRA might require such an exemption.

### 2. Government Programs

Protections for religious organizations likewise exist in government contracts, grants, and other programs. Recognizing that religious organizations can make important contributions to government programs, *see, e.g.*, 22 U.S.C. § 7601(19), Congress has expressly permitted religious organizations to participate in numerous such programs on an equal basis with secular

Federal Law Protections for Religious Liberty
Page 14a

organizations, *see, e.g.*, 42 U.S.C. §§ 290kk-1, 300x-65 604a, 629i. Where Congress has not expressly so provided, the President has made clear that "[t]he Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." Exec. Order No. 13559, § 1, 75 Fed. Reg. 71319, 71319 (Nov. 17, 2010) (amending Exec. Order No. 13279, 67 Fed. Reg. 77141 (2002). To that end, no organization may be "discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs." *Id.* "Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)" are eligible to participate in such programs, so long as they conduct such activities outside of the programs directly funded by the federal government and at a separate time and location. *Id.*

The President has assured religious organizations that they are "eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social services programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character." *See id.*; *see also* 42 U.S.C. § 290kk-1(e) (similar statutory assurance). Religious organizations that apply for or participate in such programs may continue to carry out their mission, "including the definition, development, practice, and expression of . . . religious beliefs," so long as they do not use any "direct Federal financial assistance" received "to support or engage in any explicitly religious activities" such as worship, religious instruction, or proselytization. Exec. Order No. 13559, § 1. They may also "use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities," and they may continue to "retain religious terms" in their names, select "board members on a religious basis, and include religious references in . . . mission statements and other chartering or governing documents." *Id.*

With respect to government contracts in particular, Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002), confirms that the independence and autonomy promised to religious organizations include independence and autonomy in religious hiring. Specifically, it provides that the employment nondiscrimination requirements in Section 202 of Executive Order 11246, which normally apply to government contracts, do "not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 13279, § 4, *amending* Exec. Order No. 11246, § 204(c), 30 Fed. Reg. 12319, 12935 (Sept. 24, 1965).

Because the religious hiring protection in Executive Order 13279 parallels the Section 702 exemption in Title VII, it should be interpreted to protect the decision "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. That parallel interpretation is consistent with the Supreme Court's repeated counsel that the decision to borrow statutory text in a new statute is "strong indication that the two statutes should be interpreted pari passu." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559

Federal Law Protections for Religious Liberty
Page 15a

U.S. 573, 590 (2010). It is also consistent with the Executive Order's own usage of discrimination on the basis of "religion" as something distinct and more expansive than discrimination on the basis of "religious belief." *See, e.g.*, Exec. Order No. 13279, § 2(c) ("No organization should be discriminated against on the basis of religion *or* religious belief . . . " (emphasis added)); *id.* § 2(d) ("All organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief. Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice."). Indeed, because the Executive Order uses "on the basis of religion or religious belief" in both the provision prohibiting discrimination against religious organizations and the provision prohibiting discrimination "against beneficiaries or potential beneficiaries," a narrow interpretation of the protection for religious organizations' hiring decisions would lead to a narrow protection for beneficiaries of programs served by such organizations. *See id.* §§ 2(c), (d). It would also lead to inconsistencies in the treatment of religious hiring across government programs, as some program-specific statutes and regulations expressly confirm that "[a] religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation, or receipt of funds from, a designated program." 42 U.S.C. § 290kk-1(e); *see also* 6 C.F.R. § 19.9 (same).

Even absent the Executive Order, however, RFRA would limit the extent to which the government could condition participation in a federal grant or contract program on a religious organization's effective relinquishment of its Section 702 exemption. RFRA applies to all government conduct, not just to legislation or regulation, *see* 42 U.S.C. § 2000bb-1, and the Office of Legal Counsel has determined that application of a religious nondiscrimination law to the hiring decisions of a religious organization can impose a substantial burden on the exercise of religion. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. O.L.C. at 172; *Direct Aid to Faith-Based Organizations*, 25 Op. O.L.C. at 132. Given Congress's "recognition that religious discrimination in employment is permissible in some circumstances," the government will not ordinarily be able to assert a compelling interest in prohibiting that conduct as a general condition of a religious organization's receipt of any particular government grant or contract. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. of O.L.C. at 186. The government will also bear a heavy burden to establish that requiring a particular contractor or grantee effectively to relinquish its Section 702 exemption is the least restrictive means of achieving a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1.

The First Amendment also "supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013) (internal quotation marks omitted)). Although Congress may specify the activities that it wants to subsidize, it may not "seek to leverage funding" to regulate constitutionally protected conduct "outside the contours of the program itself." *See id.* Thus, if a condition on participation in a government program—including eligibility for receipt of federally backed student loans—would interfere with a religious organization's constitutionally protected rights, *see, e.g.*,

*Hosanna-Tabor*, 565 U.S. at 188–89, that condition could raise concerns under the "unconstitutional conditions" doctrine, *see All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. at 2328.

