**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

_____

SOUL QUEST CHURCH OF MOTHER ) 
EARTH, INC. and CHRISTOPHER ) 
YOUNG, ) 
 ) 
                    Plaintiffs, ) 
 )     No.  6:20-cv-701-WBB-DCI 
          v. ) 
 ) 
MERRICK B. GARLAND, Attorney ) 
General of the United States of America, ) 
and D. CHRISTOPHER EVANS, Acting ) 
Administrator of the U.S. Drug ) 
Enforcement Administration, ) 
 ) 
                    Defendants. ) 
_____)

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' RENEWED PETITION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

STANDARD OF REVIEW ................................................................................. 5

ARGUMENT ..................................................................................................... 6

I.      THIS COURT LACKS JURISDICTION TO HEAR PLAINTIFFS' CLAIMS. ............ 6

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF ANY OF
        THEIR CLAIMS. .................................................................................... 6

        A.      Plaintiffs' RFRA claim is unlikely to succeed on the merits. ....................... 6

                1.      Plaintiffs are unlikely to establish a prima facie case that the CSA
                        substantially burdens religious practices that they sincerely
                        exercise. ........................................................................... 7

                        a.      Soul Quest's allegedly religious beliefs are not
                                sincerely held. ......................................................... 9

                        b.      The allegedly religious beliefs of Soul Quest
                                participants are not sincerely held. ........................................ 15

                        c.      Even if sincere, plaintiffs' religious exercise is not
                                substantially burdened. .......................................................... 16

                2.      DEA's decision not to exempt plaintiffs from the CSA's regulatory
                        requirements is the least restrictive means of furthering two
                        compelling interests. ........................................................... 17

                        a.      Protecting public health and safety of Soul Quest
                                adherents. ............................................................... 17

                        b.      Preventing diversion to non-adherents. ............................... 19

        B.      Plaintiffs are unlikely to succeed on their free exercise claim because
                the CSA is a neutral law of general applicability. ........................................ 25

        C.      Plaintiffs are unlikely to succeed on their procedural due process claim
                because the DEA provided them with notice and an opportunity to be
                heard, and § 877 provides a sufficient post-deprivation remedy. .............. 25

        D.      Plaintiffs cannot succeed on their substantive due process claim because
                their claims are governed entirely by the more specific provisions of the
                Free Exercise Clause and Free Speech Clause. ........................................ 27

i

      E.    Plaintiffs cannot succeed on their First Amendment speech claim because they lack standing for such a claim and have not alleged a prior restraint. ........................................................................... 29

III.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM. .............. 31

IV.    THE BALANCE OF HARMS FAVORS DEFENDANTS. ....................................... 34

CONCLUSION ............................................................................................................... 35

Defendants Merrick B. Garland, in his official capacity as U.S. Attorney General, and D. Christopher Evans, in his official capacity as Acting Administrator, U.S. Drug Enforcement Administration ("DEA"), hereby oppose Plaintiffs' Renewed Petition for Preliminary Injunction ("Plaintiffs' Motion" or "Pls.' Mot."), ECF No. 31. The grounds for Defendants' opposition are provided in the following memorandum of points and authorities, as well as the attached declarations of Karen Moreno ("Moreno Decl.") and Claude M. Redd ("Redd Decl.") and exhibits thereto.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the Controlled Substances Act ("CSA"), Congress gave the Attorney General authority to issue, deny, suspend, or revoke registrations for the importation, manufacture, handling, and distribution of controlled substances. By regulation, the Attorney General delegated this authority to DEA. Pursuant to that authority, DEA considers applications for religious exemption from the CSA. DEA grants a religious exemption application—and issues the requester an appropriate registration—when, under the rubric of the Religious Freedom Restoration Act (RFRA), (1) the requester demonstrates that the inability to import, handle, and/or distribute one or more controlled substances substantially burdens a sincere religious exercise of the requester; and (2) DEA is unable to establish that denying the registration is the least restrictive means of protecting a compelling government interest.

Plaintiffs—Soul Quest Church and its leader, Christopher Young—submitted to DEA an application for a religious exemption from the CSA's prohibitions on the importation, manufacture, and distribution of ayahuasca, which contains a Schedule I controlled substance. In response to plaintiffs' application, DEA conducted a pre-

registration investigation, amassing substantial evidence, in part through extensive interviews of Soul Quest's leadership, including Mr. Young. At the conclusion of its investigation, DEA issued to plaintiffs its Final Determination, in which DEA determined that plaintiffs were not entitled under RFRA to a religious exemption from the CSA and denied plaintiffs' application. *See* Final Determination Letter, ECF No. 38-1.

In the CSA, Congress provided a mechanism for review of a registration denial by DEA: judicial review in the courts of appeals. 21 U.S.C. § 877. Rather than pursue that available remedy, plaintiffs instead ask this Court to take the extraordinary step of entering a broad preliminary injunction against enforcement of the CSA's comprehensive legal regime pertaining to a Schedule I controlled substance. More than that, rather than preserving the status quo, as such injunctions are intended to do, plaintiffs seek to upend it via a court-ordered license to flout the CSA.

Even were it not for the heightened burden accompanying requests for mandatory preliminary injunctions, Plaintiffs' Motion should be denied. Plaintiffs have failed to satisfy any of the four requirements that must be met to justify emergency relief. At the threshold, this Court lacks jurisdiction over all of plaintiffs' claims because 21 U.S.C. § 877 vests in the courts of appeals exclusive jurisdiction for review over claims relating to the DEA's administration and application of the CSA. But, even if jurisdiction in this Court were proper, plaintiffs are unlikely to succeed on the merits of any of their claims.

Plaintiffs' RFRA claim faces near-certain doom because the evidence collected and considered by the DEA in reaching its Final Determination demonstrates that Soul Quest runs a secular wellness center, rather than a church. Additional evidence establishes that participants in Soul Quest's ayahuasca services—and many of Soul

Quest's leadership—do not sincerely subscribe to the church's claimed theological underpinnings. For these reasons, plaintiffs are unlikely to meet their burden of demonstrating that the CSA substantially burdens religious practices that they sincerely exercise. But even if they could make this threshold showing, DEA's determination not to exempt plaintiffs from the CSA is the least restrictive means of furthering two compelling government interests—ensuring the safety of sincerely religious adherents and preventing diversion to non-adherents—both of which DEA's investigation revealed to be at substantial risk from plaintiffs' proposed ayahuasca use.

Plaintiffs' constitutional claims fare no better. They are unlikely to succeed on their Free Exercise claim because the CSA is a valid and generally applicable law rationally related to the legitimate government interests of ensuring public health and safety. Their procedural due process claim is likely to fail because the DEA provided them with notice and an opportunity to be heard, and § 877 provides a sufficient post-deprivation remedy. Because plaintiffs' claims are governed entirely by the Free Exercise and Free Speech clauses, their substantive due process claim cannot succeed. And finally, plaintiffs are unlikely to succeed on their First Amendment prior restraint claim.

 Additionally, plaintiffs cannot demonstrate irreparable harm. That plaintiffs waited years before even initiating this suit cuts against any suggestion to the contrary, and they have not alleged any change in circumstances that might establish imminence now. In fact, plaintiffs present no evidence of any specific, concrete, or imminent threat of enforcement against them. In the face of plaintiffs' inadequate showing, the balance of harms weighs heavily against issuing the mandatory preliminary injunction plaintiffs seek. The public is best served by the effectuation of Congress's intention in the CSA to prevent

harm to public health and safety from controlled substances. Nor is the public—or Congress's interest in privileging sincere religious exercise over secular activities— served by restraining DEA from denying exemptions to groups that seek to take advantage of the protections reserved for sincerely religious groups.