Finally, Congress has provided an additional statutory protection for educational institutions controlled by religious organizations who provide education programs or activities receiving federal financial assistance. Such institutions are exempt from Title IX's prohibition on sex discrimination in those programs and activities where that prohibition "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). Although eligible institutions may "claim the exemption" in advance by "submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization," 34 C.F.R. § 106.12(b), they are not required to do so to have the benefit of it, *see* 20 U.S.C. § 1681.

### 3. Government Mandates

Congress has undertaken many similar efforts to accommodate religious adherents in diverse areas of federal law. For example, it has exempted individuals who, "by reason of religious training and belief," are conscientiously opposed to war from training and service in the armed forces of the United States. 50 U.S.C. § 3806(j). It has exempted "ritual slaughter and the handling or other preparation of livestock for ritual slaughter" from federal regulations governing methods of animal slaughter. 7 U.S.C. § 1906. It has exempted "private secondary school[s] that maintain[] a religious objection to service in the Armed Forces" from being required to provide military recruiters with access to student recruiting information. 20 U.S.C. § 7908. It has exempted federal employees and contractors with religious objections to the death penalty from being required to "be in attendance at or to participate in any prosecution or execution." 18 U.S.C. § 3597(b). It has allowed individuals with religious objections to certain forms of medical treatment to opt out of such treatment. *See, e.g.*, 33 U.S.C. § 907(k); 42 U.S.C. § 290bb-36(f). It has created tax accommodations for members of religious faiths conscientiously opposed to acceptance of the benefits of any private or public insurance, *see, e.g.*, 26 U.S.C. §§ 1402(g), 3127, and for members of religious orders required to take a vow of poverty, *see, e.g.*, 26 U.S.C. § 3121(r).

Congress has taken special care with respect to programs touching on abortion, sterilization, and other procedures that may raise religious conscience objections. For example, it has prohibited entities receiving certain federal funds for health service programs or research activities from requiring individuals to participate in such program or activity contrary to their religious beliefs. 42 U.S.C. § 300a-7(d), (e). It has prohibited discrimination against health care professionals and entities that refuse to undergo, require, or provide training in the performance of induced abortions; to provide such abortions; or to refer for such abortions, and it will deem accredited any health care professional or entity denied accreditation based on such actions. *Id.* § 238n(a), (b). It has also made clear that receipt of certain federal funds does not require an individual "to perform or assist in the performance of any sterilization procedure or abortion if [doing so] would be contrary to his religious beliefs or moral convictions" nor an entity to "make its facilities available for the performance of" those procedures if such performance "is prohibited by the entity on the basis of religious beliefs or moral convictions," nor an entity to "provide any personnel for the performance or assistance in the performance of" such procedures if such performance or assistance "would be contrary to the religious beliefs or moral convictions of such

Federal Law Protections for Religious Liberty
Page 17a

personnel." *Id.* § 300a-7(b). Finally, no "qualified health plan[s] offered through an Exchange" may discriminate against any health care professional or entity that refuses to "provide, pay for, provide coverage of, or refer for abortions," § 18023(b)(4); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 507(d), 129 Stat. 2242, 2649 (Dec. 18, 2015).

Congress has also been particularly solicitous of the religious freedom of American Indians. In 1978, Congress declared it the "policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. Consistent with that policy, it has passed numerous statutes to protect American Indians' right of access for religious purposes to national park lands, Scenic Area lands, and lands held in trust by the United States. *See, e.g.,* 16 U.S.C. §§ 228i(b), 410aaa-75(a), 460uu-47, 543f, 698v-11(b)(11). It has specifically sought to preserve lands of religious significance and has required notification to American Indians of any possible harm to or destruction of such lands. *Id.* § 470cc. Finally, it has provided statutory exemptions for American Indians' use of otherwise regulated articles such as bald eagle feathers and peyote as part of traditional religious practice. *Id.* §§ 668a, 4305(d); 42 U.S.C. § 1996a.

*    *    *

The depth and breadth of constitutional and statutory protections for religious observance and practice in America confirm the enduring importance of religious freedom to the United States. They also provide clear guidance for all those charged with enforcing federal law: The free exercise of religion is not limited to a right to hold personal religious beliefs or even to worship in a sacred place. It encompasses all aspects of religious observance and practice. To the greatest extent practicable and permitted by law, such religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. *See Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("[Government] follows the best of our traditions . . . [when it] respects the religious nature of our people and accommodates the public service to their spiritual needs.").