For all of these reasons, this Court should deny Plaintiffs' Motion.

## BACKGROUND

For the statutory and regulatory background relevant to Plaintiffs' Motion, defendants respectfully refer the Court to Defendant's Motion to Dismiss and Memorandum in Support, ECF No. 44, at 2-6 (Defendants' Motion to Dismiss or Defs.' Mot.). Defendants' Motion also details the background to this litigation, to which defendants respectfully refer the Court, *see* Defs.' Mot. 6-7.

On May 7, 2021, plaintiffs filed the instant motion for a preliminary injunction. Pls.' Mot. In their Motion, plaintiffs ask the Court to preliminarily enjoin defendants "from arresting, prosecuting, or threatening plaintiffs and members of plaintiff Soul Quest Church with arrest, prosecution, and/or imprisonment for importing, distributing and ingesting the sacramental tea solely at Plaintiff Soul Quest Church services." *Id.* at 33. Plaintiffs further ask the Court to "order[] that within 30 days after the date of issuance of declaratory relief, the parties present the Court with a plan to effectuate the importation, distribution, and accounting for the sacramental tea consistent with the rights of the Soul Quest Church members to use the sacramental tea in ceremonies." *Id.* In support of their motion, plaintiffs argue that they "are likely to succeed on the merits" of their arguments that: defendants' "conduct is unconstitutional both on its face and as-applied" under the First and Fourteenth Amendments; defendants "have impermissibly punished, and continue to seek to punish, the Plaintiffs for practicing their religion"; and defendants have

denied plaintiffs "the right to seek redress of their grievances" and implemented "a byzantine and unclear [administrative petition] system." *Id.* at 2-3. Plaintiffs further argue that "there remains an ongoing, imminent threat of harm stemming from the prospect of arrest and prosecution." *Id.* at 2. Finally, plaintiffs argue that defendants' conduct "does nothing to protect the public interest." *Id.* at 3.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a party must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020) (citation omitted). "[F]ailure to meet even one dooms" Plaintiffs' motion. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Plaintiffs here have an even higher burden. The "chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). "Mandatory preliminary relief," which changes the status quo, "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (per curiam) (citation omitted).

**ARGUMENT**

## I.  THIS COURT LACKS JURISDICTION TO HEAR PLAINTIFFS' CLAIMS.

It is well established that 21 U.S.C. § 877 vests the courts of appeals with exclusive jurisdiction over claims relating to the DEA's administration and application of the CSA. *See, e.g.*, *Sharma v. DEA*, 511 F. App'x 898, 903 (11th Cir. 2013); *John Doe, Inc. v. DEA*, 484 F.3d 561, 568 (D.C. Cir. 2007); *Oregon v. Ashcroft*, 368 F.3d 1118, 1120 & n.1 (9th Cir. 2004); *Hemp Indus. Ass'n v. U.S. DEA*, No. 20-cv-2921 (JEB), 2021 WL 1734920, at *1 (D.D.C. May 3, 2021), *appeal filed*, No. 20-5111 (D.C. Cir. May 21, 2021). There can be no real doubt that plaintiffs challenge "final determinations, findings, [or] conclusions" made by DEA concerning the agency's application of the CSA when considering petitions for religious exemptions. 21 U.S.C. § 877; *see* Defs' Mot. at 11-15. As explained fully in Defendants' Motion to Dismiss, because plaintiffs' claims fall comfortably within the scope of § 877, review of those claims "resides exclusively in the court of appeals," *id.*, and plaintiffs' claims should be dismissed for lack of jurisdiction. Fed. R. Civ. P. 12(b)(1).

## II.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF ANY OF THEIR CLAIMS.

### A.  Plaintiffs' RFRA claim is unlikely to succeed on the merits.

Were the Court to exercise jurisdiction, Plaintiffs are unlikely to succeed on the merits of their RFRA claim for two reasons. First, as DEA concluded, plaintiffs are unlikely to be able to demonstrate that the CSA substantially burdens their and their members' sincere religious beliefs and practices. Second, even if plaintiffs could make this threshold showing, DEA's determination not to exempt plaintiffs from the CSA is the least restrictive means of furthering two compelling government interests: ensuring the health and safety

of any sincerely religious Soul Quest adherents and preventing diversion of a Schedule I controlled substance to non-adherents.

### 1. Plaintiffs are unlikely to establish a prima facie case that the CSA substantially burdens religious practices that they sincerely exercise.

To make a prima facie RFRA showing in this context, plaintiffs must establish that "application of the Controlled Substances Act would (1) substantially burden (2) a sincere (3) religious exercise." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).

Plaintiffs are unlikely to succeed on the merits of their claim that the CSA substantially burdens *their* sincere religious beliefs and practices. And that is what RFRA demands: by its terms, RFRA requires the Court to analyze the alleged burden imposed by a governmental action "'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 430–31 (quoting 42 U.S.C. § 2000bb–1(b)). Thus, to show likelihood of success on their RFRA claim, plaintiffs "cannot simply point to other groups who have won accommodations for the sacramental use of . . . hoasca and say 'we'll have what they're having,'" particularly when there are "material differences between those particular groups and their sacramental practices, on the one hand, and the [plaintiffs' allegedly] religious exercise, on the other." *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016). But this piggybacking is essentially what plaintiffs have attempted. While *some* entities may sincerely hold religious beliefs that warrant an exemption from the CSA allowing for the regulated use of ayahuasca, *this* entity and *these* individuals have not made the requisite showing.

To question the sincerity of plaintiffs' beliefs is not to doubt whether their beliefs—if sincerely held—could constitute a religion. While courts do not decide whether "religious

beliefs are mistaken or insubstantial," RFRA does require courts to determine whether the asserted religious belief "reflects an *honest conviction*." *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)); *see also Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (under RLUIPA, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic"). That is because Congress, in enacting RFRA and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), did not "offer refuge to canny operators who seek through subterfuge to avoid laws they'd prefer to ignore." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). Congress may have chosen to broadly permit religious exercise, but that does not insulate "those who set up 'churches' as cover for illegal drug distribution operations," *id.*, or other "secular drug activities," *United States v. Quaintance*, 608 F.3d 717, 719 (10th Cir. 2010) (affirming district court decision on basis that plaintiffs' belief that "marijuana is a deity and sacrament" was not sincere). Similarly, RFRA does not condone "a corporation's pretextual assertion of a religious belief in order to obtain an exemption" from a generally applicable law. *Hobby Lobby*, 573 U.S. at 717 n.28.

The question DEA sought to answer then is not whether a religion could be organized around the Ayahuasca Manifesto as its sacred text and ayahuasca as its sacrament. DEA's inquiry instead focused on whether plaintiffs are engaged in such religious practice here. DEA properly concluded on the basis of its comprehensive pre-registration investigation that they are not. ECF No. 38-1 at 4. Instead, the evidence confirms DEA's determination: that Soul Quest has not satisfied its burden of demonstrating that it operates a church with a devout membership of believers. *Id.*

Because neither Soul Quest nor its members are likely to establish that their allegedly religious beliefs are sincerely held, they are unlikely to meet their burden under RFRA.

### a. Soul Quest's allegedly religious beliefs are not sincerely held.

For four reasons, DEA properly determined that Soul Quest has not met its burden of demonstrating that its practices, including the importation, distribution, and consumption of a Schedule I controlled substance, are based on sincerely held religious beliefs. Each of these reasons addresses whether plaintiffs are sincere—in other words, whether Plaintiffs are telling the truth—about their religious claims. That enterprise does not necessitate a "background in theological studies," Second Amended Complaint ("Compl.") ¶ 14, ECF No. 42, or a formal "understanding of world religion," Young Aff. ¶ 32, ECF No. 31-1. Rather, it requires the same tools DEA investigators employ every day in assessing credibility. DEA is well suited to conclude, as it did here, that Plaintiffs have not been candid about their purposes in importing, distributing, and consuming controlled substances.[1]

*First*, in practice, it appears that the Ayahuasca Manifesto is not treated as the sacred and central text that Mr. Young has alleged it is. Mr. Young has described the Manifesto's role in Soul Quest as analogous to the role the Bible, Koran, and Talmud play in the respective Abrahamic religions. That is to say, Mr. Young has contended that the Manifesto is a foundational text around which Soul Quest's entire religious practices are

---

[1] Mr. Young states that he "believed" that DEA's pre-registration investigation was "designed to effectuate the issuance of a religious exemption." Young Aff. ¶ 33. DEA's investigation was not designed to *effectuate* the issuance of an exemption; it was undertaken to *assess* Soul Quest's eligibility for one. Pursuant to RFRA, DEA properly considered the sincerity of Soul Quest and its members in ultimately deciding to deny Soul Quest's petition.

based. But those claims are belied by the substantial evidence gathered by DEA during its investigation. In over six months of interviews with Soul Quest leaders and members, the Manifesto was mentioned only once in the context of someone's path to Soul Quest. Moreno Decl. ¶ 13; Ex. C at 2. Dr. Irwin, who is described as Soul Quest's senior minister, mentioned it one other time in outlining the schedule of Sunday services, stating that he reads from the Manifesto during these services. Ex. C at 6.[2] Yet Dr. Irwin never mentioned the Manifesto in the course of describing how he came to become involved in the church or with ayahuasca. It is hard to imagine a priest, imam, or rabbi *never* mentioning the Bible, Koran, or Talmud, respectively, when recounting their faith journey. Other leaders similarly omitted any mention of the Manifesto. Verena Young, Mr. Young's wife, serves as a corporate officer of both Soul Quest and Soul Quest Natural Healing Center. She described in detail her journey to ayahuasca and Soul Quest, referring to the benefits of "homeopathy" and "plant medicine," but never mentioning the Manifesto. Ex. C at 7-8.

In their latest complaint, plaintiffs are similarly inconsistent in terms of how they describe the role of the Manifesto and other writings in Soul Quest's religious practices. At times, the complaint mirrors the allegations by Mr. Young that the Manifesto plays a significant role. *See* SAC ¶ 47 ("The Ayahuasca Manifesto is very much akin, and serves a similar purpose, to other faiths' sacred writings, explaining the tenets of the faith, such as the Jewish Talmudic writings and the Mishnah."); *see also* SAC ¶ 37 (explaining that Soul Quest's religious practices are built "upon a foundation of ancient teachings, *writings*,

---

[2] As DI Moreno explained in her declaration, Dr. Irwin referred to the Manifesto just once: in cataloging the schedule of Sunday services, at which ayahuasca is not consumed. Dr. Irwin made no mention of the Manifesto playing a part in any ceremony involving the ingestion of ayahuasca. Moreno Decl. ¶ 17.

records," and other traditions) (emphasis added). Yet elsewhere Plaintiffs chastise DEA for its supposed "wholesale inability" to "understand the distinction between received wisdom (more common in Western religions) and experiential wisdom (quote common in Indigenous and First Nation religions)." SAC ¶ 34. This "failure by DEA," Plaintiffs say, "results in them metaphorically attempting to place 'the square peg in the round hole.'" *Id.*; *see also id.* at n.2 (explaining that, unlike "the tradition of the receipt of divine wisdom from an external source, and its recording by humans" found in Abrahamic religions, the absence of a sacred text in Indigenous religions is to be expected because "[c]ommitting [the experiences of ancestors] to print would take them out of the very context and lived experience from which they arose").

To the extent plaintiffs are asserting that DEA improperly imposed its understanding of what constitutes a religion by insisting on proof of a sacred text, the record proves otherwise. It was—and still is—Soul Quest and its founder that have claimed that the Manifesto is at the heart of their religion. *See* SAC ¶ 47. DEA's determination does not rest on the validity of the Manifesto as a religious text, but on the insincerity of the claims by Soul Quest that the Manifesto serves that function in practice.

*Second*, Soul Quest alleges here that ayahuasca is a religious sacrament, but its public materials, as well as descriptions offered by its leadership to DEA, suggest ayahuasca is offered for medicinal and therapeutic purposes. An alleged church cannot "cloak [itself] with the protection of the law" by alleging a "religious belief that [an illegal drug] is a sacrament and deity." *Quaintance*, 608 F.3d at 722–23. Based on ample record evidence, DEA determined that is what Soul Quest is attempting to do here.

In their complaint, plaintiffs allege that ayahuasca is a sacrament ingested only during a "sacramental ceremony." SAC ¶ 67. According to plaintiffs, the "ayahuasca sacrament involves the consumption of tea using the received wisdom and learning of Plaintiff Soul Quest Church." SAC ¶ 68. Plaintiffs assert that "they are divinely commanded to consume ayahuasca to become closer to the divine." Pls.' Mot. at 13.

Yet again, the evidence gathered by DEA over many months tells a different story. These materials indicate that Soul Quest uses ayahuasca as a medicine with therapeutic benefits. Soul Quest states on its website that "Ayahuasca is used primarily as a medicine" and that it "is a natural remedy for depression, anxiety, [PTSD], drug addiction, and it also releases emotional blocks." Ex. C at 10. Soul Quest and its leadership often refer to ayahuasca as "plant medicine." Compl. Ex. 1 at 11 [ECF 30-1 at 56]; Ex. C at 8. Not surprisingly, Soul Quest's dosage instructions read like a licensed practitioner's medical guidelines: "Soul Quest estimates and measures the correct dosage of Ayahuasca for sacramental use. Dosage amounts are measured according to the member's age, gender, experience, health condition and individual needs." Compl. Ex. 1 at 17 [ECF 30-1 at 62]. Soul Quest advertises ayahuasca use as one of many possible therapies available for purchase.[3] Ayahuasca retreats are available for a fee ranging from $350 to $900. ECF No. 38-1 at 3. But ayahuasca is just "one item on an extensive menu of services ranging from yoga and acupuncture to marital counseling." ECF No. 38-1 at 3. Based on these descriptions of ayahuasca as a medicinal or therapeutic aid,[4] DEA had

---

[3] Soul Quest does business as the Soul Quest Ayahuasca Retreat and Wellness Center. The Wellness Center offers these various services to prospective participants.

[4] As DEA explained in the Final Determination Letter, in reaching the conclusion that ayahuasca is treated more as a therapeutic drug than a sacrament, "DEA does not pass

sufficient evidence on which to question the sincerity of the claim that ayahuasca is venerated by Soul Quest and its members as a sacrament.

*Third*, and relatedly, to the extent religion plays a part in the ayahuasca experience, DEA's extensive investigation determined that Soul Quest's religious practices are subordinate to the pre-existing religious beliefs of its participants. For those who do choose ayahuasca from Soul Quest's menu of services, it functions as an "add-on to whatever religious journey the individual chooses for themselves." Ex. C at 10. Those partaking in alleged sacramental consumption face neither expectation of conversion to Soul Quest's religious tradition, nor proselytization. *Id.* As Dr. Irwin explained, there are up to 20 different aftercare groups meeting primarily online, including an "ayahuasca and Christianity group" and a group for "ayahuasca and Bhagavad Gita," which is a Hindu text. *Id.* at 5. In other words, while Soul Quest describes itself as a "Christian syncretic religion," SAC ¶ 1; Young Aff. ¶ 3,[5] there appears to be less of an amalgamation of belief systems shared by the collective Soul Quest community and more of a mix of participants from distinct religious traditions, each of whom grafts the ayahuasca experience onto his own beliefs. Soul Quest's desire to accommodate and serve participants of different religions may be justified by its therapeutic and commercial aims, but it does not support

---

judgment on the potential medical benefits of ayahuasca or other 'plant medicines.' DEA states only that a RFRA petition is not the appropriate forum in which to assess a substance's potential medical benefits. In the CSA, Congress established a procedure by which scientists and health care practitioners can apply to DEA for registration to possess controlled substances in order to conduct research. DEA encourages such applications." ECF No. 38-1 at 4 n.4.

[5] *Syncretic*, Old English Dictionary (2018) ("Characterized by syncretism; aiming at a union or reconciliation of diverse beliefs, practices, or systems.").

its claim that the purported belief in ayahuasca as a sacrament is sincerely held by participants.

*Fourth*, and finally, Soul Quest has shifted its religious association over the course of just a few years, lending further support to DEA's conclusion that Soul Quest wields its purported religious beliefs more as a legal shield than as a set of sincerely held principles. In 2016, when DEA contacted Soul Quest about its unauthorized handling and distribution of controlled substances, it operated under the name "Oklevueha Native American Church Somaveda of Soul Quest, Inc." Ex. F at 1. As DEA confirmed, the "Oklevueha Native American Church (ONAC) does not consider the Ayahuasca Manifesto to be its foundational text," though it does provide "support and legal defense of the ceremonial use of various natural plant medicines by its member churches, ranging from peyote, ayahuasca, San Pedro, and psilocybin to cannabis." ECF No. 38-1 at 4. Mr. Young admitted that he "purchased the right to use ONAC documents," which he then incorporated into Soul Quest's key texts. ECF No. 38-1 at 4. In light of this history, the religious aspects of Soul Quest's practices appear to have been adopted less as an act of faith than a means of escaping legal liability. DEA was right to have questioned Soul Quest's sincerity on this basis as well.

For these reasons, DEA properly doubted Soul Quest's sincerity. Even if some aspects of Soul Quest's practices appear to be religious, because of the "additional, overwhelming contrary evidence that [Soul Quest is] running a commercial [ayahuasca] business with a religious front," plaintiffs are unlikely to succeed in satisfying their burden to establish a prima facie case under RFRA. *Quaintance*, 608 F.3d at 724.

### b. The allegedly religious beliefs of Soul Quest participants are not sincerely held.

Even if Soul Quest or Mr. Young could establish that their religious beliefs are sincerely held, they cannot do so on behalf of their members. *See* SAC ¶ 3 ("Plaintiffs bring this Complaint on behalf of all members of Soul Quest Church"). The sincerity element of a prima facie case under RFRA must be satisfied by each person seeking relief. *See* 42 U.S.C. § 2000bb-1(b). As the Supreme Court explained in *O Centro*, a religious exemption granted under RFRA applies only to those persons whose particular religious practices are substantially burdened; it does not apply categorically to all those who a plaintiff claims are similarly situated. *See O Centro*, 546 U.S. at 431. Here, even if Soul Quest sincerely intended to operate a church, there is little, if any, basis to conclude that those who participate in ayahuasca retreats sincerely hold Soul Quest's religious beliefs. Accordingly, plaintiffs cannot secure the broad relief they seek in their motion, which requests that defendants be enjoined from taking any future enforcement action against all "members" of Soul Quest.

DEA properly concluded that the record is devoid of any substantial evidence demonstrating the religiosity of ayahuasca ceremony participants. Over six months of interviews, just one person pointed to the Ayahuasca Manifesto—the allegedly sacred text of Soul Quest—in recounting their decision to participate in an ayahuasca ceremony. Ex. C at 2. When participants reflect on their ayahuasca retreat experience, they "consistently speak of the psycho-social, medicinal, and therapeutic properties of the ayahuasca experience, rather than of a religious experience." ECF No. 38-1 at 3. Participants demonstrate no real commitment to Soul Quest and its religious tenets: most individuals participate in a single retreat, and they do not appear to shed their existing

religious affiliations. ECF No. 38-1 at 2; *see also id.* at 3 (there is "no further required contact or investment with the group" after the paid retreat ends). The forms that retreat participants sign, which mostly comprise medical releases and legal waivers, include a membership form, but there is no indication that signing the form reflects any prospective commitment or approaches anything approximating a religious conversion. ECF No. 38-1 at 2. Rather, the paperwork appears to be an administrative step with little religious significance. *See Quaintance*, 608 F.3d at 722 ("On the eve of his scheduled pick-up, though, he joined, signing a church membership pledge and receiving a certificate designating him an authorized church courier. But the Quaintances never had him read the pledge or asked if he shared their beliefs."). DEA's conclusion that "membership" in Soul Quest is merely pro forma and not an expression of a sincerely held belief is amply justified by the record.

### c. Even if sincere, plaintiffs' religious exercise is not substantially burdened.

Even if plaintiffs, or the "members" on whose behalf they have filed suit, could demonstrate that their allegedly religious beliefs are sincerely held, the exercise of their religion has not been substantially burdened. Rather, as discussed more fully below in refuting plaintiffs' irreparable harm claims, *supra* at Section III, plaintiffs have not alleged that they have stopped importing, manufacturing, distributing, or using ayahuasca. Indeed, in response to DEA's questions about their future plans, "Soul Quest made no commitment to lawfully import or acquire the plant material containing DMT within the comprehensive regulatory system established under the CSA." ECF No. 38-1 at 7. To date, plaintiffs have not demonstrated that they encounter "significant pressure which directly coerces" them "to conform" or modify their religious practices. *Thai Meditation*

*Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 831 (11th Cir. 2020). Therefore, plaintiffs cannot establish a likelihood of success on the merits of their claim that DEA's actions have or imminently will substantially burden their religious exercise.

### 2. DEA's decision not to exempt plaintiffs from the CSA's regulatory requirements is the least restrictive means of furthering two compelling interests.

Even if plaintiffs were substantially likely to establish a prima facie case under RFRA, they cannot show a likelihood of success on their claim because enforcement of the CSA is the least restrictive means of furthering at least two compelling governmental interests: ensuring the safety of sincerely religious adherents and preventing diversion to non-adherents.

In evaluating this aspect of plaintiffs' RFRA claim, DEA's expertise and experience warrant significant weight. Just as "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules" such that courts defer to that expertise in the context of RLUIPA, DEA's expertise pertaining to controlled substances and diversion prevention is similarly worthy of heightened respect in evaluating whether DEA's decision not to exempt Plaintiffs from the CSA furthers these two compelling interests. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015).

### a. Protecting public health and safety of Soul Quest adherents.

The Supreme Court has recognized that "Schedule I substances such as DMT are exceptionally dangerous." *O Centro*, 546 U.S. at 432; *see also id.* at 438 ("We do not doubt the validity of . . . the general interest in promoting public health and safety by enforcing the Controlled Substances Act[.]"); *Church of the Holy Light* ("*CHLQ*") *v. Mukasey,* 615 F. Supp. 2d 1210, 1214 (D. Or. 2009) ("There is no question that Daime tea could be dangerous if used improperly."), *vacated, sub. nom.*, *CHLQ v. Holder*, 443

17

F. App'x 302 (9th Cir. 2011). The government thus has a compelling interest in protecting Soul Quest participants and the public more generally from the risks associated with the consumption of ayahuasca.

As DEA explained in its decision, the "psychoactive ingredient in the ayahuasca tea, DMT, is a Schedule I controlled substance" that "has a high potential for abuse, no currently accepted medical use in treatment in the United States, and lacks established safety for use under medical supervision." ECF No. 38-1 at 5 (citing 21 U.S.C. § 812(c), Schedule I(c)). Ingesting ayahuasca has been shown to result in "hallucinations, agitation, tachycardia, confusion, heightened blood pressure, and vomiting," and, in rare instances, "seizures, respiratory arrest, and cardiac arrest." ECF No. 38-1 at 5.

Based on Soul Quest's current practices, requiring it to fully comply with the CSA is the least restrictive means of furthering DEA's interest in avoiding these significant health risks. Other potentially less restrictive means—such as permitting sincere believers to use ayahuasca under exacting health monitoring procedures—cannot be credibly considered given Soul Quest's existing importation and use practices. DEA learned that Soul Quest imports its plants containing DMT from "Waking Herbs," a business in the Netherlands. Ex. C at 2; ECF No. 38-1 at 5. Waking Herbs confirmed that its shipments, which were labeled "aromatic herbs" and "samples," were not for human consumption. ECF No. 38-1 at 5. Instead, they were "sold only for purposes of soap and candle making and ethnobotanical research." *Id*. Allowing Soul Quest participants to ingest plant material that is not intended for human consumption raises significant health concerns, particularly where Soul Quest's supplier has refused to answer further DEA questions about the safety of its plant shipments.

These concerns about users' health have been borne out. DEA is aware of multiple adverse health events that indicate Soul Quest is not complying with its own health and safety protocols. DEA cites two examples in its Final Determination Letter. First, in 2018, a participant died after ingesting ayahuasca and kambo. ECF No. 38-1 at 7. The participant's estate has sued Soul Quest, "alleg[ing] that a three-hour delay in summoning medical aid contributed to [the participant's] death." *Id*. Second, in September 2020, another participant alleged that Soul Quest delayed calling 911 after she began experiencing adverse effects during an ayahuasca ceremony. *Id.* Hospital emergency room personnel allegedly informed this participant that numerous other Soul Quests participants had been admitted after experiencing similar adverse effects. *Id.* Based on the evidence that is currently available, DEA correctly determined that Soul Quest's safety protocols are inadequate and that an exemption from the CSA would endanger more participants.

### b.  Preventing diversion to non-adherents.

The government also has a compelling interest in ensuring that DMT-containing plants imported and distributed for religious purposes are not diverted to non-religious uses. "In passing the [CSA], 'Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels.'" *United States v. Blanton*, 730 F.2d 1425, 1427 (11th Cir. 1984) (quoting *United States v. Moore,* 423 U.S. 122, 135 (1975)). The CSA creates a comprehensive, closed regulatory regime that criminalizes the unauthorized manufacture, distribution, and possession of substances classified in any of its schedules. *See* 21 U.S.C. §§ 822, 823, 841(a); Redd Decl. ¶ 6. In this closed system, manufacturers, distributors, and practitioners (*e.g.*, pharmacies, physicians, etc.)

of controlled substances must register with DEA to become a part of the legitimate distribution chain. *See* 21 U.S.C. § 823; *see also Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 542 (D.C. Cir. 2007); Redd Decl. ¶ 6. "The registration scheme includes formalized drug ordering procedures and certain types of recordkeeping thus allowing the federal government's [DEA] to closely monitor the flow of controlled substances from manufacturer to the hands of the consumer." *Blanton*, 730 F.2d at 1428. In light of the CSA's closed system and anti-diversion purposes, courts have "little trouble concluding that the government has a compelling interest in preventing drugs set aside for sacramental use from being diverted to non-religious, recreational users." *Christie*, 825 F.3d at 1057.

The risk of diversion is heightened because of the significant and growing illicit market in DMT and ayahuasca. Especially in the last decade, interest in and consumption of ayahuasca for non-religious purposes have seen a remarkable increase in the United States and elsewhere, as has ayahuasca tourism to the Amazon. *See, e.g.*, Ariel Levy, "The Drug of Choice for the Age of Kale," *The New Yorker* (Sept. 5, 2016).[6] In fact, the wave of "international ayahuasca tourism" has prompted concern over the commodification and cultural appropriation of indigenous cultural practices by profit-minded westerners. *See, e.g.*, Kenneth W. Tupper, "The Economics of Ayahuasca: Money, Markets, and the Value of the Vine," in Beatriz Caiuby Labate, et al., eds., The

---

[6] *See* https://www.newyorker.com/magazine/2016/09/12/the-ayahuasca-boom-in-the-u-s ("If cocaine expressed and amplified the speedy, greedy ethos of the nineteen-eighties, ayahuasca reflects our present moment—what we might call the Age of Kale. It is a time characterized by wellness cravings, when many Americans are eager for things like mindfulness, detoxification, and organic produce, and we are willing to suffer for our soulfulness.").

World Ayahuasca Diaspora: Reinventions and Controversies (Routledge, Ltd. 2017). Increasing numbers of vendors offer ayahuasca experiences on the internet to those seeking to self-medicate for conditions ranging from PTSD to cancer. *See, e.g.*, Rachel Harris, Listening to Ayahuasca: New Hope for Depression, Addiction, PTSD, and Anxiety (New World Library 2017).

Here, Soul Quest's practices present a significant risk of diversion during at least two stages along the supply chain: (1) while being imported and transported to Soul Quest, and (2) while being stored at Soul Quest's facilities.

As for importation, both Soul Quest's past practices and unclear future intentions establish that there is a significant risk that DMT will be diverted before it arrives at Soul Quest. Unlike the plaintiffs in *CHLQ* and *O Centro*, plaintiffs have not imported DMT directly from co-religionists. *See CHLQ*, 615 F. Supp. 2d at 1213, *vacated sub nom. CHLQ v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1240 (D.N.M. 2002). Instead, Soul Quest obtains DMT from "Waking Herbs," a Netherlands-based business that asserts that the plant material it ships is not for human consumption. Ex. C at 2; Ex. D at 3; ECF No. 38-1 at 5.

And Soul Quest does not obtain it directly; instead, it ships the DMT to middlemen, who are not themselves registered importers. Ex. D at 1; ECF No. 38-1 at 6. In November 2019, the Department of Homeland Security seized a nearly 8,000-gram shipment of a plant substance that tested positive for DMT, which was sent to Dr. Irwin's father in Lincoln, Nebraska. Ex. D at 2; ECF No. 38-1 at 6. When questioned by DEA, Mr. Irwin's father admitted that this was not an isolated incident and that he had been receiving

packages for over a year. Ex. D at 2; ECF No. 38-1 at 6. He also volunteered to turn over 80 pounds of similar plant material—more than four times what was contained in the November 2019 shipment—that he had been storing in his garage. Ex. D at 2; ECF No. 38-1 at 6. In total, Dr. Irwin's father has turned over to DEA approximately 142 pounds of DMT-containing plant material. Ex. D at 3.

Dr. Irwin's father is not the only middleman to have facilitated DMT-containing shipments between Waking Herbs in the Netherlands and Soul Quest in Florida. On August 27, 2020, DEA's inspection of a Soul Quest storage unit revealed that plant material was also being sent through Palosanto Shop, a New York-based business. ECF No. 38-1 at 6. Like Dr. Irwin's father, this business is not a registered importer of controlled substances. *Id.* Palosanto Shop also refused to answer further questions from DEA. *Id.* As a result, DEA cannot determine how much DMT is being imported, how often packages are sent and received, whether any portion of the imported shipments are diverted to persons or entities other than Soul Quest, and whether there are adequate security measures in place to prevent DMT from finding its way into illicit channels.

As for its future importation plans, Soul Quest has offered no assurances that it will comply with the law going forward. As DEA explained in its decision letter, "[c]andor is essential to the closed regulatory scheme established by Congress to prevent diversion of controlled substances from authorized channels." *Id.* "DEA properly considers the candor of the [respondent] and his forthrightness . . . in determining whether the [respondent's] registration should be revoked." *Hoxie v. DEA*, 419 F.3d 477, 483 (6th Cir. 2005). Because DEA cannot audit every registrant frequently, DEA relies on current and prospective registrants to commit to abiding by legal requirements. Soul Quest has

refused to do so. Soul Quest does not explain why it should be entitled to a religious exemption that would allow it to be treated as a registered importer without first agreeing to comply with the remainder of the legal regime that applies to all other registered importers. In the face of Soul Quest's refusals, there is no less restrictive means of furthering DEA's interest in preventing supply chain diversion.

Even after DMT-containing plants arrive at Soul Quest, the risk of diversion is substantial. While Soul Quest has expressed a willingness to improve its physical security and has taken some steps to do so, Young Aff. ¶¶ 34-35, its failure to follow its own health and safety procedures casts some doubt over whether it will securely store DMT-containing plants and ayahuasca going forward. DEA's greater concern is that Soul Quest's refusal to answer questions about its importation processes leaves DEA incapable of assessing whether Soul Quest's proposed security improvements are adequate. ECF No. 38-1 at 6. DEA regulations do not employ a one-size-fits-all approach to physical security; instead, "[i]n evaluating the overall security system of a registrant or applicant," DEA considers a host of registrant-specific factors, including the "quantity of controlled substances handled," the "adequacy of the registrant's or applicant's system for monitoring the receipt, manufacture, distribution, and disposition of controlled substances in its operations," and "the procedures for handling business guests" and other nonemployees. 21 C.F.R. § 1301.71(b). Changes in "the quantity of controlled substances in the possession of the registrant" often necessitate changes in security protocols. 21 C.F.R. § 1301.71(c). But, citing the Fifth Amendment,[7] Soul Quest will not

---

[7] The Fifth Amendment does not justify Soul Quest's refusal to answer DEA's questions. DEA is not asking Soul Quest to incriminate itself about past conduct; it is asking Soul Quest to commit to lawful behavior in the future. Furthermore, any concern plaintiffs have

answer questions about the quantity of DMT-containing plants that it imports or the entities from which it imports them.[8] DEA therefore cannot appraise the sufficiency of Soul Quest's security measures. That leaves DEA with no less restrictive means to prevent diversion than to decline to grant Soul Quest registered importer status.

Physical security is not the only on-site diversion concern; Soul Quest's inadequate screening procedures also create a significant risk that ayahuasca will be diverted to non-adherents. Diversion "after all, simply means the threat that . . . an illegal, Schedule I controlled substance . . . will wind up in the hands of people whose use is disconnected from any sincere religious practice." *Christie*, 825 F.3d at 1057. "Such illegal, non-religious use, by definition, finds no protection under RFRA." *Id.* As described above, Soul Quest does not limit ayahuasca use to believers. ECF No. 38-1 at 3 ("Soul Quest does not tell people what to believe" and there is "no further required contact or investment with the group" after the paid retreat ends). Over six months of interviews, just a single individual mentioned Soul Quest's sacred text as relevant to his journey to ayahuasca consumption with Soul Quest. ECF No. 38-1 at 2. The only screening Soul Quest performs is to require participants to sign, among the many legal and medical waivers, a single membership form. *Id.* That act is a pro forma one; beyond that paperwork,

---

about revealing self-inculpating information rings hollow because they are currently publicly advertising ayahuasca services. "Federal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details." *Rogers v. United States*, 340 U.S. 367, 373 (1951) (footnote omitted).

[8] Mr. Young avers that "Soul Quest Church complied with every request for information made to it by DEA," Young Aff. ¶ 36, but he also acknowledges that he did refuse to answer questions about what he characterized as purchases of "the legal, raw material from its vendor," *id.* ¶ 37. As DEA explained, Soul Quest "refused" to "discuss importation" and failed to "provide essential information evidencing specific plans and a concrete commitment to the legal importation of the plant material." ECF No. 38-1 at 7.

participants demonstrate no commitment to Soul Quest or allegiance to its religious tenets. *See Quaintance*, 608 F.3d at 722. Accordingly, the "record in this case succeeds where the record in *O Centro* fell short because . . . in this case there is specific evidence that [Soul Quest's] distribution methods created a realistic possibility that [ayahuasca] intended for [adherents] would be distributed instead to outsiders who were merely feigning membership [in Soul Quest] and adherence to its religious tenets." *Christie*, 825 F.3d at 1057.

Because Soul Quest's importation practices and on-site procedures create an unreasonably high risk of diversion to non-adherents, DEA cannot, consistent with the public interest, grant an exemption that would treat Soul Quest as a registered importer. On this record, therefore, there are no less restrictive means of furthering the government's interest in preventing diversion.

### B. Plaintiffs are unlikely to succeed on their free exercise claim because the CSA is a neutral law of general applicability.

Setting RFRA aside, plaintiffs' remaining claims, all invoking the Constitution, may be dispatched with ease.

Plaintiff's Free Exercise claim (Count One) fails because the CSA is a valid and generally applicable law rationally related to the legitimate government interests of ensuring public health and safety. *See generally* Defs.' Mot. at 18-20; *First Assembly of God v. Collier Cnty.*, 20 F.3d 419, 423 (11th Cir. 1994) (discussing *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)).

### C. Plaintiffs are unlikely to succeed on their procedural due process claim because the DEA provided them with notice and an opportunity to be heard, and § 877 provides a sufficient post-deprivation remedy.

Although in their procedural due process claim in Count Three, plaintiffs assert two

theories of violation, neither is likely to succeed. Plaintiffs' first theory—that defendants' "silen[ce]" in response to Plaintiffs' Exemption Request constituted an "effective[] den[ial]" of that request "without granting the Plaintiffs access to a fair and timely consideration of their application," Compl, ¶ 104—cannot be maintained now that DEA issued its Final Determination. *See* Defs.' Mot. at 21. Plaintiffs' second theory—that defendants' decisionmaking process lacks "definition or substantive constitutional safeguards," Compl. ¶ 104—is effectively a challenge to DEA's process for considering an application for a registration under the CSA, but the Eleventh Circuit has already found that process does not violate procedural due process. *Sharma*, 511 F. App'x at 902; *see* Defs.' Mot. at 21.

It is well established that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)); *Reams v. Irvin,* 561 F.3d 1258, 1263 (11th Cir. 2009). However, "even where a governmental entity fails to follows its own regulations providing for procedural safeguards, it is not a denial of due process if the individual was provided with adequate notice such that his rights were not prejudiced." *Sharma*, 511 F. App'x at 902. Moreover, "there is no due process violation where the government has made available a post-deprivation remedy sufficient to correct an alleged procedural deprivation." *Id.* (citing *Cotton v. Jackson,* 216 F.3d 1328, 1331 (11th Cir. 2000) (per curiam).

Under this framework, defendants did provide plaintiffs with adequate process before denying plaintiffs' application. *Reams*, 561 F.3d at 1263. Namely, DEA conducted an extensive pre-registration investigation of plaintiffs over the course of many months,

culminating in the Final Determination. While it may have taken longer than plaintiffs would have liked, the eventual provision of the pre-registration investigation and the Final Determination extinguish any procedural due process claim that previously might have been available to plaintiffs. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

Plaintiffs' due process contention regarding the decisionmaking process that preceded the Final Determination, *see* Compl. ¶ 104 (alleging that defendants' determination process is "*ad hoc* … , without definition or substantive constitutional safeguards") is no more likely to succeed. "[T]here is no due process violation where the government has made available a post-deprivation remedy sufficient to correct an alleged procedural deprivation." *Sharma*, 511 F. App'x at 902 (citing *Cotton,* 216 F.3d at 1331 n.2 (per curiam)). And the Eleventh Circuit has explicitly found that, in the context of decisions by the DEA administrator to "deny, revoke, or suspend registrations"—like the Final Determination here—a sufficient post-deprivation remedy exists because 21 U.S.C. § 877 grants federal appellate courts "jurisdiction to review the Attorney General's decision" on the registration. *Id.*

Plaintiffs cite no authority permitting a procedural due process claim to proceed, let alone finding a procedural due process violation where the complaining party was provided with notice, an opportunity to be heard, and a sufficient post-deprivation remedy. Because plaintiffs are unlikely to succeed on their claim for violation of the constitutional guarantees of procedural due process, this claim cannot support emergency relief.

### D. Plaintiffs cannot succeed on their substantive due process claim because their claims are governed entirely by the more specific provisions of the Free Exercise Clause and Free Speech Clause.

Plaintiffs' substantive due process claim in Count Four, alleging that "Defendants'

processing of the Plaintiffs' DEA Exemption Application under [the 2009 Guidance] constitutes an arbitrary government act, in violation of the Plaintiffs' right to substantive due process under the Fourteenth Amendment to the United States Constitution," Compl. ¶ 117, has no likelihood of success, for two reasons. Defs.' Mot. at 22-23. First, because plaintiffs' allegations sound only in such terms of arbitrariness, they do not state a claim under the "established method of substantive-due-process analysis." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also id.* at 721 (rejecting the suggestion to "largely abandon this restrained methodology, and instead ask 'whether [the challenged] statute sets up one of those "arbitrary impositions" or "purposeless restraints" at odds with the Due Process Clause of the Fourteenth Amendment'" (citing *Glucksberg*, 521 U.S. at 752 (Souter, J., concurring in judgment (quoting *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting)))). Second, even if due process jurisprudence had not so resoundingly excluded the types of allegations plaintiffs assert here, plaintiffs would still fail to state a claim under the constitutional guarantee of substantive due process, because their claims pertain to religious liberty and free speech, which are governed entirely by the more specific provisions of the Free Exercise Clause and Free Speech Clause. As the Supreme Court and the Eleventh Circuit have repeatedly held, "where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.'" *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *West v. Davis*, 767 F.3d 1063, 1067 (11th Cir. 2014) ("when a specific provision of the Constitution is allegedly infringed, a court must decide the claim in accordance with the terms of that

provision rather than under the more general rubric of substantive due process").

Plaintiffs make no effort to contend with this clear authority precluding their claim. In their motion, the only post-*Glucksberg* case they cite is *County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998). That case compels no relief for plaintiffs, however. First, the Court there found the plaintiff had not sufficiently stated a substantive due process claim. *Id.* at 854. Second, the plaintiff in that case "alleg[ed] a deprivation of Philip Lewis's Fourteenth Amendment substantive due process right to life," *id.* at 837; unlike the rights to practice religion and speak freely, there is no separate, explicit constitutional protection for the "right to life." Because plaintiffs' substantive due process claim is clearly precluded by well-established precedent, this claim cannot support emergency relief.

### E. Plaintiffs cannot succeed on their First Amendment speech claim because they lack standing for such a claim and have not alleged a prior restraint.

Plaintiffs' claim in the Fifth Count of their complaint that the DEA's denial of Plaintiffs' Exemption Application "effectively functions as a prior restraint upon the Plaintiffs' speech," and "severely burdens the Plaintiffs' rights to freedom of speech, in violation of the First Amendment," Compl. ¶¶ 119, 121, has no likelihood of success. *See* Defs.' Mot. at 24-25. First, this claim is subject to dismissal for plaintiffs' lack of standing. *Id.* at 24. Plaintiffs identify no federal law or action by defendants that criminalizes or regulates speech concerning illicit drug use, generally, or plaintiffs' ayahuasca use specifically. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013). And even if plaintiffs had alleged that their speech about ayahuasca had been chilled, such an injury would not be traceable to defendants. *Id.* at 416; *see* Defs.' Mot. at 25.

Were they to pass the jurisdictional threshold, this claim would nevertheless be

subject to dismissal because plaintiffs do not actually challenge in their complaint any action by defendants that forbids or restrains plaintiffs' expression in any way, addresses the permissibility of plaintiffs' "proselytizing and promotional efforts," Compl. ¶ 119, or threatens an enforcement action on the basis of any such efforts; this claim "stretches the term 'prior restraint' well beyond the limits established by" caselaw. *Alexander v. United States*, 509 U.S. 544, 549–50 (1993).

Plaintiffs argue that the instant case "share[s] many factual similarities" with *Kunz v. New York*, 340 U.S. 290 (1951), and that *Kunz* "should control" here. Pls.' Mot. at 30. *Kunz* is inapposite, for precisely the same reasons the prior restraint doctrine does not apply here. *Kunz* concerned an "ordinance which makes it unlawful to hold public worship meetings on the streets without first obtaining a permit from the city police commissioner." *Kunz*, 340 U.S. at 290. The petitioner in *Kunz*, applied for and received a permit under the ordinance, but then subsequently had his permit revoked "based on evidence that [the petitioner] had ridiculed and denounced other religious beliefs in his meetings." *Id.* at 292. On these facts, the Supreme Court found that the challenged ordinance in *Kunz* "gives an administrative official discretionary power to control in advance the right of citizens *to speak on religious matters* on the streets of New York" and "[a]s such," held that "the ordinance is clearly invalid *as a prior restraint* on the exercise of First Amendment rights." *Id.* at 293 (emphasis added). But none of the actions of defendants that are at issue in this case are directed at, or actually regulate, any speech, by plaintiffs or otherwise. Thus, while on its facts *Kunz* falls neatly within the heartland of "the term 'prior restraint,'" plaintiffs' allegations "stretch[]" the term "well beyond the limits established by" caselaw. *Alexander*, 509 U.S. at 549–50. Plaintiffs offer no grounds on which they are

likely to succeed on this claim.

### III. PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

Because Plaintiffs cannot "show [a] likelihood of success on the merits," the Court need not address any other preliminary injunction factor. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). But plaintiffs are also not entitled to the "extraordinary remedy" of a preliminary injunction because they cannot establish that any plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Here, the absence of an irreparable injury provides an independent basis to deny plaintiffs' request for a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000) (en banc).

A plaintiff's "asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (citation omitted). It is well-established that "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). As the Eleventh Circuit has explained:

> A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm. A preliminary injunction requires showing "imminent" irreparable harm. Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits. For this reason, our sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm.

*Wreal, LLC*, 840 F.3d at 1248 (citations omitted). The Eleventh Circuit held that a preliminary injunction was properly denied when "the preliminary-injunction motion relied exclusively on evidence that was available to Wreal at the time it filed its complaint." *Id.* at 1248-49.

Plaintiffs' voluntary decision to delay seeking preliminary injunctive relief for several years belies their claim of irreparable harm. Plaintiffs first submitted a petition for a religious exemption to the DEA in August 2017, Compl. ¶ 14, nearly a year after being invited to do so. DEA Letter of August 1, 2016 ("DEA Letter"), ECF No. 13-3. Further, nearly three more years passed before they filed suit in this case and first sought a preliminary injunction in April 2020. Even then, plaintiffs voluntarily agreed, on more than one occasion, to stay proceedings in this case to allow the DEA to "conduct the fact-finding necessary to evaluate Plaintiffs' Petition." Compl. ¶ 24. During that time, plaintiffs admittedly continued to use distribute, import, and use ayahuasca. Moreno Decl., Ex. C at 3-6. According to their website, they have an ayahuasca retreat scheduled for this coming weekend, and additional retreats scheduled every one to two weeks for the next several months. *See* https://www.ayahuascachurches.org/calender/ (last visited May 31, 2021). Nothing has changed since plaintiffs submitted their petition or filed their complaint, except that the DEA issued a final determination denying plaintiffs' request for a religious exemption on April 16, 2021. Plaintiffs have not shown how the DEA's determination changed the urgency of their harm instantaneously or proffered additional evidence that was not available "at the time of it filed its complaint." *Wreal*, 840 F.3d at 1248-49. Indeed, plaintiffs do not even rely on the denial of the exemption as evidence of irreparable harm.

Plaintiffs may not rely on their own decision to voluntarily delay seeking relief for their alleged harms, and then claim their harm is irreparable without providing additional evidence of urgency or irreparability. *Aaron's, Inc. v. Hagopian*, No. 1:17-CV-4900-MHC, 2018 WL 11318515, at *4 (N.D. Ga. Oct. 16, 2018) ("Waiting seven or ten months to file for preliminary injunctive relief does not show irreparable harm was imminent under the

precedents of this Circuit.") (citing cases in which harm was not irreparable because of delays of three, five, and seven months); *see also InVue Sec. Prod. Inc. v. Vanguard Prod. Grp., Inc.*, No. 8:18-CV-2548-T-33SPF, 2019 WL 4671143, at *6 (M.D. Fla. July 1, 2019), *report and recommendation adopted,* No. 8:18-CV-2548-T-33SPF, 2019 WL 4673755 (M.D. Fla. Aug. 15, 2019) (finding an unjustifiable delay resulting from the time "waiting while negotiating with the opposing party").

But even if plaintiffs could defend their delay in prosecuting their request for preliminary injunctive relief, they still fail to satisfy their burden of establishing irreparable harm. Plaintiffs contend that a violation of their First Amendment rights constitutes an irreparable injury. Pls.' Mot. at 30–31 ("the plaintiffs have suffered, and continue to suffer, ongoing irreparable injuries from the deprivation of their Constitutional and statutory rights"). They also claim they are irreparably harmed because "Plaintiffs and their members live under the constant threat of federal arrest and prosecution." Pls.' Mot. at 30. But plaintiffs have not established any constitutional violation. *See supra* Sections II.B-E. And, in any event, the invocation of a harm of constitutional magnitude does not relieve plaintiffs of their burden to demonstrate that the alleged harm is not "speculative" but is "actual and imminent." *Siegel*, 234 F.3d at 1176–77. Plaintiffs have not presented evidence of a specific, concrete, or imminent threat of enforcement. Young's affidavit points to no specific threat of enforcement made against him or Soul Quest, instead resorting to generalized fear of enforcement. If that were sufficient to establish an imminent threat, all that a plaintiff need do to obtain a preliminary injunction would be to allege a constitutional violation and point to the presence of a criminal statute. To the contrary, plaintiffs' allegations of years of open ayahuasca use, distribution, and

importation belie a fear of prosecution or enforcement.

Given the absence of irreparable harm, there is no basis for the entry of a mandatory injunction here.  In the unlikely event that this Court considers itself to have jurisdiction over this action, litigation may proceed in the ordinary course, on review of a record.

## IV. THE BALANCE OF HARMS FAVORS DEFENDANTS.

Soul Quest has failed to show that the balance of equities weighs in favor of the injunction it seeks. Where the government is a party, the balance-of-the-equities and public-interest factors merge.  *Swain*, 961 F.3d at 1293.

On this record, the balance of the equities does not favor enjoining DEA from enforcing the CSA. Plaintiffs move for an immediate injunction preventing defendants from arresting, prosecuting, or threatening to arrest or prosecute Soul Quest, and any "member" of Soul Quest, "for importing, distributing and ingesting" ayahuasca at Soul Quest. Pls.' Mot. at 33. As described above, plaintiffs do not point to any specific and ongoing threat of arrest; indeed, plaintiffs' public website openly catalogs multiple upcoming ayahuasca retreats. *See supra* at Section III. Even so, prohibiting DEA from enforcing the entirety of the comprehensive legal regime pertaining to "importing [and] distributing" a Schedule I controlled substance is not in the public interest. *See* Redd Decl. ¶¶ 13-16.  Soul Quest's refusal to answer questions about its current importation practices, or to even commit to lawfully import DMT-containing plants in the future, creates a significant diversion risk and weighs strongly against an injunction here. *See supra* at Section II.A.2.b; *see also* Redd Decl. ¶ 16. Soul Quest's on-site security and screening procedures similarly present a risk of diversion to non-adherents, further counseling against immediate injunctive relief that would tie the hands of the government

in its investigative and prosecutorial functions. *See id.* The public is best served by the effectuation of Congress's intention in the CSA to prevent harm to public health and safety from controlled substances. *See* Redd Decl. ¶¶ 13-16.

Furthermore, granting plaintiffs' requested injunction and allowing secular ayahuasca consumption under the guise of RFRA only serves to minimize the importance of sincere religious exercise. Restraining DEA from denying exemptions to groups that seek to take advantage of the protections reserved for sincerely religious groups thwarts Congress's intent to privilege sincere religious exercise over secular activities.

In light of the "damage [Plaintiffs'] proposed injunction may cause" DEA and the public generally, *Swain*, 961 F.3d at 1293, and the lack of any imminent irreparable harm likely to be suffered by plaintiffs in the absence of an injunction, granting plaintiffs' motion would not be in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' renewed petition for a preliminary injunction. In the event the Court decides that it has jurisdiction notwithstanding 21 U.S.C. § 877 and concludes, after performing its limited review under the APA, that DEA's determination is infirm, the Court should proceed to summary judgment briefing and, if necessary, remand without vacating DEA's determination—rather than issue plaintiffs' requested injunction.

Dated: June 1, 2021                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

                                        BRIGHAM J. BOWEN
                                        Assistant Director
                                        Civil Division, Federal Programs Branch

/s/ *Julie Straus Harris*
JULIE STRAUS HARRIS
  DC Bar # 1021928
Senior Trial Counsel

MICHAEL J. GAFFNEY
  DC Bar # 1048531
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 353-7633
Fax: (202) 616-8470
E-mail: julie.strausharris@usdoj.gov

*Counsel for Defendant*